# **Exhibit 1**

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

MARK ANTHONY ORTEGA,          *

                              *

  Plaintiff,                  *

                              *

VS.                           * CIVIL ACTION

                              *

SIENNA MARKETING &            * NO.: 5:24-cv-487

CONSULTING, INC.,             *

A New York Corporation,       *

                              *

  Defendant.                  *


\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

ORAL AND VIDEOTAPED DEPOSITION OF
MARK ANTHONY ORTEGA
OCTOBER 21ST, 2025

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*


ORAL AND VIDEOTAPED DEPOSITION OF MARK ANTHONY ORTEGA, produced as a witness at the instance of the DEFENDANT, and duly sworn, was taken in the above-styled and numbered cause on the 21st of October, 2025, from 9:03 a.m. to 4:52 p.m., before Tammy Staggs, CSR in and for the State of Texas, reported by machine shorthand, via Zoom, at Remote Locations, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.  That the deposition shall be read and signed under penalties of perjury.



That the deposition shall be read and signed before any notary public.



Page 3

A P P E A R A N C E S

(All appearances via Zoom)

FOR THE PLAINTIFF:

    Mr. Mark Anthony, Pro Se

FOR THE DEFENDANT:

    Mr. Scott Kaplan

    BLANK ROME, LLP

    717 Texas Avenue

    Suite 1400

    Houston, Texas   77002

    713.228.6601

    scott.kaplan@blankrome.com

ALSO PRESENT:

    James Taylor - Videographer



Page 4

INDEX

                                                         PAGE

Appearances......................................    3

Exhibit List.....................................    5

Proceedings......................................    8

MARK ANTHONY ORTEGA:

     EXAMINATION BY MR. KAPLAN....................    9


Signature and Changes............................  328


Reporter's Certificate...........................  331



Page 5

EXHIBITS

NO.     DESCRIPTION                                      PAGE

1       Court Order..............................

                                                         10

2       Objections and Answers to Sienna

        Marketing's First Set of Interrogatories.   52

3       Demand letter prepared by Ms. Almanza....    89

4       Invoice from CallRail for the time period

        of July 15, 2019 to August 15,

        2019.....................................   101

5       Complaint filed against Sienna Marketing.   118

6       First Amended Class Action Complaint.....   121

7       Audio recording between Mr. Ortega and

        Vincent with Creative Solutions..........   192

8       DNC Policy of Sienna Marketing &

        Consulting...............................   208

9       Vincent's text communications with

        Mr. Ortega...............................   209

10      Text message correspondence between

        Mr. Ortega and Mr. Palazzo...............   214

11      Motion to Dismiss........................   222

12      Skipped..................................    --

13      Verizon bill for the period of April

        16th, 2022 to May 15th, 2022.............   259

14      Text messages, labeled confidential.



Page 6

Bates labeled: MAO 001574................   268

15    Objections and Answers to Defendant's

Second Set of Interrogatories............   279

16    Unsworn declaration......................   294

17    Payments made to Mr. Ruben Ortega, Jr.

Bates labeled 001496.....................   298

18    Document titled: Franchise Tax Annual No

Tax Due Report for 2022..................   302

19    Skipped..................................   --

20    Skipped..................................   --

21    Skipped..................................   --

22    Skipped..................................   --

23    E-mail between Mr. Ortega and Malissa

Bates labeled, MAO 001502................   305

24    Notice to Enter Dwelling Unit............   309

25    E-mail chain.............................   312

26    E-mail...................................   314

27    Skipped..................................

28    Skipped..................................

29    Skipped..................................

30    Skipped..................................

31    Skipped..................................

32    Skipped..................................

33    Skipped..................................



Page 7

34        Skipped.....................................

35        Skipped.....................................

36        Text thread.............................    317

37        Screenshot of text messages..............    320

38        Skipped.....................................    --

39        Skipped.....................................    --

40        Skipped.....................................    --

41        Skipped.....................................    --

42        Skipped.....................................    --

43        Ten page document filed by Mr. Ortega....    323

44        CallRail invoice, date April 14th, 2023.    324



Page 8

                    P R O C E E D I N G S

THE VIDEOGRAPHER:  We are now on the record.  This begins Media Number 1 in the deposition of Mark Anthony Ortega in the matter of Mark Anthony Ortega vs. Sienna Marketing & Consulting, Incorporated in the United States District Court, Western District of Texas, San Antonio Division.  Civil Action Number 5:24-cv-487.

Today is October 21st, 2025.  The time is 9:03 a.m. Central.  This deposition is being taken remotely at the request of Defendant.

The videographer is James Taylor, and the court reporter is Tammy Staggs of Magna Legal Services.

Will counsel please state their appearance and whom they represent.

MR. KAPLAN:  Good after- -- good morning.  Scott Kaplan on behalf of Defendant Sienna Marketing & Consulting, Incorporated.

THE VIDEOGRAPHER:  Will the court reporter please swear in the witness.

MARK ANTHONY ORTEGA, having been first duly sworn, testified as follows:

MR. KAPLAN:  Good morning, Mr. Ortega.  We are here to take your videotaped deposition in the case of Mark Anthony Ortega vs. Sienna Marketing Consulting, Inc.  24-cv-00487 in the Western District of Texas, San



Page 9

Antonio Division.  And this is taken pursuant to Notice and the applicable Rules.

EXAMINATION

BY MR. KAPLAN:

Q.   Mr. Ortega, is it okay if I call you Mark during this deposition?

A.   Yeah, that's fine.

Q.   Okay.  And -- and I'll probably interchange between the two.  I'm a creature of habit.

Mr. Ortega, is anybody else in the room with you right now?

A.   No.

Q.   Do you mind showing your camera around the room?

A.   I do not.

Q.   You -- you won't do that?

A.   No.  I'm here in my office.

Q.   And where is your office?

A.   Home.

Q.   Are you currently communicating with anyone during this deposition?

A.   No.

Q.   All right.  And I'm going to show you what will be Exhibit Number 1.

(Exhibit 1 introduced.)



Page 10

Q.   (BY MR. KAPLAN)  All right.  Mr. Ortega, let me know when you can see.

A.   It's small, but it looks like an Order.

Q.   Are you able -- are you able to enlarge it on your end?

A.   Let me see.  I mean, I can just -- can you tell me the document number and I can pull it up?

Q.   This is from the Court Docket.  This -- well, no, actually we're only going to be going off of the exhibits that I put in front of you.  So if you need me to resize this, I can.

A.   Yeah, I mean, you're going to need to resize that.  I can't read that.

Q.   All right.  Give me one second, Mr. Ortega. Is that better?

A.   Oh, there you go.  Okay.  Now I can see it.

Q.   Okay.  Give me one second.

All right.  Do you recognize this document?

A.   Document 33 Order?  Yeah, I mean, this -- I'll have to review it.  I don't know what it's -- you know, I'm not going to be able to recall.  So if you're going to want to ask questions, maybe let me review it real quick.  Just let me read this.

Q.   Well, do -- do -- do you recognize this



Page 11

document to be an order entered into this case?

A.    If I can review the document, I can answer your question.

Q.    I'm going to scroll down to the second page here.  Are you with me?

A.    Yeah, I'm with you.

Q.    So it says, (as read):  It's here -- it's therefore ordered that until July 28th, 2025 the written discovery exchange by the parties shall be limited to requesting information related to whether Plaintiff has held out his phone number as a business number to the public.  During this phase, Defendant may take Plaintiff's deposition.  To avoid having to reopen Plaintiff's deposition, the deposition of Plaintiff is not limited to this topic but may address all topics relevant to this dispute.  Do you see that?

A.    Okay.  Yeah, I see that section that you're pointing to.

Q.    Do you have any reason to dispute that -- that portion of the Court Order that's Exhibit 1 to this deposition?

A.    I mean, I haven't reviewed Exhibit 1, so I -- I would need to review it.  Let me -- if you want to scroll up to the top, let me read it.

Q.    You can take your time and review it.



Page 12

A.   Yes, thank you.

(Witness reviews document.)

A.   Could you scroll down to page 2 and make it bigger so it will be easier to read?  Thank you.

(Witness reviews document.)

A.   Could you scroll down to -- okay.  Yeah.

(Witness reviews document.)

A.   And then the last page, is that just signatures.

Q.   (BY MR. KAPLAN)  There's a little bit on the top.

A.   Oh, there's an order here, okay.  So...

(Witness reviews document.)

A.   Okay.  Yeah, I read it.

Q.   (BY MR. KAPLAN)  Okay.  So do you recognize this document that's Exhibit 1 to this deposition?

A.   Yes.

Q.   And to your understanding, what -- what is this document?

A.   Are -- are you calling for my, like, mental impression?

Q.   I'm asking for -- I'm asking for your understanding as to what this document is.

A.   I mean, it's Exhibit 1.  It's an Order from the Court.



Page 13

Q.   And do you have any reason to dispute the section that I quoted earlier, that I'm highlighting now, that -- that to avoid having to reopen Plaintiff's deposition, the deposition of Plaintiff is not limited to this topic.  This topic being the -- whether you held out your number as a business number to the public, but may address all topics relevant to this dispute?

A.   I'm not disputing that.

Q.   Okay.  Did you do anything to prepare for your deposition, Mr. Ortega?

MR. ORTEGA:  I mean, I'm going to object on, like work, product.

MR. KAPLAN:  What's -- what's the ground for -- for work product?  You're not represented by an attorney.

MR. ORTEGA:  What did I prepare for, you know, in terms of how did I prep, legal strategy.

Q.   (BY MR. KAPLAN)  You -- you -- you are not represented by an attorney, correct?

A.   Correct, but work product option still applies.

Q.   And so based on your understanding of the work product doctrine, you will not be answering the question of whether you did anything to prepare for your deposition today?  I'm not asking for, you know, your --



MAGNA
LEGAL SERVICES

Page 14

your mental impressions.  I'm asking for what did you do when you received the Notice of Deposition to prepare for this deposition today.

A.   Right, in terms of like legal strategies or what -- what did I basically do for -- in anticipation of this?

Q.   Yes.  What did you do in anticipation of the deposition today?

MR. ORTEGA:  Yeah, I mean, I'm going to object for work product on that.

Q.   (BY MR. KAPLAN)  And you're not going to answer that question?

A.   Correct.  Any, like, sort of inquiries into, like, preparation for litigation, you know, in terms of how I prepped, what did I do, mental impressions, legal theories.

Q.   Did you review any documents ahead of your deposition today?

A.   Yes.

Q.   What documents did you review?

A.   The Notice.

Q.   Anything else?

A.   The First Amended Complaint, partially.

Q.   What parts of the First Amended Complaint?

A.   Brief -- you know, briefly skimmed through it.



Page 15

Q.    Besides the Notice and the First Amended Complaint, did you review any other documents in preparation for your deposition today?

A.    Again, this is kind of the same.  This is -- I mean...

Q.    It's not -- it's not work product.  I'm just asking what documents you reviewed ahead of the deposition.  It's a standard question, Mr. Ortega.

A.    Yeah, I mean, I already ans- -- asked and answered.

Q.    You didn't answer the question.  You -- you answered those two.  And I said besides those two documents, is there any other documents that you reviewed ahead of your deposition today?

MR. ORTEGA:  I'm going to go ahead and object to in terms of asking again, legal strategy, preparation.

Q.    (BY MR. KAPLAN)  So you will not answer the question -- you had already answered two documents that you reviewed.  So I believe if you had any objection to this -- valid objection, which I don't believe you do -- it would be waived by already answering the first two parts of this question.

So I will ask again.  Are there any other documents besides the Notice of Deposition and the First



Page 16

Amended Complaint that you reviewed ahead of your deposition today?

MR. ORTEGA:  Sure.  I mean, I reserve my right, right, by objecting to that.

Q.  (BY MR. KAPLAN)  And you're not going to answer that question?

A.  Not about work product.

Q.  I'm not asking for work product.  I'm asking for documents that are already in place, that are already a part of the case, or any other documents.  I'm just asking what other documents you reviewed.  I'm not even asking at this time the -- the substance of those documents or the preparation of those documents.  I'm asking: what documents did you review?

A.  Yeah, I mean, that goes into legal strategy.  Again, this is -- this is the same.

Q.  So you're not going to answer that question?

A.  That is correct.

Q.  Did you discuss your deposition with anyone prior to coming here today?

A.  No.

Q.  Let me take a step back and do some -- just a little bit of background.

Have you ever been deposed before, Mr. Ortega?



Page 17

A.    Yes.

Q.    How many times have you been deposed before?

A.    Once.

Q.    When was that?

A.    I don't recall exactly.  Would you like an estimation?

Q.    I don't want -- I don't want you to guess. Just if you know approximately when you were deposed previously.

A.    Well, that's what -- that's what I'm saying. I can't recall the exact date.

Q.    What kind of case were you deposed in?

A.    It was a personal injury case.

Q.    Were you the plaintiff in that case?

A.    Yes.

Q.    Is that case still ongoing?

A.    No.

Q.    What court was that case filed in?

        MR. ORTEGA:  Objection to the form.

Q.    (BY MR. KAPLAN)  Are you going to answer the question?  What's the bas- -- hold on.  I'll take a step back.  Let me withdraw that question.

        MR. KAPLAN:  What's the basis for your objection as to form?

        MR. ORTEGA:  Well, actually it was



MAGNA
LEGAL SERVICES

Page 18

objection to substance, but -- because relevance, but...

Q.   (BY MR. KAPLAN)   Mr. Ortega, do you realize that at -- at a deposition that -- that objecting to relevance is not a proper objection?

A.   Are you asking me for like a legal conclusion there or...

Q.   Well, Mr. Ortega, you're the one that is lobbing a relevance objection to a question about what --

A.   Correct.  I'm just -- I'm --

Q.   Okay.  Before we go on we go on, Mr. Ortega, there's some ground rules for a deposition here.  First, you know, we need to be respectful to the court reporter because she has to take everything down.  So I will do my best to let you finish all your answers and not speak over you, and if you could please let me finish my questions before answering so that we don't have a muddled record for the court reporter.  I would appreciate that, and I believe Ms. Staggs would appreciate that as well.  Okay?

A.   Okay.  If I could just not be cut off when I'm trying to finish my answer or objection, then it would make it a little bit easier.

Q.   Okay.  So I will ask again.  What court was the personal injury case that you brought filed in?



Page 19

A.    Okay.

MR. ORTEGA:  And so there's an objection, relevance.

Do you still want an answer?

MR. KAPLAN:  Yes.

A.    It was filed in Bexar County, justice of the peace court.

Q.    (BY MR. KAPLAN)  Barrett county you said?

A.    Bexar County.

Q.    Can you spell that?

A.    B-X-A-R [sic].

Q.    And what was the nature of the -- the injury alleged in that case?

MR. ORTEGA:  Objection, the relevance.

MR. KAPLAN:  Are you going to answer the question?

A.    It was a personal injury.  Car accident.

Q.    (BY MR. KAPLAN)  When was that case filed?

MR. ORTEGA:  Again, objection, relevance.

MR. KAPLAN:  Are you going to answer the question?

A.    It was filed -- I don't recall exactly when -- what date it was filed.

Q.    (BY MR. KAPLAN)  Is that case still ongoing?

MR. ORTEGA:  Again, objection, relevance.


MAGNA
LEGAL SERVICES

Page 20

Do you still want an answer?

MR. KAPLAN:  Yes.

A.   No, it's not -- it's not still pending.

Q.   (BY MR. KAPLAN)  Did that case go to trial?

MR. ORTEGA:  Objection, again, relevance.

MR. KAPLAN:  Will you answer the question?

A.   No, I did not go to trial.

Q.   (BY MR. KAPLAN)  Did that case settle?

MR. ORTEGA:  Again, objection, relevance.

MR. KAPLAN:  Are you going to answer the question?

A.   It did.

Q.   (BY MR. KAPLAN)  And what were the terms of that settlement?

MR. ORTEGA:  Well, that one I think I'm going to have object and probably move for a protective order on that one because of the confidentiality agreement.

Q.   (BY MR. KAPLAN)  It's governed by a confidentiality agreement?

A.   Correct.

Q.   Okay.  Who is the defendant in that case?

MR. ORTEGA:  Objection, again, relevance on this case.

MR. KAPLAN:  Are you going to answer the



Page 21

question, Mr. Ortega?

A.    Her name is Diana.  I forgot her last name.

Q.    (BY MR. KAPLAN)  When did that case settle, Mr. Ortega?

MR. ORTEGA:  Again, object -- objection, relevance.

MR. KAPLAN:  Are you going to answer the question?

A.    I don't have an exact date.  I don't have an exact date when it settled.

Q.    (BY MR. KAPLAN)  Approximately when did it settle?

A.    Approximately --

MR. ORTEGA:  Well, prefaced by an objection to relevance.

A.    Approximately sometime earlier this year.

Q.    (BY MR. KAPLAN)  And just so you know, Mr. Ortega, if you're going to instruct yourself not to answer you can say, you know, objection -- and I'm not giving you legal advice.  I'm just trying to make this go as quickly as possible for the court reporter knowing that we have the seven hours that we have here today. So if you can -- so I would appreciate if you -- if you are going to not answer a question based on an objection, to let me know at the beginning so we don't



Page 22

have to go through the whole thing of -- of, you know, me having to ask you a secondary question of: are you going to answer.  Is that all right, Mr. Ortega?

A.   I won't agree with that because there's some objections, let's say, if you do a compound or vague, it's going to need to be rephrased or clarified.

Q.   Okay.  Well, if we get -- if we -- if you have one of those questions, then we can deal with that.  But if it just goes strictly on a relevance basis, I -- I -- you know, I think that that would be helpful.  If you're not going to do that, that's fine and we can do it how we're doing it.

A.   I think it's better on the safer side, right, to, I mean, kind of clear it out.  If you want -- I mean, I guess to make it easier, did you want to just do -- I mean, Texas is -- for depositions is objection, leading or objection, form.  It's limited to those.  Did you want to just do that?

Q.   Well, there's not going to be any leading question on a -- on a deposition like this where -- where you're an adverse party, Mr. Ortega.

A.   Well, no, I'm just stating if that's -- I mean, that's what Texas district courts do, so...

Q.   Okay.  Understood.  So if you're not going to agree to that, that's fine.  We can continue on.  And we


MAGNA
LEGAL SERVICES

Page 23

can have two questions for every question.  That's fine.

Mr. Ortega, what is your educational background?

MR. ORTEGA:  Again, objection, relevance.

But do you still want an answer on that one?

MR. KAPLAN:  Yes.

A.   Educational background, do you mean -- could you like clarify?  What exactly?

Q.   (BY MR. KAPLAN)  Do you have -- do you have -- do you have a high school degree, Mr. Ortega?

A.   Yes.

Q.   When did you graduate from high school?

A.   In 2010.

Q.   And do you have any college degrees?

A.   Yes.

Q.   Okay.  Where -- where did you go to college?

MR. ORTEGA:  Again, objection, relevance.

MR. KAPLAN:  Can you answer the question?

A.   I attended the University of Texas San Antonio and University of Texas Austin.

Q.   (BY MR. KAPLAN)  When did -- what -- what years did you attend the University of Texas San Antonio?

MR. ORTEGA:  Again, objection for



Page 24

relevance.

MR. KAPLAN:  Are you going to answer the question?

A.   It was from -- University of Texas at San Antonio was from 2010 to 2011.

Q.   (BY MR. KAPLAN)  Did you obtain a degree from the University of Texas San Antonio?

A.   No.

Q.   Okay.  Then for the University of Texas at Austin, what years did you attend?

MR. ORTEGA:  Objection, relevance.

MR. KAPLAN:  Are you going to answer the question?

MR. ORTEGA:  Okay.  So the -- of course, a precondition on that objection.

A.   It's from 2011 to 2014.

Q.   (BY MR. KAPLAN)  And did you obtain a degree from the University of Texas at Austin?

MR. ORTEGA:  Objection, relevance.

MR. KAPLAN:  Are you going to answer the question?

A.   I did obtain a degree from the University of Texas at Austin.

Q.   (BY MR. KAPLAN)  And what was your degree?

MR. ORTEGA:  Objection, relevance.



Page 25

MR. KAPLAN:  Are you going to answer the question?

A.   Yes.  Your question was: did I obtain it?

Q.   (BY MR. KAPLAN)  Yes.  Did you obtain it and what degree did you obtain?

MR. ORTEGA:  Well, compound.

Q.   (BY MR. KAPLAN)  Okay.  Mr. Ortega, did you obtain a degree from the University of Texas at Austin?

A.   Yes.

Q.   And what degree did you obtain?

A.   A degree -- bachelor's -- bachelor's of art.

Q.   And what was your bachelor's of art in?

MR. ORTEGA:  Again, objection, relevance.

MR. KAPLAN:  Are you going to answer?

A.   In economics.

Q.   (BY MR. KAPLAN)  Did you obtain any other degrees from the University of Texas at Austin?

A.   No.

Q.   Do you have any other collegiate or post-graduate degrees?

A.   Collegiate or post-graduate degrees?  No.

Q.   Did you attend any graduate school?

A.   No.

Q.   Okay.  After graduating from the University of Texas at Austin in 2014 -- strike that.



Page 26

Are you currently employed?

A.    No.  Self-employed.

Q.    And where are you self-employed?

A.    Well, I'm self-employed for myself.

Q.    Is that a part of any business?

A.    Yes.

Q.    And what business are you self-employed with?

A.    Well --

Q.    Business or businesses, I should say, Mr. Ortega.

A.    Okay.  Sure.  So let's see -- so I have Ortega Capital.  Well, it's not -- it's -- for timing, Grovano, MAO Real Estate, and I would say -- I mean, in a limited capacity Green Forest Capital.  To the best of my recollection, that's what I have here.

Q.    Okay.  So just so I'm clear and -- and make sure that we're clear for the record, that was Ortega Capital, Grovano, MAO Real Estate, and in a limited capacity Green Forest Capital?

A.    I mean, they're honestly all limited capacities.

Q.    What do you mean by a limited capacity?

A.    Limited capacities in terms of time dedication or involvement.

Q.    Okay.  Approximately how many hours a week are



Page 27

you working for Ortega Capital?

A.    Ortega Capital?

Q.    Yes.

A.    Per week, less than an hour.

Q.    Approximately how -- how many hours per week are you working for Grovano?

A.    Grovano?  You said currently?

Q.    Yes.

A.    Also probably about less than an hour.

Q.    Approximately how many hours per week are you working for MAO Real Estate currently?

A.    MAO, that one is also probably not even an hour.

Q.    And approximately how many hours per week are you currently working for Green Forest Capital?

A.    Almost never.

Q.    I'm sorry.  You -- you cut out there.  Did you say almost never?

A.    Almost never.

Q.    And do you currently have any other employment besides those four entities as self-employment?

A.    Let's see.  I'm trying to recall if there's anything.  I think that's probably -- Ortega Capital -- I'm trying to see if there's anything missing here.  I think that's -- I mean, to the best of my recollection.


MAGNA
LEGAL SERVICES

Page 28

Q.    When did you first start being self-employed by Ortega Capital?

A.    When?  Oh, I don't recall an exact date.

Q.    Approximately what year did you start working for Ortega Capital?

A.    What year?  I mean, it's going to be a big guess because that's almost ten years, so it's probably somewhere between 2016 to 2018-ish, somewhere around there.

Q.    Approximately what year did you start working for Grovano?

A.    For Grovano?  Let's see.  Approximately twenty -- I believe around 2022.

Q.    Approximately what year did you start working for MAO Real Estate?

A.    MAO?  That one has to -- it's probably -- approximately 2015.

Q.    And approximately what year did you start working for Green Forest Capital?

A.    Green Forest, that one is probably approximately 2018, around there, give or take a year in either direction.

Q.    During your time being self-employed with these four entities, did -- were you employed anywhere else?



Page 29

A.    During the time at these entities -- are you asking from 2015 to 2025?

Q.    Correct.

A.    If I've been employed somewhere else?

Q.    Yes.

A.    Yes.

Q.    Where have you been employed in that time?

A.    Not -- not -- not W-2 employed, but participated.

Q.    Okay.  Well, first where -- where was this and then we can get into what participated means.

A.    One of them was 2022-ish, approximately, an entity LiquidationSA.

Q.    When did you stop working for LiquidationSA?

A.    Approximately in 2023.

Q.    Why did you stop working for LiquidationSA?

A.    I mean, it wasn't so much working.  It was ownership.

Q.    Is that what you meant by participated?

A.    Participated.

Q.    Were you the sole owner of LiquidationSA?

A.    No.

Q.    Who else owned a portion of LiquidationSA?

A.    The person was Javier Bocanegra.

Q.    Can you please spell the last name for the



Page 30

court reporter?

A.   B-O-C-A-N-E-G-R-A.

Q.   Aside from LiquidationSA, were you employed anywhere else in the period of 2015 to 2025, other than the four entities that we had discussed previously?

A.   Employed?  W-2?  For clarification.

Q.   Just employed.  Did -- did work for.

A.   Oh, I mean, that's also --

MR. ORTEGA:  I mean, objection, form, vague and ambiguous.

A.   Are you talking about W-2 employed?  Working con- -- independent contracting work?

Q.   (BY MR. KAPLAN)  We can start with W-2.

A.   No.

Q.   Okay.  So I'll repeat the same question then for any work performed for any other entity between 2015 and 2025.

A.   W-2 work?

Q.   We just went over that, Mr. Ortega.  I said --

A.   I'm asking you is that your question?  Is that --

Q.   No, Mr. Ortega.

A.   What is your question?

Q.   What I'm asking you is: From 2015 to 2025 -- are you with me?



Page 31

A.    Yes.

Q.    Okay.  From 2015 to 2025, aside from LiquidationSA, Ortega Capital, Grovano, MAO Real Estate, and Green Forest Capital, did you perform work for any other entity in that time?

A.    Any work for any entity?  There -- hold on. Let me recall the name.  It was HorizonWiz, all one word, I believe.

Q.    When did you perform work for HorizonWiz?

A.    I mean, it was also in a limited capacity in -- I don't have an exact date.

Q.    Approximately what year did you start working for HorizonWiz?

A.    I mean, that's going to be a big guess.  I don't have any -- I don't even -- I can't even give you a year.

Q.    But you know it's between 2015 and 2025?

A.    Correct.

Q.    Is it within the last five years that you performed work at HorizonWiz?

A.    In the last five years?  It's -- it might be right around.  I mean, I can't say if it's within -- before or after five years, but it's somewhere -- three to -- somewhere between three to seven years.

Q.    Okay.  Other than HorizonWiz, LiquidationSA,


MAGNA
LEGAL SERVICES

Page 32

Ortega Capital, Grovano, MAO Real Estate, and Green Forest Capital, have you performed any other work for -- for -- any work for any other entity in the period of 2015 to 2025?

A.    In any capacity?  Work?

Q.    Yes.

A.    For an entity Evergreen Capital.

Q.    Approximately when did -- what year did you start performing work for Evergreen Capital?

A.    Approximately somewhere between 2016 and 2019, start year.

Q.    And when did you stop performing work for Ever- -- Evergreen Capital?

A.    Probab- -- approximately?

Q.    Yes.

A.    Also probably somewhere between 2021 and 2023 or '22.

Q.    Okay.  Besides those entities that we just went through, are there any other entities that you performed any work for in between 2015 and 2025?

A.    Let me see.  Let me review.  So we have Ortega Capital, Grovano, MAO Real Estate, Green Forest Capital, LiquidationSA, HorizonWiz, Evergreen.  To the best of what I can recall, that's -- that's probably right.

Q.    Okay.  Prior to 2015 where were you employed?



Page 33

A.    Prior to 2015?  I was employed with a company -- it was a software company.

Q.    And what was -- what's the name of that software company?

A.    There was two.  So one is Rocksauce.

Q.    Rocksauce?

A.    Rock like -- yeah, like -- like a rock.  Like an inanimate object.  And sauce like ketchup, you put sauce.

Q.    Okay.  And what was the other?

A.    I don't recall off the top of my head the other.

Q.    How long did you work at the one that you don't recall?

A.    A couple of months at most.

Q.    In 2015?

A.    It could either be 2014 or 2015.  Around those times.

Q.    Why did you stop working at the one that -- whose name you don't recall?

A.    Because I got the job at the other place.

Q.    Okay.  So -- so -- so for Rocksauce, approximately what year did you begin working at Rocksauce?

A.    That would also be somewhere in that same


MAGNA
LEGAL SERVICES

Page 34

vicinity, 2014 to 2015.

Q. And you were an employee at Rocksauce?

A. W-2?

Q. Sure. Did you receive a W-2 from Rocksauce?

A. Yes.

Q. When did you stop working for Rocksauce?

A. I believe in 2015 or thereabout.

Q. And what was your title at Rocksauce?

A. I don't recall.

Q. What kind of work were you performing at Rocksauce?

A. Software development.

Q. Did you have any kind of training in -- in software development? I ask because earlier you had said that your -- your degree was a BA in economics.

A. Do I have formal training?

Q. Yes.

A. No.

Q. Okay. And just to close the loop here, you graduated from UT Austin in 2014. So aside from Rocksauce and this company that you don't recall the name of, did you work at anywhere else -- anywhere else prior to opening up your own -- your own business with MAO Real Estate?

A. To the best of what I can recall, I don't



Page 35

believe so.

Q.   So the first -- so -- so the first job out then was -- from college was at the software company that you don't remember the name of?

A.   Correct, if I recall correctly.

Q.   And just -- I didn't ask this before, but is there any reason why you cannot give truthful testimony today at this deposition?  Are -- sorry.  I'll ask that question first.

MR. ORTEGA:  I mean, objection, argumentative.

Q.   (BY MR. KAPLAN)  Are you going to answer the question?

A.   There's -- you're assuming that it's non-truthful.  That's not -- I mean, you're mischaracterizing the testimony here.

Q.   This is a pretty standard question.  My next is:  Are you on any medications that would affect your testimony today?

A.   No.

Q.   Okay.  Mr. Ortega, what is your -- your home address?

A.   It's 152 Bedingfeld Drive, San Antonio, Texas 78231.

Q.   And Bedingfeld, how do you spell that?



Page 36

A.    Bedingfeld is B-E-D-I-N-G-F-E-L-D.

Q.    And do you -- do you use any other addresses?

A.    For -- could you provide clarification?
What...

Q.    Do you use any other addresses in your
correspondence with -- with other people?

A.    In correspondence?  As in do I not reside
there?  You're asking do I use it for mail?

Q.    Sure.  Do you receive mail at any other
addresses besides this 152 Bedingfeld Drive address?

A.    Yes.

Q.    What -- what are those -- what is that address
or what are those addresses?

A.    I have a P.O. Box 702099, San Antonio, Texas
78270.

Q.    Any other addresses that you receive mail at?

A.    Personally?

Q.    Any mail.

A.    Any -- any other places that I receive mail?

Q.    Correct.

A.    Okay.  No, not that I recall.

Q.    When did -- when did you first move to the 152
Bedingfeld Drive address?

A.    Moved to this in either late 2021/early 2022.

Q.    Prior to -- to moving there, where did you



Page 37

reside?

A.   The address -- I resided here in San Antonio.

Q.   And what's the address?

A.   It was 1507 Golden Wing, San Antonio, Texas. And I don't recall the zip code.

Q.   Mr. Ortega, do you use any phone numbers?

MR. ORTEGA:  Objection, vague, ambiguous.

MR. KAPLAN:  Are you going to answer the question?

A.   What -- what do you mean by "use"?

Q.   (BY MR. KAPLAN)  Is there a phone number that -- that somebody can call up and that you would answer?

A.   Yes, there's a phone number that people can call to reach me.

Q.   What is that phone number?

A.   That phone number is (210) 744-9663.

Q.   Is this a mobile phone number?

A.   To my cell phone?

Q.   Is this a mobile phone number, a cell phone number?

A.   It's a cell phone number.

Q.   What kind of cell phone do you currently use that's associated with this number?

A.   The -- you're asking make and model or...

Q.   Yes.  What is the make and model?



MAGNA
LEGAL SERVICES

Page 38

A.   It is an iPhone -- I think it's -- what year -- what current generation is this here?  Well, I don't recall.  So it's an iPhone.

Q.   When did you purchase this iPhone?

A.   Last year.

Q.   Prior to this iPhone, was there another mobile or cell phone that was associated with this number ending in 9663?

A.   Was there another mobile -- another cell phone before?

Q.   Yes.

A.   Yes, there was another.

Q.   And what kind -- and what was the make and model of that phone?

A.   Also an iPhone.

Q.   And when did you have that iPhone from and until?

A.   Probably maybe around '21/'22.

Q.   So '21 or '22 to 2024?

A.   Correct.

Q.   Do you still have that cell phone?

A.   No.

Q.   What did you do with that cell phone?

A.   I gave it away.

Q.   Do you recall who you gave that away to?


MAGNA
LEGAL SERVICES

Page 39

A.    Yes.

Q.    Who did you give that away to?

A.    To Ruben Ortega.

Q.    And who is Ruben Ortega?

A.    That's my father.

Q.    Is that Ruben Ortega, Jr.?

A.    No.

Q.    Who is Ruben Ortega, Jr.?

A.    That's my brother.

Q.    Did you transfer the -- the data contained on that previous iPhone to your current iPhone?

A.    Yes.

Q.    Do you have any reason to believe that any data was not transferred from the previous iPhone to your current iPhone?

A.    No.

Q.    Who is your cell phone service provider for this number ending in 9663?

A.    Cell phone service provider?  Verizon.

Q.    And for the last five years, has -- has Verizon been your cell phone service provider for this number ending in 9663?

A.    As I can recall, yeah, Verizon.

Q.    Do you have any home phone number that you use?


MAGNA
LEGAL SERVICES

Page 40

A.   Home phone?  No, I don't have a home phone.

Q.   Do you have any other numbers that -- that you use on a daily or weekly basis?

A.   Daily or weekly?  Currently?

Q.   Yes, currently.

A.   No.  No, there's none.

Q.   Okay.  And previously were there any other numbers that you used on a daily or weekly basis?

MR. ORTEGA:  I guess that's also objection, vague, ambiguous.  Can you clarify?

Q.   (BY MR. KAPLAN)  In the last five years, Mr. Ortega, are there any other numbers that you've used on a daily or weekly basis?

A.   In an individual capacity?  I guess what's --

Q.   I'm asking in any capacity, Mr. Ortega.

A.   In any capacity?  The last five years that I used -- yes.

Q.   What are those numbers?

A.   I mean, I'm not going to be able to recall off the top of my head the exact numbers.  Like, I know one of them is -- starts with (210) 610.

Q.   And what was the prime -- what -- what did you use that number for?

A.   That's just the -- that's a warehouse phone number.  So people call into the warehouse or we call



Page 41

from the warehouse.

Q.   Is that a physical warehouse?

A.   Yes.

Q.   Where is that warehouse located?

A.   Its address is 15450 Capital Port, San Antonio, Texas.  And then I don't know the zip code.

Q.   And there's a physical phone at that address?

A.   Currently?

Q.   When you used this -- when you -- when you say you used this number in the last five years, was that used as part of a physical phone at this address?

A.   Correct.

Q.   Was that -- was that attached to a wall?  Was that a cordless phone?

A.   Cordless phone.

Q.   Who owned that warehouse?

A.   I don't know the name of the owner.

Q.   How did it come to be that you used the phone in that warehouse?

A.   How did it come to be that I used it?  Well, I have a business there or I had a business there.

Q.   What business did you have there?

A.   It was Grovano.

Q.   Does Grovano not currently use that warehouse?

A.   It's basically emptied out.  There's almost



Page 42

nothing there.

Q.   Does Grovano currently operate under a lease at that warehouse?

A.   Does it operate under a lease?  I guess it's in wind down, so if you consider that operating.

Q.   I don't believe you answered the question, Mr. Ortega.

A.   Can you clarify?

Q.   Do you remember the question that I asked?

A.   Yeah, you asked if it was operating under a lease.

Q.   I said: is it currently operating under a lease?

A.   And that's what I'm asking.  Operating is not -- it's -- it's a defunct business.  It's not operating.

Q.   Does Grovano currently pay rent under a lease for this warehouse address?

A.   Does it current -- not -- this is the last month, so not currently.

Q.   When did Grovano stop paying rent?

A.   This is the final month.

Q.   This being October?

A.   October, correct.

Q.   Of 2025?



Page 43

A.   Correct.

Q.   Do you use any VOIP numbers?

MR. ORTEGA:  I guess objection, vague.

A.   Can you clarify timeline?  Current?  Past?

Q.   (BY MR. KAPLAN)  Do you currently use any VOIP numbers, Mr. Ortega?

A.   Do I currently?  No, I don't -- I don't use any VOIP.

Q.   In the past -- I'm sorry.  You can finish your question [sic].  I didn't realize you were -- you were still talking.

A.   No, you can go ahead.

Q.   In the past five years, Mr. Ortega, have you utilized any VOIP numbers?

A.   Have I utilized?  For personal use?

Q.   In any capacity.

A.   In any capacity?  I guess that's kind of -- I mean, my businesses have had VOIPs.

Q.   Okay.  So let -- let -- let's start there. How many VOIP numbers have you used in any capacity in the last five years?

A.   Have I used in the last five years?  I mean, I can't recall.

Q.   Is it more than ten?

A.   I mean, again, that goes into -- are you



Page 44

asking me personally?

Q.    No.    I'm asking you, Mr. Ortega, in any capacity.    So I'm not asking -- I'm not asking personal capacity.    I'm not asking business capacity.    I'm saying in any capacity.

Have you used a VOIP number in the last five years?    And then I asked: is it more than ten?

MR. ORTEGA:    Yeah, I mean, in terms of saying have I used it, I mean, I'm going to object to vague.

Do you still want an answer?

MR. KAPLAN:    Yes.

A.    All right.    Subject to the objection, in my individual capacity, no, I have not used more than ten. Business, I -- I actually don't recall if my businesses have.

Q.    (BY MR. KAPLAN)    Do you recall what businesses of yours utilized VOIP phone numbers in the last five years?

A.    In the last five years which business entities?    HorizonWiz is probably one.    Last five years --

Q.    I'm sorry.    Starting with Verizon whiz [sic], how many VOIP numbers has Verizon whiz [sic] utilized in the last five years?



Page 45

A.   It's not Verizon whiz.

Q.   HorizonWiz, I apologize.

HorizonWiz, in the past five years how many VOIP numbers has -- has that entity utilized?

A.   Oh, I don't recall.  I don't have an exact number.

Q.   At least one?

A.   Probably at least one.

Q.   More -- less than five?

A.   Probably less than five.

Q.   What was the purpose of those one to five VOIP numbers for HorizonWiz?

A.   The one to five, purpose of them?  I mean, I guess I'm the wrong person to ask.  That's not my part of the business.

Q.   What was your role at HorizonWiz?

A.   The software.

Q.   Okay.  So for your -- for your other entities, in the last five years have any of those other entities utilized VOIP lines?

A.   In the last five years?  Evergreen Capital possibly.

Q.   Is that more than one VOIP line?

A.   For Evergreen Capital in the last five years?  Probably.


MAGNA
LEGAL SERVICES

Page 46

Q.  Less than five?

A.  I -- I couldn't give you a number.  I don't know the extent.

Q.  So you couldn't tell me more or less five?

A.  I mean, that would be speculating.

Q.  So you can't tell me?

A.  I can't tell you an exact number, no.

Q.  Can you tell me an approximate number?

A.  An approximate number?  In the last five years?  Maybe somewhere between two to ten.

Q.  Okay.  Aside from HorizonWiz and Evergreen Capital, have any of your other entities that we've discussed today utilized VOIP lines in the last five years?

A.  VOIP in the last five years?  Possibly MAO.

Q.  And that was at least one -- that was at least one for MAO?

A.  At least one for sure.

Q.  Approximately how many VOIP lines?

A.  Approximately?  MAO utilized greater than ten.

Q.  Greater than 20?

A.  I couldn't give you an exact number.

Q.  Can you give me an approximate number?

A.  I couldn't even -- it would be pure speculation to give you an approximate on it.



Page 47

Q.   What was the purpose of those at least ten VOIP lines for MAO Real Estate?

A.   The purpose?  Primary?

Q.   Any purpose.

A.   I mean, it's compound.  Are you asking --

Q.   It's not compound.  I asked you what was the purpose of those ten lines?

A.   What was the purpose of them?  It could be anything from marketing to tenants to selling, you know. Disposition.

Q.   Were you personally using those lines on behalf of MAO Real Estate?

A.   I -- in the last five years?

Q.   In the whole existence of those VOIP lines for MAO.

A.   Did I ever?

Q.   Yes.

A.   Rarely.  Probably rarely.

Q.   And how did you utilize those -- those VOIP lines?

A.   I believe the system was called CallRail.

Q.   CallRail, R-A-I-L?

A.   R-A-I-L, correct.

Q.   And how did you access CallRail?

A.   I don't -- I mean, at this point I don't


MAGNA
LEGAL SERVICES

Page 48

recall how -- how that was used.

Q.   Was it an app?

A.   There's a weather phase, I believe, but I think it also changed.  They changed their whole thing up a couple of years in.  The admin did -- did all the stuff.

Q.   I don't believe you answered my question, Mr. Ortega.  Was it -- was it an app?

A.   I don't -- do they have an app?

Q.   Yes.  Do they have an app?

A.   I believe they do have an app.

Q.   Did you utilize the CallRail app?

A.   I don't know if -- at any point did I download the app?  I can't recall.

Q.   So I'll get back to -- the question that I had previously posed is: how did you use CallRail?

A.   How did I use CallRail?  I mean, it's going to be one of those dealing with -- what is it called -- prospective sellers more than likely.

Q.   Now I'm getting more to the mechanics of -- of you using CallRail.  So for a VOIP line, it's my understanding that there's no dedicated phone; is that correct?

A.   There's no dedicated -- yeah, I mean, that's going to be through the computer.



Page 49

Q.   So did you access it through the computer, that -- any of the VOIP lines for MAO Real Estate?

A.   Yes.

Q.   Did you also access that via a mobile app for MAO Real Estate?

A.   Again, I don't recall if I even downloaded the mobile app.

Q.   I'm asking if you -- if you used it.  Not if you downloaded it.  Did you use --

A.   Yeah, I think --

Q.   -- an app --

THE WITNESS:  Yes, ma'am?

THE COURT REPORTER:  Mr. Ortega, please don't talk over Mr. Kaplan.  He was trying to get his question out and then you started talking.  And what happens is you both get muted and I can't hear anybody and make a record, which is not fair to either side.  So if you'll just please wait for him to finish his question and then answer so that I can properly make the record.  Okay?

THE WITNESS:  Okay.  Sounds good.

THE COURT REPORTER:  Thank -- thank you so much.

Go ahead, Mr. Kaplan.

Q.   (BY MR. KAPLAN)  Did you use your cell phone



Page 50

to access any of the VOIP lines for MAO Real Estate?

A.   Did I use my cell phone to access the VOIP? Not -- I mean, not -- not that I can recall.

Q.   You can't recall?

A.   I can't recall.

Q.   And for the VOIP lines for HorizonWiz, were those also through CallRail?

A.   I don't believe so.

Q.   What were the VOIP lines for HorizonWiz?  Who is the -- the provider?

A.   That I don't -- I don't know.

Q.   How did you utilize the VOIP lines?  The mechanics of that, how did you utilize the VOIP lines for HorizonWiz?

A.   I didn't utilize the VOIP lines.

Q.   You never used the VOIP lines for HorizonWiz?

A.   No.

Q.   And for Evergreen Capital, did you ever utilize the VOIP lines for Evergreen Capital?

A.   For Evergreen, probably.

Q.   Okay.  And how did -- what was the mechanics of you utilizing those VOIP lines?

A.   That one I believe was through CallRail.

Q.   And did you ever utilize your mobile device to -- to utilize the VOIP lines for Evergreen Capital



Page 51

through CallRail?

A.   Use my mobile device to -- I mean, that one also was years ago.  I don't recall that.

MR. KAPLAN:  Do you want to take a five-minute break or do you want to keep going, Mr. Ortega?

MR. ORTEGA:  Do you need a break?

MR. KAPLAN:  No, I'm asking if you do. Just because it's been an hour, I want to be cognizant of you.  I'm going to be switching to a different topic, so I thought now would be a good stopping time if you needed a break.  But if you don't, we can keep going.

MR. ORTEGA:  Five minutes, sure.  Let me just grab a -- use the restroom real quick and then I'll be right back.

MR. KAPLAN:  Okay.

THE VIDEOGRAPHER:  Okay.  This will mark the end of Media Number 1.  We're going to go off the record.  It's 10:03.

(Recess held, 10:03 a.m. to 10:09 a.m.)

THE VIDEOGRAPHER:  This will mark the beginning of Media Number 2 in our deposition of Mark Anthony Ortega.  We're going back on the record.  It's 10:09 a.m.

Q.   (BY MR. KAPLAN)  All right.  Mr. Ortega, did



Page 52

you speak with anyone during that -- that break just now?

A. No.

Q. Did you review any documents during the break?

A. No.

Q. Okay. I'm going to show you what has been marked as Exhibit Number 2.

(Exhibit 2 introduced.)

A. Objections and...

Q. (BY MR. KAPLAN) I can make that a little bigger or smaller so you can see the whole page. I'll scroll through. I can scroll through all the pages just so you can have an understanding of what this is. All right?

A. I mean, let me review the document. I mean, if you're going to ask me something about it, I got to see. Let's see.

Q. Well, Mr. Ortega, I can represent to you that this is your Objections and Answers to Sienna Marketing's First Set of Interrogatories.

A. Okay. I mean, I need to review the document.

Q. Okay. We can scroll through all the pages then. Let me know when you meed to move on to the next.

A. Can you go to the next page?

(Witness reviews document.)



MAGNA
LEGAL SERVICES

Page 53

A.    Can you go to the next page?

(Witness reviews document.)

A.    And then can you go to the next page?  Thanks.

(Witness reviews document.)

A.    And then can you go to the next page?

Q.    (BY MR. KAPLAN)  Yes.

(Witness reviews document.)

A.    Okay.  And then the next page.

(Witness reviews document.)

A.    Okay.  And the next page?  Oh, it's just the verification.  Okay.

Q.    (BY MR. KAPLAN)  Do you recognize this document, Mr. Ortega?

A.    Yes.

Q.    And -- and what is this document?

A.    It's a response to interrogatories.

Q.    That -- that you prepared?

A.    Yes.

Q.    Did anybody assist you in preparing this document?

MR. ORTEGA:  Again, I'm going to -- I'll go ahead and object.  That's work product doctrine.

Q.    (BY MR. KAPLAN)  Asking if anybody assisted you is -- is work product?

A.    Yeah, you're asking about how did I -- what


MAGNA
LEGAL SERVICES

Page 54

legal strategy did I put together to actually prepare

and prep my legal documents.

Q.    I'm not asking what assistance they provided.

I'm asking if anybody provided assistance to you in

preparing this document.

MR. ORTEGA:  Yeah, I mean, I'm still going

to object to work product doctrine.

MR. KAPLAN:  Are you going to answer the

question?

MR. ORTEGA:  Not on -- not on work

product.

MR. KAPLAN:  And so you're going to stand

on -- on -- on your work product objection and not

answer whether anybody assisted you in preparing this

document?

MR. ORTEGA:  Correct.

Q.    (BY MR. KAPLAN)  Are you currently represented

by counsel?

A.    Currently, no.

Q.    Not -- not in this matter.  Do you have any

legal counsel?

A.    Yes.

Q.    Who is that legal counsel?

A.    In which case?

Q.    You -- you have more than one legal counsel?



MAGNA
LEGAL SERVICES

Page 55

A.   Yes.

Q.   Okay.  Please let me know their -- their names.

A.   Brian Dennis.

Q.   I'm sorry.  That -- I did not hear that answer.

A.   Brian Dennis.

Q.   Brian Dennis.  And is Mr. Dennis with a firm?

A.   Yes.

Q.   What firm is Mr. Dennis with?

A.   Lang Law Firm.

Q.   And where is that based out of?

A.   I don't know.  I don't recall off the top of my head.

Q.   Does Mr. Dennis have an office in San Antonio?

A.   I don't know if it's here in San Antonio.

Q.   Do you know where Mr. Dennis offices?

A.   No.  Oh, actually.  Yes, he does.  He does.

Q.   He does have an office in San Antonio?

A.   An office in San Antonio.

Q.   And does Mr. Dennis currently represent you in any lawsuit?

A.   Yes.

Q.   What lawsuit does Mr. Dennis represent you in?

A.   I don't even know how to say the defendant's


MAGNA
LEGAL SERVICES

Page 56

name.

Q. Do you know how it's spelled?

A. It's X-I-A and then I think H-U-A.

Q. Is that lawsuit currently pending?

A. Yes.

Q. And what court is that lawsuit pending in?

A. I think that's -- that's one of the State courts here in Bexar County.

Q. State court in -- in Bexar County?

A. Yes.

Q. Does Mr. Dennis represent you in any other litigation?

A. No.

Q. Are you the plaintiff in -- in that case that Mr. Dennis represents you in?

A. Yes.

Q. Have you spoken to Mr. Dennis about this case?

A. About this deposition?

Q. I'm asking you generally about this case. Have you spoken to Mr. Dennis about this case?

A. I don't know if I've spoken to him about this case in particular. Yeah, I'm going to go ahead -- I mean, you're more about, like, my conversations with my attorneys.

MR. ORTEGA: Like, I'm going to object for



Page 57

attorney-client privilege.

Q. (BY MR. KAPLAN) Mr. Ortega, I'm not asking you the substance of those conversations. I'm asking whether or not you had a conversation with Mr. Dennis about this case?

A. I don't recall in this case specifically.

Q. So it could have -- you could have discussed this case with Mr. Dennis. You just don't recall?

A. Correct.

Q. Are you currently represented by any other attorneys in any other capacity?

A. Yes.

Q. Okay. Who are those attorneys?

A. I think it's -- what is his name? I think it's like Anthony -- or it's Perrong.

Q. Perrong?

A. Perrong, Andrew.

Q. In what capacity is Mr. Perrong representing you in?

A. What does he do?

Q. No. In a what capacity is he representing you, Mr. Ortega?

A. Counsel.

Q. In a lawsuit? With regards to a transaction?

A. In a lawsuit.


MAGNA
LEGAL SERVICES

Page 58

Q.    In one lawsuit or multiple lawsuits?

A.    In -- currently?

Q.    We can start with currently.

A.    One.

Q.    Previously has Mr. Perrong represented you in any lawsuits?

A.    Yes.

Q.    How many?

A.    One other.

Q.    So Mr. Perrong has represented you in two lawsuits?

A.    I believe two.  Maybe three.

Q.    Okay.  The one that's currently ongoing, who is the -- are you the plaintiff or the defendant in that case?

A.    Plaintiff.

Q.    And who is the defendant in that case?

A.    Carlos something.  I don't know his full name.

Q.    What's the basis for that lawsuit?

A.    The basis?  In terms of like the cause of action in that lawsuit?

Q.    Yes.

A.    TCPA and I believe the Texas Business and Commerce Code.

Q.    Okay.  In the one or two other cases that



Page 59

Mr. Perrong previously represented you in, what kind of cases were those?

A.   I know for sure one of them was -- what kind?

Q.   Yes.

A.   Telephone Consumer Protection Act and Texas Business Commerce Code.

Q.   And who is the defendant in that case?

A.   That one was UES.

Q.   UES?

A.   Correct.

Q.   And did that case go to trial?

A.   No.

Q.   Did you settle that case?

A.   Are you asking about -- I mean, again, this might be something I'm going to have to apply for a protective order if you're asking --

Q.   I'm asking if you settled that case, Mr. Ortega.

A.   That case is -- is -- has been dismissed.

Q.   That wasn't my question.

Did you settle that case, Mr. Ortega?

MR. ORTEGA:   Yeah, this one I'm going to have to object because that might be -- yeah, in terms of...

Q.   (BY MR. KAPLAN)   I'm not asking you for the



Page 60

dollars am- -- dollar amount, if any, of the settlement. I'm just asking if there was a settlement that resolved that case?

A.   I might have to defer -- I mean, it's something I have to get a protective order.  I'll have to defer to counsel and make sure it's okay.

Q.   Refer to Mr. Perrong?

A.   Correct.

Q.   So you're not going to answer that question today?

A.   That one, I mean, that might actually be in terms of my confidential issue.

Q.   So you're objecting based on a confidentiality as to whether or not you can answer if there, in fact, was a settlement that resolved that case?

A.   That one was resolved.  And, I mean, that's the extent of the comment unless -- I mean, if you want to push forward, like I have to apply for a protective order on that one.

Q.   So you -- so you won't answer the question?

A.   Correct.  I can't answer that one.

Q.   Okay.  Have you spoken to Mr. Perrong about this case?

A.   I don't recall exactly if I mentioned it.

Q.   Did you specifically ask Mr. Perrong for any



Page 61

advice about this case?

A.    That, again, I don't recall.

Q.    So you may have.  You don't recall?

A.    Yeah, I may have.  I don't recall.

Q.    And did you ask Mr. Dennis for any advice about this case?

A.    Again, I don't recall.

Q.    So you may have.  You don't recall?

A.    Correct.

Q.    Does Mr. Perrong charge you on an hourly basis or a contingency basis?

MR. ORTEGA:  That's going to be -- yeah, I'm going to call -- that one is -- I'm going to object. Attorney-client privilege.  I'll probably have to defer on that one to request a protective order about the relationship between me and my attorney.

MR. KAPLAN:  I'm just -- I'm just asking for the compensation arrangement.  So you're objecting based on the attorney-client privilege?

MR. ORTEGA:  Yeah, I mean if you're asking about the details and -- I mean, you started off with conversations discussed, now you're moving to -- you're -- you're -- it's a lot with attorney-client privilege. So that one I'm going to have to object and probably apply for, again, a protective order to not discuss



Page 62

attorney-client privilege stuff.

Q.    (BY MR. KAPLAN)  So just -- just for the record, to be clear, you won't answer the question as to whether or not Mr. Perrong charged you on an hourly basis or whether or not his was a contingency fee basis based on -- and you're not answering based upon the attorney-client privilege; is that correct?

A.    I won't answer, yeah, based on having discussion about the structured relationship or conversations.

Q.    I'm not asking you for discussions about how -- how Mr. Perrong billed you.  I'm asking about the subs- -- about the structure of how Mr. Perrong billed you for his services.

A.    Yeah, that I'm -- I'm going to have to defer for that.

Q.    Did you -- did you receive invoices from Mr. Perrong?

A.    Did I receive an invoice?

Q.    Have you received any invoices from Mr. Perrong?

A.    Have I received any invoices?  I would have to check.

Q.    Has Mr. Perrong billed any time for discussions that you've had about this case?



MAGNA
LEGAL SERVICES

Page 63

A.   To the -- to this case?

Q.   Yes.

A.   Has he billed any time to this case?  No.

Q.   I'll ask the same question for Mr. Dennis. Did Mr. Dennis issue any invoices to you?

A.   Have they -- has he issued invoices?  Yes.

Q.   Okay.  And has Mr. Dennis billed any time with regard -- to you with regards to this case?

A.   I would have to go through invoices and look because there's line items for everything.

Q.   So the answer -- the answer is -- is -- is what?

A.   I don't recall.

Q.   But you do have invoices from Mr. Dennis?

A.   Yes.

Q.   And those are itemized based upon the -- representing the hours that -- that he has worked and the work performed during that time; is that correct?

A.   A summary.

Q.   So a summary.  So -- so your answer is: there's invoices and those are itemized with a summary of the work and the time spent doing the work summarized in that narrative; is that correct?

A.   Summarized, yeah.

Q.   You're not answering the question, Mr. Ortega.



Page 64

A.    What was the question?

MR. KAPLAN:  Ms. Staggs, do you mind reading back my previous question?

THE COURT REPORTER:  Sure, give me one second just to scroll up here.

MR. KAPLAN:  Thank you.

(Requested portion read back.)

A.    That they are summarized, hourly based --

THE WITNESS:  Can you repeat that again, Mrs. Staggs?

(Requested portion read back.)

A.    Summarized in that narrative?  Yeah, there are summaries on these invoices, correct.

Q.    (BY MR. KAPLAN)  And with those summaries is the time spent performing the work that is summarized?

A.    The time spent is listed on -- on the invoices and summarized.

Q.    And so to your recollection, are there any summaries that contain any work performed by Mr. Dennis on this case?

A.    That I'm not sure.

Q.    Has Mr. Dennis ever represented you with regards to this case?

A.    No.

Q.    You're not sure -- but you're not sure if



Page 65

there is work that he performed and contained in a narrative in an invoice that he issued to you with regards to this case?

A.   I mean, are you trying to get into, like, what are the conversations with my attorney or...

Q.   No, I'm not trying to get into the conversations, Mr. Ortega.  I'm just --

A.   I'm sure --

Q.   I'm just asking about the -- if there is somewhere on any of the invoices that Mr. Dennis sent to you for the work that he performed any work performed with regards to this case.

A.   Okay.  But even asking about that, you already know attorney-client privilege.  All of that is mainly redacted even in discovery for attorney-client privilege.  Those invoices --

Q.   I'm not --

A.   -- were discussed.

MR. ORTEGA:  And so it's, like, I'm going to go ahead and object on this one for attorney-client privilege.

Q.   (BY MR. KAPLAN)  I'm not asking about the specific work per- -- that may or may not --

A.   You're asking --

Q.   -- have been performed by Mr. Dennis on this



Page 66

case.  I'm asking generally if Mr. Dennis performed work on this case.  I don't care what the work was.  I'm not asking for the specific work.  I'm asking:  Did Mr. Dennis perform work on this case and was that reflected in any invoice that he issued to you?

A.   I don't recall.

Q.   All right.  So turning to Exhibit 2.  So the question in -- is in Interrogatory Number 2 on page 2. Are you with me?

A.   Yeah.

Q.   It says, (as read):  State the name and address of all businesses on whose behalf you've used the phone number (210) 744-9663 to conduct any business-related communications in the last ten years. Okay?

A.   Okay.

Q.   And in response you have a paragraph laying out certain objections.  And then you say, (as read): Without waiving these specific objections, Plaintiff responds as follows.  The number (210) 744-9663 is currently Plaintiff's sole and only current telephone number which he uses primarily for personal communications.  As it is his only number, Plaintiff has also used it for occasional business-related communications concerning the following entities.



MAGNA
LEGAL SERVICES

Page 67

And then it lists MAO Real Estate, LLC, Ortega Capital, Inc., Grovano, Inc., Evergreen Capital, LLC, Green Forest Capital, LLC, and HorizonWiz, LLC. Are you with me?

A.   Yeah, I'm still here.

Q.   Okay.  And then it says, (as read):  Plaintiff further states that of these entities, only Grovano, Inc., which operates a public-facing warehouse, maintains its own separate-cated -- own separate dedicated business telephone line for customer and public contact.  The other entities listed are primarily holding companies or ventures, either without or very limited public-facing operations, for which Plaintiff using his sole personal number for necessary contact.

Did I -- did I read that paragraph accurately?

A.   I believe so.

Q.   Okay.  And so with regards to Grovano, Inc., I believe that we already discussed that.  And I believe you had said that was a (210) 610 number and you couldn't recall the last four digits?

A.   I believe so.

Q.   Were the last four digits 7702?

A.   I mean, I don't recall.  I would have to look.

Q.   Okay.  And I believe that we also had some



Page 68

testimony about some VOIP numbers, correct?

A.   Correct.

Q.   And so you testified that MAO Real Estate had approximately 10 to 20 VOIP lines?

A.   Yeah, probably.  In its life, yeah.

Q.   But you didn't list that in -- in your response to Interrogatory Number 2?

A.   Yeah, you're asking for current phone numbers here.  And so I said in the last, like, four years.  If you look -- it's prefaced by saying in the last four years.  Let me see.

(Witness reviews document.)

A.   Go up.  Because I believe I make that objection to the ten-year statute of limita- -- you're -- you're well in exceed -- excess of the four years and then so I make that -- subject to those objections for ten years, and then I provide you basically for on the four years.

Q.   (BY MR. KAPLAN)  So you're saying that in the last four years MAO Real Estate has not used any of the VOIP numbers that we discussed previously?

A.   Those are -- I don't believe it has used those.

Q.   You don't believe -- you don't believe it or -- or it hasn't?


MAGNA
LEGAL SERVICES

Page 69

A.    Yeah, I don't believe so.

Q.    And -- and what about for HorizonWiz?  Has it used any of its VOIP numbers in the last four years?

A.    I mean, I'm the wrong person to ask.  You're asking if the entity has used it.  I'm not...

Q.    So you don't know?

A.    Yeah, I don't know.

Q.    And what about for Evergreen Capital?  Has it used any of the VOIP numbers that we discussed in the last four years?

A.    I don't recall the date of termination of all of those VOIP numbers, but I believe it's past four years.

Q.    And so your testimony here today is that you were only responding for the previous four years in responding to Interrogatory Number 2?

A.    Well, yeah.  (As read):  Without waiving the specific objections, Plaintiff responds as follows...

And if you had read previously further up, I was clearly objecting to on the overarching ten years being asked as disproportionate to this case.

Q.    Okay.  And -- and just to close the loop, I don't think we finished this -- this line of questioning.

A.    Sure.



Page 70

Q.   Besides Mr. Dennis and Mr. Perrong, are you --
are you currently represented by any other counsel?

A.   Any other counsel?  I do not believe so.

Q.   In the last five years, have you been
represented by any other counsel besides Mr. Perrong and
Mr. Dennis?

A.   Yes.

Q.   All right.  And who is that counsel or who are
those counsels?

A.   Okay.  So there's -- I don't even recall her
name.  I mean, I remember Mark.  There's Mark Walker.

Q.   And who is Mark Walker?

A.   An attorney.

Q.   Is he with a firm?

A.   Yes.

Q.   What is the name of Mr. Walker's firm?

A.   I don't -- I don't know.  I don't recall the
name of the firm.

Q.   And did Mr. Walker represent you in
litigation?

A.   Yes.

Q.   What case did Mr. Walker represent you in?

A.   It was -- I don't remember the full name.  The
guy's name was Oscar.

Q.   And what kind of case was that?



Page 71

A.   It was a defamation suit.

Q.   Is that defamation suit still ongoing?

A.   No.

Q.   Was that defamation suit settled?

A.   Was it -- it's resolved, yes.

Q.   Did you enter into a settlement agreement with regards to this defamation suit?

A.   That I would have to, again, run by -- like, this might be the same thing, a protective order.  Or I would have to go and check to make sure.

Q.   Just to be clear, I'm not asking about the specifics contained in any potential settlement agreement you entered into.  I'm simply asking whether or not you entered into a settlement agreement to resolve your -- your case against Oscar, who you can't recall his last name.

A.   I mean, subject to that, no.  My prior objection, I'll answer saying: yes, it was settled.

Q.   When was it settled?

A.   When?  I don't recall an exact date.

Q.   Approximately when was it settled, Mr. Ortega?

A.   Probably sometime between one to -- maybe one to two years ago.

Q.   What court was this case pending in?

A.   A court here in Bexar County.



Page 72

Q.   Were you the plaintiff or the defendant in this case?

A.   Defendant.

Q.   Were there any other causes of action asserted against you by this Oscar other than defamation?

A.   I don't recall the -- the pleadings.

Q.   How did this defamation suit come about?

MR. ORTEGA:  So first off, objection. Like, relevance.

Do you still want an answer?

MR. KAPLAN:  Yes, please.

A.   How did it come about?  I guess...

Q.   (BY MR. KAPLAN)  What's the underlying conduct that lead to Oscar filing a defamation suit against you, Mr. Ortega?

A.   It was alleged defamation.  He was alleging defamation.

Q.   Did you have a personal relationship with -- with this Oscar?

A.   No.

Q.   Did you have a business relationship with this Oscar?

A.   No.

Q.   Was this somebody that you knew prior to them filing suit against you?


MAGNA
LEGAL SERVICES

Page 73

A.    Did I know him prior to it?  Yeah.

Q.    And how did you know Oscar?

A.    He lived in my neighborhood.

Q.    And generally speaking, what was the -- the alleged defamatory statements made that -- that -- that were the impetus for Oscar bringing suit against you?

A.    What was the alleged behavior?

Q.    What were the alleged defamatory statements?

A.    I don't recall what he alleged on his pleadings, but it was accusations of defamation of character, I believe.

Q.    So you were sued for defamation and you don't recall generally speaking what -- what the actual language was that -- that brought about that suit?

A.    I mean, I don't recall, like, the -- what statements or -- I mean -- like, yeah, I would have to review the pleading.

Q.    Was it defamation per se or defamation per quod?

A.    Could you explain the difference?

Q.    Defamation per se, generally speaking, is defamation that is of a character that is, you know, so, I guess, abhorrent to the eyes of the court that -- that you don't have to, generally speaking, prove -- prove damages.



Page 74

A.   But you don't have to -- I guess -- yeah, I'm not -- I'm not going to recall.  I don't know how to answer that.  I don't know.  That's more for the attorney that represented me on that case.

Q.   Do you recall how much money Oscar -- Mr. Oscar was -- was seeking against you in that defamation suit?

A.   How much was he seeking?  I would have to review the pleadings.  I don't know how much he was requesting.

Q.   More than $100,000?

A.   I mean, it would be pure speculation to say that I -- that I -- I don't -- I don't know.  I don't know without reviewing it.

Q.   So you said that it settled approximately one to two years ago.  Do you recall approximately when the suit was brought?

A.   Approximately?  It would have been probably in twenty -- either 2020/2021.

Q.   And after this time -- and after -- after that lawsuit was filed, did you move to your current address?

A.   After?  I believe -- did I move after?  I don't know if I had already moved or -- I can't recall if I was moving.

Q.   Okay.  So aside from Mr. Walker, Mr. Perrong,



MAGNA
LEGAL SERVICES

Page 75

and Mr. Dennis, in the last five years have you been represented by any other legal counsel?

A.    Yes.

Q.    And who -- and who are the -- that other counsel or other counsels?

A.    Shavonne -- I don't know her last name.

Q.    And what -- and did Ms. Shavonne represent you in a litigation dispute?

A.    Yes.

Q.    In more than one litigation dispute?

A.    In just one litigation dispute.

Q.    What was the nature of that litigation dispute?

A.    Defamation.

Q.    Were you the defendant in that defamation case as well?

A.    Yes.

Q.    Who was the plaintiff in that case?

A.    Oscar.  I don't know his last name.

Q.    Is this the same Oscar as the other case?

A.    Yes.

Q.    Was this -- so was this the same case and you had Ms. Shavonne and Mr. Walker represent you in the same case?

A.    Yes.



Page 76

Q.   Okay.  Aside from Ms. Shavonne, Mr. Walker, Mr. Perrong, and Mr. Dennis, in the last five years have you been represented by any other legal counsel?

A.   Yes.

Q.   And who is that?

A.   Paulina Almanza.

Q.   And when did you retain Ms. Almanza?

A.   I believe that was 2024.

Q.   Did you know Ms. Almanza prior to retaining her?

A.   Did I know -- did I know her?  Yes.

Q.   How did you know Ms. Almanza prior to retaining her?

A.   You're asking for the -- well, I guess I don't know how much detail for, like, attorney-client.  You're asking for, like, what relationship or how did we end up discussing about representation?

Q.   I'm not asking about your discussions.  I'm just asking how you knew Ms. Almanza prior to retaining her.

A.   I knew her through -- basically she had represented me on another case as well partially.

Q.   How many cases did Ms. Almanza represent you in?

A.   I mean, I don't recall an exact number.



Page 77

Q.    More than five?

A.    It's probably somewhere around there.

Q.    More than ten?

A.    I don't believe more than ten.  Yeah, I don't believe it would be more than ten.

Q.    So approximately 5 to 10 cases that Ms. Almanza represented you in?

A.    One sec.  One sec.  My dogs.

Okay.  Can you repeat the question?

Q.    So approximately five to ten cases that Ms. Almanza represented you in?

A.    I wouldn't say five to ten.  I would say it's probably somewhere around five.  I don't want to give -- I don't have an exact number.  I can't recall.

Q.    Is Ms. Almanza currently representing you?

A.    No.

Q.    When did Ms. Almanza stop representing you?

A.    Stopped representing me?  I believe she went through -- I would have to check when the -- the final withdraw.

Q.    So you don't recall exactly when she withdrew?

A.    No, I don't recall when -- the date.

Q.    Would it have been January of this year?

A.    It was probably past January.

Q.    So maybe February of this year?



Page 78

A.    It probably would still be past February.

Q.    So sometime maybe in the first quarter of this year?

A.    I don't even want to -- it's in twenty -- it's this year.

Q.    Okay.  And so Ms. Almanza represented you in this case, correct?

A.    Almanza, yes, in this case.

Q.    I'm sorry.  If I'm mispronouncing it.  Almanza?

A.    Almanza, yeah, in this case.

Q.    And what other case did Ms. Almanza represent you in?

A.    In what other cases?  I mean, I would have to -- I don't recall the extent of them.  I would have to look.

Q.    Okay.  I'm not asking for you to look and -- and you shouldn't be, you know, on your computer other than -- other than discussing --

A.    I'm not a computer discussing --

Q.    -- this deposition with me.

So she represented you in approximately five cases.  Four -- and at least four other cases.  And off the top of your head, you cannot recall what those other cases were?



Page 79

A.   I don't know the names of the -- you're asking the names of the defendants?

Q.   Well, let's take a step back.

Were those all TCPA cases?

A.   No.

Q.   How many of those were TCPA cases?

A.   Again, I don't have an exact number on the number of cases.

Q.   Approximately how many of those were TCPA cases?

A.   Probably somewhere in that neighborhood. Five.  Four.  Three.  Six.  Somewhere around there.

Q.   Okay.  And so for the other cases that Ms. Almanza represented you in that weren't TCPA cases, what was the basis for those cases?

A.   The basis?  I mean, one was a defamation.

Q.   Is that the same defamation case we were discussing previously brought by Oscar?

A.   Like, I guess, on the same topic.

Q.   No, I'm asking if that's the same case.

A.   She didn't represent me in -- in the Oscar case, no.

Q.   Okay.  So this is a different defamation case?

A.   Correct.

Q.   Okay.  Were you the defendant in this



Page 80

defamation case?

A.    I was the plaintiff.

Q.    Okay.  And who was the defendant in this defamation case?

A.    It was the HOA.

Q.    The HOA of your current address or your previous address?

A.    Previous.

Q.    How much money were you seeking in that case against the HOA?

A.    I mean, it wasn't even a -- it was an indemnification case for defamation.

Q.    So did you bring a claim for defamation against this HOA or was this a claim for indemnification with regards to the defamation claim brought by -- by Oscar against you?

A.    Yeah, it was indemnification for defamation with Oscar.

Q.    And what was the name of this HOA?

A.    I mean, I don't recall the name of the association.

Q.    Is this case still ongoing?

A.    No.

Q.    What court was this case pending in?

A.    I -- it's going to be one of these courts in



Page 81

Bexar County or maybe Comal or Guadalupe County.

Q.   And did the HOA ultimately indemnify you for the underlying defamation claims?

A.   It was settled, so...

Q.   What was your basis for bringing an indemnification claim with regards to the defamation cause of action asserted against you?

A.   What was the indemnification?

Q.   No.  What was the basis for you seeking indemnification from the HOA?

A.   Because I was the -- in the capacity of the board.

Q.   So the underlying defamatory statement in the Oscar defamation case was allegedly made by you in your capacity as a member of this HOA?

A.   Yeah.

Q.   Does that help ring a bell as to what the -- the alleged defamatory statement was in the underlying claim bought -- brought by Oscar?

A.   Does it help to bring to balance?

Q.   No.  Does it help -- does it help you recall what the defamatory statement was?

A.   I mean, it does- -- it doesn't.  I've still got to look through.

Q.   No, I'm not asking you to look through it.  So



Page 82

if you don't recall, you don't recall.

A.   Yeah, I don't recall that.

Q.   Okay.  Besides Ms. Almanza, Mr. Walker, Mr. Perrong, and Mr. Dennis, have you been represented by any attorneys in the last -- any other attorneys in the last five years?

A.   Like received consultations or retained?

Q.   Retained.

A.   Retained.  In the last five years?  Yes.

Q.   And who is that -- and who is that or who are those attorneys?

A.   That's going to be -- I believe it's also another Dennis.  Let me look.  I think his name is -- no, no.  It's Daniel.

Q.   Daniel.  Do you remember Daniel's last name?

A.   Lanfear.  Lanfear (pronouncing).

Q.   Can you spell that?

A.   L-A-N-F-E-A-R.

Q.   And was Mr. Lanfear with a law firm?

A.   Yes.

Q.   Do you recall the name of that law firm?

A.   I don't recall.

Q.   And did Mr. Lanfear represent you with regards to active litigation?

A.   Did he represent me in regards to active


MAGNA
LEGAL SERVICES

Page 83

litigation?  I guess can you clarify?  What does that mean?

Q.    Did Mr. Lanfear represent you in a litigation capacity?

A.    Litigating?  I mean, as in he filed suit, is what you're asking?  What do you -- I don't --

Q.    No.  No, I'm asking whether he represented you in -- in a lawsuit.

A.    He represented me, yes, and...

Q.    Was this one lawsuit or multiple lawsuits?

A.    He represented me numerous times.

Q.    Approximately how many times did Mr. Lanfear represent you?

A.    Approximately three, four.

Q.    And what was the basis for those three or four lawsuits?

A.    For, like, debt collection on mortgage.

Q.    Were you the plaintiff or the defendant?

A.    Plaintiff.

Q.    In all three or four of these cases?

A.    Yes.

Q.    And were these cases brought in Texas State court?

A.    I mean, they didn't have to get filed.

Q.    So Mr. Lanfear sent demand letters on your


MAGNA
LEGAL SERVICES

Page 84

behalf?

A.   Yeah.  I mean, there's nonjudicial foreclosures here in Texas, so -- so it's not really a demand.  It's acceleration.

Q.   And so mis- -- so did Mr. Lanfear represent you personally or one of your businesses?

A.   He represented my business.

Q.   Which business was that?

A.   I believe it was MAO Real Estate.

Q.   Did you consult with Mr. Lanfear about this lawsuit?

A.   No.

Q.   Did you consult with Mr. Walker about this lawsuit?

A.   Mr. Walker?  No.

Q.   Okay.  Besides Mr. Lanfear, Mr. Walker, Ms. Shavonne, Ms. Almanza, Mr. Dennis, and Mr. Perrong, have you been represented by any other attorneys in the last five years?

A.   Yes.

Q.   And who is that?

A.   His first name is Daniel, again.  Also.  But I don't remember --

Q.   Do you recall his last name?

A.   No, I don't remember his last name.



Page 85

Q.   And what -- and did Mr. Daniel -- not Mr. Lanfear, but this other Daniel -- did he represent you with regards to active or threatened litigation?

A.   Active or threatened litigation?  You're saying in -- in a defense manner?  Active or threat -- what are you --

Q.   I'm saying plaintiff or defendant, any litigation.

A.   In any litigation, yes.

Q.   Okay.  Was this one case or multiple cases?

A.   I mean, he's handled multiple cases for me.

Q.   Okay.  How many cases has -- has this Daniel handled for you on your behalf?

A.   Maybe two or three.

Q.   Were you the plaintiff or defendant in those cases?

A.   Well, it was -- I mean, those are -- would have been not really like -- it's not, sort of, litigation.  More transactional in one.  And then the second is more -- supposed to be plaintiff, but then it got resolved.

Q.   Okay.  So for the transactional one, what -- was that -- was that some kind of real estate transaction? a contract dispute?

A.   A real estate transaction.



MAGNA
LEGAL SERVICES

Page 86

Q.   And the one that was threatened litigation, that one got resolved before Mr. Daniel having to file litigation on your behalf?

A.   Correct.

Q.   And has Mr. Daniel represented you with regards to any other matter?

A.   Other than those two?  I mean, I don't recall outside of those two.

Q.   Did you consult with Mr. Daniel about this lawsuit?

A.   No, I didn't on this one.

Q.   Did you consult with Ms. Shavonne about this lawsuit?

A.   With Shavonne?  I don't believe so.

Q.   Did Ms. Shavonne issue invoices to you for her services?

A.   Yes.

Q.   And did those invoices include a summary of the work performed along with the time recorded for -- for that summary of work?

A.   Did it include it?  Yes.

Q.   And so were there any entries with regards to this lawsuit contained in those invoices?

A.   In those invoices?  No.

Q.   In any invoices issued by Ms. Shavonne?



Page 87

A.   In any issues -- probably not.

Q.   Probably not, so you can't recall?

A.   Well, no, I'm thinking it's probably not.  It would have been -- yeah, I would say to the best of my ability it's probably not.

Q.   Well, so you either know or you don't know.  And if you know, it's either "yes" or "no."  And if you don't know, then it's "I don't know."

So did Ms. Shavonne -- are there any summaries contained in any of the invoices issued by Ms. Shavonne with regards to this lawsuit?

A.   No.

Q.   Okay.  And so for this lawsuit -- I'm sorry. Let me take a step back.

Are there any other attorneys besides the ones that we've gone through that you've been represented by in the last five years?

A.   The last five years?  Let me think.  I think I've covered -- I mean, that's -- that's all I can recall at this point.

Q.   Are there any other attorneys that you've consulted with in the last five years?

A.   Yes.

Q.   Do you recall who those attorneys are?

A.   That's going to be -- I definitely don't



Page 88

recall the number of consultations or even the names.

Q.    Would it be more than five attorneys that you've consulted with but haven't retained in the last five years?

A.    Yes.

Q.    More than ten?

A.    Probably.

Q.    More than 15?

A.    At that point I don't really -- I can't give you an exact -- an estimation with that much accuracy. It would be pure speculation.

Q.    But you know it's more than ten?

A.    Probably more than ten.

Q.    Okay.  Turning back to Ms. Almanza, when did you retain Ms. Almanza to represent you in this matter?

A.    That would have been in 2024.

Q.    Do you recall approximately when in 2024?

A.    I don't have an exact date.

Q.    I'm going so show you what will be marked as Exhibit Number 3.

              (Exhibit 3 introduced.)

Q.    (BY MR. KAPLAN)  Let me know when you can see that, and then I can scroll as needed if you would like, Mr. Ortega.

A.    Sure.  Let me see.



Page 89

(Witness reviews document.)

A.   Can you scroll down?

Q.   (BY MR. KAPLAN)  Yes.

A.   Oh, I see.  Okay.  Sure.  It's just one page?

Q.   Yes.

A.   No exhibits.

Q.   No exhibits.

A.   Okay.

Q.   Do you recognize this document?

A.   It's first time I've seen it.

Q.   It's the first time you've seen it?

A.   Yeah.

Q.   Did you ask Ms. Almanza to prepare a demand letter on your behalf in this matter?

A.   Did I ask her to send one?  Yes.

Q.   Do you have any reason to believe that this is not the demand letter that Ms. Almanza prepared on your behalf in this -- in this matter?

A.   You're asking for speculation.

     MR. ORTEGA:  I mean, I'll object as spec- -- I don't...

Q.   (BY MR. KAPLAN)  I'm asking if you have any reason to believe that this is not that demand letter?

A.   Do I have any reason to believe?  I mean, I don't even have -- you're showing it to me.  So it's


MAGNA
LEGAL SERVICES

Page 90

based on the assumption -- based on the assumption that you're providing this and representing that this is the demand letter, with those representations, I don't -- I wouldn't object to -- I wouldn't be thinking that it's not the demand letter sent.

Q. So you -- so you don't have any reason to believe that this is not the demand letter sent by Ms. Almanza on your behalf in this matter?

A. Based on your representations that this is what she sent, no.

Q. Okay. But you have never seen this before?

A. I have not read this before, no.

Q. How did you and your counsel Ms. Almanza come to the conclusion that the damages against Sienna Marketing have amounted to $100,000?

A. You're asking for the conversations between me and my counsel.

Q. I'm just asking how you came to the conclusion that your damages in this case amount to $100,000?

MR. ORTEGA: Well, I'm going to -- I'm going to go ahead -- that one is objection, attorney-client privilege about how I was consulted on it.

Q. (BY MR. KAPLAN) Do you have any independent basis to support your claim for $100,000 as deman- -- as



Page 91

damages in this matter?

A. Do I have independent basis?

Q. You're objecting to my previous question on the attorney-client privilege. So I'm asking if you have an independent basis supporting your allegation that you are entitled to $100,000 in this lawsuit?

A. Well, I'm not going to -- again, my representations are based on what I was consulted on.

MR. ORTEGA: And I'm also going to -- same thing, objection, attorney-client privilege. I'm not going to get into the conversations or the substance of those conversations about how those representations are made.

Q. (BY MR. KAPLAN) But my question was whether you had an independent basis, not with regards to conversations with counsel. Do you have an independent basis to support your allegation that you are entitled to $100,000 in damages from Sienna Marketing & Consulting, Incorporated?

A. No. My basis is based on the consultation with my counsel.

Q. When did you register your phone number (210) 744-9663 on the Do-Not-Call list?

A. When did I register it? I mean, I don't have an exact date on top of my head.



Page 92

Q.   Approximately when did you register your telephone number on -- of (210) 744-9663 on the Do-Not-Call list?

A.   Approximately?  Somewhere probably 2012, '11, '13.  One of -- around that.  I would say 2012 plus or minus one year.

Q.   And why did you register the phone number (210) 744-9663 on the Do-Not-Call list at that time?

A.   So people would stop SPAM calling me. Telemarketing calls.

Q.   How did you hear about the Do-Not-Call list?

A.   I don't -- I don't recall.

Q.   Did you do any independent research about the Do-Not-Call list prior to registering your number of (210) 744-9663 on it?

A.   Did I do any prior research?  I don't recall. You're asking 13, 14 years ago.

Q.   Did you -- did you Google the Do-Not-Call list?

A.   You're asking have I Googled it?

Q.   When you were registering the number (210) 744-9663, did you do a Google search about the Do-Not-Call list?

A.   I don't recall.

Q.   Did you look up in any way whether or not


MAGNA
LEGAL SERVICES

Page 93

telephone numbers that are utilized for business

purposes can be registered on the Do-Not-Call list?

A.   You're asking have I or did I during the time that I registered?

Q.   Did you during the time that you registered that number.

A.   I don't recall.

Q.   Have you registered any other phone numbers on the Do-Not-Call list?

A.   I have registered one other.

Q.   What number is that?

A.   I don't -- I don't recall that off the top of my head.  It was a 210 number.

Q.   What kind of -- what kind of phone was that number associated with?

A.   It was my cell phone.

Q.   And when was that your cell phone?

A.   It was probably six months ago or sometime I believe in twenty -- or beginning of 2025.

Q.   So you started using this other number 2 -- this other 210 number that you don't recall sometime approximately six months ago?

A.   No, it had to be more than six months.  It was probably the beginning of this year.

Q.   Are you still currently utilizing that mobile



Page 94

cell phone number?

A.    No.

Q.    Why not?

A.    I got -- I disconnected it.

Q.    Why did you -- why did you begin using that 210 other -- other cell phone number, you know, earlier this year?

A.    Why?  Because I was originally going to switch to that because kind of like -- you know, Sienna Marketing, companies like that, were just calling me too much.  Too much SPAM calls.  So I was going to get a new number and move all my stuff over to that new number.

Q.    And ultimately why did you not move all your quote, unquote stuff to that new number?

A.    Because the calls dropped a lot.

Q.    Who was the service provider for this 210 number?

A.    Verizon.

Q.    Did you inquire with Verizon as to why the -- the calls were dropping with this new number versus your 9663 number?

A.    You're -- no, you're mischaracterizing what I'm saying.  I said the calls -- the number of harassing SPAM calls on the 9633 number dropped so that there was no -- I didn't have to leave it for the new number.



Page 95

Q.   How many months did you use this -- this other 210 number for?

A.   A couple of months.  I don't recall an exact -- I don't know how many.

Q.   And so for those couple of months, were you paying for two different phone lines at the same time?

A.   Yes, there was a second phone line.

Q.   And have you produced records in this lawsuit regarding this other 210 phone number?

A.   Yes.

Q.   Did you conduct any business for MAO Real Estate on this other 210 phone number?

A.   Did I conduct -- I mean, they're -- for MAO? I don't believe so.

Q.   Did you send any text messages on behalf of MAO on this other 210 phone number?

A.   Also I don't -- I don't believe so.

Q.   Did you -- did you make any telephone numbers on behalf of Grovano on this other 210 number?

A.   Did I make any telephone numbers?

Q.   No, you're mishearing my question, Mr. Ortega.

Did you make any telephone calls on this 210 number on behalf of Grovano?

A.   On behalf of Grovano, I mean, I don't recall on that one.



Page 96

Q. You don't recall if you used this new number to make telephone calls on behalf of Grovano in the past year?

A. Correct.

Q. Did you make any text messages with this 210 number on behalf of Grovano?

A. On behalf of Grovano? I mean, I don't recall off the top of my head.

Q. Did you make any telephone calls on behalf of Green Forest Capital on this 210 number?

A. No.

Q. Did you make any text messages on behalf of Green Forest Capital on this other 210 number?

A. No.

Q. Did you make any telephone calls on behalf of Ortega Capital on this other 210 number?

A. Ortega Capital? I don't believe so.

Q. Did you make any text messages on behalf of Ortega Capital from this 210 number?

A. I also don't believe so.

Q. And so you don't recall the other seven digits of this 210 number?

A. Not off the top of my head, no.

Q. Was it (210) 802-9951?

A. I mean that might be it. I can't confirm. I


MAGNA
LEGAL SERVICES

Page 97

would have to look.

Q.   Was it (210) 686-6281?

A.   I mean, again, I would have to -- I don't recall.  I would have to look.

Q.   Okay.  So aside from this 210 number, which you call recall what -- what that number specifically was and the (210) 744-9663 numbers, have you registered any other phone numbers on the Do-Not-Call list?

A.   No.

Q.   Have you listed the number (210) 802-9951 on the Do-Not-Call list?

A.   Again, I don't know.  I don't recall.

Q.   Have you registered the number (210) 686-6281 on the Do-Not-Call list?

A.   Again, you're asking a number.  I don't recall.

Q.   Have you registered the number (512) 861-8062 on the Do-Not-Call list?

A.   Can you repeat the number again?

Q.   (512) 861-8062.

A.   No, no.

Q.   Have you registered (210) 405-7811 on the Do-Not-Call list?

A.   I don't -- I don't recall.  I don't recognize the number.



Page 98

Q.    Have you registered the number (210) 228-6615 on the Do-Not-Call list?

A.    Again, I don't recall.

Q.    Have you registered the number (210) 610-7702 on the Do-Not-Call list?

A.    61 -- 610 what?

Q.    7702.

A.    I mean, I don't recall.

Q.    Have you registered the number (361) 233-3758 on the Do-Not-Call list?

A.    361 area code?

Q.    Yes.

A.    No.

Q.    Have you registered the number (469) 379-8891 on the Do-Not-Call list?

A.    No.

Q.    Have you registered the number (915) 610-7702 on the Do-Not-Call list?

A.    No.

Q.    Have you registered the number (210) 686-6281 on the do not call region?

A.    I don't recall.

Q.    Have you registered the number (281) 925-7599?

A.    281 area code?

Q.    Yes.



A.    No.

Q.    Have you registered the number (213) 905-4504 on the Do-Not-Call list?

A.    213 area code?

Q.    Yes.

A.    No.

Q.    Have you registered the number (210) 876-3384 on the Do-Not-Call list?

A.    You said 210 or 280?

Q.    210.

A.    Oh, I don't recall.

Q.    Have you registered the number (210) 405-6941 on the Do-Not-Call list?

A.    I don't recall.

Q.    Have you registered the number (210) 944-8803 on the Do-Not-Call list?

A.    210 area code?

Q.    210 area code.

A.    No, I don't recall.

Q.    Have you registered the number (210) 405-4798 on the Do-Not-Call list?

A.    I don't recall.

Q.    Have you registered the number (210) 418-2880 on the Do-Not-Call list?

A.    That was also a 210?



Page 100

Q.    Yes.

A.    Then, yeah, I don't recall.

Q.    Have you registered the number (580) 448-4568 on the Do-Not-Call list?

A.    580?

Q.    Yes.

A.    No.

Q.    Have you registered the number (580) 749-4999 on the Do-Not-Call list?

A.    580?  No.

Q.    Have you registered the number (580) 382-2782 on the Do-Not-Call list?

A.    No.

Q.    And have you registered the number (850) 312-3292 on the Do-Not-Call list?

A.    850 area code?

Q.    Yes.

A.    No.

Q.    All right.  Before we go on to next exhibit, do you need to take any break, Mr. Ortega?

A.    Sure.  Let's do five.

MR. KAPLAN:  Okay.

THE VIDEOGRAPHER:  Okay.  This will mark the end of Media Number 2.  We're going off the record.  It's 11:18 a.m.



Page 101

(Recess held, 11:18 a.m. to 11:24 a.m.)

THE VIDEOGRAPHER:  This will mark the beginning of Media Number 3 in our deposition of Mark Anthony Ortega.  We're going back on the record at 11:24 a.m.

Q.  (BY MR. KAPLAN)  All right.  Mr. Ortega, did you speak to anyone during this previous break?

A.  No.

Q.  Okay.  Earlier you had testified about CallRail and some VOIP lines.  I want to show you what has been marked as Exhibit 4.

(Exhibit 4 introduced.)

A.  All right.

Q.  (BY MR. KAPLAN)  Let me know when you see that and then I can scroll through as needed.

A.  Okay.  Sure.  Let's see.  Okay.

(Witness reviews document.)

A.  And then scroll down.  Okay.

(Witness reviews document.)

A.  Scroll all the way down.  Okay.  Sure.

Q.  (BY MR. KAPLAN)  Okay.  And so do you -- do you recognize this document?

A.  Yes.

Q.  What is this document?

A.  This is an invoice from CallRail.


MAGNA
LEGAL SERVICES

Page 102

Q.    Okay.  And so if you look at the bottom of the first page, there is a number here MAO 001654.

A.    Okay.

Q.    And so is that a label that you put on this document when you produced it as part of this litigation?

A.    Yes.

Q.    And so this is a document that you produced in the litigation, correct?

A.    Yes, I produced this.

Q.    And so earlier you testified that CallRail was a VOIP service provider that -- that you utilized; is that correct?

A.    That -- that I utilized?  Individually?

Q.    Yes.

A.    I mean, I think you're mischaracterizing my testimony -- my prior testimony.

Q.    That you utilized on behalf of certain businesses.

A.    CallRail was the company for MAO Real Estate and a couple of these other entities, yes.

Q.    Okay.  So let -- let's get into that.  So this account summary here, invoice number 337-791-262.  We have an amount up here, $122.37.  Do you see that?

A.    Yes.



Page 103

Q.   And a date of August 15th, 2019.

A.   Okay.

Q.   Is that the date of this invoice?

A.   I mean, I don't know if that's the date of the invoice or the date of service, but that's the date listed on the document, yes.

Q.   And it says here account usage July 15, 2019 to August 15, 2019?

A.   Correct.

Q.   And so this invoice would be from CallRail for that time period of July 15, 2019 to August 15, 2019?

A.   Presumably.

Q.   Is there any -- do you have any reason to believe that that would not be the case?

A.   No, I don't have reason to believe at this point.

Q.   Okay.  And so it says here local numbers: 19. Do you know what that represents?

A.   It says quantity 19 of local numbers, yes.

Q.   And do you know what that represents?

A.   It represents the number of -- you know, the numbers on the account.

Q.   Okay.  And those numbers included in plan: 10. Do you know what that number represents?

A.   Yes.



Page 104

Q.    And what does that number represent?

A.    It says numbers included in the plan.

Q.    Yes, but what does that mean?  Does that mean that you're paying for -- for ten numbers or does that mean you get a discount for -- for that off of a certain price?  What -- what does that mean?

A.    That means that -- that's -- ten numbers are included with the current plan.

Q.    Did you pay this invoice on behalf of MAO Real Estate?

A.    Did I pay it on behalf, personally?

Q.    No.  Did you make the payment on behalf of MAO Real Estate?

A.    Did I make the payment on behalf of MAO Real Estate?  I don't recall.

Q.    Let's -- let's take a step back.  And we're going to get to this in a little bit, but I think it will be helpful now.

Are you the sole owner of MAO Real Estate?

A.    Yes.

Q.    Does MAO Real Estate have any employees other than yourself?

MR. ORTEGA:  I mean, objection to vague, ambiguous.

A.    When?  What time period are you referencing?



Page 105

Q.   (BY MR. KAPLAN)   Mr. Ortega, I asked does, meaning current.  So does MAO Real Estate have any other employees other than yourself?

A.   Currently, no.

Q.   In August of 2019 did MAO Real Estate have any other attorney -- any other employees other than yourself?

A.   W-2 employees?

Q.   Any employees.

A.   Workers?  Workers, yes.  Employees, no.

Q.   Okay.  Who was a worker for MAO Real Estate in August of 2019?

A.   Blanca De Luna.

Q.   Blanca De Luna?

A.   Yes.

Q.   Would it have been Blanca De Luna's responsibility to pay this bill on behalf of MAO Real Estate?

A.   I don't recall if -- if -- if that was under her duties.

Q.   Would it have been your responsibility to pay this invoice on behalf of MAO Real Estate at that time?

A.   Also, again, I don't recall whether it's mine or hers.

Q.   Does MA- -- in August of 2019 did MAO Real



Page 106

Estate have a bank account?

A.    Yes.

Q.    Do you have any reason to believe that funds from that bank account weren't used to pay this invoice?

A.    No, I don't believe -- there would be no reason to believe that it wasn't used.

Q.    In August of 2019 did Ms. De Luna have access to MAO Real Estate's bank account?

A.    To the account itself?

Q.    Yes.

A.    I guess that's, like, ambiguous.  Are you talking about, does she have a corporate card?  Or are you talking about that she, like, can go to the bank or withdraw?  Or what's the...

Q.    First let's talk about access.  In August of 2019 did Ms. De Luna have access to the bank account?

A.    Access?  Could she view it?  Is that the question -- I guess it's ambiguous.

MR. ORTEGA:  Again, objection for ambiguity and vague.

A.    Could you clar- --

Q.    (BY MR. KAPLAN)  Are you going to answer the question?

A.    If I understand it.

Q.    Let me phrase it this way.



Page 107

In August of 2019 did -- was Ms. De Luna able to view statements for MAO Real Estate's bank account?

A.   To view statements?  I don't recall.

Q.   In August of 2019 was Ms. De Luna able to initiate payments from MAO Real Estate's bank account?

A.   I believe so.

Q.   So did Ms. De Luna have access to the bank account in order to initiate payments or did she have a card on behalf of MAO Real Estate for its bank account?

A.   She used the card.  She had -- she had -- she was able to use the card, yes.

Q.   Okay.  So here about two-thirds of the way down it says: MAO Real Estate, LLC local numbers, 15. Do you see that?

A.   Yes.

Q.   So does that refresh your recollection as to approximately how many VOIP numbers that MAO Real Estate had in this time in August of 2019?

A.   In that month?  Yes, I mean if there's a bill stating that.

Q.   So there were 15 VOIP numbers utilized by MAO Real Estate in the month of July 15 to August 15, 2019?

A.   Yes.

Q.   Did that number fluctuate?



A.   Yes.

Q.   What was the purpose of MAO Real Estate having 15 separate VOIP numbers in this month?

A.   To track marketing effectiveness -- marketing campaign effectiveness.

Q.   Can you explain that?

A.   It's basically just tracking the performance of each marketing campaign.

Q.   Okay.  So let -- let's break that down.  So let's see if I understand that.  So at this time MAO Real Estate was participating -- participating in certain marketing campaigns, correct?

A.   Correct.

Q.   And so would those marketing campaigns differ based upon the geographic location?

A.   Different how?  In what?

Q.   So you have a number here listed (512) 861-8062 for Austin, correct?

A.   Correct.

Q.   Next to it you have one -- (210) 405-7811 for Bexar County.

A.   Bexar County.

Q.   Bexar County, I apologize.

     But is that correct?

A.   Yes.



Page 109

Q.   Okay.  So if you're conducting marketing in Austin -- if MAO is conducting marketing in Austin in July and August of 2019, would those marketing efforts include the Austin number (512) 861-8062?

A.   Yeah, the Austin campaign would include an Austin number.

Q.   But the Bexar County campaign would -- would contain this Bexar County number, correct?

A.   Bexar County.  And Bexar County would include the Bexar County phone number.

Q.   What kind of marketing campaigns was MAO Real Estate involved with at this time?

A.   At that time?  Generally mail.

Q.   Can you explain that?

A.   It's just as it sounds.  Sending mail.

Q.   Okay.  So you would prepare, what, cold -- cold mailings to -- to addresses in these areas and those would include information as to MAO Real Estate?

A.   Yes.

Q.   How did you come up with the addresses to mail these -- these mailings to?

A.   How did I come up with those addresses?

Q.   Yes.

A.   Public information.

Q.   Did you receive any correspondence from --



Page 110

from anyone -- just in general from any of these marketing campaigns for MAO Real Estate, did anyone respond to your mail marketing campaigns?

A.    Did they respond?  Did they call those numbers?

Q.    Yes.

A.    Yes, they called those numbers.

Q.    Did anyone call those numbers and tell you not to mail them anymore?

A.    I mean, I wasn't responsible for answering, so -- but -- yeah, so I'm not the one who can answer that.

Q.    Who was responsible for answering these -- these calls?

A.    Blanca.

Q.    Okay.  So -- so let's get into that.  So -- so who is Blanca De Luna?

A.    She's an independent contractor.

Q.    Okay.  And how did it be that Blanca De Luna came to perform work for MAO Real Estate?

A.    Through a friend referral.

Q.    Who is that friend?

A.    That's Tommy Ray.

Q.    And where was Ms. De Luna located when she performed work on behalf of MAO Real Estate?



Page 111

A.   As much as I believe, Mexico.

Q.   And so Ms. De Luna had access to these VOIP numbers?

A.   Correct.

Q.   And did -- did MAO Real Estate pay her to be available to answer these numbers at certain hours of the day?

A.   Did they pay her to be -- like, did -- did she receive, like, a salary or what's the question?

Q.   That's not my question, Mr. Ortega.  I'm asking: Did Ms. De Luna receive payment from MAO in order to be available at certain times to answer these 15 telephone lines?

A.   She did receive pay to be available and working during normal business hours.

Q.   And so that was for normal business hours?

A.   Correct.

Q.   So did MAO Real Estate pay her to be available for what hours during -- during what days in this time July to August of 2019?

A.   In July or August?  I mean, I don't recall, but it's going to be Monday through Friday typically.

Q.   And the hours of Monday through Friday typically?

A.   Typically it's going to be a normal working



Page 112

day, either 8:00 to 5:00.  9:00 to 6:00.  Something around there.

Q.   So Ms. De Luna was -- was -- was working during this time frame approximately 40 hours a week for MAO Real Estate?

A.   Approximately.

Q.   Did you ever answer any of these -- these VOIP lines on behalf of MAO Real Estate?

A.   Ever?

Q.   Yes.

A.   Yes.

Q.   And how did you do that?

A.   That's going to be -- it would be ringing to my phone.

Q.   Okay.  And that's your number ending in 9663, that -- that -- the phone associated with that number?

A.   You're talking about is my phone assoc- -- is my cell phone 9663?  What are you asking?

Q.   So you said -- when I asked, you know, how would you answer those calls, and you said it would ring to your phone.  So I'm asking what phone is that?

A.   Prior to it, it would ring to -- well, that's a VOIP.  I don't -- and this was -- it had to be -- I believe it's either to the phone or -- because I remember I used it on the computer, I think.  But, yeah,


MAGNA
LEGAL SERVICES

Page 113

so...

Q.    So your testimony is that it would ring -- it would ring to your phone.  And my question is: what phone is that?

A.    Well, I mean, it wouldn't just ring to the phone.  If you -- if you had the computer open, the browser, it rings to the browser to answer.

Q.    But my question is -- you said -- your answer was -- how -- how did you receive those calls?  And your answer was: it ringed to your phone.

A.    To my phone.

Q.    Yeah, ring -- ring to my phone.

And so I'm asking you: what phone is that?

A.    Yeah, it's going to be the nine -- the phone number ending in 9663.

Q.    Okay.  Also listed on this -- on the next page MAO 001655 it says -- about a third of the way down it says: Real estate partnership.  Do you see that?

A.    Yeah.

Q.    Okay.  What is this real estate partnership?

A.    That has to be -- well, I guess at that time -- I don't know if that's Evergreen or not.  It may or may not be Evergreen.  I don't know when Evergreen was formed.

Q.    And so there were three numbers util- -- three



Page 114

VOIP numbers utilized for this real estate partnership, which may be Evergreen, at this time in July and August of 2019?

A.    Correct.

Q.    And was Ms. De Luna also responsible for handling calls on behalf of this entity at that time?

A.    I believe so.

Q.    And did you ever receive any calls for -- for this entity, this real estate partnership which you believe to be Evergreen Capital?  Did you ever receive calls from the -- these three VOP -- VOIP numbers at this time?

A.    Did I ever receive them?  Not to my recollection.

Q.    And this Tommy partnership listed -- listed underneath, what -- what is that?

A.    That's just for other properties -- to purchase other properties.

Q.    I'm sorry.  What did you say?

A.    To purchase other properties.

Q.    To purchase other properties.  Who is Tommy?

A.    Tommy Ray.

Q.    Was he your business partner?

A.    I mean, acquaintance.

Q.    Well, you listed here Tommy partnership.


MAGNA
LEGAL SERVICES

Page 115

That's why I ask if you guys were business partners.

A.   No, we did not buy any properties together, I don't believe.

Q.   So do -- do you recall why you set up a number for Tommy partnership for this VOIP line in July and August of 2019?

A.   Probably to see how a marketing campaign would go.

Q.   And was Ms. De Luna responsible for handling calls for this Florida seller's line on this VOIP, the (850) 312-3292 number?

A.   Likely.  I don't recall the exact details of it.

Q.   Did you ever handle any VOIP -- did you ever handle any calls on this VOIP number?

A.   On that phone number?  I mean, that's very specific.  I don't recall on that specific phone number.

Q.   Okay.  I want to switch gears a little bit. I'm going to show you what's going to be marked as Exhibit 5.

        (Exhibit 5 introduced.)

A.   Okay.

Q.   (BY MR. KAPLAN)  Let me know when you see that.

A.   Yeah, I can see this.



Page 116

Q.   Okay.  If you want, this is -- I believe this is a 16-page document.  Do you want me to scroll through all of it before we start asking you some questions?

A.   I mean, yeah, I would like to see what this is entirely.

Q.   Okay.  Tell me when you want to move on to the next page.

A.   This one, we can go to the next page.  That's just part of the obstruction portion.  Right?

(Witness reviews document.)

A.   Okay.  No we can skip to next page.  Okay.

(Witness reviews document.)

A.   Okay.  You can go to the next page or I guess just scroll down so I can read the --

Q.   (BY MR. KAPLAN)  Yeah, I'll resize it so I can put one page on it each time we scroll, Mr. Ortega.

(Witness reviews document.)

A.   Okay.  You can go to the next page.

Q.   (BY MR. KAPLAN)  Okay.  Let me do that.  Is that -- is that big enough for you read?

A.   Just a second.

(Witness reviews document.)

A.   Okay.  You can go to the next page.

(Witness reviews document.)

A.   Okay.  You can go to the next page.



(Witness reviews document.)

A.   Okay.  Go to the next page.

(Witness reviews document.)

A.   Okay.  You can go to the next page.

(Witness reviews document.)

A.   Okay.  You can go to the next page.

(Witness reviews document.)

A.   Okay.  Next page.  Wait you cut off.  There you go.

(Witness reviews document.)

A.   All right.  Yeah, next page.

(Witness reviews document.)

A.   All right.  Next page.

(Witness reviews document.)

A.   Okay.  Next page.

(Witness reviews document.)

A.   Okay.  Next.

(Witness reviews document.)

A.   Okay.  You can go to the next page.

(Witness reviews document.)

A.   All right.  And I just assume the last page is what?

Q.   (BY MR. KAPLAN)  Is the signature block.

A.   Okay, sure.

Q.   Okay.  Do you know what -- have you seen this


MAGNA
LEGAL SERVICES

Page 118

document before?

A.   Yeah, I've seen it.

Q.   What -- what is this document?

A.   It's a petition.

Q.   Was it the petition or complaint that you filed in this case against Sienna Marketing?

A.   I didn't file it, no.

Q.   Was this the petition or complaint filed on your behalf in this matter against Sienna Marketing?

A.   Yes.

Q.   Who prepared this -- this petition?

A.   Paulina Almanza.

Q.   And did she prepare that in consult -- in consultation with you?

A.   Yes.

Q.   What was the fee arrangement between you and Ms. Almanza?

MR. ORTEGA:  I'm going to -- again, this is going to be objection, attorney-client privilege and to the relationship between me and my attorney or my former attorney.

Q.   (BY MR. KAPLAN)  Are you going to answer the question?

A.   No.

Q.   How much contact did you have with Ms. Almanza



Page 119

prior to her filing this petition?

A. Again, you're going into what is -- you know, how much contact. What was the legal strategy. What was --

MR. ORTEGA: Objection, attorney-client privilege.

Q. (BY MR. KAPLAN) I'll ask you to listen carefully to my question, Mr. Ortega. And it's how much contact -- not what was the substance of the contact. How much contact did you have with Ms. Almanza prior to her filing this complaint on your behalf?

MR. ORTEGA: Yeah, objection attorney-client privilege.

Q. (BY MR. KAPLAN) Are you going to answer the question?

A. That's a no.

Q. Okay. I'm going to show you at the same time what is marked as Exhibit 6.

(Exhibit 6 introduced.)

Q. (BY MR. KAPLAN) Right now I'll have it just on its own, but then I'm going to do a side-by-side comparison. Okay? Let me know when you can see it?

A. Okay. I can see this document. Let me...

Q. Okay. Do you want to go through all the pages of this as well before we answer any questions?



Page 120

A.   Yes.

Q.   Okay.

(Witness reviews document.)

A.   Okay.  You can go to the next page.

(Witness reviews document.)

A.   You can go to the next page on this.

(Witness reviews document.)

A.   Okay.  You can go to the next page.

(Witness reviews document.)

A.   Okay.  You can scroll down.

(Witness reviews document.)

A.   Okay.  You can scroll down.

(Witness reviews document.)

A.   All right.  This is all -- okay.  Scroll down.

Q.   (BY MR. KAPLAN)  Give me one second.

(Witness reviews document.)

A.   Okay.  Scroll to the next page.

(Witness reviews document.)

A.   Okay.  The next page.

(Witness reviews document.)

A.   All right.  Next page.

(Witness reviews document.)

A.   You cut off the top sentence.

Q.   (BY MR. KAPLAN)  No -- yeah, that's just the line, that's the first line.



Page 121

A.   All right.

(Witness reviews document.)

A.   Okay.  You can go to the next one.

(Witness reviews document.)

A.   Go to the next one.

(Witness reviews document.)

A.   All right.  Go to the next one.

(Witness reviews document.)

A.   All right.  Next page.

(Witness reviews document.)

A.   All right.  Scroll down.

(Witness reviews document.)

A.   Okay.

Q.   (BY MR. KAPLAN)  Okay.  Do you recognize this document?

A.   Yes.

Q.   What is -- what is this document?

A.   It looks like an amended complaint.

Q.   And was this -- this the amended complaint that was filed on your behalf in this litigation?

A.   On my behalf, yes.

Q.   What was the reason behind filing an amended complaint?

A.   You're asking for like the thoughts and discussions that went on behind the background with my


MAGNA
LEGAL SERVICES

Page 122

attorney?

Q.   I'm not asking for the discussions.  I'm asking for the reasoning for filing the amended complaint.

MR. ORTEGA:  I'm going to go ahead and object, attorney-client privilege.

Q.   (BY MR. KAPLAN)  Are you going to answer the question?

A.   No.

Q.   Okay.  I am going to put these side-by-side. So bear with me --

A.   Sure.

Q.   -- while I do that.

All right.  So now you should be seeing two PDF documents side-by-side document.  Are you with me?

A.   Yeah, I see them.

Q.   So on the -- on the left you can see here Exhibit 5, which is Plaintiff's Class Action Complaint. Do you see that?

A.   Yes, I see it.

Q.   And then on the right we have Exhibit 6, which is the First Amended Class Action Complaint.  Correct?

A.   Yes.

Q.   Okay.  So I just want to highlight some of the



Page 123

changes between the original complaint and the amended complaint.  So if we go to paragraph 9 of each, in the original complaint you say, (as read):  Defendant Sienna is in the business of offering financing to businesses.

Do you see that?

A.    I read that, correct.

(Witness reviews document.)

Q.    (BY MR. KAPLAN)  Okay.  And in the First Amended Complaint, that changes to:  Defendant offers financing services.  Do you see that?

A.    Yes, I see that.

Q.    What was the basis of this change?

MR. ORTEGA:  I'm going to object to attorney-client privilege.  I'm not going to discuss confidential communications with my attorney on what they did to amend a petition.

Q.    (BY MR. KAPLAN)  Are you going to answer the question?  I'm sorry.  I don't know if I heard an answer to that, Mr. Ortega.  Are you going to answer the question?

A.    That was a negative.

Q.    Okay.  If we go to paragraph 14, in the original complaint you stated, (as read):  Plaintiff registered his phone number on the Do-Not-Call registry more than 30 days prior to --



Page 124

I'm sorry.  This is actually -- okay.  So in paragraph 14 you say, (as read):  Plaintiff registered his phone number on the Do-Not-Call registry more than 30 days prior to receiving the calls at issue.

Do you see that?

A.   Oh, I can see that, yes.

Q.   Okay.  And then in the amended complaint that -- that paragraph has been changed to, (as read):  At all times material to this action, Plaintiff uses the cell phone with area code 210 and digits beginning with the digits 744 primarily for residential purposes.

First off, what do you consider the phrase "all times material" to mean with regards to this action?

A.   You're asking me to speculate on what my attorney put on here?

Q.   Well, this is your complaint, Mr. Ortega.

A.   This is submitted by -- drafted and submitted by prior counsel.

Q.   Did you have a chance to review this First Amended Complaint prior to its filing in this action?

A.   Did I have a chance to review it?  I mean, I can't recall at this time.

Q.   So you can't recall one way or the other whether or not you reviewed the First Amended Complaint



Page 125

that -- that you -- that your attorney filed in this action?

A.   I mean, I don't -- I don't recall at this time.

Q.   So are you saying there may be stuff -- allegations in this First Amended Complaint that -- that aren't true or that you have not verified?

MR. ORTEGA:  Objection to form.  That's leading.

Q.   (BY MR. KAPLAN)  Are you going to answer the question?

A.   Are you going to rephrase it?

Q.   No.  At this time, no.

A.   Okay.  Can you repeat the question?

MR. KAPLAN:  Ms. Staggs, do you mind repeating that back?

(Requested portion was read.)

A.   I'm not stating that at all.  I mean, subject to my objection I'm not stating that.

Q.   (BY MR. KAPLAN)  Okay.  So then do you have any independent basis to say what all times material to this action means in the context of this First Amended Complaint?

A.   I'm not going to go into the conversations with my attorney prior to the filing of this amended



Page 126

complaint.

                    MR. ORTEGA:  Again, objection to
attorney-client privilege.

    Q.    (BY MR. KAPLAN)  Mr. Ortega, I'm not asking
you about your conversations with your attorney.  I'm
asking you if you have an independent basis to determine
what the phrase "at all times material to this action"
means in the context of the First Amended Complaint.

    A.    The basis of my filing of this amended
complaint is based on the consultation with my attorney
and advice.

    Q.    And so -- so you don't have any independent
basis that's not based on conversations with your
counsel as to the term "at all times material" to this
action means?

    A.    This submitted is based on my consultation
with them and advice of them.  So, no, I don't have --
outside of what you're looking at as -- as basically the
result of those conversations.

    Q.    Okay.  Paragraph 15 of the First Amended
Complaint, it says (as read):  Plaintiff primarily
utilizes this number for personal calls, text messaging
with family and friends, and managing his personal
affairs.

                    Do you see that?



Page 127

A.   Yes, I see that.

Q.   And in the original complaint, paragraph 15 says, (as read):  Plaintiff uses his cell phone primarily for personal residential and household purposes.

Do you see that?

A.   Okay.

Q.   Do you have any independent basis to state why that change was made to paragraph 15 from the original to the First Amended Complaint?

A.   Independent basis?  No.

MR. ORTEGA:  And, again, objection to attorney-client privilege on why they recommended those changes.

Q.   (BY MR. KAPLAN)  I'm just asking for an independent basis, not in consultation with your attorney.

A.   Yeah, no, my representation is based on representation of my attorney.

Q.   Do you have any independent basis for the term "primarily" means in paragraph 15 of the First Amended Complaint?

A.   Again, same.  I don't have -- my representation is based on the representations of and advice of counsel.  So I can't --



Page 128

MR. ORTEGA:  It's objection to attorney-client privilege.

Q.   (BY MR. KAPLAN)  And you won't be answering the question?

A.   I just did.

Q.   And in paragraph 15 it says, (as read):  And managing his personal affairs.

What -- what are those personal affairs?

A.   What are my personal affairs?

Q.   Yes.  In the context of this paragraph, what are your personal affairs that are referred to in this paragraph 15?

A.   Anything having to do with personal matters.

Q.   Which would be...

A.   Anything having to do with personal affairs. I guess what do you -- what exactly are you looking for?

Q.   I'm just going through the language of your amended complaint, and I'm trying to get an understanding for my client as to what you mean by: managing his personal affairs.

A.   That could be anything of personal affairs. It could be medical.  It could be -- you know, anything having to do with personal.

Q.   And so this was primarily for managing your personal affairs, this -- this phone number?


MAGNA
LEGAL SERVICES

Page 129

A.   As it reads there, it says, (as read):   As primarily utilizes per- -- for -- number for personal calls, text messages with family and friends, and managing his personal affairs.

Q.   All right.  Let's go to paragraph 21.  One second.  I'm going to share my screen again.  Apologies for that.

A.   Okay.

Q.   All right.  So paragraph 18 in the original Complaint says, (as read):  Defendant used lead services to make initial contact with Plaintiff.

And then in paragraph 21 of the First Amended Complaint, which is not included in the initial complaint, it says, (as read):  Upon information and belief, Defendant transmitted nonworking number for caller ID.

Do you know what -- what that -- the allegation in that paragraph means?

A.   Do I know the alle- -- what's the question?  Do I know what the allegation -- what that -- it says, (as read): Upon information and belief, Defendant transmitted nonworking number for caller ID.

Q.   Yes.  So does that mean that -- that you looked at the caller ID when you received this call and it said nonworking number?



Page 130

A.    Is that the -- can you rephrase the question?
I mean, I feel like that was leading.  What was it?

Q.    Again, Mr. Ortega, there's no leading on a
deposition of an adverse party.

A.    What is -- what is the -- what was your
question?

Q.    I'm trying to get to the bottom of what you
mean in this paragraph 21 in the First Amended
Complaint.  So it says, (as read):  Upon information and
belief, Defendant transmitted nonworking number for
caller ID.

To me I'm not sure what that means, but
you're -- this is your First Amended Complaint, so I'm
asking you: What does that mean?

A.    I mean, I can't really get into the
conversations of why my attorney drafted -- how -- or
how we -- why we put certain things in here, the
reasonings behind these.

MR. ORTEGA:  Again, that's more objection,
attorney-client privilege.

A.    I do believe the text stands for itself.  (As
read):  Upon information and belief, Defendant
transmitted nonworking number for caller ID.

Q.    (BY MR. KAPLAN)  And so you don't have any
independent basis to tell me what this paragraph means?


MAGNA
LEGAL SERVICES

Page 131

A.   An independent -- I don't have an independent bas- -- my -- basically this draft here is based off of representations and conversations with my attorney, so...

Q.   And -- and -- and -- and you don't recall whether or not you reviewed this First Amended Complaint prior to filing?

A.   I don't recall if I reviewed the -- the -- you know, Amended Complaint before it was actually filed.

Q.   Do you know if Sienna Marketing uses lead services to make initial contacts with potential customers?

A.   You're asking me if Sienna uses lead services?

Q.   I'm asking: do you know if Sienna uses lead services to make initial contacts with -- with customers or perspective customers?

A.   I mean it's definitely plausible if you're using callers like that, so -- I mean, but that's -- without the benefit of discovery, I wouldn't be able to answer that question at this time.

Q.   So -- so you're not able to answer that question whether or not -- whether or not you know if Sienna uses lead services to make initial contact?

A.   That's definitely probable, yeah, so -- but I can't -- without the benefit of discovery, like I said,


MAGNA
LEGAL SERVICES

Page 132

at this time I would not know until that's flushed out.

Q. So as part of this litigation there's allegations that you received a call from somebody on behalf of Sienna Marketing, correct?

A. Correct.

Q. Okay. And do you know what the -- what business Sienna Marketing is in?

A. Offering financing.

Q. Okay. Had you ever sought financing on behalf of any of your businesses?

A. On any of my businesses? Ever?

Q. Yes.

A. Yes.

Q. Okay. What businesses had you previously sought financing?

A. That I can recall would be I think Evergreen Capital.

Q. Evergreen Capital. Do you recall approximately when you sought financing on behalf of Evergreen Capital?

A. Approximately? I don't recall -- I couldn't give an approximate date.

Q. Was it before March 7th, 2024?

A. It was before, yes.

Q. Okay. And who did Evergreen Capital seek


MAGNA
LEGAL SERVICES

financing from at that time?

A.    I believe one bank was Arvest Bank.

Q.    Can you spell that, please?

A.    A-R-V-E-S-T.

Q.    And what was the amount of financing sought by Arvest -- from Arvest Bank?

A.    Oh, I don't -- I don't recall the amount.

Q.    Did Evergreen Capital receive financing from Arvest Bank?

A.    Yes.

Q.    And you said this was on behalf of Evergreen Capital?

A.    Evergreen Capital.

Q.    And were you involved in discussions to obtain financing from Arvest Bank on behalf of Evergreen Capital?

A.    Yes.

Q.    How did you participate in those conversations?

A.    I believe -- how?  I guess can you be more -- or less vague and ambiguous.

Q.    I'm going to say that I don't appreciate the mischaracterization of my questioning as vague, ambiguous, but I can rephrase, Mr. Ortega.

You had conversations with people at



Page 134

Arvest Bank regarding financing for Evergreen Capital, correct?

A.    Correct.

Q.    Were those conversations in person?

A.    Some.

Q.    Okay.  For the conversations that weren't in person, how were those conversations conducted?

A.    Some through e-mail and some through phone.

Q.    Okay.  And the conversations through e-mail, what e-mail address did you use?

A.    I don't recall which e-mail.

Q.    How many e-mail addresses do you have currently?

A.    Currently?  I don't know the exact number.

Q.    More than two?

A.    More than two, yes.

Q.    Okay.  Let's start with those first two.  What are those two e-mail addresses?

A.    It would be mortega@utexas.edu.

Q.    And the second e-mail address?

A.    Would be mark@grovano.com.

Q.    Okay.  Any other e-mail addresses currently?

A.    Mark@maorealestate.com.

Q.    Any others?

A.    I think me@markanthonyortega.com.


MAGNA
LEGAL SERVICES

Page 135

Q.    Okay.  Any others?

A.    Marko9812@yahoo.com.

Q.    Okay.  Any others?

A.    Not that I can recall currently, no.

Q.    Okay.  And so the conversations with R bank [sic] -- between you and R bank [sic] -- between you on behalf of Evergreen Capital and R bank [sic], did those -- those e-mail conversations occur through one of those e-mail addresses?

A.    It was Arvest.  And I believe so.  It would probably be one of those e-mails.

Q.    Do you have any idea of which of those five e-mail addresses it would be?

A.    No.

Q.    Okay.  And you said that some of these conversations were in person.  Some were via e-mail, and some were via phone.  Okay.  Was this on -- were these conversations on your cell phone?

A.    Likely.

Q.    And that is the cell phone number ending in 9663?

A.    Yes.

Q.    So (210) 744-9663?

A.    Yes.

Q.    And is that because Evergreen Capital did not


MAGNA
LEGAL SERVICES

Page 136

have its own phone number?

A. Evergreen Capital? I mean that's not -- we've already talked about that. No, it's not. It's mischaracterizing what I said previously about Evergreen.

Q. Okay. So what did you say about Evergreen?

A. Well, you just went through it on the CallRail exhibit.

Q. Okay. But you believe that it's likely the calls were from your 9663 number?

A. They weren't -- the calls to my phone number 9663? Yes.

Q. Let's take a step back.

On the VOIP numbers -- strike that.

Okay. So your calls with R -- it's Arvest Bank, right?

A. A-R-V-E-S-T.

Q. Yes, Arvest. Your calls with Arvest Bank on behalf of Evergreen Capital, those, you said, were likely on your cell phone number ending in 9663, correct?

A. Correct.

Q. Okay. Did any of your other businesses ever seek or obtain financing?

A. Seek or obtain financing? Yes.



Page 137

Q.    Okay.  Explain one of those occasions.

A.    One of those occasions?

Q.    Yes.

A.    I guess what's the -- what's the question?
What information --

Q.    You just told me about Arvest -- about
Evergreen Capital's attempt to obtain financing from
Arvest Bank.  Okay?  I asked you for another example
because you said that there were others.  What is
another example of one of your businesses seeking or
obtaining outside financing?

A.    Another example -- I mean, are you looking --
is there any entity in particular or what's the...

Q.    Mr. Ortega, you are the one with the knowledge
of all of this.  We've gone through your five or six
other entities.  I'm not sure which one.  You said that
there were others.  So if you can just start with --
            Okay.  Let's start with MAO Real Estate.
How about that?  Has MAO Real Estate ever sought or
obtained outside financing?

A.    Yes.

Q.    Okay.  Who did -- was it -- was it just from
one entity or was it from multiple?

A.    Multiple entities, I believe.

Q.    Okay.  Let's go for the first one.  The first



Page 138

time that MAO Real Estate ever sought or obtained financing, who was that with?

A. First time? I don't recall.

Q. Do you recall the specifics of anybody that MAO Real Estate sought or obtained financing from?

A. Specifics as -- as into what type of specifics?

Q. The name of the entity, Mr. Ortega.

A. The name of the entity? Yeah.

Q. Okay. Please provide that to us.

A. Sure. One time from I believe Jody Welchans.

Q. Can you spell that?

A. Jody, J-O-D-Y.

Q. Yeah.

A. Welchans, W-E-L-C-H-A-N-S.

Q. Okay. Let's start with Jody. Ms. Welchans. Okay? Do you recall approximately when MAO Real Estate sought outside financing from Ms. Welchans?

A. Mr. Welchans.

Q. Mr. Welchans. Apologies to Mr. Welchans.

A. Yes, do I recall when?

Q. Approximately when.

A. Approximately when? Within the last ten years.

Q. And you can't give me any more specific than



within the last ten years?

A.   I mean, it had to be somewhere five to ten years.

Q.   Okay.  Who is Mr. Welchans?

A.   An individual.

Q.   How did -- how do you know Mr. Welchans?

A.   How do I know Mr. Welchans?  Through networking.

Q.   Okay.  And did MAO Real Estate obtain financing from Mr. Welchans?

A.   Yes.

Q.   How -- do you recall the amount of financing that mist- -- that MAO Real Estate obtained from Mr. Welchans?

A.   I don't recall the amount, no.

Q.   Do you recall approximately when MAO Real Estate obtained this financing from Mr. Welchans?

A.   Somewhere between, like, five to ten years ago probably.

Q.   Okay.  How did -- how did -- and were you the one in charge of communicating on behalf of MAO Real Estate with Mr. Welchans?

A.   Yes.

Q.   Okay.  How did you communicate on behalf of MAO Real Estate with Mr. Welchans?



Page 140

A.    In person, e-mail, phone.

Q.    When you communicated with Mr. Welchans via phone on behalf of MAO Real Estate, was that on your cell phone ending in the 9663?

A.    Yes.

Q.    Do you recall approximately how many times you communicated with Mr. Welchans about obtaining financing for MAO Real Estate on this phone line?

A.    No.

Q.    Okay.  You said that -- that MAO Real Estate sought financing from multiple individuals or entities. Mr. Welchans was one of them.  Do you recall the names of any of the other entities that MAO Real Estate sought or obtained financing from?

A.    Yes.

Q.    Okay.  Can you please tell me?

A.    Of another name?

Q.    Yes, Mr. Ortega.

A.    Sure.  Larry Hyden.

Q.    How do you spell that?

A.    L-A-R-R-Y, Larry.  And then Hyden I believe is H-Y-D-E-N.

Q.    All right.  And did MAO Real Estate obtain financing from Mr. Hyden?

A.    Yes.



Page 141

Q.   Do you recall the approximate amount of
financing that MAO Real Estate obtained from Mr. Hyden?

A.   No.

Q.   Do you recall when MAO Real Estate obtained
financing from Mr. Hyden?

A.   I don't have an exact date.

Q.   Do you know the approximate time that MAO Real
Estate obtained financing from Mr. Hyden?

A.   Somewhere probably five to ten years ago.

Q.   You can't nail it down any more specific than
five to ten years ago?

A.   No.

Q.   Okay.  How did you -- how -- and did you --
were you in charge of obtaining finance -- financing
from Mr. Hyden on behalf of MAO Real Estate?

A.   Yes.

Q.   Okay.  How did -- how did you first get in
touch with Mr. Hyden?

A.   I don't recall.

Q.   Do you recall if you knew him through --
through networking?  Through family and friends?

A.   I don't recall.

Q.   Okay.  And when discussing financing with
Mr. Hyden, how did you communicate with Mr. Hyden?

A.   The same.  Phone, in person, e-mail.



Page 142

Q.   And when you communicated with Mr. Hyden on the phone, was that on the 9663 number?

A.   Yes.

Q.   Okay.  And the communications with -- with Mr. Hyden, were those with regards to obtaining financing?

A.   What do you mean?

Q.   Well, typically when you're obtaining financing from somebody -- and I don't want to speak for you or out of turn -- is that -- that you need to come to an arrangement as to the terms.  How much money is going to be loaned, what the term -- what the interest rate is, what the repayment schedule is, et cetera.  So are those things that you discussed with Mr. Hyden?

A.   The terms of the -- of the loans?

Q.   Yes.

A.   Those were discussed.

Q.   Those were discussed with Mr. Hyden?

A.   Correct.

Q.   And that -- and was that discussed on the phone?

A.   I don't recall.

Q.   How many times, approximately, did you meet in person with Mr. Hyden?

A.   Several, but I don't recall.



Page 143

Q.   Okay.  And did you discuss -- is there any outstanding amount still due and owing to Mr. Hyden from MAO Real Estate?

A.   No.

Q.   Okay.  During the life of the financing arrangement, did you have conversations with Mr. Hyden about repayment of the loan?

A.   Did I have conversations about repayment? Could you be more specific?  What is -- what exactly about repayment?  Like...

Q.   I would believe, Mr. Ortega, that that would be self-evident about what it means to repay somebody that you took a loan out from.

A.   Well, obviously.  But are you talking about, like, pay off -- pay off -- like getting paid off or...

Q.   I'm -- I'm talking about all of it, Mr. Ortega.

A.   I mean, you probably need to be more specific. What exactly are you asking?  What's the question?

Q.   Did you have monthly conversations with Mr. Hayden about -- about interest -- monthly interest payments?

A.   I don't believe I had monthly conversations.

Q.   Did you have conversations with Mr. Hayden about monthly interest payments?



MAGNA
LEGAL SERVICES

Page 144

A.   Did I have conversations about monthly payments?

Q.   Yes.

A.   Did I have con- -- I mean, I would assume that would be in the terms in part of a conversation.  So at one point it had to be discussed.

Q.   Okay.  And do you recall if that -- that conversation occurred on the phone?

A.   No, I don't recall.

Q.   And when you had calls with Mr. Hayden, did you use any other phone number other than the 9663 number?

A.   I don't believe so.

Q.   And when you had calls with Mr. Welchans on the phone with regards to the financing for MAO Real Estate, did that occur on any number other than the 9663 number?

A.   I don't believe so.

Q.   Okay.  Besides Mr. Welchans and Mr. Hyden, did MAO Real Estate seek or obtain financing from any other person or entity?

A.   From any other person or entity?  Yes.

Q.   Okay.  Who -- who is that person or entity?

A.   Ruben Ortega.

Q.   And is that your father?



MAGNA
LEGAL SERVICES

Page 145

A.   Yes.

Q.   Okay.  Do you recall the amount of the financing that MAO Real Estate received from Mr. Ortega?

A.   No, I don't.

Q.   Do you recall if MAO Real Estate repaid the -- the monies advanced to MAO Real Estate to Ruben Ortega?

A.   Yes.

Q.   When were those monies repaid?

A.   I don't recall a date.

Q.   In the last five years?

A.   For MAO Real Estate?

Q.   Yes.

A.   I don't recall.  I don't -- I don't believe so in the last for MAO.

Q.   Did you have conversations with Ruben Ortega on the phone with regards to the financing obtained on behalf of MAO Real Estate?

A.   On the phone?  Probably, I would say.

Q.   Was that on the 9663 number?

A.   Yes.

Q.   Would there have been any other number that you would speak to mister -- Ruben Ortega with -- with regard to the financing for MAO Real Estate?

A.   No.

Q.   Okay.  Besides Mr. Ortega, Mr. Hyden, and


MAGNA
LEGAL SERVICES

Page 146

Mr. Welchans did MAO Real Estate seek or obtain financing from any other person or entity?

A.    MAO?  Yeah.

Q.    And -- and who is that person or entity?

A.    It's going to be a General Patrick Brady.

Q.    Patrick Brady?

A.    Yes.

Q.    And when -- and did MAO Real Estate obtain financing from Mr. Brady?

A.    2017 or 2019 -- somewhere between 2017 and 2019, approximately.

Q.    Okay.  And do you recall the amount of the financing obtained by MAO Real Estate from Mr. Brady?

A.    I believe it was 210,000.

Q.    And was this a factoring agreement?  Was this just a loan?  You know, a traditional loan.  What -- what -- what was this?

A.    I'm not sure of the question.  I don't even know what factoring is.

Q.    That's where you advance -- you know, a lender advances funds for, you know, accounts receivable.

A.    No, it was not.

Q.    Secured by accounts receivable.  Okay.

Did you have conversations with Mr. Brady on the phone with regards to the financing obtained by



Page 147

MAO Real Estate?

A.   No, I don't -- well, I guess I don't recall.
I'm not sure.

Q.   You're not sure.

Did you have conversations with Mr. Brady
via e-mail about obtaining financing on behalf of MAO
Real Estate?

A.   I don't think it was on e-mail.

Q.   Do you recall how you met MA- -- how you met
Mr. Brady?

A.   I met him at a listing or a showing.

Q.   And so you struck up a conversation there
about -- about financing for -- for your business?

A.   Correct.

Q.   And from that you obtained this $210,000 on
behalf of MAO Real Estate?

A.   Correct.

Q.   Has that been paid off?

A.   Yes.

Q.   And you don't recall if you ever had any --
any phone conversations with Mr. Brady about this --
this financing arrangement?

A.   I believe almost all is in e-mail.

Q.   And what e-mail address did you correspond
with Mr. Brady on?



Page 148

A. E-mail? Let's see. Probably the mark@maorealestate.

Q. Do you have any -- do you have a subject -- or I'm sorry. Do you have a signature line on your e-mails from the e-mail account at mark@maorealestate.com?

A. Do I? I guess what's the time frame you're asking?

Q. At the time you obtained financing from Mr. Brady, did you have a signature line for your e-mail mark@maorealestate.com?

A. I do not recall.

Q. And do you recall if that -- if, you know, if you had a signature line, if it would have included a telephone number?

A. I don't recall.

Q. Okay. Do you currently utilize the e-mail address mark@maorealestate.com?

A. Yes.

Q. Do you -- does that real- -- does that e-mail address currently have a signature line on outgoing e-mails?

A. It does not currently have a signature line.

Q. Has it previously had a signature line on outgoing e-mails?

A. I don't recall.



Page 149

Q.   You don't recall?

Did you produce e-mails from your e-mail account mark@maorealestate.com as part of this litigation?

A.   Yes, I did.

Q.   All right.  On behalf of MAO Real Estate, did it seek or obtain financing from anybody else besides the individuals that -- that we've just discussed?

A.   Yeah.

Q.   Okay.  And who is that next one?

A.   His name is Kevin Harrahill.

Q.   Can you lease spell his last name?

A.   H-A-R-R-A-H -- or H-I-L-L, Harrahill.

Q.   Okay.  And did MAO Real Estate obtain financing from Mr. Harrahill?

A.   Yes.

Q.   And were you in charge of obtaining the financing on behalf of MAO Real Estate for Mr. Harrahill?

A.   Yes.

Q.   Did you correspond with Mr. Harrahill via phone for this financing?

A.   I believe so.  Somewhat.

Q.   And was that on the number ending in 9663?

A.   Yes.



Page 150

Q.    Okay.  Besides Mr. Harrahill and the other ones that we've just gone through, did MAO seek or obtain financing from any other individuals or entities?

A.    Yes.

Q.    Okay.  Who is this next one?

A.    I believe her last name -- it's Katherine Straus.

Q.    All right.  And -- and I'm going to assume right now that -- that's Ms. Straus, but I'm been wrong in the past with Jody.  So you can -- you can correct me if I'm wrong, Mr. Ortega.  How about that?

A.    That's a good one.

Q.    Did MAO Real Estate obtain financing from Ms. Straus?

A.    Yes.

Q.    Okay.  Do you recall the amount of that financing?

A.    I don't recall the amount.

Q.    Okay.  And were you primarily in charge of obtaining that financing on behalf of MAO Real Estate for Ms. Straus?

A.    Yes.

Q.    Okay.  And did you communicate with Ms. Straus for that financing on the phone?

A.    I believe so.



Page 151

Q.   And that would be on the number ending in 9663?

A.   Yes.

Q.   And it wouldn't be any other number, correct?

A.   I don't believe so.

Q.   Okay.  Continuing on down this line of questioning.  Besides the individuals we just discussed, are there any other individuals or entities that MAO Real Estate sought or obtained financing from?

A.   Yes.

Q.   And who is the next one?

A.   It's going to be the IRA of Jill Greene.

Q.   And just going back.  How did you -- how did you meet Ms. Straus?

A.   Straus?

Q.   Yeah.  Yes.  If you didn't hear my answer, yes how did you meet Ms. Straus?

A.   Through a friend.

Q.   Do you recall who that friend was?

A.   Tommy Ray.

Q.   The same one from the Tommy partnership that -- that was listed in the CallRail?

A.   Yes.

Q.   Okay.  And how did meet Mr. Harrahill?

A.   Through an acquaintance.


MAGNA
LEGAL SERVICES

Page 152

Q.    Who is that acquaintance?

A.    Jody Welchans.

Q.    And how did you meet Ms. Greene?

A.    I've never met Ms. Greene.

Q.    And did MAO Real Estate obtain financing from Ms. Greene?

A.    Yes.

Q.    Okay.  And were you in charge of obtaining financing on behalf of MAO Real Estate from Ms. Greene?

A.    Yes.

Q.    And did you communicate with Ms. Greene regarding that financing on the phone?

A.    No.

Q.    How did you communicate with Ms. Greene for that financing?

A.    I did not communicate with Ms. Greene.

Q.    Who did you contact on behalf of Ms. Greene for that financing for MAO Real Estate?

A.    Rick Greene.

Q.    And did you communicate with Mr. Greene on the phone with regarding -- with regards to the financing obtained on behalf of MAO Real Estate?

A.    Yes.

Q.    And was that on the number ending in 9663?

A.    Yes.



Page 153

Q.   And it wouldn't have been on any other phone number?

A.   No, I don't believe so.

Q.   Okay.  Continuing on the MAO Real Estate. Besides those individuals that we've already gone through, did MAO Real Estate seek or obtain financing from any other individual or entity?

A.   Yes.

Q.   Okay.  And who is the next one?

A.   Steven Johnson.

Q.   And did MAO Real Estate obtain financing from Mr. Johnson?

A.   Yes.

Q.   Were you in charge of obtaining financing for MAO Real Estate on behalf of Mr. Johnson?

A.   Yes.

Q.   Or on -- yes, from Mr. Johnson.

So I think my question was confusing, so I can rephrase that, Mr. Ortega, if you --if you would like.

A.   Sure.

Q.   Were you in charge -- for MAO Real Estate were you in charge of obtaining financing from Mr. Johnson?

A.   Oh, Mr. Johnson, yes.

Q.   Okay.  And did you communicate with


MAGNA
LEGAL SERVICES

Page 154

Mr. Johnson on the phone with regards to that financing?

A. I don't believe so.

Q. How did you communicate with Mr. Johnson for that financing?

A. Predominantly in person and e-mail.

Q. How did you know Mr. Johnson?

A. Through an acquaintance.

Q. Which acquaintance?

A. Acquaintance's name was Rick Greene.

Q. And how did you know Mr. Greene?

A. Rick Greene, I don't know how I met him. I don't recall.

Q. And so the financing arrangements that we're speaking of, is that just money -- un-secured money lent to MAO Real Estate or are these investors coming in with -- with MAO Real Estate to purchase properties?

A. I guess that's two questions. Can you ask individually?

Q. Okay. Well, what -- what -- what -- what was the nature of -- of all of these -- of all of this financing? What was MAO Real Estate raising money for?

A. Properties.

Q. And so would MAO Real Estate own these properties in conjunction with other -- other people?

A. In conjunction, no.



Page 155

Q.   Or are these more in lines of a purchase money mortgage for -- for these properties?

A.   Purchase money mortgage.

Q.   Okay.  When you communicated with Mr. Johnson about -- about his financing to MAO Real Estate, you said that it was primarily in person and e-mail.  What e-mail address did you use to communicate with Mr. Johnson?

A.   Probably MAO Real Estate.

Q.   The mark@maorealestate.com?

A.   Yes.

Q.   Okay.  Other than the individuals that we've already spoken about, did MAO Real Estate seek or obtain financing from any other individuals or entities?

A.   Let's see, yeah.

Q.   And who would that be?

A.   It would be Dennis Wenzel.

Q.   Can you spell his last name, please?

A.   W-E-N-Z-E-L.

Q.   And did MAO Real Estate obtain financing from Mr. Wenzel?

A.   Yes.

Q.   How -- how did you become acquainted with -- acquainted with Mr. Wenzel?

A.   Through an acquaintance.



MAGNA

LEGAL SERVICES

Page 156

Q.    And who is that acquaintance?

A.    That was through Kevin Harrahill.

Q.    And did you communicate directly with Mr. Wenzel on behalf of MAO Real Estate?

A.    Yes.

Q.    And how did you communicate with Mr. Wenzel?

A.    E-mail and phone.

Q.    What e-mail address did you use to communicate with Mr. Wenzel?

A.    I believe MAO Real Estate.

Q.    And when you communicated with Mr. Wenzel via phone with regards to this financing, was that on your cell phone number ending in 9663?

A.    Yes.

Q.    And do you have any reason to believe that you used any other numbers besides that 9663 number?

A.    Do I have any reason?  No, I don't.

Q.    Okay.  Besides all these individuals and entities, are there any others that MAO Real Estate sought or obtained financing from?

A.    Through -- yeah.

Q.    And who is that person or entity?

A.    It's Jessica.  I don't know her last name.

Q.    And how did you become acquainted -- acquainted with Jessica?



Page 157

A.   I've just known her for -- for a while.

Q.   But you don't recall her last name?

A.   No.

Q.   And did MAO Real Estate obtain financing from this Jessica?

A.   Yes.

Q.   And were you primarily responsible for discussing that financing with Jessica on behalf of MAO Real Estate?

A.   Was I primarily responsible for discussing on behalf?  Yes.

Q.   Okay.  And how -- how did those conversations occur?

A.   I believe phone, yeah.

Q.   And when you communicated with Jessica on the phone, was that on the 9663 number?

A.   Yes.

Q.   And no -- no other number?

A.   No.

Q.   Do you know Jessica's phone number?

A.   No, I don't recall.

Q.   Do you know Dennis Wenzel's phone number?

A.   I don't recall.

Q.   Do you know Steven Johnson's phone number?

A.   I also don't recall off the top of my head.



Page 158

Q.   Do you know Rick Green's phone number?

A.   I do not recall off the top of my head.

Q.   Do you know Katherine Straus's phone number?

A.   No, I don't recall.

Q.   Do you know -- do you know Kevin Harrahill's number?

A.   Kevin's?  I don't recall it off the top of my head.

Q.   Do you know Patrick Brady's phone number?

A.   No, I don't recall Patrick's phone number.

Q.   Do you know Ruben Ortega Senior's phone number?

A.   Yes.

Q.   And what's his phone number?

A.   (915) 252-5325.

Q.   Do -- do you know Larry Hyden's phone number?

A.   Larry?  No, I don't recall his phone number.

Q.   Do you know Jody Welchans' phone number?

A.   Jody's number?  No, I don't recall Jody's off the top of my head.

Q.   Okay.  Besides all of those individuals, did MAO Real Estate seek or obtain financing from any other individual or entity?

A.   Let me think.  I believe so.

Q.   Okay.  And who is that?



A.   I want to say it was Tommy Ray.

Q.   Okay.  And when did MAO Real Estate seek or obtain financing from Mr. Ray?

A.   I don't recall that.  I don't have an exact date.

Q.   Approximately when?

A.   Approximately five to ten years ago.

Q.   You can't nail it down any -- any -- without any more specificity than that?

A.   Not at this time.

Q.   Was this with regard to a specific property?

A.   I believe so.

Q.   What's the address of that property?

A.   I don't recall which property.

Q.   And when speaking with Mr. Ray, did you speak with Mr. Ray on behalf of MAO Real Estate?

A.   Yes.

Q.   And did you speak with Mr. Ray on the phone?

A.   Have I spoken to him on the phone?

Q.   With regards to obtaining financing on behalf of MAO Real Estate.

A.   That actually I do not recall.

Q.   Have you spoken with Mr. Ray on the phone for any purpose?

A.   Yes.



Page 160

Q.   And was that on the 9663 number?

A.   Yes.

Q.   And mister -- and you were involved in some marketing efforts with Mr. Ray?

A.   Yes.

Q.   Okay.  Going -- going back for -- for -- for Jessica -- for the financing from Jessica, was that with regard to a specific property?

A.   Yes.

Q.   Do you recall the address for that property?

A.   I do not.

Q.   The same questions for Mr. Wenzel.

A.   In regards to -- I mean, you want to ask the question?

Q.   Yes, Mr. Ortega.  Did MAO Real Estate obtain financing from Mr. Wenzel with regard to a specific property?

A.   With regards to a specific property, yes.

Q.   What's the -- what's the address for that property?

A.   I don't recall.

Q.   Did MAO Real Estate obtain financing from Mr. Johnson with regard to a specific property?

A.   Yes.

Q.   What's the address of that property?



Page 161

A.    I don't recall.

Q.    Did MAO Real Estate obtain financing from the IRA of Jill Greene with regards to a specific property?

A.    Yes.

Q.    What's the address of that property?

A.    That I also do not recall.

Q.    Did MAO Real Estate obtain financing from Ms. Straus with regards to a specific property?

A.    To a specific property, yeah.

Q.    What's the address for that property?

A.    Also I don't recall.

Q.    Did MAO Real Estate seek -- obtain financing from Mr. Harrahill with regards to a specific property?

A.    Yes.

Q.    Do you recall the address of that property?

A.    I believe he did 1507 Golden Wing.

Q.    1507 what?

A.    Golden Wing.

Q.    Isn't that your previous residential address?

A.    Correct.

Q.    What was MAO Real Estate's involvement with -- with -- with your previous residential address?

A.    In what way?  What's the question?

Q.    Did MAO Real Estate own that property?

A.    At that time or what time are you requesting?



Page 162

Q. When you -- when you lived there, Mr. Ortega.

A. When I lived there, I don't believe so.

Q. After you lived there did Golden -- did MAO Real Estate own that property?

A. I don't think so.

Q. So it was before you lived there that MAO Real Estate owned that property?

A. Yes, I believe so.

Q. Who owned that property when you lived there?

A. I owned that property when I lived there.

Q. Individually?

A. I believe so.

Q. You don't recall how you owned property?

A. I've owned several properties.

Q. I know, but you're saying you believe so. If I had -- when I own property, I know how I own it. You're saying you believe so. Yes or no, did you own that Golden Wing property individually?

A. Depends on how much property you own.

Q. No. If you live somewhere, Mr. Ortega, a strange credulity, and you don't know how -- don't speak over me. You need to let me finish and we can keep going.

A. You keep interrupting me.

Q. We can do this civilly, Mr. Ortega, or -- or


MAGNA
LEGAL SERVICES

Page 163

it can devolve. I don't want it to devolve, but I'm asking you what should be a simple question. Okay?

A. And I'm giving you an answer that you are not happy with.

Q. No, you're not -- you're not giving me an answer. You're saying I believe so.

A. I believe so.

Q. And so you're sitting here today and you cannot recall that a property that you lived in, what the specific ownership structure was?

A. Correct.

Q. Okay. Thank you, Mr. Ortega.

Did MAO Real Estate obtain financing from Mr. Brady with regards to a specific property?

A. Yes.

Q. Do you recall what that property address is?

A. That one was 205 Winter Frost.

Q. Winter Frost?

A. Cibolo, Texas.

Q. What -- in what -- in what city?

A. Cibolo.

Q. Can you spell that?

A. C-I-B-O-L-O.

Q. Texas. Okay.

Did MAO Real Estate obtain financing from



MAGNA
LEGAL SERVICES

Page 164

Mr. Ruben Ortega with regards to a specific property?

A.  Yes.

Q.  And what -- what was that property address?

A.  It was 269 West Mayfield, San Antonio, Texas.

Q.  Did MAO Real Estate obtain financing from Mr. Hyden with regards to a specific property?

A.  Yes.

Q.  What was the address for that property?

A.  I don't recall the specific address.

Q.  And did MAO Real Estate obtain financing from Mr. Welchans with regards to a specific property?

A.  Yes.

Q.  And what was the address for that property?

A.  The address -- I don't recall the address.

Q.  Do you recall Tommy Ray's phone number?

A.  Do I recall it?  Not off the top of my head.

Q.  Besides all these individuals, are there any -- and entities are there any other individuals or entities that MAO Real Estate sought or obtained financing from?

A.  Let me think.  Yes.

Q.  Who is that individual or entity?

A.  I believe her name is -- full name Trinette Wanyeung.

Q.  Can you spell that?



Page 165

A.   T-R-I-N-E-T-T-E.  W-A-N-Y-E-U-N-G.

Q.   All right.  And I'm assuming that's Ms. Wanyeung?

A.   Yes.

Q.   Okay.  And did MAO Real Estate obtain financing from Ms. Wanyeung?

A.   Yes.

Q.   And was that with regards to a specific property?

A.   Yes.

Q.   And what's the address for that property?

A.   I don't recall.

Q.   Were you in charge of discussing this financing on behalf of MAO Real Estate with Ms. Wanyeung?

A.   Yes.

Q.   And did those conversations occur over the phone?

A.   Partially.

Q.   And was that on the number ending in 9663?

A.   Yes.

Q.   Any other number that you would have contacted Ms. Wanyeung from?

A.   No.

Q.   All right.  I want to keep asking about these,


MAGNA
LEGAL SERVICES

Page 166

but do want to be cognizant of everyone's needs.  I know we're getting towards lunchtime.  So I think it's probably appropriate to take a 30 or 35 minute break for -- for -- for everybody at this time and then we can get back into it.

MR. ORTEGA:  All right.

James, what are we at for time?

THE VIDEOGRAPHER:  Let me take us off the record and I'll let you know.

This will mark the end of Media Number 3.  We're going off the record.  It is 1:02 p.m.

(Recess held, 1:02 p.m. to 1:37 p.m.)

THE VIDEOGRAPHER:  This will mark the beginning of Media Number 4 in our deposition of Mark Anthony Ortega.  We're going back on the record.  The time now is 1:37 p.m.

Q.  (BY MR. KAPLAN)  Mr. Ortega, welcome back.  Did you speak to anybody on the break just now during this deposition?

A.  No.

Q.  Okay.  So we were just going through some individuals and entities that had provided financing to MAO Real Estate.  And I guess we can continue there.  Besides the ones we've already identified, are there any other, individuals or entities, that MAO Real Estate



Page 167

sought or obtained financing from?

A.    Tell me or recall -- can you give me ones that I've already stated?

Q.    Trinette Wanyeung.  Tommy Ray.  Jessica, unknown last name.  Dennis Wenzel.  Steven Johnson.  The IRA of Jill Greene.  Katherine Straus.  Kevin Harrahill.  Patrick Brady.  Ruben Ortega.  Larry Hyden and Jody Welchans.

A.    Okay.  So you went a little too fast.  The last one I got was Jessica.

Q.    Jessica, unknown last name.  Dennis Wenzel.

A.    Dennis, okay.

Q.    Steven Johnson.

A.    All right.

Q.    The IRA of Jill Greene.

A.    All right.

Q.    Katherine Straus?

A.    All right.

Q.    Kevin Harrahill.

A.    All right.

Q.    Patrick Brady.

A.    Okay.

Q.    Larry Hyden.

A.    All right.

Q.    And Jody Welchans.



MAGNA
LEGAL SERVICES

Page 168

A.    Jody, okay.

Q.    So besides those, are there any other individuals or entities that MAO Real Estate sought or obtained financing from?

A.    Let's see.  Probably -- yeah, I think so.

Q.    Okay.  And who would that be?

A.    Nora Delarosa.

Q.    Can you spell the last name?

A.    D-E-L-A-R-O-S-A.

Q.    And did MAO Real Estate obtain financing from Ms. Delarosa?

A.    Yes.

Q.    And were you primarily responsible for discussing that financing with Ms. Delarosa?

A.    Yes.

Q.    And did those conversations occur on the phone?

A.    On the phone?

Q.    Yes.

A.    I believe so.

Q.    And that's the number ending in 9663?

A.    Yes.

Q.    And would you have communicated with her over the phone on any other number?

A.    I don't think so.



Page 169

Q.    Do you recall the amount of the financing obtained by Ms. Delaro- -- obtained from Ms. Delarosa?

A.    No.

Q.    And was this financing with regard to a specific property?

A.    Yes.

Q.    And do you recall the address for that property?

A.    The address?  No, I don't recall the specific address.

Q.    Okay.  And besides those -- those individuals, including Ms. Delarosa -- Delarosa, were there any other individuals or entities that MAO Real Estate sought or obtained financing from?

A.    Let me think.  Not that I can recall at this time.

Q.    Okay.  And just switching gears for a second before we dive back in here.  Earlier we were talking about invoices sent to you from one of your attorneys, Brian Dennis.

A.    Yeah.

Q.    We would ask that those invoices be produced in redacted form.  You can redact the narratives to -- to block out any attorney-client privilege information, but we believe that the dates and the timing of -- of



MAGNA
LEGAL SERVICES

Page 170

those entries are -- are relevant here.  And so we would ask that those be produced as part of this litigation.

A.    You can request, yeah.

Q.    Well, I'm asking as part of this deposition.

A.    Yeah, as part of this deposition.  I mean, you're going to have to request that in discovery for production.

Q.    Are you going to object to the production of that?

A.    Yes.

Q.    On what grounds?

A.    Attorney-client privilege.

Q.    Well, if they're redacted, we don't believe that that's a relevant ground.  So we do request those.  And if you're going to be objecting, then we can take the appropriate action with the Court.

A.    Okay.

Q.    Okay.  So we went through MAO Real Estate.  Now let's go through Grovano.  Did Grovano ever seek or obtain financing from any individuals or entities?

A.    Did Grovano ever obtain from individuals or entities financing?  Yes.

Q.    Okay.  And who -- who would that be?

A.    Let's see.  For Grovano?  It would be American Express.



Page 171

Q.   And were you responsible for interfacing with American Express on behalf of Grovano for this financing?

A.   Was I responsible for interfacing with them? For...

Q.   Yes.

A.   Main contact?

Q.   With any contact with regards to -- to obtaining the financing from American Express.

A.   Yes, I was in contact with them.

Q.   On behalf of Grovano?

A.   On -- yeah, for Grovano.

Q.   And how did those communications occur?

A.   Through the website.

Q.   Did you participate in any calls with American Express?

A.   Yes.

Q.   What -- what phone number did you call from to American Express with regards to this financing?

A.   What phone number did I recall?  I don't recall there --

Q.   Or -- or were you called?

A.   On what phone number was I called?

Q.   Yes.

A.   The -- the 9663 and then the warehouse number.



MAGNA
LEGAL SERVICES

Page 172

Q.    Did you -- did you receive statements from American Express for this financing on behalf of Grovano?

A.    Did I receive a statement?  Yeah, I received a statement from them.

Q.    We would ask that those statements also be produced as part of this litigation.

MR. ORTEGA:  I'm going to -- I guess I'm going to object for relevance also on that.

Q.    (BY MR. KAPLAN)  Did those -- we don't think that's a valid basis for -- for an objection here.  I mean, especially -- did those invoices -- I mean, it's hard to -- hard to ask the questions without the invoices.  But did those invoices, were they addressed to you Mr. Ortega?

A.    I don't recall.

Q.    Did those invoices contain your phone number ending in 9663?

A.    I don't recall as well.

Q.    Okay.  I mean, that's why we're asking for -- for those records as part of this deposition and in discovery.  And you are objecting to that?

A.    Correct.

Q.    Okay.  Besides American Express, did Grovano seek or obtain financing from any other individual or



Page 173

entity?

A.   From any individual or entity?  Did it obtain -- yes.

Q.   And who was that?

A.   From Mark Ortega, myself.

Q.   What was the amount of financing you provided to Grovano?

A.   50,000.

Q.   And that was financing?  That wasn't equity?

A.   No, that was financing.

Q.   And did Grovano pay that loan back to you?

A.   Partially.

Q.   Is Grovano still operating?

A.   It's in wind down.

Q.   Do you expect Grovano to pay back the rest of the $50,000 to you?

A.   Probably not.

Q.   Approximately how much is left on the $50,000 that's unpaid?

A.   I don't recall.

Q.   You don't recall how much is owed to you personally from your business?

A.   I don't have an exact amount for you.

Q.   What's the approximate value?

A.   I don't have the approximate value without



Page 174

pulling up the...

Q.    Okay.  Did -- okay.  So besides -- besides American Express and you, did Grovano seek or obtain financing from any other individual or entity?

A.    Yes.

Q.    Who is that?

A.    That would be -- let's see.  Square.

Q.    And did you participate in communications with Square regarding this financing for Grovano?

A.    Did I participate in communications?

Q.    Yes.

A.    I don't believe I've spoken with anybody with -- from Square.

Q.    Did you have any kind of communications, whether written or oral, with anybody at Square regarding the financing for Grovano?

A.    I don't think -- I don't think it was -- not that I can recall.

Q.    So how -- how did it come about that -- that Grovano sought this financing from Square?

A.    Application.

Q.    And how did you send that application?

A.    It was through the app.

Q.    And how did you access the Square app?

A.    I believe through my computer.



Page 175

Q. The Square app -- you have a Square app on your computer?

A. There's a -- on the tablet too.

Q. Do you have -- you have a tablet?

A. Yes.

Q. Is that tablet connected to a mobile device -- a mobile phone number?

A. No.

Q. Did you -- were you able to access the Square app from your mobile phone ending in 9663?

A. Am I able to?

Q. Yes.

A. It's possible, yes.

Q. Do you access the Square app from your mobile device ending in 9663?

A. Currently?

Q. Currently, Mark. And then we'll go through every month if we need to. We're here for seven hours, but I promise you we could be here for more when we bring to the Judge your delay tactics, Mr. Ortega. So whenever you want to be done with the rest of your day, we can -- we can do that, Mr. Ortega, or you can play games. Either way we're going to answer the questions that I'm asking.

A. I'm not playing -- I mean, your prioritizing


MAGNA
LEGAL SERVICES

Page 176

of what you want to ask during -- that's your prerogative. I'm just trying to clarify and make sure that, you know, there's no ambiguity in the answer.

Q. Mark, do you currently use the Square app on your mobile device ending in 9663?

A. No, I don't currently use it.

Q. Have you ever utilized the Square app on your mobile device ending in 9663?

A. Yes.

Q. When was the last time you utilized the Square app on your mobile device ending in 9663?

A. I don't recall an exact date.

Q. Approximately when was the last time you utilized the Square app on your mobile device ending in 9663?

A. Approximately a year or two.

Q. For what purpose did you access the Square app on your mobile device ending in 9663?

A. For what purpose?

Q. Was it in connection with Grovano?

A. It would have been in connection with Grovano.

Q. Would it have been in connection with MAO Real Estate?

A. No.

Q. Would it have been -- been in connection with


MAGNA
LEGAL SERVICES

Page 177

any of your other businesses?

A.   No, it wouldn't have been.

Q.   Okay.  Besides Square, besides Amex, and besides yourself, did -- did Grovano seek or obtain financing from any other individual or entity?

A.   Yes.

Q.   And who is that?

A.   Trinette.

Q.   Trinette Wanyeung?

A.   Yeah.

Q.   And how did you connect Ms. Wanyeung on behalf of Grovano?

A.   You're -- that's assuming facts.  I mean, you're assuming facts in evidence that I assumed on behalf of it.  Do you want to, like, ask the question again?

Q.   Mr. Ortega, did you contact Ms. Wanyeung on behalf of Grovano?

A.   Did I contact her on behalf of Grovano?

Q.   Yes.

A.   Yes.

Q.   Okay.  When you contacted her on behalf of Grovano, how did those conversations occur?

A.   On the phone.

Q.   And that's the phone ending in 9663?



MAGNA
LEGAL SERVICES

Page 178

A.   That is correct.

Q.   Okay.  Besides Ms. Wanyeung, Square, Amex, and yourself is there anybody else that Grovano sought or obtained financing from?

A.   Let's see.  Amex, Square, Trinette.  Yeah.  Yes.

Q.   Okay.  Who is that?

A.   That would be Dennis.

Q.   Okay.  Before we go on, let's list them all out right now.  Dennis.  Who else?

A.   I mean, you're assuming there's anoth- -- let me think about that.  You're assuming there's...

Q.   Okay.  Please list every single other person, besides the ones you've already listed, who Grovano sought or obtained financing from.

A.   There's another one, Shopify.  And that's -- that's the best I can recall.

Q.   Okay.  Dennis -- do you remember his last name?

A.   Wenzel.

Q.   And did you speak with Mr. Wenzel on behalf of Grovano, Inc. with regards to this financing?

A.   There's two questions in there.  In regards to financing and speaking on behalf of Grovano.  Do you want to ask each individual?



Page 179

Q.    No, that's one question, Mr. Ortega.

A.    Okay.

        MR. ORTEGA:  Then you're assuming facts in evidence.

Q.    (BY MR. KAPLAN)  Are you going to answer the question, Mr. Ortega?

A.    Are you going to rephrase it?

Q.    No, Mr. Ortega.  You can answer the question as asked.

A.    Okay.

        MR. ORTEGA:  Well, objection for that. Fact -- assumes facts in evidence, compound.

A.    And yes.

Q.    (BY MR. KAPLAN)  Okay.  And did you communicate with Mr. Wenzel on -- on the phone?

A.    Yes, I did.

Q.    And that's the number ending in 9663?

A.    Yes.

Q.    All right.  And when you sought financing on behalf of Grovan- -- Grovano from Shopify, did you submit an application to Shopify for that financing?

A.    That is correct.

Q.    How did you submit that application?

A.    Through the application.

Q.    Was this a paper application?  Is this on --


MAGNA
LEGAL SERVICES

Page 180

online?

A.    Online.

Q.    Did you submit this on -- on your phone?  On your computer?  On your tablet?

A.    I don't recall.

Q.    So it could have been on your phone?

A.    Could have, but I don't recall.

Q.    And that would be the phone ending in 9663?

A.    Yes.

Q.    Okay.  With regards to Evergreen Capital, did Evergreen Capital seek or obtain financing from any individual or entity?

A.    Evergreen Capital?

Q.    Yes.

A.    Yeah, it did.

Q.    All right.  And who -- and who would that be?

A.    Let's see.  Evergreen got it from Arvest.

Q.    Anybody else besides Arvest?  You can list them all.

A.    Lets see.  Arvest.  Citi National Bank.

Q.    Okay.

A.    I think I -- Jill Greene.  And then who else? Steven Johnson.  Larry Hyden.  And I think that's probably -- from what I can recall.

Q.    Okay.  So I think we already went through



Page 181

Arvest. With regards to Citi National Bank, were you in charge of communicating with Citi National Bank for obtaining the financing for -- for Evergreen Capital?

A.   Yes.

Q.   Okay. And how did those communications occur?

A.   How? E-mail. Phone. In person.

Q.   What e-mail address did you use to correspond with Citi National Bank?

A.   I don't recall which one I used.

Q.   Did you have an e-mail address for Evergreen Capital?

A.   I don't believe so.

Q.   Do you recall what e-mail address you normally used when conducting business on behalf of Evergreen Capital?

A.   I don't recall.

Q.   Okay. For the phone, is that -- when you communicated with Citi National Bank on Evergreen Capital, was that on the number ending in 9663?

A.   What was the question?

Q.   On the phone -- when you communicated with Citi National Bank on behalf of Evergreen Capital, was that on the phone number ending in 9663?

MR. ORTEGA: Assuming facts not in evidence.





Page 182

Q.   (BY MR. KAPLAN)  You said -- you -- I'm sorry, Mr. Ortega.  But you said you communicated via e-mail, the phone, and in person.  So I'm not sure what facts you are assuming are not -- are not in evidence there.

A.   You're assuming on behalf of.

Q.   You said that you were the one in charge of obtaining the financing from Citi National Bank.  So was there somebody else that was communicating on the phone with Citi National Bank for Evergreen Capital?

A.   No.

Q.   Okay.  So I will repeat my question.  When you communicated with Citi National Bank with regards to the financing for Evergreen Capital on the phone, was that on the number ending in 9663?

A.   When I communicated with Citi National bank --

Q.   Yes.

A.   -- with my phone number ending in 9663.

Q.   Are you going to answer the question, Mr. Ortega?

A.   What was the question?

Q.   I've repeated it twice now, Mr. Ortega.

A.   What's the question?

Q.   When you communicated on the phone because -- let's take a step back.

          You told me you communicated with Citi



Page 183

National Bank on behalf of Evergreen Capital on the phone, e-mail, and in person, correct?

A.    You're mischaracterizing my testimony.  You asked when I communicated with them, how was it?  And I said phone, e-mail, in person.

Q.    And so -- but are you contacting Citi National Bank not on behalf of Evergreen Capital?

A.    I mean, there was multiple times I contacted Citi National Bank.

Q.    And so you never contacted them on behalf of Evergreen Capital in an attempt to obtain financing from Citi National Bank?

A.    Yes, but that's what you -- you didn't ask that question earlier, right?  You were stating it in a different format.

Q.    So in those conversations on the phone, was that on the number ending in 9663?

A.    I did have contact with Citi National Bank with my phone number ending in 9663.

Q.    You did?

A.    I did.

Q.    Thank you.

Mr. Ortega, this will go much more smoothly if you just answer the questions that I ask you.


MAGNA
LEGAL SERVICES

Page 184

A.    It's the questions.  They're just -- the way you're asking.  I'm just trying to give you -- help me help you.

Q.    Whatever you say, Mr. Ortega.

For Jill Greene, I believe that you had said you previously never spoken with Ms. Greene when you were obtaining financing on behalf of MAO Real Estate.  Was that the same for when you were seeking financing on behalf of Evergreen?

A.    You're mischaracterizing my prior testimony saying it was on behalf of MAO Real Estate and so --

Q.    I'm not.  We can go back -- and I'm sure I'm going to have to go back when we -- when we file whatever motion we need to, Mr. Ortega.  So I will -- I will ask the question.

A.    Okay.  Ask it.

Q.    Did you contact Jill Greene with regards to obtaining financing for Evergreen Capital?

A.    Did I contact Jill Greene?  No.

Q.    Did you contact her husband with regards to obtaining financing for Evergreen Capital?

A.    I don't know if that's her husband, so no.

Q.    Did you contact Rick Greene with regards to obtaining financing for Evergreen Capital?

A.    I did contact Rick Greene.



Page 185

Q.   Was that on the phone?

A.   I believe it was.

Q.   And was that on the number ending in 9663?

A.   Probably.

Q.   Probably?  Would it have been any other number?

A.   It could have been via e-mail, but I'm pretty sure it would have been on the phone.

Q.   No, we're talking about the phone.  You said these conversations did occur on the phone.  So -- so I'm trying to nail down what number that was.  So if it wasn't -- if you're saying probably 9663, I'm asking you what other number could it have been?

A.   It wouldn't have been from another number.

Q.   Okay.  Thank you.  That was the question that I asked, Mr. Ortega.  I appreciate that.

We're going to go back to Exhibit 6.  All right.  Let me know when you can see it.

A.   Yeah, I can see it.

Q.   Okay.  Do you know who Vincent Palazzo is?

A.   Do I know him personally?  No.

Q.   Have you ever had any conversation with Vincent Palazzo?

A.   Presumed to be Vincent.

Q.   What do you mean by presumed to be Vincent?



Page 186

A.    I mean, that's what he represented.

Q.    So have you had a conversation with Mr. Palazzo?

A.    Who I believe to be Mr. Palazzo, yes.

Q.    Do you have any reason to believe that it wasn't Mr. Palazzo?

A.    Given that people always give fake names and spoof phone numbers, I mean, there's a decent probability it might not -- it might not be him.

Q.    What do you mean by people -- what do you mean by people always give fake names?  Do you continually --

A.    Oh, the SPAM callers.  Like --

Q.    Can I finish the question, Mr. Ortega?

      What do you mean by people always give fake names?  Do I take that to mean that you give fake names when you're talking to people on the phone?

A.    You're mischaracterizing my testimony.

Q.    I'm not.  Can you answer the question?

A.    I mean, you're mischaracterizing the testimony.  So --

Q.    And will you answer the question, Mr. Ortega?

      MR. ORTEGA:  Yeah, I was just going to object to that and mischaracterization of the testimony.

A.    But, no, yeah.  I mean, your client and a lot of these other SPAM callers when they harass people on



Page 187

telephone marketing calls, they give fake names, fake numbers.  So it's safe to assume that there's a good probability it may or may not be that person just because they state that name.  So that's what was represented to me, and that's what -- I mean, at this point it's probably him, but...

Q.   But you have no reason to know one -- but you have no reason to know one way or the other whether or not Mr. Palazzo was giving you a fake name on the phone, correct?

A.   Correct.  I don't have -- without discovery, I don't know the actual identity of the callers.

Q.   Do you recall what was said on your conversation with this Mr. Palazzo?

A.   Not at this time, no.

Q.   Are you aware that your couns- -- your previous counsel Ms. Almanza was sent a recording of your con- -- conversation with Mr. Palazzo?  And she -- she received that recording on April 13th, 2024.

A.   Do I recall it?

Q.   Yeah.

A.   Yes.

Q.   Did Ms. Almanza share that recording with you?

A.   Yes.

Q.   And did you listen to it?



Page 188

A.   I believe I have at one point.

Q.   Okay.  I am going to play what's been marked as Exhibit 7.  We can listen to it through, and then we can ask some questions about it.

A.   Okay.  Yes.

(Audio playing.)

MR. VINCENT:  Hello, Mark.  This is Vincent here.

Q.   (BY MR. KAPLAN)  I'm stopping it just for one second to make sure everyone can hear that recording. Mr. Ortega, can you hear this recording?

A.   I heard the fist snippet of it, yes.

MR. KAPLAN:  Okay.  And miss -- Ms. Staggs, are you able to hear this as well?  Thank you.

I will replay this from the beginning.

(Audio playing.)

MR. VINCENT:  Hello, Mark, this is Vincent here, Creative Solutions.

MR. ORTEGA:  (Inaudible).

MR. VINCENT:  I was reaching out, Mark, because, you know, we specialize in bonding finance, such as those like yourself.  I wanted to see if you're still



Page 189

currently, you know, working with any of my competition right now or if you're in the market for a competitive --

A.    It's hard -- it's hard to hear.

        THE WITNESS:  Right, Ms. Staggs?

A.    Like, this is, like, muffled.

Q.    (BY MR. KAPLAN)  All right.  Let me see if I can play it another way.

A.    Thank you.

Q.    Give me one second.  Okay.  Let's see if this works.

        (Audio playing.)

        MR. VINCENT:  Hello, Mark, this is Vincent here -- hello, Mark, this is Vincent here, Creative Solutions.

        MR. ORTEGA:  (Inaudible).

        MR. VINCENT:  I was reaching out Mark because, you know, we specialize in bonding finance, such as those like yourself.  I wanted to see if you're still currently, you know, working with any of my competition right now or



Page 190

if you're in the market...

Q.    (BY MR. KAPLAN)  Can you hear that?  Okay. I'm going to turn it up as loud as it goes and we can -- we can listen.  All right?  Let me see where my microphone is.

A.    It plays static-y when you put it so loud and close to the mic.

Q.    Yeah, so I'm going to look where the mic is so we can see where -- where I need to put it.  Okay.

(Audio playing.)

MR. VINCENT:  Hello, Mark.  This is Vincent here, Creative Solutions.

MR. ORTEGA:  (Inaudible).

MR. VINCENT:  I was reaching out, Mark, because, you know, we specialize in bonding fiance in business owners like yourself.  I wanted to see if you're still currently, you know, working with any of my competition right now or if you're in the market for a competitive deal.

MR. ORTEGA:  I mean, I guess. What kind of interest rates are


MAGNA
LEGAL SERVICES

Page 191

you guys doing?

MR. VINCENT:  No, the only interest rate -- it's not the rate.  Are you familiar with our refinance, unsecured?

MR. ORTEGA:  Yeah, yeah, I mean, it's --

Q.   (BY MR. KAPLAN)  Can you not hear this?  Okay. I'm going to play it on -- on my system.  And if we can't hear it, we can go through certain portions later or you can also listen to it again back when -- actually, you know what.  Do you still have a copy of the recording with you, Mr. Ortega?

A.    Not on me right now.  You could send it to me.

Q.   Yeah, give me one second.  I'm going to -- I'm going to pop off my video for one second.

MR. KAPLAN:  Let's take a -- let's take a three-minute recess if possible.

THE VIDEOGRAPHER:  Okay.  We're going to go off the record at 2:07.

(Recess held, 2:07 p.m. to 2:11 p.m.)

THE VIDEOGRAPHER:  We're going back on the record.  The time is 2:11 p.m.

(Exhibit 7 introduced.)

Q.   (BY MR. KAPLAN)  And so I've just sent



Page 192

Mr. Ortega a copy of Exhibit 7, which is a recording that he is going to play now.  And then we will get into some questioning.

A.    Yes.

(Audio playing.)

MR. VINCENT:  Hello, Mark.  This is Vincent here, Creative Solutions.  Hope all is well today.  I'm reaching out, Mark, because do you know we specialize in bonding finance in business owners like yourself.  I wanted to see if you're still currently, you know, working with any of my competition right now or if you're in the market for a competitive deal.

MR. ORTEGA:  I mean, I guess. What kind of interest rates are you guys doing?

MR. VINCENT:  So no interest. Here are the facts.  Are you familiar with our (inaudible) finance, unsecured.

MR. ORTEGA:  Yeah, yeah, I mean,



Page 193

but I guess --

MR. VINCENT:  It goes on your time and business --

MR. ORTEGA:  It's a percentage of --

MR. VINCENT:  Yeah, I mean, we go where they vary.  They vary case by case, business by business.  Something you qualify for might not be what (inaudible) qualifies for.  They go, you know, anywhere above a couple of points (inaudible) all the way up to, you know, 40 to 50 percent.  Really, it comes down to the risk of the deal and what the business qualifies for.  How many years do you got -- have you been established?

MR. ORTEGA:  Probably about three years.

MR. VINCENT:  Three years, God bless.  Have you ever borrowed money before for the company at all?  Do you have any borrowing



MAGNA
LEGAL SERVICES

Page 194

history?

MR. ORTEGA: I mean, very little.

MR. VINCENT: Very little. Who do you typically work with? Is it bank money? Private money?

MR. ORTEGA: No, it's just Square.

MR. VINCENT: Oh, it's Square. All right. It's similar. Do you bank with Square as well?

MR. ORTEGA: No.

MR. VINCENT: All right. Cool. Yeah, it's kind of like Square this is, sort of, a credit card Square, right?

MR. ORTEGA: It's a percentage of --

MR. VINCENT: It's kind of a long (inaudible). So, I mean, to be honest with you, that's an interesting scenario, you know. Better your business is the one that gets paid, right?

MR. ORTEGA: Yeah, I mean, it fluctuates.

MR. VINCENT: I understand. Yeah,



MAGNA
LEGAL SERVICES

Page 195

so it's just like the business. What exactly do you guys do?  Are you retail?

MR. ORTEGA:  It's resell, specifically of liquidated goods.

MR. VINCENT:  Oh, nice.  So you do like pallets?

MR. ORTEGA:  No, I mean everything is like kicking off the top (inaudible) basically.

MR. VINCENT:  Oh, nice.  How many employees do you have?  Do you have a warehouse.

MR. ORTEGA:  Yeah, it's (inaudible).

MR. VINCENT:  Where do you get the liquidated goods from?  You buy pallets and just you sort it out and that's how you're selling the goods?

MR. ORTEGA:  I mean, it's like two different big-box retailers.

MR. VINCENT:  Understand.

MR. ORTEGA:  We receive them.

MR. VINCENT:  Okay.  And as far as



Page 196

monthly sales goes, what are you guys grossing each month?

MR. ORTEGA:  I mean, that also varies.  But it's anywhere around a hundred or so.

MR. VINCENT:  A hundred or so?

MR. ORTEGA:  Yeah.

MR. VINCENT:  Okay.  Now, you're 50 percent owner?  50/50?

MR. ORTEGA:  No, no, no.  I own it completely.

MR. VINCENT:  Oh, beautiful.  100 percent owner.  All right.  So, I mean, what's the dollar amount you see yourself purchasing, you know, for -- I assume inventory, correct?

MR. ORTEGA:  Yeah, I mean in a typical month, my purchases are probably, like, 25, 30.

MR. VINCENT:  25 or 30 grand for an inventory purchase?

MR. ORTEGA:  Yeah.

MR. VINCENT:  All right.  So if I gave you 20 grand, 700 a week, you


MAGNA
LEGAL SERVICES

Page 197

could work with that, right?

MR. ORTEGA:  I mean, I guess it depends on what's the total, like, payback or what's the percentages.

MR. VINCENT:  But you could pay it off earlier.  That's where it gets -- that's where it gets good for you, Mark.  Because if you can pay it off earlier, you know, it will save you thousands of dollars.

MR. ORTEGA:  And what's the -- I mean, I guess this is like the rates though.  Like, okay, you pay X amount or how fast you pay it. Does it, like, fluctuate or is it a set fee or is it like a percentage basis (inaudible)?

MR. VINCENT:  That was ten-month deal right there.  So we like to, you know, stretch out the term as long as possible, obviously, because this is different than bank money.  Like I said, it's unsecured money.  So you have to think about it like this.  The


MAGNA
LEGAL SERVICES

Page 198

shorter the money exposed, the cheaper it's going to be.  If you can pay it off in 30, 60, 90 days, (inaudible), then you're  flipping retail.  Liquidated moves pretty fast. That's where you're going to save on the cost of the capital there and it's cutting it down tremendously and you're saving thousands of dollars on. Even if you don't, halfway through the term I can re-fi the deal and get you more cash, stretch it out, change the payment potentially.

MR. ORTEGA:  Could you -- because I've got to close up shop here in a minute.  We close at 6:00.

MR. VINCENT:  I understand.  Is this something that you would be --

MR. ORTEGA:  Can you call me back or send me an e-mail.

MR. VINCENT:  Let me ask you real quick though.  If I got -- let's just say I got you this money


MAGNA
LEGAL SERVICES

Page 199

tomorrow, rate/terms makes sense, is this something that you plan on moving on tomorrow if I made it available?

MR. ORTEGA:  I mean, probably like within the next week, yeah.

MR. VINCENT:  All right. Beautiful.  That's fine.  The money is unsecured.  (Inaudible). I know you say you're about to leave shop right now.  It takes two seconds.  All I need is the last three months bank statements and the application.  Can you bang that out pretty quick before you leave?  I can have my office have it ready to go for you tomorrow.

MR. ORTEGA:  I mean, I could probably get it done in the morning.  Can you just send it and then --

MR. VINCENT:  Sure.  What's your e-mail?

MR. ORTEGA:  We get in at 10:00.

MR. VINCENT:  Yeah, 10 o'clock.



Page 200

You're in (210) located on the...

MR. ORTEGA: (Inaudible).

MR. VINCENT: So you're like an hour or so behind me. I've got an e-mail here for you: mark@maorealestate.com?

MR. ORTEGA: That's the other entity. This one is mark@grovano -- G-R-O-V-A --

MR. VINCENT: G-R -- I'm sorry. Mark@gro?

MR. ORTEGA: Yeah, G-R-O-V-A-N-O.

MR. VINCENT: Okay.

MR. ORTEGA: .com.

MR. VINCENT: .com. All right. Beautiful. Can you just confirm -- do you have access on your phone by any chance?

MR. ORTEGA: Let me see. Yeah, I have my phone.

MR. VINCENT: All right. Just confirm with me you received it. It's coming from Vincent Palazzo@ccap.

MR. ORTEGA: Okay. I got it.



Page 201

MR. VINCENT:  All right. Beautiful.  Yeah, so like I said, if you can get that over to me, that plan option, that will be tomorrow -- I'm east coast.  Wire cuts off around 5 p.m.  I need a couple of hours to have the underwriting team go over it. It's like another 20, 30 minutes. It's about 7 o'clock over here. So, yeah, if you can get that over to me tonight, I can definitely have options for you.  If not, first thing in the morning will be good.  I'll work something out for you.

MR. ORTEGA:  Okay.  Cool.

MR. VINCENT:  (Inaudible) I just sent you over my contact card, my personal number, (718).  Save that.  That's my main line of contact.  That's my personal line. Questions, anything when you fill out the app, let me know.  And, of course, once I receive everything,



Page 202

I will shoot you a text, Mark.
I'll let you know that everything
is on course.

MR. ORTEGA:  Okay.

MR. VINCENT:  All right.  Mark.
Okay.  Thanks.  Bye.

Q.   (BY MR. KAPLAN)  All right.  So do you recall having that conversation with Mr. Palazzo?

A.   Yes.

Q.   Okay.  And did you agree with Mr. Palazzo at the 6:22 mark of that call recording that he could send you more texts?

A.   At the 6:22 mark?

Q.   Yes.

(Audio playing.)

Q.   (BY MR. KAPLAN)  So you said I'll shoot you over a text and you said all right, correct?

A.   I did not say all right.

Q.   What did you say?  Are you playing that again?

A.   Play it again?

Q.   Well, you can play the 6:22 mark again.  You said you didn't say all right.  So what did you say?

A.   Oh, you said at 6:22.  You said at...

(Audio playing.)

A.   That's 6:22.


MAGNA
LEGAL SERVICES

Page 203

Q.   (BY MR. KAPLAN)  Okay.  All right.  So -- so in response to his question about sending more texts, you said okay, correct?

A.   I did not say okay.

Q.   What did you say at -- at that portion?

A.   I said perfect.

Q.   Okay.  Perfect.  So you said perfect in response to that question?

A.   Yes.

Q.   Okay.  Did you -- did you ask Mr. Palazzo in this call not to call you back?

A.   Not on this call.

Q.   Did you have another call with Mr. Palazzo?

A.   I mean, text messages are considered calls, so yes.

Q.   No, I'm asking -- I'll ask separately about text messages.  Did you have another call with Mr. Palazzo other than this one?

A.   Under the law, calls are considered -- text messages are considered calls.  Are you talking about voice mes- -- did we have voice communication or did we have written communication?

Q.   I'm talking about oral communication over the phone, Mr. Ortega.

A.   I don't believe we had another oral



MAGNA
LEGAL SERVICES

Page 204

conversation.

Q.   So this is the only oral conversation that you had with Mr. Palazzo?

A.   On that day that I can recall.

Q.   Not -- not just that day.  I'm talking ever with Mr. Palazzo.

A.   Oh, I mean, I can't recall.

Q.   You can't recall -- can you recall any other call that you had with Mr. Palazzo?

A.   Not at this time.

Q.   Okay.  Did you tell Mr. Palazzo on this call that you were on the DNC list?

A.   I did not.

Q.   Was it out of the ordinary to receive a business call on this 9663 line?

A.   Out of the ordinary?

Q.   Yeah.

A.   To receive a business call?  That wasn't really a -- are you talking about from a business?

Q.   I'm talking about -- about any business call on this 9663 line, was that out of the ordinary?

A.   It is out of the ordinary to receive business communications.

Q.   Even though you had sought and obtained financing using this 9663 line previously, correct?



Page 205

A.   That's correct.  It's not in the ordinary.

Q.   Why -- why -- why have this discussion with Mr. Palazzo at all?

A.   Because the -- I mean, like your client and a lot of SPAM callers, they'll give fake information. There's no way to actually receive and figure out who it is without actually feigning interest until they give you the information.  Because when you give the information, they quickly redirect as you saw in that call when I asked for an e-mail or a callback number or any sort of identifying information, well, you never get it from these guys because they know they're not --

Q.   So it's your pos- --

A.   -- supposed to be calling.

Q.   I'm sorry to cut you off.  So please finish your answer.

A.   No, I'm done.

Q.   So it's your position that you were feigning interest with Mr. Palazzo?

A.   Correct, to be able to receive identifying information about who was calling.

Q.   What company were you discussing on the call with Mr. Palazzo?

A.   What company was that?

Q.   Yes.



Page 206

A.    He wanted to talk about financing.  So the one -- you're talking about what was feigned interest in?

Q.    Well, you gave him an e-mail address.  He -- he -- I think he started off asking about your MAO Real Estate address and instead you gave him a different e-mail address, correct?

A.    I gave him -- yes, I gave him a different one.

Q.    And which -- and the e-mail address was for which one of your entities?

A.    That e-mail address is associated with Grovano.

Q.    Do you know that your counsel was previously sent Sienna Marketing's DNC policy also on April 13th, 2024?

A.    I believe you guys told me that -- something to that effect.

Q.    And did you see a copy of that?

A.    No, I -- I don't recall seeing a copy of it.

Q.    Okay.  I'm going to show you what's been marked as Exhibit 8.

A.    Sure.

            (Exhibit 8 introduced.)

Q.    (BY MR. KAPLAN)  Let me know when you see this.

A.    Okay.  I can see it.



Page 207

Q.    Okay.  And I can scroll through the entirety if you want to read it.

A.    Yeah, can you -- is that the top of it right there?

Q.    Yes.

A.    Okay.

(Witness reviews document.)

A.    It says all Do-Not-Call numbers will be removed from Sien- -- I wonder how I even got a call if that's what the statement is.

(Witness reviews document.)

A.    (As read):  These numbers are removed from the active calling and put on the master Do-Not-Call list. Instantaneous update, okay, for a Do-Not-Call request. Prior to making any telephone solicitation, the firm shall remove any and all telephone numbers listed.

Okay.  Can you scroll down?  Exceptions 3 and 4...

Are all the exhibits to be made part of the record as part of this deposition?

Q.    (BY MR. KAPLAN)  We will -- we will have the exhibits as part of the transcript, Mr. Ortega.

A.    Okay.

Q.    All right.  Are you done reviewing this document?


MAGNA
LEGAL SERVICES

Page 208

A.    Not yet.

Q.    I'm sorry?

A.    Almost.

(Witness reviews document.)

A.    Okay.  Is that it for page 2?

Q.    (BY MR. KAPLAN)  That's just -- just -- just one page.

A.    Is there a date or anything on this listed or no?  Okay.

Q.    So is this your first time reviewing this policy?

A.    Yes, I believe so.

Q.    And are you going to continue on with your DNC claim after seeing this policy?

A.    Yes.  I mean, that's even more damming evidence of not updating instantaneous requests for do not contacting.  It says this is updated instantaneous.

Q.    Did you -- did you tell Mr. Palazzo on the call that -- that you did not wish to be contacted?

A.    No, I told him in the text after that.  And he sent nine more text messages blowing up my phone.

Q.    We can -- we can go through that in a second, Mr. Ortega.

A.    And then the fact that they even called me in the first place when they say that they pull from the


MAGNA
LEGAL SERVICES

Page 209

Do-Not-Call list and updated it every 31 days.  And I've been on it for over ten years.

Q.   All right.  I'm going to show you what's being marked as Exhibit Number 9.

(Exhibit 9 introduced.)

Q.   (BY MR. KAPLAN)  Mr. Ortega, do you see this?

A.   Yes, I see it.

Q.   Okay.  Do you recognize this -- this document?

A.   Yes.

Q.   And what is this document?

A.   This is Vincent's communications that he sent to my cell phone.

Q.   Do you have any basis to say that Vincent was an agent of Sienna Marketing?

A.   -- opposite side.  He sent it to me because he's the blue.

Q.   Understood.

Do you have any basis to say -- for your allegation that -- that Vincent is an agent of Sienna Marketing?

A.   Wait.  This isn't accurate.  This is not the complete --

Q.   I have -- there's a second part to this.

A.   Okay.

Q.   This is a screenshot, Mr. Ortega.  Don't



Page 210

worry.

A.    Okay.  What was the question?

Q.    Okay.  Do you have any basis for your allegation in the amended complaint that Mr. Palazzo is an agent of Sienna Marketing?

A.    Well, their DBA even in that internal do not policy, it's listed in -- that's how their business entity states it.  Creative Capital Solutions is the d/b/a for Sienna Marketing.

Q.    I'm asking about Mr. Palazzo though.

A.    That's what the representation was to me, is that he's with Creative Capital Solutions which is d/b/a for Sienna Marketing, so yes.

Q.    And so that -- and so that's your basis to say he's an agent for Sienna Marketing?

A.    Correct, and -- yeah, I mean, there was...

Q.    So in response to -- so it looks like after this call, pretty much -- or -- or it might have been right at the end of this call Mr. Palazzo sent you his contact information; is that correct?

A.    That appears correct.

Q.    Okay.  And three hours later before Mr. Palazzo sent anything else, you responded with, (as read):  Stop.  I'm not interested and on the Do-Not-Call list.  Don't contact me anymore.



Page 211

A.   Three hours later, yes, approximately.

Q.   Well, three hours and eight minutes, correct?

A.   Correct.

Q.   So why text "stop" after this call?

A.   Why text "stop" after that?

Q.   Yes.  Is it because you were feigning interest and you got -- you got out everything that you needed and now you could file a lawsuit?

A.   Well, no, they actually identified who they are.  So...

Q.   And that's why you're saying stop now?

A.   Correct.  It's stop after I was able to obtain the information about who was making the violative calls.

Q.   After feigning interest, correct?

A.   That's correct.

Q.   And so then Mr. Palazzo sent you a couple of text messages the -- the next day after -- after receiving your text?

A.   I believe it was nine more text messages.

Q.   Okay.  Starting on Friday at 1:05 p.m., so that would be the next day?

A.   Correct.

Q.   Are these -- are these marketing texts?

A.   Are these marketing?



Page 212

Q.   Yes.

A.   Where he tries to -- yeah, 100 percent. Trying to get me about -- you know, wanting to reconvene about selling his financing.

Q.   Which -- which of these texts are marketing texts?

A.   Why don't you go -- continue to the next exhibit where you show --

Q.   Well, let's start on this one and then we can go to the next one.

A.   I mean, you're not showing the full extent of it.

Q.   Mark, I'm not hiding anything from you.  We're going to go to that next.  The way that it's in front of me is two separate documents.  We're going to go through one and then we're going to go through the next.

A.   (As read):  You have experience with -- with the Square.  These programs can blow them out of the water.

     That does not sound like he's trying to convince you to bring you back to the table to try to...

Q.   I'm asking you, Mr. Ortega.  Is that a marketing text?

A.   That's telemarketing.  They're allowed one opt -- opt-out message and that's it after a Do-Not-Call



Page 213

request is made.  And their own Do-Not-Call policy states it should be respected instantaneously.

Q.   And I'm asking about which of these texts is marketing, Mr. Ortega.

A.   All of them.  Everything -- all nine text messages after.

Q.   So every single text on this page?  The one, two, three, four, five, six texts on this page?

A.   I mean, two, four, six -- yeah, I would say all six are telemarketing.  It's the purpose of telemarketing.

Q.   Okay.  I'm going to show you what's been marked as Exhibit 10.

THE COURT REPORTER:  Mr. Kaplan, did you mean to skip Exhibit 9?  Because I think you identified the last text message as 8, but I'm going to double check.

MR. KAPLAN:  Then I'm going to -- I'm going to apologize because 8 was the DNC policy.

THE COURT REPORTER:  Oh, no, you did.  I'm sorry.  This is my fault.  I apologize for interrupting. You did mark 9.

MR. KAPLAN:  That's fine.

THE COURT REPORTER:  I'm sorry.  I'm falling asleep, I guess.



MAGNA
LEGAL SERVICES

Page 214

MR. KAPLAN:  Not a problem, Tammy.  No worries.

THE COURT REPORTER:  Thank you.  Go ahead.

Q.   (BY MR. KAPLAN)  Okay.  So I'm going to share what's been marked as Exhibit 10.

(Exhibit 10 introduced.)

Q.   (BY MR. KAPLAN)  All right.  Let me know when you see -- when you see that, Mr. Ortega.

A.   Yeah, I can see that.

Q.   Does this appear to be the continuation of the text message correspondence between you and Mr. Palazzo?

A.   Yes, it does.

Q.   And is it your contention that all the texts on this page are also marketing texts?

A.   Correct.

Q.   Did you respond to any of these text messages?

A.   No.

Q.   Prior to March -- let me go back a second.

Prior to this call with Mr. Palazzo, had you ever filed a TCPA lawsuit against anybody?

A.   Have I personally filed one?

Q.   Prior to this call, have you -- have you filed -- have you filed or has a TCPA lawsuit been filed on your behalf?

A.   I don't recall exact dates, but -- yeah.  I



Page 215

don't recall exact dates.

Q.  How many TC- -- how many TCPA law- -- okay. So before that, let's get -- let's get back to my question.

So had you or an attorney on your behalf filed a TCPA lawsuit prior to this text message exchange that's contained in Exhibits 9 and 10?

A.  I mean, I can't recall the exact dates, so I can't recall at this moment.

Q.  Approximately how many TCPA lawsuits have you filed or have been filed on your behalf?

A.  I don't recall an exact number.

Q.  More than five?

A.  Yes.

Q.  More than ten?

A.  Yes.

Q.  More than 15?

A.  I would say yes.

Q.  More than 20?

A.  I don't know an exact number.  I can't give you an exact est- -- estimation.

Q.  So in your mind somewhere between 15 and 20 lawsuits flagging TCPA violations?

A.  No, that is not my testimony.

Q.  So what is your testimony, Mr. Ortega?


MAGNA
LEGAL SERVICES

Page 216

A.    My testimony is I don't recall an exact number.

Q.    Well, you said that it was more than 15 and you can't recall if it's less than 20.

A.    Correct.  So, I mean, I can't recall.

Q.    So it could be 50 is what you're saying?

A.    I'm not stating an exact amount.  That's what my testimony is.

Q.    Okay.  So I think we went through this already, but how many calls do you allege that Sienna Marketing made to you that violated the TCPA?

A.    I don't know at this time without the benefit of discovery.

Q.    So aside from the one call that we've just listened to, are you aware of any other calls made by Sienna Marketing call to you?

A.    Yes, the nine calls here in this screenshot that you're showing us here.

Q.    Okay.  Setting your distinct- -- your lack of distinction between call and text messages -- and I'll -- I'll ask you about texts, so I'll be clear.

Besides -- putting aside the text messages and besides the one call that we listened to that was Exhibit 7, are you aware of any other calls made to you by Sienna Marketing or its agents?


MAGNA
LEGAL SERVICES

Page 217

A.    At this time without the benefit of discovery, I'm not aware of any other calls.

Q.    Okay.  And how many text messages do you allege were made to you by Sienna Marketing in violation of the TCPA?

A.    At this time without -- again, without the benefit of discovery, it can be subject and updated later -- is ten for now.

Q.    Are you aware of any other text messages besides the ones contained in Exhibits 9 and 10 made to you by Sienna Marketing?

A.    At this moment without the benefit of discovery, that's fully what I'm aware of up until now.

Q.    So without the benefit -- benefit of discovery, no, correct?

A.    Without the benefit of discovery, I am not aware of additional ones until a later date.

Q.    All right.  Getting to the -- the procedural history of this case, at some point earlier this year your counsel Ms. Almanza requested a withdrawal from the case, correct?

A.    That's correct.

Q.    Why did -- why did you oppose Ms. Almanza's request to withdraw from the case?

A.    Yeah, I'm not going to get into that whole --



Page 218

well, between my attorney and myself.

MR. ORTEGA:  Objection attorney-client privilege.

Q.    (BY MR. KAPLAN)  And you're not going to answer?

A.    Correct.

Q.    Well, you filed a written response in opposition to Ms. Almanza's Motion To Withdraw, correct?

A.    Correct.

Q.    And that's a public filing, correct?

A.    Correct.

Q.    Okay.

A.    Well, no, actually I don't think that was.

Q.    Well, I think that some of the exhibits thereto were not, if I recall correctly.

A.    I believe that was -- I don't recall at this moment, but I don't believe it was a public filing.

Q.    And so you -- and so at this time you are not going to say why you oppose Ms. Almanza's withdrawal from the case based upon the attorney-client privilege?

A.    Yeah, I'm not getting into the discussions between me and my attorney on that one.

Q.    I'm not asking for the discussions.  I'm asking why you felt you needed to oppose --

A.    That's -- I -- I --



Page 219

Q.   Mr. Ortega, again, for the sake of Ms. Staggs you cannot speak over me and I'm doing my best to let you finish all of your answers before I start my next one.  We need to be respectful of Ms. Staggs and the Court with regards to keeping a clean record.  Okay?

A.   Please stop interrupting me when I'm answering and then we go back and forth.

Q.   You can turn it around on me, Mark.  That -- that's fine.  I can take it.

So, again, I will ask the question. You're not going to answer why you opposed Ms. Almanza's withdrawal from the case?

A.   No, I'm not going to answer it.

MR. ORTEGA:   I'm object to attorney-client privilege.

A.   And I'm not going to get into the discussions that are confidential with my prior counsel.

Q.   (BY MR. KAPLAN)  And at some point in time you started representing yourself in this case?

A.   Correct.

Q.   Did you seek to obtain any other counsel after Ms. Almanza withdrew?

A.   I don't recall.

Q.   Did you contact any attorneys after Ms. Almanza withdrew?


MAGNA
LEGAL SERVICES

Page 220

A.   Have I been in contact with any attorney since Almanza withdrew?

Q.   I'm asking if you contacted any attorneys after Ms. Almanza withdrew.

A.   Have I contacted any attorneys since Almanza withdrew, yes.

Q.   With regards to this case?

A.   I don't believe so.

Q.   Why did you decide to proceed pro se in this case?

MR. ORTEGA:  I'm going to object to work product doctrine.  If you're asking for my strategies or thoughts or, you know, materials preparing in this litigation, that's protected.

Q.   (BY MR. KAPLAN)  I'm not asking for your strategy, Mr. Ortega.  I'm just asking why you made a decision to proceed pro se.

A.   That's part of it, yeah, so...

Q.   And are you not answering based on some kind of privilege that you believe you have?

A.   Product doctrine, yes.

Q.   The work product doctrine is what you said?

A.   You're asking for what are my thoughts and strategies behind representing myself in this case.

Q.   So you won't answer the question?



Page 221

A.   That is correct.

Q.   And have you consulted with any other counsel during this case about this case, besides Ms. Almanza?

A.   I don't believe so.

Q.   It's a yes -- it's a yes or no or I don't know.  So is the answer: I don't know?

A.   I don't know.

Q.   Did you have anybody review any e-mails that you sent to Sienna Marketing's counsel in this case prior to you sending them?

A.   I don't believe so.

Q.   It's yes or no or I don't know, Mr. Ortega.

A.   I don't know.

Q.   Did you have anybody review any of your filings that you filed in this case prior to -- to filing them?

A.   No.

Q.   Did anyone help you prepare any filings in this case?

     MR. ORTEGA:  That's going to move more into work product doctrine.  Objection.

A.   If you're asking me how did I prepare or what are my strategies or how did I...

Q.   (BY MR. KAPLAN)  No, I'm not asking how you prepared or what your strategies are.  I'm asking if



Page 222

somebody helped -- I'm asking if somebody helped you, Mr. Ortega.  That is a separate question.

A.   No.

Q.   So the answer is: no, nobody helped you prepare any filings in this case?

A.   Not -- not in this -- you're asking after Almanza?

Q.   After Ms. Almanza withdrew.

A.   After Ms. Almanza withdrew, no.

Q.   At some point the Court dismissed some of the -- some of the claims at issue in this case, right?

A.   What -- what was the question?

Q.   At some point the Court dismissed some of the claims at issue in this case, correct?

A.   Not -- not some claims.

Q.   All right.  I'm going to show you what's been marked as Exhibit Number 11.

(Exhibit 11 introduced.)

A.   They dismissed one claim.

Q.   (BY MR. KAPLAN)  All right.  Mr. Ortega, have you seen this document before?

A.   You want to scroll through it and let me see?

(Witness reviews document.)

Q.   (BY MR. KAPLAN)  Let's stop at the first page. It says: To the Honorable United States District Judge



Page 223

Orlando Garcia.  Do you see that?

A.    Yes.

Q.    Okay.  And you see it's, (as read):  For the reasons set forth below, it is recommended that the Motion to Dismiss be granted in part and denied in part.

Do you see that?

A.    Let me go on and read the exhibit and then we can ask questions about it.

Q.    Okay.  Well, then we might have to go past the seven-hour mark, Mr. Ortega.

A.    It's -- it's your -- however you want to strategize your deposition is up to you.  Do you want to answer questions about this or we can move on.

Q.    How about we put this aside.  At some point -- at some point the Court dismissed some of your claims, correct?

A.    At some point, one claim, I believe.

Q.    What -- what claim was dismissed?

A.    I believe it was 227b.

Q.    So 47 USC 227b?

A.    I believe so.

Q.    And that was a claim for automatic telephone dialing systems?

A.    I believe so.

Q.    The Court also dismissed your class action



claims?

A.   I believe that was what I put in my motion to -- to have that dismissed because I'm -- it's pro se.

Q.   So the Court dismissed your class action claims, correct?

A.   They granted it, yes.

Q.   So those claims are no longer active, correct?

A.   That's correct.

Q.   Okay.  And besides the claims at issue in your First Amended Complaint and the ones that you have requested that the Court entertain as part of your proposed Second Amended Complaint, are there any other federal claims that you have against Sienna Marketing?

A.   Not that I can recall at this moment.

Q.   Do you have any basis for any other -- any other claims against Sienna Marketing other than what's contained in the current First Amended Complaint or the proposed Second Amended Complaint?

A.   Or the proposed second amendment -- not that I can recall at this moment.

Q.   Have you previously thought of other claims that you might bring against Sienna Marketing?

A.   Have I thought of other claims?  We haven't even done discovery.  I don't know what other additional stuff is going to come to during discovery to be able --



Page 225

to need to amend and add additional claims.

Q.   So at this moment you're not aware of any additional claims against Sienna Marketing, correct?

A.   Not that I can recall at this time.

Q.   I'm not asking you to recall.  I'm saying: What do you know at this moment?

A.   That's what I'm saying, and my answer is: not that I can recall at this time.

Q.   But I'm not asking what you're recalling.  I said: what do you know at this moment?  Either you know or don't know.

A.   That's my answer.

MR. ORTEGA:  At this point, you know, objection, asked and answered.

Q.   (BY MR. KAPLAN)  As part of this case, you've participated in some settlement negotiations with counsel for Sienna Marketing, correct?

A.   Correct.

Q.   And those settlement negotiations began back in November of 2024?

MR. ORTEGA:  I'm going to object also too for -- I think it's, what, 402 for this, you know, settlement conf- -- settlement negotiations are confident -- confidential.  So pursuant to that, I'll answer your questions, but just so we have it on the



MAGNA
LEGAL SERVICES

Page 226

record that I'm objecting to it.

MR. KAPLAN: Understood. Thank you, Mr. Ortega.

Q. (BY MR. KAPLAN) So those discussions began back in November of 2024?

A. I don't recall what date -- what exact date when they began.

Q. Do you recall participating in a con- -- in a telephone conference with Mr. Jeffrey Rosenthal on November 19th, 2024 with regards to this case?

A. I don't recall the exact date of a conference call with Jeffrey. It was November -- what did you say November 19th?

Q. Yes. Do you recall participating in any telephone calls with Mr. Rosenthal as part of this case?

A. I've had voice calls with Jeffrey.

Q. And starting with the first call that you can remember and -- and which I am representing occurred on November 19th, 2024, did you record that -- that call?

A. No.

Q. Okay. Did you take notes of that call?

A. I don't even think I did.

Q. And so there's no audio recording of that call?

A. What was that?



MAGNA

LEGAL SERVICES

Page 227

Q. And so there's no audio recording of that call?

A. That's correct.

Q. Okay. And you participated in another call with Mr. Rosenthal a week later on November 26th, 2024. Do you recall that -- that -- that -- that call?

A. I do not recall that.

Q. Okay. And did you record that call?

A. I don't have a recording from -- with Jeffrey.

Q. Did you -- did you -- did you create an audio recording of that call?

A. No.

Q. Okay. And you participated in a call with Mr. Rosenthal on July 7th, 2025. Did you create an audio recording of that call?

A. I don't recall what -- that conversation.

Q. You don't recall that -- you don't recall whether or not you created an audio recording of that call?

A. I don't recall even the conversation, is what you're asking. You're asking me if I recorded a conversation I don't recall.

Q. Have you recorded any conversations that you've had on the phone with Mr. Rosenthal?

A. I have one recording, yes.



Page 228

Q.    And what is that from?

A.    I don't recall the date.

Q.    Was that in the last month?

A.    Probably within -- within the last two months, yeah.

Q.    What's the -- what's the substance of that recording?

A.    Basically letting him know that I'm recording the call, and he didn't want to participate in the Court ordered conferral process.  At which point he just put a blockade and more obstructionist tactics.  We never got the conferral done until later.

Q.    And it's your testimony that's the only call that you've recorded with Mr. Rosenthal?

A.    Correct.

MR. KAPLAN:  All right.  As part of this deposition and the ongoing discovery in this case, we would ask for a copy of that recording.

Q.    (BY MR. KAPLAN)  Are you going to be providing that to us, Mr. Ortega?

A.    For that call recording?

Q.    Yes.

A.    I mean if you send a -- send -- go ahead and send a discovery request.

Q.    I can ask as part of this deposition for any



Page 229

documents or other evidence that we discuss here a request for that.  If you want to further kick out the discovery schedule, you know, but we don't need to go that route, but we can.  I'm asking: As part of this deposition are you going to agree to produce that recording or any recordings that you made of Mr. Rosenthal?

A.   No, I'm not going to agree.

Q.   Okay.  And so that -- that -- the call that you have a recording of, does it refresh your recollection that occurred on October 1st, 2025?

A.   I don't recall exactly what date.

Q.   Okay.  And earlier you said that you had filed or had your attorneys file on your behalf at least 15 TCPA lawsuits; is that correct?

A.   Yes, that is correct on my behalf or personally.

Q.   Okay.  I'm going to go through -- go through some cases, and I'm going to ask you some questions. All right?

Are you familiar with the case of Ortega vs. Keller Williams Realty, Inc.?

A.   Yes, I'm familiar.

Q.   Okay.  Are you the plaintiff in that case?

A.   Yes, I'm the plaintiff.



Page 230

Q.   Were you represented by counsel in that case?

A.   Yes, I was represented by counsel.

Q.   Who were you represented by?

A.   That was Paulina Almanza.

Q.   And that case was closed on March 5th, 2025.
Is that accurate?

A.   I don't recall the exact date.

Q.   Was that case settled?

A.   That I'm going to have to request -- I mean,
that one, more objection and might have to request a
protective order because I don't know about the
substance of...

Q.   I'm not asking about the substance,
Mr. Ortega.  I'm asking if that case was settled.

A.   That case is -- is dismissed at this time,
yes.

Q.   That's not my -- that's not my question.  Was
the -- did you enter a settlement agreement with regards
to that case?

A.   I'm going to go ahead and refuse to answer
that one and then --

Q.   Okay.

A.   A protective order.

Q.   On what ground?

A.   That's going to be on confidentiality.



Page 231

Q.    Even though I'm not asking about the substance of the settlement?

A.    Well, yeah, you're about it in general, so...

Q.    No, I'm not asking about the substance.  I'm asking whether there was a settlement.

A.    And I told you that it was resolved.

Q.    No, you -- but you didn't answer the question of whether it was settled.

A.    Okay.  Yeah, so I'm not going --

Q.    Okay.  So you're -- so you're refusing to answer the question?

A.    That is correct.

Q.    Okay.  Are you familiar with the case of Ortega -- and just to go back to Ortega vs. Keller Williams Realty, is that a TCPA case?

A.    Is that a TCPA case?

Q.    Yes.

A.    Not exclusively, no.

Q.    Can you speak louder when you answer the question?

A.    Not exclusively.

Q.    Not exclusively?

A.    Exactly.

Q.    Did it also violate the same Texas statutes that you -- that you allege violations of in this


MAGNA
LEGAL SERVICES

Page 232

lawsuit?

A.    That's correct.

Q.    Okay.  Are there any other claims besides the TCPA and the Texas statutes in that matter?

A.    I don't believe so.

Q.    Okay.  Okay.  Are you familiar with a case of Ortega vs. DiTommaso, Inc.?

A.    Yes, I'm familiar.

Q.    Okay.  Are you the named plaintiff in that case?

A.    Yes, I'm the named plaintiff.

Q.    Were you represented by counsel in that case?

A.    I don't -- I don't recall at this moment.

Q.    And is that case currently still pending?

A.    D. Tomoso, no, I don't believe so.

Q.    In that case were alleging causes of action for the TCPA and violation of the same Texas statutes at issue in this case?

A.    I believe so.

Q.    Any other claims in that case?

A.    Not that I can recall.

Q.    Okay.  And you said that you don't believe that it is still pending, so did you enter a settle agreement in that case?

A.    It's been resolved.



MAGNA
LEGAL SERVICES

Page 233

Q.    That's not my question, Mr. Ortega.  Did you enter into a settlement agreement in that case?

MR. ORTEGA:  Okay.  So I'm going to have to move for a protective order on that.

MR. KAPLAN:  Are you objecting to my question, Mr. Ortega?

MR. ORTEGA:  Yes.

MR. KAPLAN:  Yes or no?

MR. ORTEGA:  Yes, I'm objecting to it.

Q.    (BY MR. KAPLAN)  And you're -- and you're not going to be answering whether or not you signed a settlement agreement, notwithstanding that I'm not asking you for the substance of that settlement agreement?

A.    You're asking if there is a settlement agreement for it, which I'm objecting to that.

Q.    Okay.  Are you familiar of a case of Ortega vs. JKB Financial, Inc.?

A.    JKB Financial, Inc., yes, I'm familiar.

Q.    Okay.  Are you the named plaintiff in that case?

A.    Yes, I'm the named plaintiff.

Q.    Does that case also involve alleged violations of the TCPA and the Texas statutes at issue in this case?



Page 234

A.   I don't know if they're all of them, but I believe similar.

Q.   Are you represented by counsel in that case?

A.   I don't recall if I was represented on that case.

Q.   Is that case still pending?

A.   No, that one is not pending.

Q.   Okay.  Did you enter into a settlement agreement in that case?

MR. ORTEGA:  Again, objection for that one.  I'll be filing a protective order.  That was for JKB.

Q.   (BY MR. KAPLAN)  Are you not going to be answering that question?

A.   No.

Q.   All right.  Are you familiar with the case of Ortega vs. Cally Consulting, PLLC?

A.   Cally Consulting, yes.

Q.   Okay.  Are you the named plaintiff in that case?

A.   Yes, I'm the named plaintiff in that case.

Q.   Does that case involve violation -- alleged violations of the TCPA and the Texas statutes that are at issue in this litigation?

A.   I don't know the extent of which claims.  The



Page 235

Telephone Consumer Protection Act, but I don't know if Texas is in that one.

Q.   So that -- so that one might just be a TCPA case?

A.   I don't recall at the moment.

Q.   Were you represented by counsel in that case?

A.   I believe I wasn't.

Q.   Is that case still pending?

A.   No.

Q.   And did you enter into a settlement agreement in that case?

MR. ORTEGA:  I'm going to object to it. And for the record, it's been resolved.

Q.   (BY MR. KAPLAN)  Okay.  But that -- my question is whether -- if you entered into a settlement agreement in that case.

A.   Understood.

MR. ORTEGA:  And, yes, I'm still going to object and file for a protective order.

Q.   (BY MR. KAPLAN)  So you won't be answering that question?

A.   That's correct.

Q.   All right.  Are you familiar with the case of Ortega vs. Fields, et al.?

A.   Yes, I'm familiar with it.



Page 236

Q.   Okay.  Are you the plaintiff in that case?

A.   Yes, I'm the named plaintiff.

Q.   Are you represented by counsel in that case?

A.   I don't know if I -- if I was represented by counsel in that one -- or if I was ever represented by counsel in that one.  I don't recall.

Q.   Does that case involve alleged TCPA violations and violat- -- and alleged violations of the same Texas statute at issue in this case?

A.   The same exact ones?  I don't know if it's the exact same ones, if it's both 302, 305.

Q.   There are -- but there are TCPA viol- -- alleged TCPA violations in that case?

A.   Correct.

Q.   Is that case still pending?

A.   Yes.

Q.   And you said you're the named plaintiff.  Is that -- is that still the case or are you proceeding pro se and just on behalf of yourself?

A.   That one is pro se as -- as of current.

Q.   So it's just on behalf of yourself that you're proceeding in that case?

A.   Correct.

Q.   Okay.  Are you familiar with the case of Ortega vs. Secure One Capital Corporation?


MAGNA
LEGAL SERVICES

Page 237

A.    Secure One, yes.

Q.    All right.  And are you the plaintiff in that case?

A.    Yes, I'm the plaintiff.

Q.    And does that case involve alleged violations of the TCPA?

A.    Violations of the TCPA, yes.

Q.    And is that case still pending?

A.    Correct.

Q.    Are you represented by counsel in that case?

A.    Secure One, not at this time.

Q.    Were you previously represented by counsel in that case?

A.    I don't recall.

Q.    Do you have -- do you have plans to be represented by counsel in that case?

A.    Do I have plans?  Like, in terms of, like, what is my strategy for continuing pursue my claims in that case?

Q.    I'm just asking if you plan on retaining counsel in that case.  I'm not asking for how you plan to -- to win at trial.  I'm asking whether or not you plan to retain counsel.

A.    I have no -- at this current moment I do not have plans.


MAGNA
LEGAL SERVICES

Page 238

Q.   Okay.  Are you familiar with the case of
Ortega vs. Cornerstone Auto Protection, Inc.?

A.   Cornerstone Auto, yes.

Q.   Okay.  Are you the plaintiff in that case?

A.   Wait, Cornerstone Auto.  Yes, I believe so.

Q.   Are you represented by counsel in that case?

A.   I don't recall.

Q.   Is that case still pending?

A.   Actually, I don't even recall if that one is.

Q.   So you don't know if that case was settled?

A.   I also do not recall.

Q.   It must be hard to keep track.

Are you familiar with the case of Ortega
vs. Doe?

A.   Yes.

Q.   Okay.  Are you the plaintiff in that case?

A.   Yes.

Q.   Are you represented by counsel in that case?

A.   No, I'm not at this moment.

Q.   At this moment?  Were you previously
represented by counsel?

A.   I don't believe so.

Q.   Okay.  And is that case still pending?

A.   Yes.

Q.   Does that case involve alleged violations of



the TCPA?

A.   The Telephone Consumer Protection Act?  Yes.

Q.   And the same with Cornerstone, does that case also involve alleged violations of the TCPA?

A.   Cornerstone?  I believe so.

Q.   Okay.  Are you familiar with the case of Ortega vs. Elite Living Realty, LLC?

A.   Yes, I am.

Q.   Are you the plaintiff in that case?

A.   Yes, I'm the plaintiff in that case.

Q.   And were you represented by counsel in that case?

A.   No.

Q.   Okay.  Is that case still pending?

A.   Yes.

Q.   Okay.  And do -- are you -- and does that case involve alleged violations of the TCPA?

A.   Yes, it does allege violations of the Telephone Consumer Protection Act.

Q.   Okay.  Are you familiar with the case of Ortega vs. DH and RK Investments, LLC?

A.   Yes.

Q.   Are you the plaintiff in that case?

A.   Yes.

Q.   Is that case still pending?



Page 240

A.    I don't believe so.

Q.    Did you enter into a settlement agreement in that case?

A.    I don't believe so.

Q.    Was that case dismissed?

A.    I don't believe so.

Q.    But it's not still pending?

A.    I don't believe so.

Q.    So you don't believe it was settled.  You don't believe it was dismissed.  And you don't believe -- now I'm confused.  So is it still pending?

A.    I don't believe so.

Q.    Okay.  But you don't know -- you don't know if it was dismissed or settled?

A.    I don't think it was either.

Q.    Okay.  How was that case disposed of?

A.    How was it disposed of?  I believe it was a default judgment.

Q.    What was the amount of the default judgment?

A.    I believe 55,000.

Q.    What was the basis for -- was that an alleged TCPA violation case?

A.    Not alleged.  It's found responsible for Telephone Consumer Protection Act violations as well as business -- Texas business and commerce good.



Page 241

Q.    At default, correct?

A.    Correct.

Q.    How many telephone calls were at issue in that case?

A.    I don't recall.

Q.    Who was the judge in that case?

A.    I don't recall.

Q.    Have you collected any of that $55,000 judgment entered into that case?

A.    Again, this is getting into --

MR. ORTEGA:  Or just put objection, relevance.

A.    And do you still want an answer on this?

Q.    (BY MR. KAPLAN)  Yes.

A.    None.

Q.    Are you familiar with the case of Ortega vs. Ensurety Ventures, LLC?

A.    Yes.

Q.    Are you the plaintiff in that case?

A.    Yes.

Q.    Is that case still pending?

A.    Is that case still pending?  Ensurety?  What's the case number on that?  What case number do you have?

Q.    24-00801.

A.    No.



Page 242

Q.    How was that case disposed of?

A.    It was resolved.

Q.    So did you enter into a settlement agreement in that matter?

MR. ORTEGA:  I'm going to go ahead and object to that one.

Q.    (BY MR. KAPLAN)  And you're not going to answer?

MR. ORTEGA:  For a protective order for Ensurety.  Got it.

Q.    (BY MR. KAPLAN)  Are you familiar with the case Ortega vs. Ambrosio?

A.    Ambrosio.

Q.    Yes.

A.    Yes.

Q.    All right.  Are you the plaintiff in that case?

A.    Yes.

Q.    Does that case involve alleged violations of the TCPA?

A.    I believe so.

Q.    Okay.  And does -- the Ensurety Ventures, LLC case, was that also TCPA violations?

A.    I believe so.

Q.    Okay.  And is the Ambrosio case still pending?


MAGNA
LEGAL SERVICES

Page 243

A. I bel- -- I don't recall at this time.

Q. Do you recall if you entered into a settlement agreement in the Ambrosio case?

A. I don't recall.

Q. Were you -- were you represented by counsel in the Ambrosio case?

A. Again, I also don't recall when they were sealed.

Q. Are you currently represented by counsel in any TCPA case that you're -- that you're actively bringing?

A. That I'm actively bringing?

Q. Yes.

A. That I'm actively pursuing new litigation on, no.

Q. No, that is currently pending.

A. That is currently pending before the court, no.

Q. Are you familiar with the case of Ortega vs. Insurance Company of Texas?

A. Insurance Company of Texas. Do you have the full name of the comp- -- of the defendant?

Q. Insurance Company of Texas. I have the case number, 24-CV-01038.

A. 2401438, I believe that's truncated.



Page 244

Q.   Are you familiar with that case?

A.   Well, I just need to make sure it's the correct case I'm thinking of.  I'm not sure.  Do you have the full name of the defendant?

Q.   I can go back and get that.  Maybe we can send that in an e-mail and discuss it later.  How about that, Mr. Ortega?

A.   I would appreciate it.

Q.   Are you familiar with the case of Ortega vs. Stern Rock Capital, LLC?

A.   Yes.

Q.   Are you the plaintiff in this case?

A.   Yes.

Q.   Is that case still pending?

A.   I believe so.

Q.   Does that case involve alleged violations of the TCPA?

A.   I believe so.

Q.   Are you familiar with the case of Ortega vs. Senior Life Insurance Company?

A.   Senior Life, yes.

Q.   Are you the plaintiff in that case?

A.   Yes.

Q.   Is that case still pending?

A.   I believe so.



Page 245

Q.   Does that case involve alleged violations of the TCPA?

A.   I also believe so.

Q.   Do you recall how much money you're -- you're seeking in damages in that case?

A.   I don't recall.

Q.   Are you familiar with the case of Ortega vs. American-Amicable Life Insurance Company of Texas?

A.   What's the case number?

Q.   25-CV-00816.

A.   816, yes.

Q.   Are you the plaintiff in that case?

A.   Yes.

Q.   Is that case still pending?

A.   Yes.

Q.   Does that case involve alleged violations of the TCPA?

A.   I believe so.

Q.   Are you familiar with the case of Ortega vs. Silver Shark, Inc.?

A.   Silver Shark.  Do you have the case number on that one?

Q.   25-CV-00850.

A.   So this year.  Yeah, I do recall it.

Q.   All right.  And is that case still pending?



Page 246

A.   I believe so.

Q.   Does that case involve alleged violations of the TCPA?

A.   Actually, change that answer.  Strike the answer.  I don't recall if it's still pending.

Q.   Are you aware if that's been resolved, that case?

A.   Not at this time.  I don't recall.

Q.   Did that case involve alleged violations of the TCPA?

A.   Yes.

Q.   All right.  Are you aware of the case of Ortega vs. Solcharge Nano, LLC?

A.   Yes.

Q.   Are you the plaintiff in that case?

A.   Yes.

Q.   Does that case involve alleged violations of the TCPA?

A.   Yes, it does.

Q.   Is that case still pending?

A.   It is not pending.

Q.   How was that case resolved?

A.   It was resolved with a dismissal without prejudice.

Q.   Did you enter into a settlement agreement in



Page 247

that case?

MR. ORTEGA:  Also I'm going to object to that and move for a protective order.

MR. KAPLAN:  Based on?

MR. ORTEGA:  Confidentiality.

Q.   (BY MR. KAPLAN)  Are you aware of the case of Ortega vs. Powur, PBC, Inc.?

A.   Yes.

Q.   Are you the plaintiff in that case?

A.   Yes.

Q.   Does that case involve allege violations of the TCPA?

A.   I believe so.

Q.   Is that case still pending?

A.   Powur, I believe so.

Q.   Are you aware of the case of Ortega vs. TriSmart Solar, LLC?

A.   TriSmart, yes.

Q.   Are you the plaintiff in that case?

A.   Yes.

Q.   Does that case involve alleged violations of the TCPA?

A.   I believe so.

Q.   Is that case still pending?

A.   I believe so.



MAGNA
LEGAL SERVICES

Page 248

Q.    Are you aware of the case of Ortega vs. Renewal By Andersen, LLC?

A.    Renewal By Andersen, yes.

Q.    Are you the plaintiff in this case?

A.    Yes, I am.

Q.    Does that case involve alleged violations of the TCPA?

A.    The Telephone Consumer Protection Act?  Yes, it does allege violations of the TCPA.

Q.    Is that case still pending?

A.    The case against Renewal By Andersen is no longer pending.

Q.    Did you enter into a settlement agreement in that case?

MR. ORTEGA:  That I'm also going to object to based on confidentiality and move for a protective order.

Q.    (BY MR. KAPLAN)  So you're not going to be answering that one?

A.    Correct.

Q.    All right.  Are you aware of the case of Ortega vs. Green Light Solar, LLC?

A.    Green Light Solar, yes.

Q.    Are you the plaintiff in that case?

A.    Yes, I am.



Page 249

Q.    Is that case still pending?

A.    Green Light Solar?  Yes, it is still pending.

Q.    And does that case involve alleged violations of the TCPA?

A.    It does allege violations of the Telephone Consumer Protection Act.

Q.    Now, I just find this next one -- I get a kick out of the name and maybe you do too.  Are you involved in -- are you aware of the case of Ortega vs. Can I Have Money, LLC?

A.    Yeah, I am familiar with that one.

Q.    Are you -- are you the plaintiff in that case?

A.    I am the plaintiff in that one.

Q.    Okay.  Is that case still pending?

A.    Yeah, that case is still pending.

Q.    Does that case involve alleged violations of the TCPA?

A.    Yeah, it alleges -- similar to your client. Another New Yorker, you know, selling these -- these loans.  You know, it's another kiddo similar to Vincent.

Q.    Now, I have a question about -- about this next one.  It looks like that you're also involved -- or I'll strike that.

Are you aware of the case of Ortega vs. Ensurety Ventures, but this one was filed in 2025?



Page 250

A.    I'm aware of that one.

Q.    Okay.  Is that a separate case from the Ensurety Ventures case that was filed in 2024?

A.    Yes.

Q.    Does that involve a breach of a settlement agreement?

A.    No.

Q.    Does that involve alleged violations of the TCPA?

A.    Yes.

Q.    Is that the same entity as the case that is the defendant in the case that was filed in 2024?

A.    Yes.

Q.    Why -- why is there a separate lawsuit against that entity?

A.    Additional violations.

Q.    Of the -- of the TCPA?

A.    Correct.

Q.    Is that case still pending?

A.    Yes.

Q.    All right.  And are you aware of the case of Ortega vs. Go Car Wash Management Corp.?

A.    Yes.

Q.    Are you the plaintiff in that case?

A.    I am.



MAGNA
LEGAL SERVICES

Page 251

Q.   And does that case involve alleged violations of the TCPA?

A.   Yes.

Q.   And is that case still pending?

A.   It is still pending, yes.

Q.   So am I missing any TCPA cases that you're currently or have brought in the last two years?

A.   Well, let me think about it.  Yeah, you -- you're missing some.

Q.   About approximately how many cases have we now discussed today that involve claims brought by you against defendants for alleged violations of the TCPA?

A.   How many?

Q.   Approximately.

A.   I mean, I don't recall even an approximation. I know of another one you're missing.

Q.   What -- what -- what case is that?

A.   The case would be against Priority Roofing.

Q.   Is that pending in the Western District of Texas?

A.   It is not pending in the Western District of Texas.

Q.   What court is that case pending in front of?

A.   It's not pending.

Q.   Is it -- is it a claim that you're about to


MAGNA
LEGAL SERVICES

bring?

A.   No.

Q.   Okay.  What -- what court did that -- did that case -- was that case in?

A.   Texas Western District.

Q.   When was that -- when -- when was that case disposed of?

A.   Disposed of?

Q.   Or is it still pending?

A.   I don't recall an exact date.

Q.   2025?

A.   Early 2025/late 2024.  I'm not sure.

Q.   Okay.  So have you considered what a ruling that the 9664 number that's a business number, have you considered what a ruling like that would affect -- how that would affect your other TCPA cases?

A.   I don't have a number 9664, so I don't --

Q.   I'm sorry, 9663.

A.   And what was the question?

Q.   Have you considered whether a ruling that that 9663 number is a business number, what affect that will have on these numerous other TCPA cases that you've brought?

MR. ORTEGA:  I'm going to object to work product doctrine.  I'm not going to discuss, like, my



Page 253

legal strategies in pursuing these other cases and how they're intertwined.

Q.    (BY MR. KAPLAN)  And you're not going to answer?

A.    Correct.

Q.    All right.

MR. KAPLAN:  We've been going for a little bit if you want to have a five-minute break.

MR. ORTEGA:  It's up to you guys.

MR. KAPLAN:  Well, I'm -- I'm fine to keep going.  I'm cognizant of the other people on this call. So let's take a five-minute break.

MR. ORTEGA:  Okay.

THE VIDEOGRAPHER:  Okay.  This will mark the end of Media Number 4.  We're going to go off the record.  The time is 3:16 p.m.

(Recess held, 3:16 p.m. to 3:22 p.m.)

THE VIDEOGRAPHER:  This will mark the beginning of Media Number 5 in our deposition of Mark Anthony Ortega.  We're going back on the record.  It's 3:22 p.m.

Q.    (BY MR. KAPLAN)  All right.  Mr. Ortega, did you speak with anyone during that -- that break?

A.    No, I did not.

Q.    And is there anyone in the room with you right



Page 254

now?

A.    There is not.

Q.    All right.  I want to go back to Exhibit Number 2, which we previously reviewed.  Let me pull that up for you.  Let me know when you see it.

A.    I can see it here.

Q.    All right.  This is your Objections and Answers to Sienna Marketing's First Set of Interrogatories.  We've already reviewed this, but I want to, kind of, go through a couple of details in specific.

One, did you review and sign these -- this first -- this objections and answers?

A.    Yes, I reviewed it and signed it.

Q.    Okay.  So looking at response to Interrogatory Number 1, you say -- subject to all these objections, you say, (as read):  Plaintiff uses this number primarily for personal purposes.

What does -- what does primarily for personal purposes mean with respect to this interrogatory?

A.    It means that I use my phone primarily for personal use.

Q.    Would you put a percentage on that, what is personal and what is not personal?



MAGNA

LEGAL SERVICES

Page 255

A.    You're requesting --

        MR. ORTEGA:  I mean, I'm going to object. That calls for speculation.

Q.    (BY MR. KAPLAN)  So what does on occasion -- I'm looking at the next sentence.  (As read):  Plaintiff has on occasion used this personal number for communications concerning his entity MAO Real Estate, LLC within the last four years.

        What does -- what does "on occasion" mean in that context?

A.    On occasion means rarely.

Q.    Does it mean daily?

A.    Occasionally.  It does not mean daily.

Q.    Does it mean weekly?

A.    It does not even mean weekly actually.

Q.    Does it mean monthly?

A.    I would --

        MR. ORTEGA:  Again, I'm going to object. This calls for speculation.

A.    I don't know what you want me to...

Q.    (BY MR. KAPLAN)  Are you going to answer subject to the objection?

A.    Subject to the objection?  Can you state your question then.

Q.    I said: Does occasionally mean monthly?


MAGNA
LEGAL SERVICES

Page 256

A.    Occasionally does not mean monthly.

Q.    Did you review all of your call records on this 9663 number to answer Interrogatory Number 2?

A.    (As read):  State the name and addresses of all businesses on whose behalf...

Okay.  What was your question?

Q.    Did you review -- in coming up with your answer that you used this number on occasion for communications concerning his entity, MAO Real Estate, did you review your Verizon records to come up with this answer?

A.    On number 2?

Q.    Number 1.

A.    Oh, number 1.  Did I review my Verizon records in coming up with the answer?

Q.    Yes.

A.    I believe so.

Q.    And what -- and you reviewed all of your monthly invoices?

A.    Not all the monthly invoices.

Q.    Did you tabulate how many -- how many calls were personal versus how many were business in nature?

A.    I did not tabulate.

Q.    So how did you come up with that you used this occ- -- on -- on occasion, but that primarily you use


MAGNA
LEGAL SERVICES

Page 257

the number for -- for personal purposes?

A.    Due to the sheer number of calls of personal versus occasional business.

Q.    And I'm asking how you made that determination as to which call was personal and which call was business.

A.    A call that is not business is personal.

Q.    And I'm asking you how you made that distinction in reviewing your records or did you come up with that a different way?

A.    No, I came up with it reviewing records and also just a sheer notion of how many calls.  Primary would mean the primary use is personal.  So it's basically just how many calls were received over a duration and how many calls of those were business, but I did not tabulate to a percentile.

Q.    And you're able to determine by looking at your Verizon records, for instance, and looking at numbers on a page of outgoing and incoming which one is personal and which one is business?

A.    I know just how many calls I receive that are actual business, and that's going to give me a good -- good estimate, if I know I rarely get any business calls and I get tons of personal use calls.

Q.    How do you know that though?  I think



Page 258

previously I had asked you questions about your phone interactions with people when obtaining -- when seeking to obtain financing, and I asked you for all of their telephone numbers.  And the only number that you could give me at that point was for your father.

So in reviewing a record, such as a Verizon record that shows outgoing and incoming calls to this 9663 number, how are you able to determine which is personal versus which is business?

A.    Because the -- well, you can see that the majority of those calls -- if you look through the records, the vast majority are one-minute incoming calls, which the vast majority of those are considered personal.

Q.    How would you make that determination?

A.    Because they're not business calls.  A one minute tele-marketer calling me is -- they're not calling me on bus- -- on my business and I'm not, you know, trying to solicit any business.  All those calls -- and just off the sheer fact of how many of those calls come in -- I mean, that puts it -- you know, you can tabulate your own percentages just solely off one-minute incoming because the bill will dictate direction of the call and duration of the call.

Q.    I'm going to show you what has been marked as



Page 259

Exhibit 13.

(Exhibit 13 introduced.)

MR. KAPLAN:  And, Tammy, before you go off, I know I'm skipping number 12.  It's just how I've premarked things.

THE WITNESS:  Is there a 12 exhibit to be shown?

MR. KAPLAN:  Not today.

THE WITNESS:  Is it going to be included as part of the transcript?

MR. KAPLAN:  Nope.

Q.   (BY MR. KAPLAN)  All right.  Let me know when -- when you see that.

A.   I can see it.

Q.   Okay.  So I'm going to represent to you that this is a 37-page document.  If you see the -- up here it says Verizon.  Do you see that?

A.   Yeah, I see it says Verizon on the top.

Q.   And down here there's a number 000001.  Is that a number that you inputted on this document?

A.   Correct.

Q.   And so this is a document that you produced as part of discovery in this case?

A.   I believe so.

Q.   And does this represent a Verizon bill for the



Page 260

period of April 16th, 2022 to May 15th, 2022?

A. Yes, that looks like...

Q. Okay. And the account number is redacted. Did you perform that redaction?

A. Correct.

Q. And why did you redact the account number?

A. Confidential information.

Q. You didn't -- you didn't want to provide even the last four of the account number?

A. I don't have control over that -- I mean, these are just -- the account statements, so...

Q. Okay. There's -- there's -- under changes this month, the chosen number here -- which is the second, I guess, entry in this category -- and it's (210) 744-9663. That's your personal -- I'm sorry. That's your cell phone number?

A. That is my personal cell phone, yes.

Q. And what is the entry above this that's been redacted?

A. I don't recall at this moment.

Q. But you performed that redaction?

A. Correct.

Q. Do you know why you performed that redaction?

A. It's probably some sort of personal identifying information or something. I don't know what



MAGNA
LEGAL SERVICES

Page 261

it was on there.

Q.   Okay.  And so this shows the monthly charges for the account.  But what I am interested in is if we scroll down.  So talk activity, there's a section that -- that's fully redacted here under talk activity.  Do you see that?

A.   Correct.

Q.   And do you know why you performed that redaction?

A.   Yeah, that's con- -- that's other people's call records.

Q.   Who are the other people that would be reflected in this Verizon bill?

A.   Family members.

Q.   So is this a family plan?

A.   Correct.

Q.   How many other family members are on this family plan?

A.   I don't recall.

Q.   More than one?

A.   Correct.

Q.   More than two?

A.   Yes.

Q.   How many people are in your family, Mr. Ortega?



Page 262

A.   In my family?

Q.   In your -- in your nuclear family, your parents and your -- your siblings.

A.   There's a total of six of us.

Q.   Are all six of them on this family plan?

A.   No.

Q.   So -- so some number between two and six is --

A.   No.

Q.   -- on this family plan?

Is it more than six?

A.   Yes.

Q.   Do you know the number that's on this family plan?

A.   I don't recall the exact number of people.

Q.   All right.  And then -- so then here on page 12 we have talk activity that has not been redacted.

A.   Correct.

Q.   Okay.  So we can just start.  This number (210) 685-1474, do you know that number?

A.   Not off the top of my head, no.

Q.   Okay.  And so would -- so when -- when formulating your response to request number 1 to Interrogatory Number 1, did you review records such as this to determine the -- your statement that on occasion you used this number for business purposes for MAO Real



Estate?

A.    Well, I can tell you, I mean, some of these are, for example, family members.

Q.    Which ones are these are family members?

A.    The fourth one.

Q.    (505) 440-3070?

A.    Yeah.

Q.    Okay.  But what about (210) 360-0429, do you know that number?

A.    Not off the top of my head, no.

Q.    And that was for three minutes, right?

A.    Yeah, that was three minutes.

Q.    So -- so do you have any way to say if that was a personal or business call?

A.    Not without reviewing it additionally, the phone number.

Q.    Okay.  And what about this (210) 685-1474, do you know that number?

A.    That's I believe -- I believe so, but I would need to review.

Q.    Who do you believe that number to be?

A.    My mom.

Q.    You don't know?

A.    No, I said my mom.

Q.    Your mom, okay.



Page 264

What about this (210) 833-4095 number?

A.   I don't know.

Q.   Okay.  And that was for 18 minutes, right?

A.   Correct.

Q.   And so you have no way, as you sit here today, whether that's a personal or business call?

A.   Not as we sit here currently without pulling up additional information and looking at who it is.

Q.   What about this (580) 699-2298 number?  Do you see that?

A.   Yeah, I see that.

Q.   Okay.  That was an incoming call for two minutes.  Do you see that?

A.   Yes, I do see that.

Q.   And do you know whose number that is?

A.   I don't, again, recall off the top of my head.

Q.   So do you have any way to tell whether that was a personal or a business call?

A.   As I currently sit here?

Q.   Yes.

A.   Without additional information?  Correct, I don't have a way of looking it up.

Q.   What about this (505) 440-3070 number?  Do you see that?

A.   Yes.


MAGNA
LEGAL SERVICES

Page 265

Q.    Do you know that number?

A.    Yes.

Q.    Whose number is that?

A.    It's my brother.

Q.    What about (210) 953-4195?

A.    No, I don't -- I don't know off the top of my head.

Q.    Do you -- do you have any way to determine whether that's a personal or a business call?

A.    Do I have it?  I'm sure.

Q.    As you sit here today, are you able to tell me if that's a personal or a business call?

A.    Not as I sit here today recalling off the top of my head, no.

Q.    When you were preparing your responses to the interrogatories, did you determine whether or not the calls such as that one was -- was a personal or business call in formulating your answer?

A.    Did I determine calls such as that?

Q.    Yes.  Did -- when you were formulating your answer saying that on occasion you used this number for business purposes, are you -- did you go through your records such as this one and -- and go through and see how many you believe to be personal versus how many you believe to be business calls?



Page 266

A.    I did go through my records, yes.

Q.    And did you determine a set amount or a percentage that -- that you believed were personal versus business?

A.    I did not determine or tabulate.

Q.    Okay.  So how did you come up with that -- that on -- that you only on occasion used this 9663 number for business purposes?

A.    Because the sheer volume of calls that are personal versus business, it's substantial.  I mean, there's minimal usage.

Q.    But as we sit here today.  We've gone through six or seven calls and at least four of them have been -- have been calls that you could not determine, as you're sitting here today, to be personal or business, correct?

A.    Four out of six?  I don't know if it was four out of six.

Q.    I think it was four out of seven.

A.    Okay.

Q.    But -- but that -- that's correct, right?  There -- there's been -- there's been calls that we've gone through on -- on this talk activity sheet from this Verizon bill that you cannot determine as you sit here today to be personal or business.  You just cannot make



Page 267

that determination today, correct?

A. As we sit in this deposition, the -- if you're representing to me four out of seven, no, without looking up additional information.

Q. So as you sit here today, you cannot state with 100 percent confidence that the majority of these calls are one way or the other, business or personal?

A. Not with 100 percent, no, that's not -- that's not accurate. There are several calls in there that I could state with 100 percent accuracy that are personal.

Q. And I'm saying the totality, Mr. Ortega.

A. Also not the totality. Four out of -- or three out of seven is not anywhere clear.

Q. No, I'm saying -- I'm saying all the numbers. I'm saying all the numbers. That you cannot say for all the numbers on this sheet whether they're business or personal.

A. No, at this moment I cannot determine that these phone numbers are business.

Q. I'm going to show you what's been marked as Exhibit Number 14.

(Exhibit 14 introduced.)

Q. (BY MR. KAPLAN) All right. Let me know when you see that, Mr. Ortega.

A. Yes, I can see it.



MAGNA
LEGAL SERVICES

Page 268

Q.   So this is a 22-page document.  It's titled Confidential at the top, and then it looks to be some kind of table.  Do you see that?

A.   Yeah, I see it.

Q.   Okay.  And at the bottom here there's a number MAO 001574.  Do you see that?

A.   Yes, I see it.

Q.   Is that a number that you affixed to this document?

A.   Yes, it is.

Q.   Okay.  So is this a document you produced as part of discovery in this matter?

A.   It's a document that I produced in discovery, yes.

Q.   Okay.  And so can you tell me what this document is?

A.   It's a list of text messages.

Q.   Did you prepare this list?

A.   No.

Q.   How did you -- how did you come to this list?

A.   Verizon.

Q.   Did Verizon stamp confidential at the top?

A.   No, it did not.

Q.   I'm sorry.  I missed that answer.

A.   No, it did not stamp confidential.



Page 269

Q.    Did you stamp confidential at the top?

A.    Correct.

Q.    And so did you ask Verizon to provide you with a list of your -- of your text messages for a certain time period?

A.    It was exported from Verizon's website, correct.

Q.    And so is this for the telephone line (210) 744-9663?

A.    It appears to be.

Q.    Okay.  Do you have any reason to believe that this is not an accurate reflection of your text log from Verizon?

A.    No, I don't.

Q.    Okay.  Was this prepared as a native spreadsheet or did you receive this as a PDF printout?

A.    I believe -- I don't recall exactly in -- which method.

Q.    If you received it as part of a native spreadsheet, we would ask that that be produced.

A.    Okay.  I mean, I would have to look to see how it is.

Q.    All right.  Thank you, Mr. Ortega.

        Going through this, it looks like we have texts ranging from --



Page 270

A.   That's also going to be contingent on -- they only provide you with certain dates up to a certain time frame, so you may need to do a third-party subpoena to Verizon.  It's not going to be in my control or custody at this point to be able to pull those records.

Q.   What time period were you able to pull?  So it looks like it starts here April 16th, 2025.

A.   I provided everything I could whenever I received the request.

Q.   Okay.  So is this -- is this from multiple spreadsheets or from, you know, multiple requests?

A.   I don't recall the way of -- on the website how it is, but that's -- I just know that to the extent of, that's the maximum that I was able to pull.

Q.   Understood.

Looking just at -- at one of these -- we can pull this one.  All right.  So this is one of the entries.  Do you see that --

A.   Yeah.

Q.   -- where I've highlighted?

So it looks like, starting from the left, it says (210) 744-9663.  Are you with me?

A.   Yes.

Q.   So is that -- is that your cell phone number?

A.   That is my cell phone number.


MAGNA
LEGAL SERVICES

Page 271

Q.    Then it says 5/22/2025.  So May 22nd of this year, 5:38 p.m. received, right?

A.    Correct.

Q.    And then there's a number (695) 025-0000, correct?

A.    Correct.

Q.    Do you know -- do you know whose number that is?

A.    Not off the top of my head, no.

Q.    So do you have any way to determine as you sit here today whether that is a personal text message or a business text message?

A.    The only way to determine, as I sit here right now, is off of recall.  And, no, I don't recall off the top of my head.

Q.    Did you use your text message log in formulating your response to Interrogatory Number 1?

A.    Can you pull up Interrogatory Number 1?

Q.    Yeah.

A.    (As read):  Identify all phone numbers you use or have used in the past ten years for business purposes, including businesses -- which businesses or employees...

I believe so.  I mean, I provided you guys with text messages as well.



Page 272

Q.   All right.  Going back to Exhibit 14.  So we're on page 18.  We can go down.  All we can go to this -- to this one.  All right.  So, again, it's from your same number.  This is now May 23rd, and there's a number (561) 782-7817.  Do you see that?

A.   Correct.  I see it.

Q.   Do you know whose number that is?

A.   I have an idea.

Q.   And who -- who do you believe that to be?

A.   I believe my sister.

Q.   All right.  The one above that (915) 540-2479, do you know whose number that is?

A.   I'm originally from El Paso.  That -- the only people that text me from 915 are family members.

Q.   Couldn't be anybody else besides family members?

A.   Friends from El Paso.

Q.   What about (713) 913-1653?

A.   Houston?  Not that I recall off the top of my head.

Q.   So you can't tell me as you sit here today whether that is a personal text or a business text with 100 percent certainty?

A.   Without looking at my text messages, no.

Q.   All right.  So in response to Interrogatory



Page 273

Number 2 where I asked to state the name and address of all businesses on whose behalf you've used the number (210) 744-9663 to conduct any business-related communications in the last ten years, you provided a response, which the first paragraph consists of this objection. And then without waiving the objections, you responded, (as read): The telephone number (210) 744-9663 is currently Plaintiff's sole and only personal telephone number which he uses primarily for personal communications. As it is his only number, Plaintiff has also used it for occasional business-related communication concerning the following entities.

And then it lists MAO Real Estate, Ortega Capital, Grovano, Inc., Evergreen Capital, LLC, Green Forest Capital, LLC, and HorizonWiz, LLC. Do you see that?

A. Yes.

Q. Okay. So let's start with MAO Real Estate, LLC. When was that entity formed?

A. That entity was formed -- I don't recall an exact date.

Q. Sometime around 2015?

A. I would believe so.

Q. Is it still in existence today?

A. It is still in existence.


MAGNA
LEGAL SERVICES

Page 274

Q.    Yes.  Did you answer the question, Mr. Ortega?

A.    Yeah, I said it's still in existence.

Q.    Okay.  What is -- what is the primary business of MAO Real Estate?

A.    The primary business?

Q.    Yes.

A.    Real estate.

Q.    So does it -- does it buy commercial property? Residential property?

A.    That's a compound question.

Q.    Is it involved with personal -- with -- with residential property?

A.    Yes.

Q.    Okay.  Buying and selling?

A.    That's compound as well.

Q.    Does MAO Real Estate participate in the purchase of real estate property?

A.    Does it participate in the purchase? Occasionally.

Q.    Does it participate in the sale of residential property?

A.    Occasionally.

Q.    Besides you, are there any employees currently at MAO Real Estate?

A.    Currently, no.



Page 275

Q.   Have there previously been employees?

A.   Workers, yes.  Independent contractors.

Q.   And who are -- who are those independent contractors?

A.   I don't recall all of them, but Blanca De Luna is one.

Q.   Any others?

A.   Not that I can recall at this time.

Q.   Okay.  Does MAO Real Estate have any website?

A.   Not that I can recall.

Q.   Does it have any social media presence currently?

A.   Currently?  Not that I can recall.  Although they did request it, which is further in my interrogatories, that I did not -- I don't even control those.

Q.   Does MAO Real Estate currently own any property?

A.   Does it currently own property?  Yes.

Q.   What property does it own?

A.   Single-family homes.

Q.   Approximately how many single-family homes?

A.   Oh, I don't -- I don't know the exact number.

Q.   That's why I asked approximately.

A.   Approximately, maybe five.



Page 276

Q.   All in the San Antonio area?

A.   No.

Q.   Any outside of Texas?

MR. ORTEGA:  Objection, relevance, just to mark it down.

A.   You still want an answer?

Q.   (BY MR. KAPLAN)  Yes.

A.   All in Texas?  Yes.

Q.   Okay.

A.   Wait.  Well, yeah, I believe so.

Q.   For Ortega Capital, Inc., when was that incorporated?

A.   Ortega Capital, Inc., I don't recall.

Q.   Do you know approximately when?

A.   I don't have an approximation.

Q.   What's the primary business of Ortega Capital?

A.   Real estate.

Q.   Does Ortega Capital own real estate?

A.   Yes, it does.

Q.   When was Grovano, Inc. incorporated?

A.   Grovano, twenty -- approximately 2022-ish. 2023/2022.

Q.   What's the primary business purpose of Grovano, Inc.?

A.   Just retail sales.  Wholesale.



Page 277

Q.   Of what products?

A.   Home goods.

Q.   What kind of home goods?

A.   Home goods you would see at a big box retailer.

Q.   What about Evergreen Capital, LLC, when was that formed?

A.   Evergreen Capital?  I don't have an exact date.

Q.   What's the primary business purpose of Evergreen Capital?

A.   Evergreen Capital primarily was involved in real estate.

Q.   What does involved mean?  Does it own real estate?

A.   Does it currently own real estate?

Q.   Did it own real estate?

A.   Yes.

Q.   Does it currently own real estate?

A.   No.

Q.   What's the primary business purpose of Green Forest Capital?

A.   Primary purpose?  Real estate.

Q.   Has Green Forest Capital owned property in the past?



Page 278

A.   Yes.

Q.   Did you -- for Green Forest Capital were you the sole -- sole owner?

A.   No.

Q.   Who -- who is -- besides you who are the owners of Green Forest Capital?

A.   Who are the owners?

Q.   Yes.

A.   Joseph Llerena.

Q.   Anybody else?

A.   No.

Q.   Besides you are there any owners -- other owners of Evergreen Capital?

A.   I guess that's also ambiguus or vague.  What time period are you asking?

Q.   I said are there, so that would be --

(Simultaneously talking.)

Q.   (BY MR. KAPLAN)  -- Mr. Ortega.  Besides you are there any other owners of Grovano, Inc.?

A.   No.

Q.   Besides you are there any other owners of Ortega Capital, Inc.?

A.   No.

Q.   Besides you are there any other owners of MAO Real Estate LLC?



Page 279

A.   No.

Q.   All right.  In response to interrogatory --
I'm going to show you what is marked as Exhibit Number
15.

(Exhibit 15 introduced.)

Q.   (BY MR. KAPLAN)  Let me know when you see
that.

A.   Second set -- I see the exhibit.

Q.   Okay.  Do you want me to scroll through or
have you seen this document before?

A.   I mean, I would like to see the exhibit.

Q.   All right.

A.   It's too small.  You've got to zoom in.  There
you go.  I mean, you can go to the next page.

(Witness reviews document.)

Q.   (BY MR. KAPLAN)  Can I go to the next page?

A.   Almost.

(Witness reviews document.)

A.   Okay.  You can go to the next page.

(Witness reviews document.)

Q.   (BY MR. KAPLAN)  Let me know when I can scroll
down, Mr. Ortega.

A.   Yeah, you can go ahead and scroll.

(Witness reviews document.)

A.   All right.  You can scroll down.


MAGNA
LEGAL SERVICES

Page 280

Q.   (BY MR. KAPLAN)  Actually, I'm only asking questions about Interrogatories Number 10 and 11.  So I can show you the rest of the document just to show you that it's complete.

A.   Is it going to make any difference to any of the other stuff further down or no?

Q.   No, we're only going to go with 10 and 11.

A.   Okay.

Q.   All right.  So do you recognize this document?

A.   Yes.

Q.   And what is this document?

A.   It's Objections and Answers to Defendant's Second Set of Interrogatories.

Q.   Okay.  And you prepared this document?

A.   Correct.

Q.   And you signed it?

A.   Correct.

Q.   Okay.  You say, (as read):  The telephone number (210) 744-9663 -- this is in response Interrogatory Number 10 -- is Plaintiff's sole personal and residential telephone number.  Plaintiff uses this number primarily for personal matters.  Plaintiff has on occasion used it for limited business-related communications.  With respect to MAO Real Estate, LLC such communications have generally been with tenants or



Page 281

prospective tenants regarding leasing, maintenance, or other property management issues.

Okay.  So with respect to MAO Real Estate, can you tell me who its tenants or prospective tenants have been?

A.    I don't recall at this time.

Q.    So you couldn't tell me their telephone numbers?

A.    Not at this time off the top of my head.

Q.    You go further on to say in response to Interrogatory Number 10, (as read):  With respect to the other entities listed, which are primarily holding companies or ventures with limited to no public-facing operations, any, quote, occasional business-related communications, closed quote, using this number would have been for necessary contact that is administrative in nature, such as communications with co-investors, legal counsel regarding formation, governance, or financial matters.  And Plaintiff does not maintain a log or record of such communications.  And given the passage of time, cannot recall with any specificity the date, time, or detailed substance of each individual communication over the last ten years.  To do so would be impossible and would require pure speculation.

So who are the co-investors that you


MAGNA
LEGAL SERVICES

Page 282

identify in this portion of your response to

Interrogatory Number 10?

A.    Who are the co-investors?

Q.    Yes.

A.    Which entity?

Q.    It's not -- it just says with respect to the

other entities listed and then it mentions the

co-investors, Mr. Ortega.  So I'm asking who those

co-investors are.

A.    The co- -- I mean, of which entity are we

talking about?

Q.    Mr. Ortega, you're the one that -- that

drafted this, but I can show you that the request asks

for Ortega Capital, Grovano, Inc., LiquidationSA,

Evergreen Capital, Green Forest Capital, and HorizonWiz,

besides MAO, which isn't part of this part of the

answer.

So with respect to those, who are those

co-investors?

A.    Sure.  Can you scroll up so we can just go one

by one?

Q.    Yeah.

A.    Okay.  So co-investors in Ortega Capital, I'm

sole owner.  Grovano, Inc., sole owner.  LiquidationSA,

that would have been co-owner that is investing in it,



Page 283

Javier Bocanegra.

Q.   Okay.

A.   Evergreen Capital.  Wait, Evergreen Capital.
For a time being, co-investor Shawn Whitehorn.  Green
Forest Capital, Joseph Llerena.

Q.   Can you spell that?

A.   L-L-E-R-E-N-A.

Q.   All right.

A.   HorizonWiz, which that would be Alia Melendez.

Q.   All right.  So then with Interrogatory Number
11 you were asked to identify the individual or
individuals with whom you had occasional, quote --
quote, occasional business-related communications,
closed quote, using the phone number (210) 744-9663
concerning or on behalf of (1) Ortega Capital, Inc.; (2)
Grovano, Inc.; (3) LiquidationSA; (4) Evergreen Capital,
LLC; (5) Green Forest Capital, LLC; (6) HorizonWiz; and
(7) MAO Real Estate, LLC as identified in your June
12th, 2025 responses to Sienna Marketing's
Interrogatories Numbers 2 and 3 since 2015.

So then in response after these objections
-- let's go through some of these.  So you say, (as
read):  Subject to and without waiving the objections,
however to provide a good faith response based on his
general recollection, the categories of individuals with



MAGNA
LEGAL SERVICES

Page 284

whom such occasional business-related communications --

in quotes -- would have occurred are as follows.  So

with respect to MAO Real Estate, LLC communications

would have generally been with individuals such as

tenants, prospective tenants, contractors or vendors,

and for a period with virtual assistant Blanca De Luna.

So I think we already went over this just

a few seconds ago or minutes ago.  As to the tenants or

prospective tenants, you couldn't provide me, as we sit

here today, with who those people are, correct?

A.    Yeah.  I mean, subject to all those existing

objections in that answer, I mean, the response stays

the same.  I -- in terms of tenants and prospective

tenants.  As we sit here today, I don't have them off

the top of my head for you.

Q.    So you couldn't tell us their phone numbers?

A.    I couldn't give you their phone number off the

top of my head.  I don't have them remembered by memory.

Q.    And so with contractors for MAO Real Estate,

do you know who those contractors are or were?

A.    Do I know who?

Q.    Yes.

A.    Some.

Q.    Okay.  Who are they?

A.    I mean, there was -- Mario is one.


MAGNA
LEGAL SERVICES

Page 285

Q.   Okay.  Does Mario have a last name?

A.   I don't know his last name.

Q.   Do you know Mario's phone number?

A.   Not off the top of my head.

Q.   All right.  Any other contractors besides Mario?

A.   Another Mario.

Q.   Okay.  Do you know that other Mario's phone number?

A.   No, I don't know off the top of my head.

Q.   Besides the Marios, anybody else?

A.   Not that I can recall at this moment.

Q.   What about vendors?  Can you tell me who the vendors are in this section of the response?

A.   Vendors means something simply as if I were to order something from Lowes, they would call me to go pick it up or let me know that it's ready.

Q.   And so if they would call you to come pick it up, would that be on your 9663 number?

A.   It would be -- it depends on the time frame.

Q.   If they called you in the last five years to come pick something up, would that be on the 9663 number?

A.   Not all, no.

Q.   Okay.  Excluding this past year when you had



Page 286

two numbers, if they called you asking to pick something up, would that be on the 9663 number?

A.    In the last five years?

Q.    Yes.

A.    I would probably say -- I mean, that's, again, speculation.  I would probably say not, but...

Q.    Is there -- so you're saying probably not if they had called you, it wouldn't have been on the 9663 number?

A.    You asked if it was always on the 9663 number.

Q.    No, I said: if they had called you, would it have been on the 9663 number?

A.    Would it have been?

Q.    And Blanca De Luna, I think you testified earlier you don't her phone number?

A.    Not off the top of my head.

Q.    Okay.  So with respect to Ortega Capital, you said communications would have generally been with individuals such as tenants, prospective tenants, contractors, or vendors, and for a period with virtual assistant Blanca De Luna.  Am I reading that correctly?

A.    Sounds -- yeah, that's correct.

Q.    Okay.  Do you know who those tenants -- those tenants are who are referenced in this portion of the answer?



Page 287

A.   Not off the top of my head, no.

Q.   And so you can't tell me their phone numbers, right?

A.   I don't have them memorized, no.

Q.   So you can't tell me as we sit here today?

A.   Not as we sit here today, no.

Q.   And the prospective tenants, can you tell me who those prospective tenants are referenced in this portion of the answer?

A.   No, not as we sit here today.  I don't have them off the top of my head.

Q.   So you can't tell me those prospective tenants' numbers either?

A.   No, not at this -- not sitting here in this moment.

Q.   And contractors, can you tell me who those contractors are that you're referring to in -- in this portion of the answer?

A.   I mean, not off the top of my head.

Q.   And so you can't tell me today who those contractors are or what their phone numbers are or were, correct?

A.   Not off the top of my head, no.

Q.   And you can't do that as we sit here today?

A.   Not off the top of my head, no.



Page 288

Q.   And -- and for vendors, can you tell me who those vendors are referenced in this portion of the answer?

A.   It would be similar to the other response.

Q.   And so -- and so could you tell me who the -- the phone numbers for those vendors as we sit here today?

A.   Not as we sit here.

Q.   Okay.  And we already answered for Ms. De Luna, so we'll go down to Evergreen Capital, LLC.  You say, (as read):  Communications would have generally been with individuals such as tenants, prospective tenants, contractors or vendors, and partner Shawn Whitehorn.

Is your answer going to be for Evergreen Capital any different than the answers you provided for MAO or Ortega with regards to the specific names of any of these people besides Mr. Whitehorn?

A.   Would it be any different?

Q.   Yes.

A.   I'm not sure.

Q.   All right.  Then let's run through it.  Why not?

A.   Sure.

Q.   For Greene For- -- so can you identify who the



Page 289

-- the tenants would be for Evergreen Capital?

A.   Can I identify them?

Q.   Yeah.

A.   Not all of them.

Q.   Can you identify some of them?

A.   Some.

Q.   All right.  Let's hear it.

A.   Charles Grass.

Q.   All right.  What's Mr. Grass's phone number?

A.   I don't know his phone number off the top of my head.

Q.   All right.  Any other tenants?

A.   I mean, they would be -- current tenants?

Q.   Current or former.  You just said: has been with individuals, such as tenants.

A.   Yeah, tenants.  Not off the top of my head.

Q.   Okay.  What about prospective tenants?

A.   Not that I can -- no, not off the top of my head.

Q.   So you couldn't tell me their phone numbers either as we sit here today?

A.   No.

Q.   And for contractors, can you tell me who the contractors identified in this portion of the answer?

A.   Contractors, some.



Page 290

Q.    And who are those contractors?

A.    Jack Philbrick.

Q.    Okay.  And do you know his phone number?

A.    No, not at this moment.

Q.    What about any other contractors?

A.    Not at this moment.

Q.    Okay.  And so you wouldn't be able to tell me their phone numbers either, correct?

A.    I wouldn't be able to recall from memory, no.

Q.    And what about -- what about for vendors?  Are you able to identify any specific vendors with regard to this portion of your response?

A.    It's going to be similar.

Q.    Okay.  And could you tell me any of those vendors' phone numbers as we sit here today?

A.    No, I could not tell you the vendors' phone numbers off of memory at this point.

Q.    All right.  And what about Shawn Whitehorn, can you tell me his phone number as we sit here today?

A.    No, not off of memory.  I don't have it memorized.

Q.    Okay.  All right.  And so for Green Forest Capital you say, (as read):  Communications would have generally been with individuals such as virtual assistants and partner Joseph Llerena.



Page 291

Who are those virtual assistants referenced in this portion of the answer?

A. Who are they?

Q. Yes.

A. Rocky.

Q. Okay. Do you have -- do you know Rocky's number as you sit here today?

A. No.

Q. Any other personal assist- -- virtual assistants?

A. Joaquin.

Q. Do you know Joaquin's number?

A. No, I don't.

Q. Do you know either if their last names?

A. Not off of memory, no.

Q. Anybody else besides Rocky and Joaquin?

A. Probably, but I don't recall at this point.

Q. And so you couldn't tell me anybody else -- any other virtual assistant's phone numbers as you sit here today?

A. No.

Q. And what about Joseph Llerena? Do you know his phone number?

A. I don't recall his phone number from memory.

Q. So you can't tell me that as we sit here



Page 292

today?

A. No.

Q. For HorizonWiz, LLC, it says, (as read): Communications would have generally been with individuals such as partner Aila Melendez.

Do you see that?

A. Yes, I see it.

Q. Okay. And do you know Aila Melendez's number?

A. No, I don't know Aila's number off the top of my head.

Q. Thank you for that correction.

And for Grovano, it says (as read): Communications would have generally been with individuals such as virtual assistants and employees.

Who are the employees referenced in this portion of the response?

A. The employees of the warehouse.

Q. Okay. And who are -- and so do you know who those employees are?

A. Yes.

Q. And who are those employees?

A. What is her name? I would have to go back and look.

Q. So you couldn't tell me any of their phone numbers as you sit here today?



Page 293

A.    Not off the top of my head.  I don't have them memorized.

Q.    Okay.  And so when you were preparing your response to the interrogatories, specifically with response to Interrogatory Number 1, did you cross reference any of the numbers for the individuals listed in this response versus your call logs to see how many calls were for these people that you said you spoke with for business purposes?

A.    I don't recall.

Q.    Okay.  I am going to show you what has been marked as Exhibit 16.

                (Exhibit 16 introduced.)

Q.    (BY MR. KAPLAN)  Do you see this, Mr. Ortega?

A.    Yes, let me see.  This is just one -- oh, it's two pages.  All right.  Let me see.

                (Witness reviews document.)

A.    Can you go to the second page?

                (Witness reviews document.)

Q.    (BY MR. KAPLAN)  All right.  Let me know when you've finished reading that.

A.    Okay.

Q.    All right.  So -- so did you -- did you prepare and sign this document?

A.    Yes, I did.



MAGNA
LEGAL SERVICES

Page 294

Q.   Is there any reason why you called it an unsworn declaration?

A.   The title of the document?

Q.   Yeah.

A.   That's because that's what it is.

Q.   Not -- not a sworn declaration?  It's an unsworn declaration?

A.   It's not an affidavit.  I didn't go get it notarized.

Q.   Okay.  So in this you say, (as read):  I hereby declare that I do not have access to the e-mail accounts associated with the following e-mail addresses: mark@horizonwhiz.com.

Why do you no longer have access to that e-mail?

A.   Why do I no longer have access to it?  Because we don't use those.  Whenever the company closed, that was never maintained, the access to any of this or those accounts.

Q.   But you still have some kind of local access to -- to that account?

A.   No.

Q.   Okay.  And what about for mark@liquidationessay.com, why do you no longer have access to that account?



Page 295

A.    That -- that -- I sold my ownership in that company.

Q.    Who did you sell your ownership in that company to?

A.    Javier Bocanegra.

Q.    And so you say: I no longer have access -- I'm looking at number 6.  (As read):  I no longer have access to the e-mail server for the account mark@gforestcapital.com.

Do you see that?

A.    Yes, I see it there.

Q.    And you say, (as read):  However, a limited number of historical e-mails from before I lost access to that account remain safe locally in the mail application on my computer.

So you did have some e-mails for this account saved locally, correct?

A.    Yes, I do.

Q.    And so what kind of search did you do -- let me take a step back.

You received document production requests as part of discovery in this matter, correct?

A.    Did I receive production requests?

Q.    Yes.

A.    Yes.


MAGNA
LEGAL SERVICES

Page 296

Q.   Okay.  What kind of search did you do of your documents and your electronic documents to respond to those document production requests?

A.   To which document production request are you referring to specifically?

Q.   To the -- to the entirety.  Did you run a search on your e-mails?  You know, if so, do you remember what those search terms were?

A.   I mean, that's pretty blanket.  I need to know which -- can you pull up the -- do you have the exhibit for the productions [sic]?

Q.   I'm not going to go through that right now, Mr. Ortega.

A.   I can't respond to your question if you're asking me about the production requests and I don't know what you're talking -- like what --

Q.   So you can't tell me generally what you did?

A.   I can't tell you in respect to -- just in a general sense.

Q.   What time frame did you search for?

A.   For what -- which requests?

Q.   For all of the requests.  In some of your responses to the interrogatories you say you were only providing responses for four years.  Well, did you search for four years?



MAGNA
LEGAL SERVICES

Page 297

A.   Are you referring to the production requests or are you referring to the court order that I produce certain documents at certain time frames that are sample?

Q.   Well, Mr. Ortega, I'm referring to the production requests because the Court ordered you to do that because you did not comply properly with the production requests.

A.   Yeah, but --

Q.   So that's all inclusive -- do not talk over me, Mr. Ortega.

That is all inclusive in my question.

A.   It's all inclusive?

MR. ORTEGA:  I mean, I'm just going to object for vague and ambiguous unless you want to go ahead and act- -- like, ask me a specific question.

Q.   (BY MR. KAPLAN)  Did you have any assistance when reviewing your documents to respond to the -- the discovery requests?

MR. ORTEGA:  I'm going to object for work product doctrine about prep -- preparation.  You're asking about strategies/preparation for my legal documents.

Q.   (BY MR. KAPLAN)  And -- and I think you're confusing my question.  I'm not -- I'm not asking what



Page 298

assistance you received.  I'm asking: did you receive assistance?

A.    No.

MR. ORTEGA:  And I guess I'll preface that with also, I guess, I'm answering subject to an objection of, like, ambiguus and vague.

A.    Like assistance, are you saying assistance from somebody?  It's just not clear.

Q.    (BY MR. KAPLAN)  Yeah, assistance from somebody.  It couldn't any clearer than that?

A.    Okay.  No.

Q.    All right.  I'm going to show you what's been marked as Exhibit Number 17.

(Exhibit 17 introduced.)

Q.    (BY MR. KAPLAN)  This is a six-page document. I'm going to scroll down a little bit.  Do you see that?

A.    Yes.

Q.    All right.  That's the -- that's the first page and a half and here's the second one.

A.    Yeah, let me go ahead and review the -- go back to the first.

Q.    So let me just show you at the bottom.  At the bottom here it says: 001496, right?

A.    Yeah, okay.

Q.    Okay.  So is that a number that you put in?


MAGNA
LEGAL SERVICES

A.   Yes.

Q.   So is this a document you produced as part of discovery?

A.   Correct.

Q.   Okay.

A.   I mean, I didn't see the entirety of the document to I guess --

Q.   I'm happy to show you, but I -- I also know that you're going to cut off right at seven hours.  So that's why I want to get through everything I want to get through.

A.   You're -- whatever you decide.  I need to have time to actually review any exhibits you provide.

Q.   Tell me when you're done with this page, Mr. Ortega.

A.   I mean, it's just up to you what you want to show for --

Q.   Mr. Ortega, tell me when you're done with this page.  I'm giving you the opportunity.

A.   Okay.  Thank you.  Can you go to the next page?  Zoom in.  I mean, a little bit more zooming in.  This is small.  Thank you.

            (Witness reviews document.)

A.   Okay.  Next.

            (Witness reviews document.)



Page 300

A.    Okay.  Next.  Is there anymore after that?

(Witness reviews document.)

Q.    (BY MR. KAPLAN)  Okay.  So do you recognize this document, Mr. Ortega?

A.    Yes.

Q.    So are these payments that -- that you made to a Ruben Ortega, Jr.?

A.    For clarification this is two separate documents in this exhibit.

Q.    Okay.  So the first five pages of this, are these payments you made to Mr. Ruben Ortega, Jr.?

A.    Correct.

Q.    Okay.  And why were you paying Mr. Ortega, Jr.?

A.    Reimbursement for the phone bill -- for my phone bill.

Q.    So was the phone bill at this time, specifically here January 1, 2021, in Mr. Ruben Ortega, Jr.'s name?

A.    It's not -- we each have our own lines in our own name, and we're both managers on the account.  But it comes out of his account and then we reimburse.

Q.    Who is the holder of the family plan?

A.    The holder?  We're both managers, so it's Ruben and I.



Page 301

Q.    So there was no primary user?

A.    We're both designated managers or I guess we were both designated managers.

Q.    Are you able to produce un-redacted bills that show that -- that you are -- are both designated as managers for this phone line?

A.    There's nothing going to be on those bills that -- you would have to subpoena Verizon to show account status or like permissions on it at that time because I'm no longer on that account.

Q.    When did you cease being on that account?

A.    The end of, I believe, 2024.  Around the end of 2024.

Q.    So after the alleged -- the alleged communications at issue in this case?

A.    After.  I mean, that's up to what is currently known without discovery, correct.

Q.    And so Mr. Ortega, Jr. paid the bill when you guys were both on this family plan, and then you paid him back, correct?

A.    Yes, it would draft from his account and then everybody reimburses Ruben Ortega, Jr.

Q.    Okay.  I'm going to show you what's been marked as Exhibit 18.

(Exhibit 18 introduced.)



Page 302

Q.   (BY MR. KAPLAN)  I'll pull it back a little bit.

A.   Okay.

(Witness reviews document.)

A.   Can you scroll down?

Q.   (BY MR. KAPLAN)  Yeah, let me know when you want me to scroll down.

A.   Yeah, scroll down to the next page.  Okay. Yeah, keep going.

(Witness reviews document.)

A.   Okay.  Is there anything after that or no?

Q.   (BY MR. KAPLAN)  Just -- just the bottom here.

A.   That's good.  All right.

Q.   Okay.  So do you see here it says: MAO 001623?

A.   Yes, I see that.

Q.   Is that a number that you put on this document?

A.   Yes, I put that number on the document.

Q.   And is this a document that you produced as part of discovery in this matter?

A.   Yes, I believe so.

Q.   And so does this appear to be a Franchise Tax Annual No Tax Due Report for 2022?

A.   It would appear so.

Q.   Did you prepare this report?



A.    The tax due report?  I believe so.

Q.    It says here: Entered by Mark A. Ortega.  Does that help refresh your recollection?

A.    I mean, if that's what the document states, yes.

Q.    And it lists a telephone number as (210) 744-9663, correct?

A.    That's correct.

Q.    And that is your mobile number?

A.    That's my personal cell phone.

Q.    That's your cell phone.  Okay.

And so it also lists: Tax payor MAO Real Estate LLC, correct?

A.    That's correct.

Q.    So this is the MAO Real Estate, LLC Franchise Tax 2022 Annual No Tax Due Report, correct?

A.    That is the Franchise Tax 2022 Annual No Tax Due Report, correct.

Q.    And -- and you submitted this report, correct?

A.    I believe so.

Q.    Is there any reason to believe that you did not submit this report?

A.    I mean, I -- you're representing to me as there, so I don't have any representation that it wouldn't be.



Q.    I'm going to go through some other exhibits?

MR. KAPLAN:  And, Tammy, you're going to have to forgive me.  We're going to be jumping around a little bit.  All right?

MR. ORTEGA:  Also too, I guess, just before we finish or we get too close, if you want to just document on the record too pursuant to Rule 30(e) I am requesting to review both the transcript, as well as the video.

You can continue.

MR. KAPLAN:  Wait -- can we go off -- can we go off the record for a second?  What are you asking for, Mr. Ortega?

THE VIDEOGRAPHER:  Okay.  Hang on.  Let me take us off the record here.

We're going off the record.  This will mark the end of Media Number 5.  We're going off the record at 4:22.

(Recess held, 4:22 p.m. to 4:24 p.m.)

THE VIDEOGRAPHER:  This will mark the beginning of Media Number 6 in our deposition of Mark Anthony Ortega.  We're going back on the record.  The time is 4:24 p.m.

Q.    (BY MR. KAPLAN)  All right.  Thank you.  I'm going to show what is marked as Exhibit Number 23.



MAGNA
LEGAL SERVICES

Page 305

(Exhibit 23 introduced.)

Q.   (BY MR. KAPLAN)  This is a one-page document with only something at the top.  Let me know when you finish reviewing, Mr. Ortega.

A.   I can't see anything.

Q.   Oh, well, that's because I didn't share it with you.  There you go.  Let me know when -- when it pops up for -- for you.

A.   Okay.

(Witness reviews document.)

A.   Okay.  Yeah, I read it.

Q.   (BY MR. KAPLAN)  All right.  So at the bottom here it says MAO 001502.  Is that a number that you affixed on to this document?

A.   Correct.

Q.   So is this a document that you produced as part of discovery in this matter?

A.   I believe so.

Q.   Okay.  And is this -- you -- so this says from Mark Ortega, mark@maorealestate.com.  Is that one of the e-mail addresses that you use?

A.   Yes, it is.

Q.   So it's to M-A-L-I-S-S-A @sovereigntitleok.com.  Do you see that?

A.   I do see it.



Page 306

Q.   And it says the date: January 7th, 2022 at 10:50 a.m.  All right.  And so it says, (as read):  Hi, Malissa.  My name is Mark Ortega, and I'm the owner of Evergreen Capital and the seller in this transaction.  I put together a list of all the security deposits so we can pro rate the rents for next week's closing.  Let me know if you have any questions.

And it looks like there's an attachment for Evergreen Capital's rent roll.  Do you see that?

A.   I do see it.

Q.   So is this an e-mail you sent on behalf of Evergreen Capital?

A.   On behalf of Evergreen Capital?  I mean, I'm just the principal in the transaction.

Q.   So were you conducting business on behalf of Evergreen Capital as part -- through this e-mail?

A.   This was -- am I conducting business?  Can you be more, like, less vague.

MR. ORTEGA:  I'm just going to put objection, form for vague and ambiguous.  What --

Q.   (BY MR. KAPLAN)  Are you going to answer the question?  Are you going to answer the question?

A.   Oh, am I conducting business?

Q.   Yes.

A.   I'm providing rent rolls to Malissa.


MAGNA
LEGAL SERVICES

Q.    Whose rent rolls?

A.    The rent rolls of Evergreen.

Q.    Okay.  So -- so you're sending a document prepared by Evergreen Capital to somebody named Malissa, right?

A.    That is correct.

Q.    Okay.  And you're sending this from your MAO Real Estate.com e-mail address, correct?

A.    That is correct.

Q.    Okay.  And there's a signature block here, right?  Do you see that?

A.    No, it says: Regards, Mark Anthony Ortega. Yeah.

Q.    There's a phone number underneath that, correct?

A.    There is a phone number.

Q.    And it's (210) 744-9663, correct?

A.    Correct.

Q.    And is that your cell phone number?

A.    That is my personal cell phone.

Q.    You're saying personal, but this -- this is an e-mail with regard to Evergreen Capital, correct?

A.    This e-mail is in regard to rent rolls of Evergreen, correct.

Q.    Of Evergreen, yes.  Okay.



Page 308

I'm going to show you what's been marked as Exhibit Number 24.

(Exhibit 24 introduced.)

Q.   (BY MR. KAPLAN)   This is -- I'm going to blow this up a little bit so you can see it better.   All right?

A.   Sure.

Q.   Is that better?

A.   Yeah.

Q.   Okay.   So do you want me to scroll down through this so you can get an understanding of it?

A.   I can't tell -- yeah.   Where is the start of this?   What's the --

Q.   It starts at the bottom.

A.   Okay.

Q.   So this is actually a partial e-mail that was produced in discovery.   I can represent to you that the whole e-mail was not -- the whole e-mail chain was not produced.   So what you have here on the bottom of - or, you know, on this page is the entirety of what was produced in this e-mail chain.   All right?

A.   I mean that is the -- the entirety of the e-mail chain.

Q.   There's nothing after E down here?

A.   No.   I mean, it's just -- it's just the


MAGNA
LEGAL SERVICES

statute.

Q.   Okay.   So -- so -- so tell me when -- when I can keep scrolling up so you can -- or tell me when you're ready to answer questions about this document.

(Witness reviews document.)

A.   Okay.   Go up.

(Witness reviews document.)

A.   All right.   Scroll up.   Keep going.   Keep going.

(Witness reviews document.)

A.   Yeah, okay.

Q.   (BY MR. KAPLAN)   Okay.   So have you seen this document before?

A.   I have.

Q.   What is this document?

A.   It's a Notice to Enter Dwelling Unit.

Q.   Okay.   And Charles Grass, I believe that you had mentioned his name previously in this deposition, correct?

A.   Correct.

Q.   As -- as a -- as a tenant of one of your entities?

A.   Prior tenant, yes.

Q.   Yes.   And what entity was that?

A.   It was Evergreen Capital.



Page 310

Q.    Okay.  And so it looks like this is some e-mail correspondence between you and him on December 20th, 2021, or at least that's the top e-mail.  I believe the earlier ones are from previous dates, correct?

A.    I bel- -- I mean, if you want to scroll down, I believe they're all from a previous date.

Q.    Yes.  Well, the top one is from December 20th, and then it goes down from December 17th down, correct?

A.    Correct.  It's -- yeah, it's descending.

Q.    Okay.  So on -- so on November 18th, 2021, right down here --

A.    Okay.

Q.    -- you say, (as read):  Hello, my name is Mark Anthony Ortega.  I'm the owner of Evergreen Capital, LLC and I'm giving formal notice that an Oklahoma licensed appraiser prospective buyer and I will be by the property sometime between Saturday November 20th, 20 -- it just says 201 -- through T your unit by tomorrow morning.  If you have any questions or concerns, please reach out to me by e-mail at mark@mark -- at -- sorry -- mark@maorealestate.com or by phone at (210) 744-9663.  Also if you have a four-hour block of time that works best for you on Saturday/Sunday, please text me with your preference.



Page 311

Okay.  Do you see that?

A.    Yeah, I see it.

Q.    And so is this a notice that Evergreen Capital, LLC is sending to one of its then tenants?

A.    To one, no.

Q.    This isn't a notice that Evergreen Capital, LLC is sending to -- to one of its then tenants?

A.    To one of?  No, it's not to just one tenant.

Q.    Okay.  So -- so is this to multiple tenants of Evergreen Capital?

A.    Yes.

Q.    Okay.  Who besides Charles Grass is this to?

A.    This is -- it doesn't show the bcc on it.

Q.    But -- but your understanding is that you -- is that you sent this to not just Charles Grass, but others as well?

A.    It should have been a blind carbon copy.

Q.    Okay.  But that was to other people besides Mr. Grass, correct?

A.    Correct.

Q.    And so you told those people and Mr. Grass that if they have any concerns or questions, please reach out to me by e-mail at mark@maorealestate.com or phone at (210) 744-9663.

Correct?


MAGNA
LEGAL SERVICES

Page 312

A.    Correct.  Because the tenants normally don't have my personal cell phone, so they needed -- I was actually going to there and this is the sale of it, so yes.

Q.    But you're -- but you're coming there for your work with Evergreen Capital, LLC, correct?

A.    No, it was the final -- yeah, I mean, this was the sale of all assets of Evergreen, yeah.

Q.    Okay.  I'm going to show you what's been marked as Exhibit Number 25.

(Exhibit 25 introduced.)

Q.    (BY MR. KAPLAN)  All right.  Again, this is an e-mail chain so we might want to start from the bottom, although that might be -- okay.  So I'm going to scroll down for you.  All right?

A.    Okay.

(Witness reviews document.)

A.    All right.  Scroll up.

(Witness reviews document.)

A.    Okay.  Scroll up.

(Witness reviews document.)

A.    And then now you can skip past this.  Go up.

(Witness reviews document.)

A.    Okay, sure.

Q.    (BY MR. KAPLAN)  Okay.  And so is this -- what



Page 313

is this document?

A.   It looks like an e-mail from a partner to a agent.

Q.   And by a partner -- partner, that was your partner in -- in Green Forest, Mr. Llerena?

A.   Yeah, it was a business partner, Joseph.

Q.   Okay.  And on Friday September 15th, 2023 at 9:30 Mr. Llerena is saying, (as read):  E-mail is fine. Phone for time-sensitive matters.  Joseph (210) 900-1511.  Mark (210) 744-9663.  Do you see that?

A.   Yes, I see that.

Q.   So who was Joseph e-mailing in this e-mail?

A.   I believe he was e-mailing Brittany Hawthorne.

Q.   And who is Brittany Hawthorne?

A.   Brittany Hawthorne looks like a -- she works at Exit Silver Thread, is what it looks like.

Q.   Do you know what Exit Silver Thread is?

A.   I'm going to assume it's a real estate company.

Q.   And was Green Forest Capital working with Exit Silver Thread at this time?

A.   I mean, I don't recall what Joseph -- he was in charge of the properties and all that.

Q.   But Joseph said that you could be contacted at (210) 744-9663 number, correct?



Page 314

A.    He put my phone number on there for -- my personal cell phone number for personal -- for time-sensitive matters, yes.

Q.    Did you have any personal relationship with Brittany Hawthorne?

A.    I don't.

Q.    So the only -- the only reason you know Brittany Hawthorne is through G Forest Capital and its business with Exit Silver Thread, correct?

A.    Whatever Joseph was doing, yeah.  I don't know if I've actually spoken to Brittany.

Q.    But that's the only time that you would have spoken to Brittany was part of transactions between G Force Capital and Exit Silver Thread?

        MR. ORTEGA:  That's -- I mean, that's -- objection, speculation.  You're asking hypothetical.

A.    I don't recall speaking with Brittany.

Q.    (BY MR. KAPLAN)  I'll show you what's been marked as Exhibit Number 26.

        (Exhibit 26 introduced.)

Q.    (BY MR. KAPLAN)  I'll scroll to the bottom here.  So there's nothing on this page besides confidential and the Bates label.  So we can start here.

A.    All right.

Q.    I'm just getting to the top of that e-mail and



Page 315

we can go down if you need.

A.   Okay.

(Witness reviews document.)

A.   And go down.  Let's see.

(Witness reviews document.)

A.   Scroll down.

(Witness reviews document.)

A.   Okay.  You can scroll up to the top or I guess before that e-mail.

Q.   Yeah.

(Witness reviews document.)

A.   Okay.  Scroll up.

(Witness reviews document.)

A.   Okay.  Scroll up.  Yeah, that's fine keep going.

(Witness reviews document.)

A.   Yeah, keep going up.  Okay.  And then let's see.  All right.  Sure.

Q.   (BY MR. KAPLAN)  So looking that the top e-mail, it looks like it's from Mark Ortega, mark@grovano.com; is that correct?

A.   That is.

Q.   And you're e-mailing Rebecca Carnicle, rcarnicle@greatamtitle.com as well as efrelator@gmail.com, correct?



Page 316

A.    Yes.

Q.    All right.  And so it looks like you're telling her that if there's -- if there's a notary needed for a transaction, that they could use your notary, correct?

A.    Correct.

Q.    And then for scheduling it says, location of appointment: home.  Address of appointment: 152 Bedingfeld Drive, Shavona Park, Texas 78231.  Community gate code: 2616.  Time of appointment: anytime 11 a.m. to 2 p.m., Monday to Friday.  And best contact number: (210) 744-9663.  Is that correct?

A.    That is -- looks -- that's correct.

Q.    And that's -- and that's your cell phone number?

A.    That's my personal cell phone, yes.

Q.    With regards to this transaction, you're e-mailing from your Grovano.com e-mail account?

A.    Yes.

Q.    Do you recall what call of transaction was happening?  What kind of document needed to be notarized?

A.    It's Hirschfeld.  I mean, that's property -- a property document.

Q.    And so the Hirschfeld Road property, is that



Page 317

property that was owned by Grovano?

A.    It was owned by Grovano.

Q.    Not you individually?

A.    Not me individually.

Q.    All right.

MR. KAPLAN:  We're going to jump a little bit, Tammy, so don't be alarmed.  Exhibit 36.  All right.

(Exhibit 36 introduced.)

Q.    (BY MR. KAPLAN)  So this -- if you want to take a second to look at this text thread.

(Witness reviews document.)

A.    Okay.  Oh, we're going in reverse order here? Can you just scroll down to the beginning of this because you're going backwards.

Q.    (BY MR. KAPLAN)  I don't think we are because this is January 29, 2022 and the next page is June 24th, 2022.

A.    You're right.  Okay.  Is there anything down?

Q.    Yeah.

(Witness reviews document.)

A.    Okay.

Q.    (BY MR. KAPLAN)  So that's everything there. So -- so is this a screenshot from your mobile cell phone?



Page 318

A.   I believe so.

Q.   The one ending in 9663?

A.   It's text messages from my cell phone.

Q.   Okay.  And who -- who is Alfred?

A.   He is a contractor.

Q.   A contractor.  So at this time in January of 2022 was this Golden Wing property owned by one of your businesses?

A.   On that specific date, I wouldn't recall.

Q.   Were you living at the Golden Wing property at this time?

A.   Again, I don't recall the exact date, if I was already living there or not.

Q.   You don't recall what date you were living in -- in what place?

A.   I don't recall if I was already living there or -- January of 2022?

Q.   Yes.

A.   Let's see.  I believe I...

Q.   So I think I can help you with that.  It says the address is, (as read):  1507 Golden Wing, San Antonio, Texas 78260.  It's vacant and you can access it by going through the garage door.

So does that refresh your recollection as to whether you were living there at the time?



Page 319

A.   Yeah, this is going to be right after I moved.

Q.   Okay.  And do you recall why you were having Alfred the contractor come to this property?

A.   To work on the -- let's see.  Let me read here.  It says for the HVAC unit.

Q.   And you don't know the ownership of this property at that time in January of 2022?

A.   If it was in -- after I moved out, then it should be in my name.

Q.   Should or shouldn't be?

A.   Should.

Q.   Should?

A.   Should be in my personal name.

Q.   I'm going to show you what's been marked as Exhibit Number 37.

(Exhibit 37 introduced.)

Q.   (BY MR. KAPLAN)  All right.  So do you want to take a second to look through this?

A.   Okay.

Q.   Let me know when you want me to scroll down.

(Witness reviews document.)

A.   Yeah, okay.  You can scroll down.

(Witness reviews document.)

A.   Okay.

Q.   (BY MR. KAPLAN)  All right.  So -- so is this



MAGNA
LEGAL SERVICES

Page 320

a document that you produced as part of discovery in this matter?

A.    Yes.

Q.    And is this a screenshot of some text messages sent and received on your 9663 cell phone?

A.    Yes.

Q.    Okay.  What is the property in Canyon Lake that's being referenced in this top text message?

A.    I don't recall which property.

Q.    Did one of your businesses own a property in Canyon Lake?

A.    Did they own -- I mean, I think I've owned several.

Q.    Okay.  In this time of December of 2022?

A.    I don't recall which one or which property this is.

Q.    Have you ever individually owned property in Canyon Lake?

A.    Individually?

Q.    Personally, in your own name, have you owned property in Canyon Lake?

A.    I mean, I can't say with 100 percent determination that I've owned...

Q.    But your businesses have owned several properties in Canyon Lake is what you're saying?



A.   Yes.

Q.   Okay.  So is there any reason to believe --
okay.  So first, who is Edward?

A.   Edward is a contractor.

Q.   Okay.  And so you're contacting Edward about a
property in Canyon Lake, correct?

A.   That's what it appears to be.

Q.   On your cell phone?

A.   Correct.

Q.   Okay.  Do you have any reason to believe it's
not regarding a property owned by one of your
businesses?

A.   Do I have reason to believe?  I would presume
no.

Q.   Okay.

A.   I can't see the...

Q.   Yeah, I took it off.  Give me one second.

A.   I still can't see anything.

Q.   Yeah, I know.

     Do you know who Megan Byrd is?

A.   Do I know who she is?

Q.   Yeah.

A.   Yes.

Q.   Who is Megan Byrd?

A.   A former tenant.


MAGNA
LEGAL SERVICES

Page 322

Q. Do you know what property she was a former tenant at?

A. It was -- yes.

Q. What property?

A. It was a property located in Schertz.

Q. And which one of your entities own that property in Schertz?

A. The one in Schertz? Well, that one in particular is probably MAO.

Q. Did you have any personal relationship with Megan Byrd?

A. Personal?

Q. Yeah.

A. To what extent?

Q. What -- what does to an extent mean?

A. Well, I guess what do you mean in terms of personal relationship with her?

Q. Besides acting as her landlord, did you have any relationship with Megan Byrd?

A. No.

Q. Okay. I am going to show you what will be marked as Exhibit 43.

          (Exhibit 43 introduced.)

A. If you're trying to show it, I can't see the --



Page 323

Q.   (BY MR. KAPLAN)  I'm about to do that right now.  All right.  Can you see this document?

A.   Yes.

Q.   Let me know if you want -- it's a ten-page document that you filed last week in this matter.

A.   Yeah, I mean, I'd prefer to -- I mean, if you're going to ask me questions about it -- to review it to make sure I refresh my memory on it.

Q.   Actually, you know, what let's just go Exhibit 44, if you don't mind.

(Exhibit 44 introduced.)

A.   Okay, sure.

Q.   (BY MR. KAPLAN)  All right.  This is a two-page document.  Let me zoom out on it.  Do you see that?

A.   Yes, I can see it.

Q.   Okay.  Let me know when you want me to scroll down to the next page.

A.   Can you scroll down?  Just keep scrolling all the way down to the second page or not -- not that far.  About -- where I can see the -- there you go.

(Witness reviews document.)

A.   Okay.  Can you go down to the -- oh, that's it.  There's no third page?

Q.   (BY MR. KAPLAN)  No, just these two.



Page 324

All right.  Have you seen this document before, Mr. Ortega?

A.   I believe so.

Q.   And what is this document?

A.   It's CallRail invoice.

Q.   Okay.  And what's -- what's the date of this CallRail invoice?

A.   The date it shows it's billed -- billed on April 14th, 2023.

Q.   Okay.  And so on the second page here it details some of the charges.  And it says one minutes, 250 included.  Eight numbers.  Five included, three billed.  Do you see that?

A.   I do see that.

Q.   Okay.  And do you know what those eight numbers -- so, one, are these -- are these VOIP lines that are being -- that are being addressed in this CallRail invoice?

A.   They would be VOIP phone numbers that are -- are the eight numbers.

Q.   Okay.  And are those eight numbers associated with any of your businesses, these eight VOIP numbers?

A.   They would be associated with one of my entities.

Q.   And which -- which entity would that be?



Page 325

A.    I mean, without knowing or it actually listing on the invoice, I wouldn't know which entity, as you saw in the prior exhibit where it had MAO Real Estate and Evergreen Capital.

Q.    Well, what -- could it be MAO Real Estate?

A.    Could it be MAO?  Unlikely.

Q.    Why unlikely?

A.    Because MAO hasn't really done much of anything.  Doesn't do much of anything.

Q.    Could it be Ortega Capital?

A.    Also unlikely.

Q.    Could it be Grovano?

A.    Highly unlikely.

Q.    Could it be -- Hor- -- one second.

A.    What?  I don't know if you cut out.

Q.    Could it be HorizonWiz?

A.    I mean, I --

        MR. ORTEGA:  I mean this is -- again, I guess, I'm going to object for speculation.

A.    I really don't know.  I can't recall which entity it would be for.

Q.    (BY MR. KAPLAN)  So you have no idea which entity this could be for?

A.    Without the invoices.  And this is produced as provided from CallRail, unless you would -- I would have




Page 326

to request additional information because that's all the extent of what I could produce.

Q.   Does this refresh your recollection as to -- to who the numbers could be for?

A.   It's -- I mean, it's --

Q.   It's -- it says: Bill to MAO Real Estate, LLC, correct?

A.   It does say that.

Q.   Okay.

MR. KAPLAN:  No further questions.

THE COURT REPORTER:  Are we going off the record, Mr. Kaplan?

MR. KAPLAN:  Yes, Ms. Staggs.

THE VIDEOGRAPHER:  Counsel, if you'll stop sharing for just a second.

This concludes today's deposition; is that correct, Mr. Kaplan?

MR. KAPLAN:  Yes, Mr. Taylor.

THE VIDEOGRAPHER:  This will mark the end of Media Number 6 and concludes today's deposition. We're going off the record.  It's 4:52 p.m.

(Deposition concluded at 4:52 p.m.)



CHANGES AND SIGNATURE

Reason Codes: (1) to clarify the record; (2) to conform to the facts; (3) to correct a transcription error; (4) other (please explain).

PAGE            LINE            CHANGE              REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____



Page 328

I, MARK ANTHONY ORTEGA, have read the foregoing deposition and hereby affix my signature that same is true and correct, except as noted above.

_____
MARK ANTHONY ORTEGA

THE STATE OF _____)

COUNTY OF _____)

Before me, _____, on this day personally appeared MARK ANTHONY ORTEGA, known to me (or proved to me under oath or through _____) (description of identity card or other document)) to be the person whose name is subscribed to the foregoing instrument and acknowledged to me that they executed the same for the purposes and consideration therein expressed.



MAGNA
LEGAL SERVICES

Page 329

Given under my hand and seal of office this

_____ day of _____, 20____.

                    _____

                    NOTARY PUBLIC IN AND FOR

                    THE STATE OF _____

                    COMMISSION EXPIRES: _____

___ No changes made  ___ Amendment Sheet(s) Attached

MARK ORTEGA VS. SIENNA MARKETING & CONSULTING, INC., a
New York Corporation



Page 330

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

MARK ANTHONY ORTEGA,          *

                              *

   Plaintiff,                 *

                              *

VS.                           * CIVIL ACTION

                              *

SIENNA MARKETING &            * NO.: 5:24-cv-487

CONSULTING, INC.,             *

A New York Corporation,       *

                              *

   Defendant.                 *


REPORTER'S CERTIFICATION

DEPOSITION OF MARK ANTHONY ORTEGA

OCTOBER 21ST, 2025


        I, Tammy Staggs, Certified Shorthand Reporter in
and for the State of Texas, hereby certify to the
following:
        That the witness, MARK ANTHONY ORTEGA, was duly
sworn by the officer and that the transcript of the oral
deposition is a true record of the testimony given by
the witness;
        That the original deposition was delivered to
Mr. Scott Kaplan.
        That a copy of this certificate was served on all
parties and/or the witness shown herein on
_____, 20____.



Page 331

I further certify pursuant to FRCP Rule 30(f)(1) that the signature of the deponent:

_X_ was requested by the deponent or a party before the completion of the deposition and that the signature is to be before any notary public and returned within 30 days (or ____ days per agreement of counsel) from date of receipt of the transcript.  If returned, the attached Changes and Signature Page contains any changes and the reasons therefore:

__ was not requested by the deponent or a party before the completion of the deposition.

That the amount of time used by each party at the deposition is as follows:

Mr. Mark Anthony - (0:00)

Mr. Scott Kaplan - (6:50)


That pursuant to information given to the deposition officer at the time said testimony was taken, the following includes counsel for all parties of record:

FOR THE PLAINTIFF:

Mr. Mark Anthony, Pro Se


FOR THE DEFENDANT:

Mr. Scott Kaplan



Page 332

That $_____ is the deposition officer's charges to the Defendant for preparing the original deposition transcript and any copies of exhibits;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this _____ day of _____, 20____.

_____
Tammy Lea Staggs
CSR  7496
Expiration Date:  10/31/2026
MAGNA LEGAL SERVICES
866.624.6221
www.magnals.com
Firm No.  633



Page 333

COUNTY OF _____)

STATE OF TEXAS)

I hereby certify that the witness was notified on _____ that the witness has 30 days or (____ days per agreement of counsel) after being notified by the officer that the transcript is available for review by the witness and if there are changes in the form or substance to be made, then the witness shall sign a statement reciting such changes and the reasons given by the witness for making them;

That the witness' signature was/was not returned as of _____, 20_____.

Subscribed and sworn to on this, the _____ day of _____, 20_____.

_____
Tammy Lea Staggs
CSR  7496
Expiration Date:  10/31/2026
MAGNA LEGAL SERVICES
866.624.6221
www.magnals.com
Firm No. 633



# Magna
## Key Contacts

**Schedule a Deposition:**
Scheduling@MagnaLS.com | 866-624-6221

**Order a Transcript:**
CustomerService@MagnaLS.com | 866-624-6221

**General Billing Inquiries:**
ARTeam@MagnaLS.com | 866-624-6221

**Scheduling Operations Manager:**
Patricia Gondor (E: PGondor@MagnaLS.com | C: 215-221-9566)

**Customer Care:**
Cari Hartley (E: CHartley@MagnaLS.com | C: 843-814-0841)

**Director of Production Services:**
Ron Hickman (E:RHickman@MagnaLS.com | C: 215-982-0810)

**National Director of Discovery Support Services:**
Carmella Mazza (E: CMazza@MagnaLS.com | C: 856-495-1920)

**Billing Manager:**
Maria Capetola (E: MCapetola@MagnaLS.com | C: 215-292-9603)

**Director of Sales Operations:**
Kristina Moukina (E: KMoukina@MagnaLS.com | C: 215-796-5028)



**A**

**abhorrent**
73:23
**ability**
87:5
**able**
10:4,4,22 40:19
107:2,5,12 131:19
131:21 175:9,11
188:14 205:20
211:12 224:25
257:17 258:8
265:11 270:5,6,14
290:7,9,11 301:4
**above**
193:12 260:18
272:11 328:3
**above-styled**
1:18
**acceleration**
84:4
**access**
47:24 49:1,4 50:1,2
106:7,15,16,17
107:8 111:2 174:24
175:9,14 176:17
200:17 294:11,14
294:16,18,20,25
295:6,8,13 318:22
**accident**
19:17
**account**
102:23 103:7,22
106:1,4,8,9,16
107:3,6,9,10 148:5
149:3 260:3,6,9,11
261:3 294:21,25
295:8,14,17 300:21
300:22 301:9,10,11
301:21 316:18
**accounts**
146:21,23 294:12,19
**accuracy**
88:10 267:10
**accurate**

209:21 230:6 267:9
269:12
**accurately**
67:16
**accusations**
73:10
**acknowledged**
328:23
**acquaintance**
114:24 151:25 152:1
154:7,8 155:25
156:1
**Acquaintance's**
154:9
**acquainted**
155:23,24 156:24,25
**act**
59:5 235:1 239:2,19
240:24 248:8 249:6
297:16
**acting**
322:18
**action**
1:5 5:12 8:7 58:21
72:4 81:7 122:19,23
124:9,14,21 125:2
125:22 126:7,15
170:16 223:25
224:4 232:16 330:5
332:6,8
**active**
82:24,25 85:3,4,5
207:13 224:7
**actively**
243:10,12,14
**activity**
261:4,5 262:16
266:23
**actual**
73:13 187:12 257:22
**actually**
10:9 17:25 44:15
54:1 55:18 60:11
124:1 131:9 159:22
191:12 205:6,7

211:9 218:13 238:9
246:4 255:15 280:1
299:13 308:16
312:3 314:11 323:9
325:1
**add**
225:1
**additional**
217:17 224:24 225:1
225:3 250:16 264:8
264:21 267:4 326:1
**additionally**
263:15
**address**
11:15 13:7 35:22
36:10,12,23 37:2,3
41:5,7,11 42:18
66:12 74:21 80:6,7
134:10,20 147:24
148:17,20 155:7
156:8 159:13
160:10,19,25 161:5
161:10,15,19,22
163:16 164:3,8,9,13
164:14,14 165:11
169:7,9,10 181:7,10
181:13 206:3,5,6,8
206:10 273:1 307:8
316:8 318:21
**addressed**
172:14 324:17
**addresses**
36:2,5,10,13,16
109:17,20,22
134:12,18,22 135:9
135:13 256:4
294:12 305:21
**admin**
48:5
**administrative**
281:16
**advance**
146:20
**advanced**
145:6

**advances**
146:21
**adverse**
22:21 130:4
**advice**
21:20 61:1,5 126:11
126:17 127:25
**affairs**
126:24 128:7,8,9,11
128:15,20,21,25
129:4
**affect**
35:18 252:15,16,21
**affidavit**
294:8
**affix**
328:2
**affixed**
268:8 305:14
**after**
8:15 25:24 31:23
74:20,20,20,22,22
162:3 208:14,20
210:17 211:4,5,12
211:15,18,18
212:25 213:6
219:21,24 220:4
222:6,8,9 283:21
300:1 301:14,16
302:11 308:24
319:1,8 333:5
**again**
15:4,16,24 16:16
18:24 19:19,25 20:5
20:9,23 21:5 23:4
23:18,25 25:13
43:25 49:6 53:21
59:14 61:2,7,25
64:9 71:8 79:7
84:22 91:7 97:3,12
97:15,19 98:3
105:23 106:19
118:18 119:2 126:2
127:12,23 129:6
130:3,19 177:16



191:11 202:19,20
202:21 217:6 219:1
219:10 234:10
241:10 243:7
255:18 264:16
272:3 286:5 312:12
318:12 325:18
**against**
5:11 71:15 72:5,14
72:25 73:6 74:6
80:10,14,16 81:7
90:14 118:6,9
214:20 224:13,16
224:22 225:3
248:11 250:14
251:12,18
**agent**
209:14,19 210:5,15
313:3
**agents**
216:25
**ago**
51:3 71:23 74:16
92:17 93:18,22
139:18 141:9,11
159:7 284:8,8
**agree**
22:4,25 202:10 229:5
229:8
**agreement**
20:18,20 71:6,13,14
146:15 230:18
232:24 233:2,12,14
233:16 234:9
235:10,16 240:2
242:3 243:3 246:25
248:13 250:6 331:6
333:5
**ahead**
14:17 15:7,14,15
16:1 43:12 49:24
53:22 56:22 65:20
90:21 122:5 214:3
228:23 230:20
242:5 279:23

297:16 298:20
**Aila**
292:5,8
**Aila's**
292:9
**al**
235:24
**alarmed**
317:7
**Alfred**
318:4 319:3
**Alia**
283:9
**alle**
129:19
**allegation**
91:5,17 129:18,20
209:19 210:4
**allegations**
125:6 132:3
**allege**
216:10 217:4 231:25
239:18 247:11
248:9 249:5
**alleged**
19:13 72:16 73:5,7,8
73:9 81:18 233:23
234:22 236:7,8,13
237:5 238:25 239:4
239:17 240:21,23
242:19 244:16
245:1,16 246:2,9,17
247:21 248:6 249:3
249:16 250:8 251:1
251:12 301:14,14
**allegedly**
81:14
**alleges**
249:18
**alleging**
72:16 232:16
**allowed**
212:24
**Almanza**
5:7 76:6,7,9,12,19,23

77:7,11,15,17 78:6
78:8,10,11,12 79:14
82:3 84:17 88:14,15
89:13,17 90:8,13
118:12,17,25
119:10 187:17,23
217:20 219:22,25
220:2,4,5 221:3
222:7,8,9 230:4
**Almanza's**
217:23 218:8,19
219:11
**almost**
27:16,18,19 28:7
41:25 147:23 208:3
279:17
**along**
86:19
**already**
15:9,19,22 16:9,10
65:13 67:19 74:23
136:3 153:5 155:13
166:24 167:3
178:14 180:25
216:10 254:9 284:7
288:9 318:13,16
**also**
3:11 27:9,12 30:8
31:10 32:16 33:25
38:15 40:9 48:4
49:4 50:7 51:3
66:24 67:25 82:12
84:22 91:9 95:17
96:20 99:25 105:23
113:16 114:5
157:25 161:6,11
172:6,9 191:11
196:3 206:13
214:14 223:25
225:21 231:24
233:23 238:11
239:4 242:23 243:7
245:3 247:2 248:15
249:22 257:12
267:12 270:1

273:11 278:14
298:5 299:8 303:12
304:5 310:23
325:11
**although**
275:13 312:14
**always**
186:7,11,14 286:10
**am**
60:1 122:10 175:11
188:2 217:16
226:18 239:8 248:5
248:25 249:11,13
250:25 251:6 261:3
286:21 293:11
304:8 306:17,23
322:21 332:4,7
**ambiguity**
106:20 176:3
**ambiguous**
30:10 37:7 40:10
104:24 106:11,18
133:21,24 297:15
306:20
**ambiguus**
278:14 298:6
**Ambrosio**
242:12,13,25 243:3,6
**amend**
123:16 225:1
**amended**
5:12 14:23,24 15:1
16:1 121:18,19,22
122:3,23 123:1,9
124:7,21,25 125:6
125:22,25 126:8,9
126:20 127:10,21
128:18 129:13
130:8,13 131:6,9
210:4 224:10,12,17
224:18
**amendment**
224:19 329:14
**American**
170:24 171:2,9,15,19



172:2,24 174:3
**American-Amicable**
245:8
**Amex**
177:3 178:2,5
**amount**
60:1 90:19 102:24
133:5,7 139:12,15
141:1 143:2 145:2
146:12 150:16,18
169:1 173:6,23
196:14 197:14
216:7 240:19 266:2
331:12
**amounted**
90:15
**Andersen**
248:2,3,11
**Andrew**
57:17
**and/or**
330:24
**Annual**
6:8 302:23 303:16,17
**anoth**
178:11
**another**
38:6,9,9,12 76:22
82:13 137:8,10,12
140:17 178:16
185:14 189:9 201:9
203:13,17,25 227:4
249:19,20 251:16
285:7
**ans**
15:9
**answered**
15:10,12,19 42:6
48:7 225:14 288:9
**answering**
13:23 15:22 18:17
62:6 63:25 110:10
110:13 128:3 219:6
220:19 233:11
234:14 235:20

248:19 298:5
**answers**
5:5 6:3 18:15 52:19
219:3 254:8,13
280:12 288:16
**Anthony**
1:3,12,16 3:3 4:5 8:4
8:4,20,24 51:23
57:15 101:4 166:15
253:20 304:22
307:12 310:15
328:1,9,19 330:3,11
330:17 331:14,22
**anticipation**
14:5,7
**Antonio**
1:2 8:7 9:1 23:20,24
24:5,7 35:23 36:14
37:2,4 41:6 55:15
55:16,19,20 164:4
276:1 318:22 330:2
**anybody**
9:10 49:16 53:19,23
54:4,14 138:4 149:7
166:18 174:12,15
178:3 180:18
214:20 221:8,14
272:15 278:10
285:11 291:16,18
**anymore**
110:9 210:25 300:1
**anyone**
9:20 16:19 52:1
101:7 110:1,2,8
221:18 253:23,25
**anything**
13:9,24 14:22 27:23
27:24 47:9 128:13
128:15,21,22
201:23 208:8
210:23 212:13
302:11 305:5
317:19 321:18
325:9,9
**anytime**

316:10
**anywhere**
28:24 30:4 34:22,22
193:11 196:4
267:13
**Apologies**
129:6 138:20
**apologize**
45:2 108:23 213:19
213:21
**app**
48:2,8,9,10,11,12,14
49:4,7,11 174:23,24
175:1,1,10,14 176:4
176:7,11,14,17
201:24
**appear**
214:10 302:22,24
**appearance**
8:13
**appearances**
3:2 4:2
**appeared**
328:19
**appears**
210:21 269:10 321:7
**applicable**
9:2
**application**
174:21,22 179:21,23
179:24,25 199:14
295:15
**applies**
13:21
**apply**
59:15 60:18 61:25
**appointment**
316:8,8,10
**appraiser**
310:17
**appreciate**
18:19,20 21:23
133:22 185:16
244:8
**appropriate**

166:3 170:16
**approximate**
46:8,9,23,25 132:22
141:1,7 173:24,25
**approximately**
17:8 21:11,13,16
26:25 27:5,10,14
28:4,10,12,14,17,18
28:21 29:12,15
31:12 32:8,10,14
33:23 46:19,20 68:4
71:21 74:15,16,18
77:6,10 78:22 79:9
83:12,14 88:17 92:1
92:4 93:22 107:18
112:4,6 132:19,21
138:17,22,23
139:16 140:6
142:23 146:11
159:6,7 173:18
176:13,16 211:1
215:10 251:10,14
275:22,24,25
276:14,21
**approximation**
251:15 276:15
**April**
5:23 7:11 187:19
206:13 260:1 270:7
324:9
**area**
98:11,24 99:4,17,18
100:16 124:10
276:1
**areas**
109:17
**aren't**
125:7
**argumentative**
35:11
**around**
9:13 28:8,13,21
31:22 33:17 38:18
77:2,13 79:12 92:5
112:2 196:4 201:6


MAGNA
LEGAL SERVICES

219:8 273:22
301:12 304:3
**arrangement**
61:18 118:16 142:11
143:6 147:22
**arrangements**
154:13
**art**
25:11,12
**Arvest**
133:2,6,6,9,15 134:1
135:10 136:15,18
136:18 137:6,8
180:17,18,20 181:1
**aside**
30:3 31:2 34:20
46:11 74:25 76:1
97:5 216:14,22
223:14
**ask**
10:23 15:24 18:24
22:2 34:14 35:6,8
45:14 52:16 60:25
61:5 63:4 69:4
89:13,15 115:1
119:7 154:17
160:13 169:22
170:2 172:6,13
176:1 177:15
178:25 183:13,24
184:15,16 188:4
198:23 203:10,16
216:21 219:10
223:8 228:18,25
229:19 269:3,20
297:16 323:7
**asked**
15:9 42:9,10 44:7
47:6 69:21 105:1
112:19 137:8 179:9
183:4 185:16
205:10 225:14
258:1,3 273:1
275:24 283:11
286:10

**asks**
282:13
**asleep**
213:25
**asserted**
72:4 81:7
**assets**
312:8
**assist**
53:19 291:9
**assistance**
54:3,4 297:17 298:1
298:2,7,7,9
**assistant**
284:6 286:21
**assistants**
290:25 291:1,10
292:14
**assistant's**
291:19
**assisted**
53:23 54:14
**assoc**
112:17
**associated**
37:23 38:7 93:15
112:16 206:10
294:12 324:21,23
**association**
80:21
**assume**
117:21 144:4 150:8
187:2 196:16
313:18
**assumed**
177:14
**assumes**
179:12
**assuming**
35:14 165:2 177:13
177:14 178:11,12
179:3 181:24 182:4
182:5
**assumption**
90:1,1

**attached**
1:24 41:13 329:14
331:8
**attachment**
306:8
**attempt**
137:7 183:11
**attend**
23:23 24:10 25:22
**attended**
23:20
**attorney**
13:15,19 61:16 65:5
70:13 74:4 105:6
118:20,21 122:1
123:15 124:16
125:1,25 126:5,10
127:17,19 130:16
131:3 215:5 218:1
218:22 220:1
**attorneys**
56:24 57:11,13 82:5
82:5,11 84:18 87:15
87:21,24 88:2
169:19 219:24
220:3,5 229:14
332:6
**attorney-client**
57:1 61:14,19,23
62:1,7 65:14,15,20
76:15 90:22 91:4,10
118:19 119:5,13
122:6 123:14 126:3
127:13 128:2
130:20 169:24
170:12 218:2,20
219:14
**audio**
5:13 188:6,17 189:13
190:10 192:5
202:15,24 226:23
227:1,10,15,18
**August**
5:9 103:1,8,11 105:5
105:12,25 106:7,15

107:1,5,19,23 109:3
111:20,21 114:2
115:6
**Austin**
23:21 24:10,18,23
25:8,17,25 34:20
108:18 109:2,2,4,5
109:6
**Auto**
238:2,3,5
**automatic**
223:22
**available**
111:6,12,14,18 199:4
333:6
**Avenue**
3:7
**avoid**
11:13 13:3
**aware**
187:16 216:15,24
217:2,9,13,17 225:2
246:6,12 247:6,16
248:1,21 249:9,24
250:1,21
**away**
38:24,25 39:2
**A-R-V-E-S-T**
133:4 136:17
**a.m**
1:20 8:9 51:20,20,24
100:25 101:1,1,5
306:2 316:10

---
**B**
**BA**
34:15
**bachelor's**
25:11,11,12
**back**
16:22 17:22 48:15
51:15,23 64:3,7,11
79:3 87:14 88:14
101:4 104:16
125:16 136:13



151:13 160:6 166:5 166:15,17 169:18 173:11,15 182:24 184:12,13 185:17 191:11,22 198:21 203:11 212:21 214:18 215:3 219:7 225:19 226:5 231:14 244:5 253:20 254:3 272:1 292:22 295:20 298:21 301:20 302:1 304:22

**background**
16:23 23:3,8 121:25

**backwards**
317:15

**balance**
81:20

**bang**
199:14

**bank**
106:1,4,8,13,16 107:2,6,8,10 133:2 133:2,6,9,15 134:1 135:5,6,7 136:16,18 137:8 180:20 181:1 181:2,8,18,22 182:7 182:9,12,15 183:1,7 183:9,12,18 194:5,9 197:23 199:13

**Barrett**
19:8

**bas**
17:21 131:2

**based**
13:22 21:24 55:12 60:13 61:19 62:6,6 62:8 63:16 64:8 90:1,1,9 91:8,20 108:15 126:10,13 126:16 127:18,24 131:2 218:20 220:19 247:4 248:16 283:24

**basically**
14:5 41:25 68:17 76:21 108:7 126:18 131:2 195:10 228:8 257:14

**basis**
17:23 22:9 40:3,8,13 58:19,20 61:10,11 62:5,5 79:15,16 81:5,9 83:15 90:25 91:2,5,15,17,20 123:12 125:21 126:6,9,13 127:8,11 127:16,20 130:25 172:11 197:17 209:13,18 210:3,14 224:15 240:21

**Bates**
6:1,7,15 314:23

**bcc**
311:13

**bear**
122:11

**beautiful**
196:12 199:8 200:16 201:2

**because**
18:1,14 20:17 22:4 28:7 33:21 34:14 51:9 59:23 63:10 68:13 81:11 94:8,9 94:15 112:24 135:25 137:9 182:23 187:4 188:22 189:20 190:16 192:10 197:8,22 198:15 205:4,8,12 209:15 211:6 213:15,19 224:3 230:11 258:10,16,23 266:9 294:5,16 297:6,7 301:10 305:6 312:1 317:15,16 325:8 326:1

**become**
155:23 156:24

**Bedingfeld**
35:23,25 36:1,10,23 316:9

**been**
8:21 16:24 17:2 29:4 29:7 39:21 51:9 52:6 59:19 65:25 70:4 74:18 75:1 76:3 77:23 82:4 84:18 85:18 87:4,16 88:16 101:11 105:16,21 124:8 145:21 147:18 150:9 153:1 176:21 176:22,25,25 177:2 180:6 185:5,7,8,13 185:14 188:2 193:18 206:19 209:2 210:18 213:12 214:5,23 215:11 220:1 222:16 232:25 235:13 246:6 253:7 258:25 260:18 262:16 266:13,14 266:22,22 267:20 275:1 280:25 281:5 281:16 282:25 284:4 286:8,12,13 286:18 288:12 289:14 290:24 292:4,13 293:11 298:12 301:23 308:1 311:17 312:9 314:18 319:14

**before**
1:20 2:1 16:24 17:2 18:11,17 31:23 35:6 38:10 86:2 90:11,12 100:19 116:3 118:1 119:25 131:9 132:23,24 162:6 169:18 178:9

193:24 199:15 210:22 215:3 219:3 222:21 243:17 259:3 279:10 295:13 304:6 309:13 315:9 324:2 328:18 331:4,5,11

**began**
225:19 226:4,7

**begin**
33:23 94:5

**beginning**
21:25 51:22 93:19,24 101:3 124:10 166:14 188:16 253:19 304:21 317:14

**begins**
8:3

**behalf**
8:16 47:12 66:12 84:1 85:13 86:3 89:14,18 90:8 95:15 95:19,23,24 96:2,6 96:7,9,12,15,18 102:18 104:9,11,12 104:14 105:17,22 107:10 110:25 112:8 114:6 118:9 119:11 121:20,21 132:4,9,19 133:11 133:15 135:7 136:19 139:21,24 140:3 141:15 145:17 147:6,16 149:6,18 150:20 152:9,17,22 153:15 156:4 157:8,11 159:16,20 165:14 171:2,11 172:2 177:11,15,18,19,22 178:21,24 179:20 181:14,22 182:5 183:1,7,10 184:7,9 184:11 214:24


MAGNA
LEGAL SERVICES

215:5,11 229:14,16
236:19,21 256:5
273:2 283:15
306:11,13,15
**behavior**
73:7
**behind**
121:22,25 130:18
200:4 220:24
**being**
8:9 13:5 28:1,23
42:23 69:21 209:3
283:4 301:11 320:8
324:17,17 333:5
**bel**
243:1 310:6
**belief**
129:15,21 130:10,22
**believed**
266:3
**bell**
81:17
**below**
223:4
**benefit**
131:19,25 216:12
217:1,7,12,14,14,16
**besides**
15:1,12,25 27:21
32:18 36:10 70:1,5
82:3 84:16 87:15
144:19 145:25
149:7 150:1 151:7
153:5 156:16,18
158:21 164:17
166:24 168:2
169:11 172:24
174:2,2 177:3,3,4
178:2,14 180:18
216:22,23 217:10
221:3 224:9 232:3
272:15 274:23
278:5,12,18,21,24
282:16 285:5,11
288:18 291:16

311:12,18 314:22
322:18
**best**
18:15 26:14 27:25
32:23 34:25 87:4
178:17 219:2
310:24 316:11
**better**
10:15 22:13 194:21
308:5,8
**between**
5:13,19 6:14 9:9 28:8
30:16 31:17,24
32:10,16,20 46:10
61:16 71:22 90:16
118:16,20 123:1
135:6,6 139:18
146:10 214:11
215:22 216:20
218:1,22 262:7
310:2,18 314:13
**Bexar**
19:6,9 56:8,9 71:25
81:1 108:21,22,23
109:7,8,9,9,10
**big**
28:6 31:14 116:20
277:4
**bigger**
12:4 52:11
**big-box**
195:22
**bill**
5:23 105:17 107:20
258:23 259:25
261:13 266:24
300:15,16,17
301:18 326:6
**billed**
62:12,13,24 63:3,7
324:8,8,13
**bills**
301:4,7
**bit**
12:10 16:23 18:23

104:17 115:18
253:8 298:16
299:21 302:2 304:4
308:5 317:7
**Blanca**
105:13,14,16 110:15
110:17,19 275:5
284:6 286:14,21
**BLANK**
3:7
**blanket**
296:9
**bless**
193:23
**blind**
311:17
**block**
117:23 169:24
307:10 310:23
**blockade**
228:11
**blow**
212:18 308:4
**blowing**
208:21
**blue**
209:16
**board**
81:12
**Bocanegra**
29:24 283:1 295:5
**bonding**
188:23 189:21
190:17 192:11
**borrowed**
193:23
**borrowing**
193:25
**both**
49:16 236:11 300:21
300:24 301:2,3,5,19
304:8
**bottom**
102:1 130:7 268:5
298:22,23 302:12

305:12 308:14,19
312:13 314:21
**bought**
81:19
**box**
36:14 277:4
**Brady**
146:5,6,9,13,24
147:5,10,21,25
148:9 163:14 167:7
167:21
**Brady's**
158:9
**breach**
250:5
**break**
51:5,7,12 52:1,4
100:20 101:7 108:9
166:3,18 253:8,12
253:23
**Brian**
55:4,7,8 169:20
**Brief**
14:25
**briefly**
14:25
**bring**
80:13 81:20 175:20
212:21 224:22
252:1
**bringing**
73:6 81:5 243:11,12
**Brittany**
313:13,14,15 314:5,8
314:11,13,17
**brother**
39:9 265:4
**brought**
18:25 73:14 74:17
79:18 80:15 81:19
83:22 251:7,11
252:23
**browser**
113:7,7
**bus**



258:18
**business**
11:11 13:6 26:5,7,9
34:23 41:21,21,22
42:15 44:4,15,20
45:15 58:23 59:6
67:10 72:21 84:7,8
93:1 95:11 111:15
111:16 114:23
115:1 123:4 132:7
147:13 173:22
181:14 190:18
192:11 193:3,8,8,16
194:21 195:1
204:15,18,19,20,22
210:7 240:25,25
252:14,21 256:22
257:3,6,7,15,20,22
257:23 258:9,16,18
258:19 262:25
263:14 264:6,18
265:9,12,17,22,25
266:4,8,10,15,25
267:7,16,19 271:12
271:21 272:22
274:3,5 276:16,23
277:10,21 293:9
306:15,17,23 313:6
314:9
**businesses**
26:9 43:18 44:15,17
66:12 84:6 102:19
123:4 132:10,11,14
136:23 137:10
177:1 256:5 271:22
271:22 273:2 318:8
320:10,24 321:12
324:22
**business-related**
66:14,24 273:3,11
280:23 281:14
283:13 284:1
**buy**
115:2 195:17 274:8
**buyer**

310:17
**Buying**
274:14
**Bye**
202:6
**Byrd**
321:20,24 322:11,19
**B-E-D-I-N-G-F-E-...**
36:1
**B-O-C-A-N-E-G-R...**
30:2
**B-X-A-R**
19:11

———————————
**C**
———————————
**C**
3:1 8:1
**call**
9:5 37:12,14 40:25
40:25 61:13 97:6
98:21 110:4,8
129:24 132:3
171:18 198:21
202:11 203:11,11
203:12,13,17 204:9
204:11,15,18,20
205:10,22 207:9
208:19 210:18,19
211:4 214:19,22
216:14,16,20,23
226:12,17,19,21,24
227:2,4,6,8,11,13
227:15,19 228:9,13
228:21 229:9
253:11 256:2 257:5
257:5,7 258:24,24
261:11 263:14
264:6,12,18 265:9
265:12,18 285:16
285:18 293:7
316:20
**callback**
205:10
**called**
47:21 48:18 110:7

171:22,23 208:24
285:21 286:1,8,11
294:1
**caller**
129:16,22,24 130:11
130:23
**callers**
131:18 186:12,25
187:12 205:5
**calling**
12:20 92:9 94:10
205:14,21 207:13
258:17,18
**CallRail**
5:8 7:11 47:21,22,24
48:12,16,17,21 50:7
50:23 51:1 101:10
101:25 102:11,20
103:10 136:7
151:22 324:5,7,18
325:25
**calls**
92:10 94:11,15,20,23
94:24 95:22 96:2,9
96:15 110:14
112:20 113:9 114:6
114:8,11 115:10,15
124:4 126:22 129:3
136:10,11,15,18
144:10,14 171:15
187:1 203:14,19,20
211:14 216:10,15
216:17,24 217:2
226:15,16 241:3
255:3,19 256:21
257:2,12,14,15,21
257:23,24 258:7,11
258:13,16,19,21
265:17,19,25 266:9
266:13,14,22 267:7
267:9 293:8
**Cally**
234:17,18
**came**
90:18 110:20 257:11

**camera**
9:13
**campaign**
108:5,8 109:5,7
115:7
**campaigns**
108:12,14 109:11
110:2,3
**cannot**
35:7 78:24 163:9
219:2 266:24,25
267:5,15,18 281:21
**Canyon**
320:7,11,18,21,25
321:6
**can't**
10:13 17:11 31:15,22
43:23 46:6,7 48:14
49:16 50:4,5 60:21
71:15 74:23 77:14
87:2 88:9 96:25
124:23,24 127:25
130:15 131:25
138:25 141:10
159:8 191:10 204:7
204:8 215:8,9,20
216:4,5 272:21
287:2,5,12,20,24
291:25 296:14,17
296:18 305:5
308:12 320:22
321:16,18 322:24
325:20
**capacities**
26:21,23
**capacity**
26:14,19,22 31:10
32:5 40:14,15,16
43:16,17,20 44:3,4
44:4,5,14 57:11,18
57:21 81:11,15 83:4
**Capital's**
137:7 306:9
**Car**
19:17 250:22



MAGNA
LEGAL SERVICES

**carbon**
311:17
**card**
106:12 107:10,11,12
194:13 201:19
328:22
**care**
66:2
**carefully**
119:8
**Carlos**
58:18
**Carnicle**
315:23
**cases**
58:25 59:2 76:23
77:6,10 78:14,23,23
78:25 79:4,6,8,10
79:13,14,15 83:20
83:22 85:10,11,12
85:16 229:19 251:6
251:10 252:16,22
253:1
**cash**
198:13
**categories**
283:25
**category**
260:14
**cause**
1:19 58:20 81:7
**causes**
72:4 232:16
**cease**
301:11
**cell**
37:18,19,21,22 38:7
38:9,21,23 39:17,19
39:21 49:25 50:2
93:16,17 94:1,6
112:18 124:10
127:3 135:18,20
136:20 140:4
156:13 209:12
260:16,17 270:24

270:25 303:10,11
307:19,20 312:2
314:2 316:14,16
317:24 318:3 320:5
321:8
**Central**
8:9
**certain**
66:18 102:18 104:5
108:12 111:6,12
130:17 191:10
269:4 270:2,2 297:3
297:3
**certainty**
272:23
**certificate**
4:10 330:23
**CERTIFICATION**
330:10
**Certified**
330:14 332:9
**certify**
330:15 331:1 332:4
333:3
**cetera**
142:13
**chain**
6:17 308:18,21,23
312:13
**chance**
124:20,22 200:18
**change**
123:12 127:9 198:14
246:4 327:5
**changed**
48:4,4 124:8
**changes**
4:8 123:1,9 127:14
260:12 327:1
329:14 331:8,9
333:7,9
**character**
73:11,22
**charge**
61:10 139:21 141:14

149:17 150:19
152:8 153:14,22,23
165:13 181:2 182:6
313:23
**charged**
62:4
**charges**
261:2 324:11 332:2
**Charles**
289:8 309:17 311:12
311:15
**cheaper**
198:2
**check**
62:23 71:10 77:19
213:17
**chosen**
260:13
**Cibolo**
163:19,21
**Citi**
180:20 181:1,2,8,18
181:22 182:7,9,12
182:15,25 183:6,9
183:12,18
**city**
163:20
**Civil**
1:5,23 8:7 330:5
**civilly**
162:25
**claim**
80:13,14,15 81:6,19
90:25 208:14
222:19 223:17,18
223:22 251:25
**claims**
81:3 222:11,14,15
223:15 224:1,5,7,9
224:13,16,21,23
225:1,3 232:3,20
234:25 237:18
251:11
**clar**
106:21

**clarification**
30:6 36:3 300:8
**clarified**
22:6
**clarify**
23:9 40:10 42:8 43:4
83:1 176:2 327:2
**class**
5:12 122:19,23
223:25 224:4
**clean**
219:5
**clear**
22:14 26:16,17 62:3
71:11 216:21
267:13 298:8
**clearer**
298:10
**clearly**
69:20
**client**
128:19 186:24 205:4
249:18
**close**
34:19 69:22 190:7
198:16,17 304:6
**closed**
230:5 281:15 283:14
294:17
**closing**
306:6
**co**
282:10
**coast**
201:5
**code**
37:5 41:6 58:24 59:6
98:11,24 99:4,17,18
100:16 124:10
316:10
**Codes**
327:2
**cognizant**
51:9 166:1 253:11
**cold**



109:16,17
**collected**
241:8
**collection**
83:17
**college**
23:15,17 35:3
**collegiate**
25:19,21
**com**
200:14,15
**Comal**
81:1
**come**
41:18,20 72:7,12
90:13 109:20,22
142:10 174:19
224:25 256:10,24
257:9 258:21 266:6
268:20 285:18,22
319:3
**comes**
193:15 300:22
**coming**
16:20 154:15 200:23
256:7,15 312:5
**comment**
60:17
**commerce**
58:24 59:6 240:25
**commercial**
274:8
**COMMISSION**
329:10
**communicate**
139:24 141:24
150:23 152:11,14
152:16,20 153:25
154:3 155:7 156:3,6
156:8 179:15
**communicated**
140:2,7 142:1 155:4
156:11 157:15
168:23 181:18,21
182:2,12,15,23,25

183:4
**communicating**
9:20 139:21 181:2
182:8
**communication**
203:21,22,23 273:12
281:23
**communications**
5:17 66:14,23,25
123:15 142:4
171:13 174:8,10,14
181:5 204:23
209:11 255:7 256:9
273:4,10 280:24,25
281:15,17,20
283:13 284:1,3
286:18 288:11
290:23 292:4,13
301:15
**Community**
316:9
**comp**
243:22
**companies**
67:12 94:10 281:13
**company**
33:2,2,4 34:21 35:3
102:20 193:24
205:22,24 243:20
243:21,23 244:20
245:8 294:17 295:2
295:4 313:19
**comparison**
119:22
**compensation**
61:18
**competition**
189:2,25 190:21
192:15
**competitive**
189:4 190:23 192:16
**complaint**
5:11,12 14:23,24
15:2 16:1 118:5,8
119:11 121:18,19

121:23 122:4,19,23
123:1,2,3,9,23
124:7,17,21,25
125:6,23 126:1,8,10
126:21 127:2,10,22
128:18 129:10,13
129:14 130:9,13
131:6,9 210:4
224:10,12,17,18
**complete**
209:22 280:4
**completely**
196:11
**completion**
331:4,11
**comply**
297:7
**compound**
22:5 25:6 47:5,6
179:12 274:10,15
**computer**
48:25 49:1 78:18,20
112:25 113:6
174:25 175:2 180:4
295:15
**con**
30:12 144:4 187:18
226:8 261:10
**concerning**
66:25 255:7 256:9
273:12 283:15
**concerns**
310:20 311:22
**concluded**
326:22
**concludes**
326:16,20
**conclusion**
18:5 90:14,18
**conduct**
66:13 72:13 95:11,13
273:3
**conducted**
134:7
**conducting**

109:1,2 181:14
306:15,17,23
**conf**
225:23
**conference**
226:9,11
**conferral**
228:10,12
**confidence**
267:6
**confident**
225:24
**confidential**
5:25 60:12 123:15
219:17 225:24
260:7 268:2,22,25
269:1 314:23
**confidentiality**
20:17,20 60:13
230:25 247:5
248:16
**confirm**
96:25 200:16,22
**conform**
327:2
**confused**
240:11
**confusing**
153:18 297:25
**conjunction**
154:24,25
**connect**
177:11
**connected**
175:6
**connection**
176:20,21,22,25
**consider**
42:5 124:12
**consideration**
328:25
**considered**
203:14,19,20 252:13
252:15,20 258:13
**consists**



273:5
**consult**
84:10,13 86:9,12
 118:13
**consultation**
91:20 118:14 126:10
 126:16 127:16
**consultations**
82:7 88:1
**consulted**
87:22 88:3 90:22
 91:8 221:2
**Consulting**
1:6 5:16 8:5,17,24
 91:19 234:17,18
 329:16 330:6
**Consumer**
59:5 235:1 239:2,19
 240:24 248:8 249:6
**contact**
67:11,14 118:25
 119:3,9,9,10 129:11
 131:23 152:17
 171:7,8,10 177:17
 177:19 183:18
 184:17,19,20,23,25
 201:19,22 210:20
 210:25 219:24
 220:1 281:16
 316:11
**contacted**
165:22 177:22 183:8
 183:10 208:19
 220:3,5 313:24
**contacting**
183:6 208:17 321:5
**contacts**
131:11,15
**contain**
64:19 109:8 172:17
**contained**
39:10 65:1 71:12
 86:23 87:10 215:7
 217:10 224:17
**contains**

331:8
**contention**
214:13
**context**
125:22 126:8 128:10
 255:10
**contingency**
61:11 62:5
**contingent**
270:1
**continually**
186:11
**continuation**
214:10
**continue**
22:25 166:23 208:13
 212:7 304:10
**continuing**
151:6 153:4 237:18
**contract**
85:24
**contracting**
30:12
**contractor**
110:18 318:5,6 319:3
 321:4
**contractors**
275:2,4 284:5,19,20
 285:5 286:20
 287:16,17,21
 288:13 289:23,24
 289:25 290:1,5
**control**
260:10 270:4 275:15
**conversation**
57:4 144:5,8 147:12
 185:22 186:2
 187:14,18 202:8
 204:1,2 227:16,20
 227:22
**conversations**
56:23 57:3 61:22
 62:10 65:5,7 90:16
 91:11,12,16 125:24
 126:5,13,19 130:16

131:3 133:19,25
 134:4,6,7,9 135:5,8
 135:16,18 143:6,8
 143:20,23,24 144:1
 145:15 146:24
 147:5,21 157:12
 165:17 168:16
 177:23 183:16
 185:10 227:23
**convince**
212:21
**Cool**
194:11 201:17
**copies**
332:3
**copy**
191:12 192:1 206:17
 206:18 228:18
 311:17 330:23
**cordless**
41:14,15
**Cornerstone**
238:2,3,5 239:3,5
**Corp**
250:22
**corporate**
106:12
**Corporation**
1:7 236:25 329:17
 330:7
**correction**
292:11
**correctly**
35:5 218:15 286:21
**correspond**
147:24 149:21 181:7
**correspondence**
5:19 36:6,7 109:25
 214:11 310:2
**cost**
198:7
**could**
12:3,6 18:16,21 23:8
 33:17 36:3 47:8
 57:7,7 73:20 106:17

106:21 128:21,22
 128:22 143:9
 175:19 180:6,7
 185:7,13 191:14
 197:1,5 198:15
 199:18 202:11
 211:8 216:6 258:4
 266:14 267:10
 270:8 288:5 290:14
 290:16 313:24
 316:4 325:5,6,10,12
 325:14,16,23 326:2
 326:4
**couldn't**
46:2,4,22,24 67:21
 132:21 272:15
 281:7 284:9,16,17
 289:20 291:18
 292:24 298:10
**couns**
187:16
**counsel**
8:13 54:18,21,23,25
 57:23 60:6 70:2,3,5
 70:8 75:2,5 76:3
 90:13,17 91:16,21
 124:19 126:14
 127:25 187:17
 206:12 217:20
 219:17,21 221:2,9
 225:17 230:1,2
 232:12 234:3 235:6
 236:3,5,6 237:10,12
 237:16,21,23 238:6
 238:18,21 239:11
 243:5,9 281:18
 326:14 331:6,19
 332:4 333:5
**counsels**
70:9 75:5
**county**
19:6,8,9 56:8,9 71:25
 81:1,1 108:21,22,23
 109:7,8,9,9,10
 328:15 333:1



couple
33:15 48:5 95:3,5
102:21 193:12
201:7 211:17
254:10
course
24:14 201:25 202:3
court
1:1 5:3 8:6,12,18
10:8 11:20 12:25
17:18 18:13,18,24
19:7 21:21 30:1
49:13,22 56:6,9
64:4 71:24,25 73:23
80:24 83:23 170:16
213:14,20,24 214:3
219:5 222:10,13
223:15,25 224:4,11
228:9 243:17
251:23 252:3 297:2
297:6 326:11 330:1
courts
22:23 56:8 80:25
covered
87:19
co-investor
283:4
co-investors
281:17,25 282:3,8,9
282:19,23
co-owner
282:25
create
227:10,14
created
227:18
Creative
5:14 188:19 189:16
190:12 192:7 210:8
210:12
creature
9:9
credit
194:13
credulity

162:21
cross
293:5
CSR
1:20 332:14 333:18
current
38:2 39:11,15 42:19
43:4 66:21 68:8
74:21 80:6 104:8
105:2 224:17
236:20 237:24
289:13,14
currently
9:20 26:1 27:7,11,15
27:20 37:22 40:4,5
41:8,24 42:2,12,17
42:20 43:5,7 54:17
54:19 55:21 56:4
57:10 58:2,3,13
66:21 70:2 77:15
93:25 105:4 134:13
134:14,22 135:4
148:16,20,22
175:16,17 176:4,6
189:1,24 190:20
192:13 232:14
243:9,16,17 251:7
264:7,19 273:8
274:23,25 275:12
275:13,17,19
277:16,19 301:16
custody
270:4
customer
67:10
customers
131:12,15,16
cut
18:21 27:17 117:8
120:23 205:15
299:9 325:15
cuts
201:6
cutting
198:8

C-I-B-O-L-O
163:23

_____
**D**
_____

D
8:1 232:15
daily
40:3,4,8,13 255:12
255:13
damages
73:25 90:14,19 91:1
91:18 245:5
damming
208:15
Daniel
82:14,15 84:22 85:1
85:2,12 86:2,5,9
Daniel's
82:15
data
39:10,14
date
7:11 17:11 19:23
21:9,10 28:3 31:11
69:11 71:20 77:22
88:18 91:25 103:1,3
103:4,5,5 132:22
141:6 145:9 159:5
176:12 208:8
217:17 226:6,6,11
228:2 229:12 230:7
252:10 273:21
277:9 281:22 306:1
310:7 318:9,12,14
324:6,8 331:7
332:14 333:18
dates
169:25 214:25 215:1
215:8 270:2 310:4
day
111:7 112:1 175:21
204:4,5 211:18,22
328:19 329:2 332:9
333:13
days

111:19 123:25 124:4
198:3 209:1 331:6,6
333:4,5
DBA
210:6
De
105:13,14,16 106:7
106:16 107:1,5,8
110:17,19,24 111:2
111:11 112:3 114:5
115:9 275:5 284:6
286:14,21 288:9
deal
22:8 190:23 192:17
193:16 197:19
198:12
dealing
48:18
debt
83:17
December
310:2,8,9 320:14
decent
186:8
decide
220:9 299:12
decision
220:17
declaration
6:5 294:2,6,7
declare
294:11
dedicated
48:22,24 67:10
dedication
26:23
defamation
71:1,2,4,7 72:5,7,14
72:16,17 73:10,12
73:18,18,21,22 74:7
75:14,15 79:16,17
79:23 80:1,4,12,13
80:15,17 81:3,6,14
defamatory
73:5,8 81:13,18,22



default
240:18,19 241:1
defendant
1:8,18 3:6 8:10,16
11:12 20:22 58:14
58:17 59:7 72:1,3
75:15 79:25 80:3
83:18 85:7,15 123:3
123:9 129:10,15,21
130:10,22 243:22
244:4 250:12 330:8
331:24 332:2
defendants
79:2 251:12
defendant's
6:3 55:25 280:12
defense
85:5
defer
60:4,6 61:14 62:15
definitely
87:25 131:17,24
201:12
defunct
42:15
degree
23:11 24:6,17,22,24
25:5,8,10,11 34:15
degrees
23:15 25:17,20,21
Delaro
169:2
Delarosa
168:7,11,14 169:2,12
169:12
delay
175:20
delivered
330:21
deman
90:25
demand
5:7 83:25 84:4 89:13
89:17,23 90:3,5,7
denied

223:5
Dennis
55:4,7,8,8,10,15,17
55:21,24 56:11,15
56:17,20 57:4,8
61:5 63:4,5,7,14
64:19,22 65:10,25
66:1,4 70:1,6 75:1
76:2 82:4,13 84:17
155:17 157:22
167:5,11,12 169:20
178:8,10,18
depends
162:19 197:3 285:20
deponent
331:2,3,10
deposed
16:24 17:2,8,12
deposition
1:11,16,24 2:1 8:3,9
8:23 9:6,21 11:13
11:14,14,21 12:16
13:4,4,10,25 14:2,3
14:8,18 15:3,8,14
15:25 16:2,19 18:3
18:12 22:20 35:8
51:22 56:18 78:21
101:3 130:4 166:14
166:19 170:4,5
172:21 207:20
223:12 228:17,25
229:5 253:19 267:2
304:21 309:18
326:16,20,22 328:2
330:11,19,21 331:4
331:11,13,18 332:1
332:3
depositions
22:16
deposits
306:5
descending
310:10
description
5:2 328:21

designated
301:2,3,5
detail
76:15
detailed
281:22
details
61:21 115:12 254:10
324:11
determination
257:4 258:15 267:1
320:23
determine
126:6 257:17 258:8
262:24 265:8,16,19
266:2,5,14,24
267:18 271:10,13
development
34:12,14
device
50:24 51:2 175:6,15
176:5,8,11,14,18
devolve
163:1,1
DH
239:21
dialing
223:23
Diana
21:2
dictate
258:23
didn't
15:11 35:6 43:10
50:15 68:6 79:21
83:24 86:11 94:25
118:7 151:16
183:13 202:22
228:9 231:7 260:8,8
294:8 299:6 305:6
differ
108:14
difference
73:20 280:5
different

51:10 79:23 95:6
108:16 183:15
195:22 197:22
206:5,7 257:10
288:16,19
digits
67:21,23 96:21
124:10,11
direction
28:22 258:24
directly
156:3
disconnected
94:4
discount
104:5
discovery
11:9 65:15 131:19,25
170:6 172:22
187:11 216:13
217:1,7,13,15,16
224:24,25 228:17
228:24 229:3
259:23 268:12,13
295:22 297:19
299:3 301:17
302:20 305:17
308:17 320:1
discuss
16:19 61:25 123:14
143:1 229:1 244:6
252:25
discussed
30:5 46:13 57:7
61:22 65:18 67:19
68:21 69:9 142:14
142:17,18,20 144:6
149:8 151:7 251:11
discussing
76:17 78:19,20 79:18
141:23 157:8,10
165:13 168:14
205:22
discussion
62:9 205:2



**discussions**
62:11,25 76:18
121:25 122:2
133:14 218:21,23
219:16 226:4
**Dismiss**
5:21 223:5
**dismissal**
246:23
**dismissed**
59:19 222:10,13,19
223:15,18,25 224:3
224:4 230:15 240:5
240:10,14
**disposed**
240:16,17 242:1
252:7,8
**Disposition**
47:10
**disproportionate**
69:21
**dispute**
11:16,19 13:1,7 75:8
75:10,11,13 85:24
**disputing**
13:8
**distinct**
216:19
**distinction**
216:20 257:9
**district**
1:1,1 8:6,6,25 22:23
222:25 251:19,21
252:5 330:1,1
**DiTommaso**
232:7
**dive**
169:18
**Division**
1:2 8:7 9:1 330:2
**DNC**
5:15 204:12 206:13
208:13 213:19
**Docket**
10:8

**doctrine**
13:23 53:22 54:7
220:12,21,22
221:21 252:25
297:21
**documents**
14:17,20 15:2,7,13
15:13,19,25 16:9,10
16:11,13,13,14 52:4
54:2 122:15 212:15
229:1 296:2,2 297:3
297:18,23 300:9
**Doe**
238:14
**doesn't**
81:23 311:13 325:9
**dogs**
77:8
**doing**
22:12 63:22 191:1
192:20 219:2
314:10
**dollar**
60:1 196:14
**dollars**
60:1 197:10 198:10
**done**
175:21 199:19
205:17 207:24
224:24 228:12
299:14,18 325:8
**door**
318:23
**double**
213:16
**down**
11:4 12:3,6 18:14
42:5 89:2 101:18,20
107:14 108:9
113:17 116:14
120:10,12,14
121:11 141:10
151:6 159:8 173:14
185:11 193:15
198:9 207:17

259:19 261:4 272:2
276:5 279:22,25
280:6 288:10
298:16 302:5,7,8
308:10,24 310:6,9,9
310:12 312:15
315:1,4,6 317:14,19
319:20,22 323:18
323:19,20,23
**download**
48:13
**downloaded**
49:6,9
**Do-Not-Call**
91:23 92:3,8,11,14
92:18,23 93:2,9
97:8,11,14,18,23
98:2,5,10,15,18
99:3,8,13,16,21,24
100:4,9,12,15
123:24 124:3 207:8
207:13,14 209:1
210:24 212:25
213:1
**draft**
131:2 301:21
**drafted**
124:18 130:16
282:13
**Drive**
35:23 36:10,23 316:9
**dropped**
94:15,24
**dropping**
94:20
**due**
6:9 143:2 257:2
302:23 303:1,16,18
**duly**
1:18 8:21 330:17
**duration**
257:15 258:24
**during**
9:6,21 11:12 28:23
29:1 52:1,4 63:18

93:3,5 101:7 111:15
111:19,19 112:4
143:5 166:18 176:1
221:3 224:25
253:23
**duties**
105:20
**Dwelling**
6:16 309:16
**D-E-L-A-R-O-S-A**
168:9
**d/b/a**
210:9,12

_____
**E**
_____
**E**
3:1,1 8:1,1 308:24
**each**
108:8 116:16 123:2
178:25 196:2
281:22 300:20
331:12
**earlier**
13:2 21:16 34:14
94:6 101:9 102:11
169:18 183:14
197:6,9 217:19
229:13 286:15
310:4
**Early**
252:12
**easier**
12:4 18:23 22:15
**east**
201:5
**economics**
25:15 34:15
**educational**
23:2,8
**Edward**
321:3,4,5
**effect**
206:16
**effectiveness**
108:4,5



efforts
109:3 160:4
efrelator@gmail.c...
315:25
eight
211:2 324:12,15,20
324:21,22
either
28:22 33:17 36:24
49:17 67:12 74:19
87:6,7 112:1,24
175:23 225:10
240:15 287:13
289:21 290:8
291:14
El
272:13,17
electronic
296:2
Elite
239:7
else
9:10 14:22 28:25
29:4,23 30:4 34:22
34:22 149:7 178:3
178:10 180:18,22
182:8 210:23
272:15 278:10
285:11 291:16,18
employed
26:1 28:24 29:4,7,8
30:3,6,7,11 32:25
33:1 332:5
employee
34:2
employees
104:21 105:3,6,8,9
105:10 195:12
271:23 274:23
275:1 292:14,15,17
292:19,21
employment
27:20
emptied
41:25

end
10:5 51:18 76:16
100:24 166:10
210:19 253:15
301:12,12 304:17
326:19
ending
38:8 39:18,22 112:15
113:15 135:20
136:20 140:4
149:24 151:1
152:24 156:13
165:20 168:21
172:18 175:10,15
176:5,8,11,14,18
177:25 179:17
180:8 181:19,23
182:14,17 183:17
183:19 185:3 318:2
enlarge
10:4
enough
116:20
Ensurety
241:17,22 242:10,22
249:25 250:3
enter
6:16 71:6 230:18
232:23 233:2 234:8
235:10 240:2 242:3
246:25 248:13
309:16
entered
11:1 71:13,14 235:15
241:9 243:2 303:2
entertain
224:11
entirely
116:5
entirety
207:1 296:6 299:6
308:20,22
entities
27:21 28:24 29:1
30:5 32:18,19 44:21

45:18,19 46:12
66:25 67:7,11
102:21 137:16,24
140:11,13 150:3
151:8 155:14
156:19 164:18,19
166:22,25 168:3
169:13 170:20,22
206:9 273:12
281:12 282:7
309:22 322:6
324:24
entitled
91:6,17
entity
29:13 30:16 31:5,6
32:3,7 45:4 69:5
114:6,9 137:13,23
138:8,9 144:21,22
144:23 146:2,4
153:7 156:22
158:23 164:22
173:1,2 174:4 177:5
180:12 200:8 210:8
250:11,15 255:7
256:9 273:19,20
282:5,10 309:24
324:25 325:2,21,23
entries
86:22 170:1 270:18
entry
260:14,18
equity
173:9
error
327:3
especially
172:12
est
215:21
established
193:19
Estate's
106:8 107:2,6 161:21
Estate.com

307:8
estimate
257:23
estimation
17:6 88:10 215:21
et
142:13 235:24
even
16:12 27:12 31:15,15
46:24 49:6 55:25
65:13,15 70:10 78:4
80:11 88:1 89:25
146:18 198:11
204:24 207:9
208:15,24 210:6
224:24 226:22
227:20 231:1 238:9
251:15 255:15
260:8 275:15
ever
16:24 32:13 47:16
50:18,24 64:22
112:7,9 114:8,10,13
115:14,14 132:9,11
136:23 137:19
138:1 147:20
170:19,21 176:7
185:22 193:23
204:5 214:20 236:5
320:17
Evergreen
32:7,9,13,23 45:21
45:24 46:11 50:18
50:19,20,25 67:2
69:8 113:22,23,23
114:2,10 132:16,18
132:20,25 133:8,11
133:13,15 134:1
135:7,25 136:2,5,6
136:19 137:7
180:10,11,13,17
181:3,10,14,18,22
182:9,13 183:1,7,11
184:9,18,21,24
273:14 277:6,8,11



277:12 278:13 282:15 283:3,3,16 288:10,15 289:1 306:4,9,12,13,16 307:2,4,22,24,25 309:25 310:15 311:3,6,10 312:6,8 325:4

**every**
23:1 175:18 178:13 209:1 213:7

**everybody**
166:4 301:22

**everyone**
188:10

**everyone's**
166:1

**everything**
18:14 63:10 195:9 201:25 202:2 211:7 213:5 270:8 299:10 317:23

**evidence**
177:14 179:4,12 181:25 182:4 208:16 229:1

**exact**
17:11 21:9,10 28:3 31:11 40:20 45:5 46:7,22 71:20 76:25 77:14 79:7 88:10,18 91:25 95:4 115:12 134:14 141:6 159:4 173:23 176:12 214:25 215:1,8,12 215:20,21 216:1,7 226:6,11 230:7 236:10,11 252:10 262:14 273:21 275:23 277:8 318:12

**exactly**
17:5 19:22 23:9 60:24 77:21 128:16 143:9,19 195:2

229:12 231:23 269:17

**EXAMINATION**
4:6 9:3

**example**
137:8,10,12 263:3

**exceed**
68:15

**except**
328:3

**Exceptions**
207:17

**excess**
68:15

**exchange**
11:9 215:6

**Excluding**
285:25

**exclusively**
231:18,21,22

**executed**
328:24

**exhibit**
4:3 9:24,25 11:20,22 12:16,24 52:7,8 66:7 88:20,21 100:19 101:11,12 115:20,21 119:18 119:19 122:19,22 136:8 185:17 188:3 191:24 192:1 206:20,22 209:4,5 212:8 213:13,15 214:5,6 216:24 222:17,18 223:7 254:3 259:1,2,6 267:21,22 272:1 279:3,5,8,11 293:12 293:13 296:10 298:13,14 300:9 301:24,25 304:25 305:1 308:2,3 312:10,11 314:19 314:20 317:7,9 319:15,16 322:22

322:23 323:9,11 325:3

**exhibits**
5:1 10:10 89:6,7 207:19,22 215:7 217:10 218:14 299:13 304:1 332:3

**existence**
47:14 273:24,25 274:2

**existing**
284:11

**Exit**
313:16,17,20 314:9 314:14

**expect**
173:15

**experience**
212:17

**Expiration**
332:14 333:18

**EXPIRES**
329:10

**explain**
73:20 108:6 109:14 137:1 327:4

**exported**
269:6

**exposed**
198:1

**Express**
170:25 171:2,9,16,19 172:2,24 174:3

**expressed**
328:25

**extent**
46:3 60:17 78:15 212:11 234:25 270:13 322:14,15 326:2

**eyes**
73:23

**e-mail**
6:14,17,18 134:8,9 134:10,11,12,18,20

134:22 135:8,9,13 135:16 140:1 141:25 147:6,8,23 147:24 148:1,5,9,16 148:19 149:2 154:5 155:6,7 156:7,8 181:6,7,10,13 182:2 183:2,5 185:7 198:22 199:23 200:5 205:10 206:3 206:6,8,10 244:6 294:11,12,15 295:8 305:21 306:11,16 307:8,22,23 308:16 308:18,18,21,23 310:2,3,21 311:23 312:13 313:2,8,12 314:25 315:9,20 316:18

**e-mailing**
313:12,13 315:23 316:18

**e-mails**
135:11 148:4,21,24 149:2 221:8 295:13 295:16 296:7

---

**F**

**fact**
60:14 179:12 208:24 258:20

**factoring**
146:15,19

**facts**
177:13,14 179:3,12 181:24 182:3 192:22 327:3

**fair**
49:17

**faith**
283:24

**fake**
186:7,11,15,15 187:1 187:1,9 205:5

**falling**



213:25
**familiar**
191:4 192:23 229:21
229:23 231:13
232:6,8 233:17,19
234:16 235:23,25
236:24 238:1,13
239:6,20 241:16
242:11 243:19
244:1,9,19 245:7,19
249:11
**family**
126:23 129:3 141:21
261:14,15,17,18,24
262:1,2,5,9,12
263:3,4 272:14,15
300:23 301:19
**far**
195:25 323:20
**fast**
167:9 197:14 198:6
**father**
39:5 144:25 258:5
**fault**
213:21
**February**
77:25 78:1
**federal**
1:22 224:13
**fee**
62:5 118:16 197:16
**feel**
130:2
**feigned**
206:2
**feigning**
205:7,18 211:6,15
**felt**
218:24
**few**
284:8
**fiance**
190:17
**Fields**
235:24

**figure**
205:6
**file**
86:2 118:7 184:13
211:8 229:14
235:19
**filed**
5:11 7:10 17:18
18:25 19:6,18,22,23
74:21 83:5,24 118:6
118:8 121:20 125:1
131:9 214:20,21,23
214:23,23 215:6,11
215:11 218:7
221:15 229:13
249:25 250:3,12
323:5
**filing**
72:14,25 119:1,11
121:22 122:3
124:21 125:25
126:9 131:7 218:10
218:17 221:16
234:11
**filings**
221:15,18 222:5
**fill**
201:23
**final**
42:22 77:19 312:7
**finance**
141:14 188:23
189:21 192:11,24
**financial**
233:18,19 281:19
**financially**
332:7
**find**
249:7
**fine**
9:7 22:11,25 23:1
199:8 213:23 219:9
253:10 313:8
315:14
**finish**

18:15,16,22 43:9
49:18 162:22
186:13 205:15
219:3 304:6 305:4
**finished**
69:23 293:21
**firm**
55:8,10,11 70:14,16
70:18 82:19,21
207:15 332:16
333:20
**first**
5:6,12 8:21 14:23,24
15:1,22,25 18:12
28:1 29:10 35:2,2,9
36:22 52:20 72:8
78:2 84:22 89:10,11
102:2 106:15
120:25 122:23
123:8 124:12,20,25
125:6,22 126:8,20
127:10,21 129:12
130:8,13 131:6
134:17 137:25,25
138:3 141:17
201:14 208:10,25
222:24 224:10,17
226:17 254:8,13
273:5 298:18,21
300:10 321:3
**fist**
188:12
**five**
31:19,21,23 39:20
40:11,16 41:10
43:13,21,22 44:7,18
44:20,21,25 45:3,9
45:10,11,13,19,21
45:24 46:1,4,9,13
46:15 47:13 51:13
70:4 75:1 76:2 77:1
77:10,12,13 78:23
79:12 82:6,9 84:19
87:17,18,22 88:2,4
100:21 135:12

137:15 139:2,18
141:9,11 145:10
159:7 213:8 215:13
275:25 285:21
286:3 300:10
324:12
**five-minute**
51:5 253:8,12
**flagging**
215:23
**flipping**
198:4
**Florida**
115:10
**fluctuate**
107:25 197:15
**fluctuates**
194:24
**flushed**
132:1
**following**
66:25 273:12 294:12
330:16 331:19
**follows**
8:21 66:20 69:18
284:2 331:13
**Force**
314:14
**foreclosures**
84:3
**foregoing**
328:1,23
**Forest**
26:14,19 27:15 28:19
28:20 31:4 32:2,22
67:3 96:10,13
273:15 277:22,24
278:2,6 282:15
283:5,17 290:22
313:5,20 314:8
**forgive**
304:3
**forgot**
21:2
**form**



17:19,24 22:17 30:9 125:8 169:23 306:20 333:8
**formal**
34:16 310:16
**format**
183:15
**formation**
281:18
**formed**
113:24 273:19,20 277:7
**former**
118:21 289:14 321:25 322:1
**formulating**
262:22 265:18,20 271:17
**forth**
219:7 223:4
**forward**
60:18
**found**
240:23
**four**
27:21 28:24 30:5 67:21,23 68:9,10,15 68:18,20 69:3,10,12 69:15 78:23,23 79:12 83:14,15,20 213:8,9 255:8 260:9 266:13,17,17,19 267:3,12 296:24,25
**fourth**
263:5
**four-hour**
310:23
**frame**
112:4 148:6 270:3 285:20 296:20
**frames**
297:3
**Franchise**
6:8 302:22 303:15,17
**FRCP**

331:1
**Friday**
111:22,23 211:21 313:7 316:11
**friend**
110:21,22 151:18,19
**friends**
126:23 129:3 141:21 272:17
**front**
10:10 212:14 251:23
**Frost**
163:17,18
**full**
58:18 70:23 164:23 212:11 243:22 244:4
**fully**
217:13 261:5
**funds**
106:3 146:21
**further**
67:7 69:19 229:2 275:14 280:6 281:10 326:10 331:1 332:4,7

---

**G**

**G**
8:1 314:8,13
**games**
175:23
**garage**
318:23
**Garcia**
223:1
**gate**
316:10
**gave**
38:24,25 196:25 206:3,5,7,7
**gears**
115:18 169:17
**general**
110:1 146:5 231:3

283:25 296:19
**generally**
56:19 66:1 73:4,13 73:21,24 109:13 280:25 284:4 286:18 288:11 290:24 292:4,13 296:17
**generation**
38:2
**geographic**
108:15
**get**
22:7 29:11 48:15 49:14,16 60:5 65:4 65:6 83:24 91:11 94:11 102:22 104:5 104:17 110:16 128:18 130:7,15 141:17 166:4 192:2 195:16 198:13 199:19,24 201:3,11 205:11 212:3 215:3 215:3 217:25 219:16 244:5 249:7 257:23,24 294:8 299:10,11 304:6 308:11
**gets**
194:22 197:6,7
**getting**
48:20 143:15 166:2 217:18 218:21 241:10 314:25
**give**
10:14,17 28:21 31:15 35:7 39:2 46:2,22 46:23,25 64:4 77:13 88:9 120:15 132:22 138:25 167:2 184:2 186:7,11,14,15 187:1 189:11 191:15 205:5,7,8 215:20 257:22 258:5 284:17

321:17
**given**
186:7 281:20 329:1 330:19 331:17 333:10
**giving**
21:20 163:3,5 187:9 299:19 310:16
**God**
193:22
**goes**
16:15 22:9 43:25 190:3 193:2 196:1 310:9
**Golden**
37:4 161:16,18 162:3 162:18 318:7,10,21
**gone**
87:16 137:15 150:2 153:5 266:12,23
**good**
8:15,15,22 49:21 51:11 150:12 187:2 197:7 201:15 240:25 257:22,23 283:24 302:13
**goods**
195:5,17,20 277:2,3 277:4
**Google**
92:18,22
**Googled**
92:20
**got**
33:21 52:16 81:24 85:21 86:2 94:4 167:10 180:17 193:18 198:16,24 198:25 200:4,25 207:9 211:7,7 228:11 242:10 279:13
**governance**
281:18
**governed**



20:19
**grab**
 51:14
**graduate**
 23:13 25:22
**graduated**
 34:20
**graduating**
 25:24
**grand**
 196:21,25
**granted**
 223:5 224:6
**Grass**
 289:8 309:17 311:12
  311:15,19,21
**Grass's**
 289:9
**greater**
 46:20,21
**Green**
 26:14,19 27:15 28:19
  28:20 31:4 32:1,22
  67:3 96:10,13
  248:22,23 249:2
  273:14 277:21,24
  278:2,6 282:15
  283:4,17 290:22
  313:5,20
**Greene**
 151:12 152:3,4,6,9
  152:11,14,16,17,19
  152:20 154:9,10,11
  161:3 167:6,15
  180:22 184:5,6,17
  184:19,23,25
  288:25
**Green's**
 158:1
**grossing**
 196:2
**ground**
 13:13 18:12 170:14
  230:24
**grounds**

 170:11
**Grovan**
 179:20
**Grovano**
 26:12,18 27:6,7
  28:11,12 31:3 32:1
  32:22 41:23,24 42:2
  42:17,21 67:2,7,18
  95:19,23,24 96:2,6
  96:7 170:19,19,21
  170:24 171:2,11,12
  172:3,24 173:7,11
  173:13,15 174:3,9
  174:16,20 176:20
  176:21 177:4,12,18
  177:19,23 178:3,14
  178:22,24 179:20
  206:11 273:14
  276:20,21,24
  278:19 282:14,24
  283:16 292:12
  317:1,2 325:12
**Grovano.com**
 316:18
**Guadalupe**
 81:1
**guess**
 17:7 22:15 28:7
  31:14 40:9,14 42:4
  43:3,17 45:14 72:12
  73:23 74:1 76:14
  79:19 83:1 106:11
  106:18 113:21
  116:13 128:16
  133:20 137:4 147:2
  148:6 154:17
  166:23 172:8
  190:24 192:18
  193:1 197:2,12
  213:25 260:14
  278:14 298:4,5
  299:7 301:2 304:5
  315:8 322:16
  325:19
**guys**

 115:1 191:1 192:20
  195:2 196:2 205:12
  206:15 253:9
  271:24 301:19
**guy's**
 70:24
**G-R**
 200:10
**G-R-O-V-A**
 200:9
**G-R-O-V-A-N-O**
 200:12

_____
        **H**
_____
**habit**
 9:9
**had**
 15:19,20 30:5 34:14
  41:21 43:18 48:15
  57:4 62:25 67:20,25
  68:3 69:19 74:23
  75:23 76:21 91:15
  93:23 101:9 107:11
  107:11,19 111:2
  112:23 113:6 132:9
  132:14 133:25
  139:2 143:23 144:6
  144:10,14 147:20
  148:13,23 162:16
  166:22 184:5
  185:22 186:2
  203:25 204:3,9,24
  214:19 215:5
  226:16 227:24
  229:13,14 258:1
  283:12 285:25
  286:8,11 309:18
  325:3
**half**
 298:19
**halfway**
 198:11
**hand**
 329:1
**handle**

 115:14,15
**handled**
 85:11,13
**handling**
 114:6 115:9
**Hang**
 304:14
**happening**
 316:21
**happens**
 49:16
**happy**
 163:4 299:8
**harass**
 186:25
**harassing**
 94:23
**hard**
 172:13,13 189:5,5
  238:12
**Harrahill**
 149:11,13,15,19,21
  150:1 151:24 156:2
  161:13 167:6,19
**Harrahill's**
 158:5
**has**
 11:10 18:14 28:16
  39:20,20 44:24 45:4
  45:4 52:6 58:5,10
  59:19 62:24 63:3,6
  63:7,17 64:22 66:23
  68:20,22 69:2,5,8
  85:12,12 86:5
  101:11 113:21
  124:8 137:19
  147:18 148:23
  214:23 255:6
  258:25 262:16
  273:10 277:24
  280:22 289:14
  293:11 333:4
**hasn't**
 68:25 325:8
**haven't**



| | | | |
|---|---|---|---|
| 11:22 88:3 224:23 | 11:11 13:5 51:20 | **high** | 300:23,24 |
| **having** | 101:1 166:12 | 23:11,13 | **holding** |
| 8:21 11:13 13:3 22:2 | 191:21 253:17 | **highlight** | 67:12 281:12 |
| 62:8 86:2 108:2 | 304:19 | 122:25 | **home** |
| 128:13,15,23 202:8 | **hello** | **highlighted** | 9:19 35:21 39:24 |
| 319:2 | 188:7,18 189:14,15 | 270:20 | 40:1,1 277:2,3,4 |
| **Hawthorne** | 190:11 192:6 | **highlighting** | 316:8 |
| 313:13,14,15 314:5,8 | 310:14 | 13:2 | **homes** |
| **Hayden** | **help** | **Highly** | 275:21,22 |
| 143:21,24 144:10 | 81:17,20,21,21 184:2 | 325:13 | **honest** |
| **he** | 184:3 221:18 303:3 | **him** | 194:19 |
| 49:14 55:18,18,19 | 318:20 | 49:18 56:21 73:1 | **honestly** |
| 57:20,21 63:3,6,17 | **helped** | 141:20 147:11 | 26:20 |
| 65:1,2,11 66:5,22 | 222:1,1,4 | 154:11 159:19 | **Honorable** |
| 70:14 72:16 73:3,9 | **helpful** | 185:21 186:9 187:6 | 222:25 |
| 74:8,9 82:25 83:5,7 | 22:10 104:18 | 206:3,5,7,7 208:20 | **Hope** |
| 83:9,11 84:7 85:2 | **her** | 228:8 301:20 310:2 | 192:8 |
| 114:23 161:16 | 21:2,2 70:10 75:6 | **Hirschfeld** | **Hor** |
| 186:1 192:2 202:11 | 76:10,11,13,20,21 | 316:23,25 | 325:14 |
| 206:1,3,4,4 208:20 | 86:15 89:15 105:20 | **his** | **HorizonWiz** |
| 209:11,15 212:2 | 111:5,8,18 119:1,11 | 11:11 49:14,18 57:14 | 31:7,9,13,20,25 |
| 228:9,10 273:9 | 150:6 156:23 157:1 | 58:18 62:5,14 66:23 | 32:23 44:21 45:2,3 |
| 313:13,22 314:1 | 157:2 164:23 | 67:14 71:16 73:9 | 45:12,16 46:11 50:6 |
| 318:5 | 168:23 177:19,22 | 75:19 82:13 84:22 | 50:9,14,16 67:3 |
| **head** | 184:20,22 286:15 | 84:24,25 123:24 | 69:2 273:15 282:15 |
| 33:11 40:20 55:14 | 292:22 316:3 | 124:3 126:23 127:3 | 283:9,17 292:3 |
| 78:24 91:25 93:13 | 322:17,18 | 128:7,20 129:4 | 325:16 |
| 96:8,23 157:25 | **hereby** | 149:11,12 155:5,18 | **hour** |
| 158:2,8,20 164:16 | 294:11 328:2 330:15 | 158:14,17 178:18 | 27:4,9,13 51:9 200:4 |
| 262:20 263:10 | 333:3 | 203:2 210:19 212:4 | **hourly** |
| 264:16 265:7,14 | **herein** | 255:7 256:9 273:10 | 61:10 62:4 64:8 |
| 271:9,15 272:20 | 330:24 | 283:24 285:2 | **hours** |
| 281:9 284:15,18 | **hereto** | 289:10 290:3,19 | 21:22 26:25 27:5,10 |
| 285:4,10 286:16 | 1:24 | 291:23,24 300:22 | 27:14 63:17 111:6 |
| 287:1,11,19,23,25 | **here's** | 301:21 309:18 | 111:15,16,19,23 |
| 289:11,16,19 | 298:19 | **historical** | 112:4 175:18 201:7 |
| 292:10 293:1 | **hers** | 295:13 | 210:22 211:1,2 |
| **hear** | 105:24 | **history** | 299:9 |
| 49:16 55:5 92:11 | **he's** | 194:1 217:19 | **household** |
| 151:16 188:10,11 | 85:11 209:16 210:12 | **HOA** | 127:4 |
| 188:14 189:5 190:2 | 210:15 212:20 | 80:5,6,10,14,19 81:2 | **Houston** |
| 191:8,10 289:7 | **Hi** | 81:10,15 | 3:8 272:19 |
| **heard** | 306:2 | **hold** | **however** |
| 123:18 188:12 | **hiding** | 17:21 31:6 | 223:11 283:24 |
| **held** | 212:13 | **holder** | 295:12 |



MAGNA
LEGAL SERVICES

hundred
196:5,6
husband
184:20,22
HVAC
319:5
Hyden
140:19,21,24 141:2,5
141:8,15,18,24,24
142:1,5,14,18,24
143:2,6 144:19
145:25 164:6 167:7
167:23 180:23
Hyden's
158:16
hypothetical
314:16
H-A-R-R-A-H
149:13
H-I-L-L
149:13
H-U-A
56:3
H-Y-D-E-N
140:22

### I

ID
129:16,22,24 130:11
130:23
idea
135:12 272:8 325:22
identified
166:24 211:9 213:15
283:18 289:24
identify
271:20 282:1 283:11
288:25 289:2,5
290:11
identifying
205:11,20 260:25
identity
187:12 328:21
impetus
73:6

impossible
281:24
impression
12:21
impressions
14:1,15
inanimate
33:8
inaudible
188:20 189:18
190:14 192:23
193:10,13 194:18
195:10,15 197:17
198:4 199:9 200:2
201:18
Inc
1:6 8:25 67:2,2,8,18
178:22 229:22
232:7 233:18,19
238:2 245:20 247:7
273:14 276:11,13
276:20,24 278:19
278:22 282:14,24
283:15,16 329:16
330:6
include
86:18,21 109:4,5,9
109:18
included
103:23 104:2,8
129:13 148:13
259:9 324:12,12
includes
331:19
including
169:12 271:22
inclusive
297:10,12,13
incoming
257:19 258:7,12,23
264:12
incorporated
8:5,17 91:19 276:12
276:20
indemnification

80:12,14,17 81:6,8
81:10
indemnify
81:2
independent
30:12 90:24 91:2,5
91:15,16 92:13
110:18 125:21
126:6,12 127:8,11
127:16,20 130:25
131:1,1 275:2,3
INDEX
4:1
individual
40:14 44:14 139:5
153:7 158:23
164:22 172:25
173:2 174:4 177:5
178:25 180:12
281:22 283:11
individually
102:14 154:18
162:11,18 317:3,4
320:17,19
individuals
140:11 149:8 150:3
151:7,8 153:5
155:12,14 156:18
158:21 164:17,18
166:22,25 168:3
169:11,13 170:20
170:21 283:12,25
284:4 286:19
288:12 289:15
290:24 292:5,14
293:6
information
11:10 109:18,24
129:14,21 130:9,22
137:5 169:24 205:5
205:8,9,11,21
210:20 211:13
260:7,25 264:8,21
267:4 326:1 331:17
initial

129:11,13 131:11,15
131:23
initiate
107:6,9
injury
17:13 18:25 19:12,17
inputted
259:20
inquire
94:19
inquiries
14:13
instance
1:17 257:18
instantaneous
207:14 208:16,17
instantaneously
213:2
instead
206:5
instruct
21:18
instrument
328:23
Insurance
243:20,21,23 244:20
245:8
interactions
258:2
interchange
9:8
interest
142:12 143:21,21,25
190:25 191:3
192:19,21 205:7,19
206:2 211:6,15
interested
210:24 261:3 332:8
interesting
194:20
interfacing
171:1,4
internal
210:6
interrogatories



5:6 6:4 52:20 53:16
254:9 265:16
275:15 280:2,13
283:20 293:4
296:23
**interrogatory**
66:8 68:7 69:16
254:15,21 256:3
262:23 271:17,18
272:25 279:2
280:20 281:11
282:2 283:10 293:5
**interrupting**
162:24 213:21 219:6
**intertwined**
253:2
**into**
11:1 14:13 16:15
29:11 40:25 43:25
65:4,6 71:6,13,14
91:11 102:22
110:16 119:2
125:24 130:15
138:6 166:5 192:2
217:25 218:21
219:16 221:21
233:2 234:8 235:10
235:15 240:2 241:9
241:10 242:3 243:2
246:25 248:13
**introduced**
9:25 52:8 88:21
101:12 115:21
119:19 191:24
206:22 209:5 214:6
222:18 259:2
267:22 279:5
293:13 298:14
301:25 305:1 308:3
312:11 314:20
317:9 319:16
322:23 323:11
**inventory**
196:16,22
**investing**

282:25
**Investments**
239:21
**investors**
154:15
**invoice**
5:8 7:11 62:19 65:2
66:5 101:25 102:23
103:3,5,10 104:9
105:22 106:4 324:5
324:7,18 325:2
**invoices**
62:17,20,22 63:5,6,9
63:14,21 64:13,16
65:10,16 86:15,18
86:23,24,25 87:10
169:19,22 172:12
172:14,14,17
256:19,20 325:24
**involve**
233:23 234:22 236:7
237:5 238:25 239:4
239:17 242:19
244:16 245:1,16
246:2,9,17 247:11
247:21 248:6 249:3
249:16 250:5,8
251:1,11
**involved**
109:12 133:14 160:3
249:8,22 274:11
277:12,14
**involvement**
26:24 161:21
**iPhone**
38:1,3,4,6,15,16
39:11,11,14,15
**IRA**
151:12 161:3 167:6
167:15
**isn't**
161:19 209:21
282:16 311:6
**issue**
60:12 63:5 86:15

124:4 222:11,14
224:9 232:18
233:24 234:24
236:9 241:3 301:15
**issued**
63:6 65:2 66:5 86:25
87:10
**issues**
87:1 281:2
**itemized**
63:16,21
**items**
63:10
**its**
41:5 67:9 68:5 69:3
107:10 119:21
124:21 136:1
216:25 281:4 311:4
311:7 314:8
**itself**
106:9 130:21
**I'd**
323:6
**I'll**
9:8 10:20 17:21
30:15 35:8 48:15
51:14 52:11 53:21
60:5 61:14 63:4
71:18 89:20 116:15
119:7,20 166:9
201:15 202:2,16
203:16 216:20,21
216:21 225:24
234:11 249:23
298:4 302:1 314:18
314:21
**I've**
29:4 56:21 81:23
87:19 89:10 118:2
152:4 157:1 162:14
167:3 174:12
182:21 191:25
198:16 200:4 209:1
226:16 259:4
270:20 314:11

320:12,23

---

**J**

**Jack**
290:2
**James**
3:12 8:11 166:7
**January**
77:23,24 300:18
306:1 317:17 318:6
318:17 319:7
**Javier**
29:24 283:1 295:5
**Jeffrey**
226:9,12,16 227:9
**Jessica**
156:23,25 157:5,8,15
160:7,7 167:4,10,11
**Jessica's**
157:20
**Jill**
151:12 161:3 167:6
167:15 180:22
184:5,17,19
**JKB**
233:18,19 234:12
**Joaquin**
291:11,16
**Joaquin's**
291:12
**job**
33:21 35:2
**Jody**
138:11,13,16 150:10
152:2 158:18 167:7
167:25 168:1
**Jody's**
158:19,19
**Johnson**
153:10,12,15,17,23
153:24 154:1,3,6
155:4,8 160:23
167:5,13 180:23
**Johnson's**
157:24



**Joseph**
278:9 283:5 290:25
291:22 313:6,9,12
313:22,24 314:10
**Jr**
6:6 39:6,8 300:7,11
300:14,19 301:18
301:22
**judge**
175:20 222:25 241:6
**judgment**
240:18,19 241:9
**July**
5:9 11:8 103:7,11
107:23 109:3
111:20,21 114:2
115:5 227:14
**jump**
317:6
**jumping**
304:3
**June**
283:18 317:17
**justice**
19:6
**J-O-D-Y**
138:13

**— K —**

**Katherine**
150:6 158:3 167:6,17
**keep**
51:5,12 162:22,24
165:25 238:12
253:10 302:9 309:3
309:8,8 315:14,17
323:19
**keeping**
219:5
**Keller**
229:22 231:14
**ketchup**
33:8
**Kevin**
149:11 156:2 158:5

167:6,19
**Kevin's**
158:7
**kick**
229:2 249:7
**kicking**
195:9
**kiddo**
249:20
**kind**
15:4 17:12 22:14
34:10,13 37:22
38:13 43:17 59:1,3
70:25 85:23 93:14
93:14 94:9 109:11
174:14 190:25
192:19 194:12,17
220:19 254:10
268:3 277:3 294:20
295:19 296:1
316:21
**knew**
72:24 76:19,21
141:20
**knowing**
21:21 325:1
**knowledge**
137:14
**known**
157:1 301:17 328:19

**— L —**

**label**
102:4 314:23
**labeled**
5:25 6:1,7,15
**lack**
216:19
**Lake**
320:7,11,18,21,25
321:6
**landlord**
322:18
**Lanfear**
82:16,16,19,23 83:3

83:12,25 84:5,10,16
85:2
**Lang**
55:11
**language**
73:14 128:17
**Larry**
140:19,21 158:16,17
167:7,23 180:23
**last**
12:8 21:2 29:25
31:19,21 38:5 39:20
40:11,16 41:10
42:19 43:21,22 44:6
44:18,20,21,25
45:19,21,24 46:9,13
46:15 47:13 66:14
67:21,23 68:9,10,20
69:3,10 70:4 71:16
75:1,6,19 76:2 82:5
82:6,9,15 84:19,24
84:25 87:17,18,22
88:3 117:21 138:23
139:1 145:10,14
149:12 150:6
155:18 156:23
157:2 167:5,10,11
168:8 176:10,13
178:18 199:13
213:16 228:3,4
251:7 255:8 260:9
273:4 281:23 285:1
285:2,21 286:3
291:14 323:5
**late**
36:24
**later**
191:10 210:22 211:1
217:8,17 227:5
228:12 244:6
**law**
55:11 82:19,21
203:19 215:2
**lawsuit**
55:22,24 56:4,6

57:24,25 58:1,19,21
74:21 83:8,10 84:11
84:14 86:10,13,23
87:11,13 91:6 95:8
211:8 214:20,23
215:6 232:1 250:14
**lawsuits**
58:1,6,11 83:10,16
215:10,23 229:15
**laying**
66:17
**Lea**
332:13 333:17
**lead**
72:14 129:10 131:10
131:13,14,23
**leading**
22:17,19 125:9 130:2
130:3
**lease**
42:2,4,11,13,17
149:12
**leasing**
281:1
**least**
45:7,8 46:16,16,18
47:1 78:23 229:14
266:13 310:3
**leave**
94:25 199:11,16
**left**
122:18 173:18
270:21
**legal**
8:12 13:17 14:4,15
15:16 16:15 18:5
21:20 54:1,2,21,23
54:25 75:2 76:3
119:3 253:1 281:18
297:22 332:15
333:19
**lender**
146:20
**lent**
154:14



**less**
27:4,9 45:9,10 46:1,4
133:21 216:4
306:18
**let**
10:1,6,23,24 11:23
11:24 16:22 17:22
18:15,16 21:25 31:7
32:21,21 43:19,19
51:13 52:15,23 55:2
68:11 82:13 87:14
87:18 88:22,25
101:14 102:22
106:25 108:9
115:23 116:19
119:22,23 158:24
162:22 164:21
166:8,9 169:15
178:11 185:18
189:8 190:4 198:23
200:19 201:24
202:2 206:23 214:7
214:18 219:2
222:22 223:7 251:8
254:4,5 259:12
267:23 279:6,21
285:17 293:15,16
293:20 295:19
298:20,22 302:6
304:14 305:3,7
306:6 319:4,20
323:4,14,17
**Lets**
180:20
**letter**
5:7 89:14,17,23 90:3
90:5,7
**letters**
83:25
**letting**
228:8
**let's**
22:5 26:11 27:22
28:12 43:19 52:17
79:3 100:21 101:16

102:22 104:16,16
106:15 108:9,10
110:16 129:5
134:17 136:13
137:18,25 138:16
148:1 155:15 168:5
170:19,24 174:7
178:5,9 180:17
182:24 189:11
191:17,17 198:24
212:9 215:3,3
222:24 253:12
273:18 283:22
288:22 289:7 315:4
315:17 318:19
319:4 323:9
**licensed**
310:16
**life**
68:5 143:5 244:20,21
245:8
**Light**
248:22,23 249:2
**likely**
48:19 115:12 135:19
136:9,20
**limita**
68:14
**limited**
11:9,15 13:4 22:17
26:13,18,20,22,23
31:10 67:13 280:23
281:13 295:12
**line**
45:23 48:21 63:10
67:10 69:23 95:7
115:5,10 120:25,25
140:8 148:4,9,13,20
148:22,23 151:6
201:21,22 204:15
204:21,25 269:8
301:6 327:5
**lines**
45:20 46:13,19 47:2
47:7,11,14,20 49:2

50:1,6,9,12,13,15
50:16,19,22,25 68:4
95:6 101:10 111:13
112:8 155:1 300:20
324:16
**liquidated**
195:5,17 198:5
**LiquidationSA**
29:13,14,16,21,23
30:3 31:3,25 32:23
282:14,24 283:16
**list**
4:3 68:6 91:23 92:3,8
92:11,14,19,23 93:2
93:9 97:8,11,14,18
97:23 98:2,5,10,15
98:18 99:3,8,13,16
99:21,24 100:4,9,12
100:15 178:9,13
180:18 204:12
207:13 209:1
210:25 268:17,18
268:20 269:4 306:5
**listed**
64:16 67:11 97:10
103:6 108:17
113:16 114:15,15
114:25 151:22
178:14 207:16
208:8 210:7 281:12
282:7 293:6
**listen**
119:7 187:25 188:3
190:4 191:11
**listened**
216:15,23
**listing**
147:11 325:1
**lists**
67:1 273:13 303:6,12
**Litigating**
83:5
**litigation**
14:14 56:12 70:20
75:8,10,11,12 82:24

83:1,3 85:3,4,8,9,19
86:1,3 102:6,9
121:20 132:2 149:4
170:2 172:7 220:14
234:24 243:14
**little**
12:10 16:23 18:23
52:10 104:17
115:18 167:9 194:2
194:3 253:7 298:16
299:21 302:1 304:4
308:5 317:6
**live**
162:20
**lived**
73:3 162:1,2,3,6,9,10
163:9
**living**
239:7 318:10,13,14
318:16,25
**LLC**
67:1,3,3,3 107:14
239:7,21 241:17
242:22 244:10
246:13 247:17
248:2,22 249:10
255:8 273:14,15,15
273:19 277:6
278:25 280:24
283:17,17,18 284:3
288:10 292:3
303:13,15 310:15
311:4,7 312:6 326:6
**Llerena**
278:9 283:5 290:25
291:22 313:5,8
**LLP**
3:7
**loan**
143:7,13 146:16,16
173:11
**loaned**
142:12
**loans**
142:15 249:20



**lobbing**
18:8
**local**
103:17,19 107:14
294:20
**locally**
295:14,17
**located**
41:4 110:24 200:1
322:5
**location**
108:15 316:7
**Locations**
1:22
**log**
269:12 271:16
281:20
**logs**
293:7
**long**
33:13 194:17 197:21
**longer**
224:7 248:12 294:14
294:16,24 295:6,7
301:10
**look**
63:9 67:24 68:10
78:16,17 81:24,25
82:13 92:25 97:1,4
102:1 190:8 258:11
269:21 292:23
317:11 319:18
**looked**
129:24
**looking**
126:18 128:16
137:12 254:15
255:5 257:17,18
264:8,22 267:4
270:16 272:24
295:7 315:19
**looks**
10:3 121:18 210:17
249:22 260:2 268:2
269:24 270:7,21

306:8 310:1 313:2
313:15,16 315:20
316:2,13
**loop**
34:19 69:22
**lost**
295:13
**lot**
61:23 94:15 186:24
205:5
**loud**
190:3,6
**louder**
231:19
**Lowes**
285:16
**Luna**
105:13,14 106:7,16
107:1,5,8 110:17,19
110:24 111:2,11
112:3 114:5 115:9
275:5 284:6 286:14
286:21 288:10
**Luna's**
105:16
**lunchtime**
166:2
**L-A-N-F-E-A-R**
82:18
**L-A-R-R-Y**
140:21
**L-L-E-R-E-N-A**
283:7

---

**M**

**MA**
105:25 147:9
**machine**
1:21
**made**
6:6 73:5 81:14 91:13
127:9 199:3 207:19
213:1 216:11,15,24
217:4,10 220:16
229:6 257:4,8 300:6

300:11 329:14
333:8
**Magna**
8:12 332:15 333:19
**mail**
36:8,9,16,18,19
109:13,15,20 110:3
110:9 295:14
**mailings**
109:17,21
**main**
171:7 201:21
**mainly**
65:14
**maintain**
281:19
**maintained**
294:18
**maintains**
67:9
**maintenance**
281:1
**majority**
258:11,12,13 267:6
**make**
12:3 18:23 21:20
22:15 26:16 37:24
37:25 38:13 49:17
49:19 52:10 60:6
68:13,16 71:10
95:18,20,22 96:2,5
96:9,12,15,18
104:12,14 129:11
131:11,15,23 176:2
188:10 244:2
258:15 266:25
280:5 323:8
**makes**
199:1
**making**
207:15 211:13
333:10
**Malissa**
6:14 306:3,25 307:4
**management**

250:22 281:2
**managers**
300:21,24 301:2,3,6
**managing**
126:23 128:7,20,24
129:4
**manner**
85:5
**many**
17:2 26:25 27:5,10
27:14 43:20 44:24
45:4 46:19 58:8
76:23 79:6,9 83:12
85:12 95:1,4 107:18
134:12 140:6
142:23 193:17
195:11 215:2,2,10
216:10 217:3 241:3
251:10,13 256:21
256:21,22 257:12
257:14,15,21
258:20 261:17,24
265:24,24 275:22
293:7
**March**
132:23 214:18 230:5
**Mario**
284:25 285:1,6,7
**Marios**
285:11
**Mario's**
285:3,8
**mark**
1:3,12,16 3:3 4:5 8:4
8:4,20,24 9:5 51:17
51:21,22 70:11,11
70:12 100:23 101:2
101:3 166:10,13,14
173:5 175:17 176:4
188:7,18,22 189:14
189:15,20 190:11
190:16 192:6,9
197:8 202:1,5,11,13
202:21 212:13
213:22 219:8


MAGNA
LEGAL SERVICES

223:10 253:14,18
253:19 276:5 303:2
304:17,20,21
305:20 306:3
307:12 310:14
313:10 315:20
326:19 328:1,9,19
329:16 330:3,11,17
331:14,22
**marked**
52:7 88:19 101:11
115:19 119:18
188:2 206:20 209:4
213:13 214:5
222:17 258:25
267:20 279:3
293:12 298:13
301:24 304:25
308:1 312:10
314:19 319:14
322:22
**market**
189:3 190:1,22
192:16
**marketing**
1:6 5:11,15 8:5,16,24
47:9 90:15 91:18
94:10 108:4,4,8,12
108:14 109:1,2,3,11
110:2,3 115:7 118:6
118:9 131:10 132:4
132:7 160:4 187:1
209:14,20 210:5,9
210:13,15 211:24
211:25 212:5,23
213:4 214:14
216:11,16,25 217:4
217:11 224:13,16
224:22 225:3,17
329:16 330:6
**Marketing's**
5:6 52:20 206:13
221:9 254:8 283:19
**Marko9812@yaho...**
135:2

mark@gforestcapi...
295:9
**Mark@gro**
200:11
**mark@grovano**
200:9
**mark@grovano.com**
134:21 315:21
**mark@horizonwhi...**
294:13
**mark@liquidation...**
294:24
**mark@maorealest...**
148:2
**mark@maorealest...**
134:23 148:5,10,17
149:3 155:10 200:6
305:20 310:22
311:23
**mark@mark**
310:21
**master**
207:13
**material**
124:9,13 125:21
126:7,14
**materials**
220:13
**matter**
8:4 54:20 86:6 88:15
89:14,18 90:8 91:1
118:9 232:4 242:4
268:12 295:22
302:20 305:17
320:2 323:5
**matters**
128:13 280:22
281:19 313:9 314:3
**maximum**
270:14
**may**
5:24 11:12,15 13:7
61:3,4,8 65:23,23
113:22,23 114:2
125:5 187:3,3 260:1

270:3 271:1 272:4
**maybe**
10:23 38:18 46:10
58:12 71:22 77:25
78:2 81:1 85:14
244:5 249:8 275:25
**Mayfield**
164:4
**ma'am**
49:12
**meaning**
105:2
**means**
29:11 104:7 125:22
126:8,15 127:21
129:18 130:12,25
143:12 254:22
255:11 285:15
**meant**
29:19
**mechanics**
48:20 50:13,21
**media**
8:3 51:18,22 100:24
101:3 166:10,14
253:15,19 275:11
304:17,21 326:20
**medical**
128:22
**medications**
35:18
**meed**
52:23
**meet**
142:23 151:14,17,24
152:3
**Megan**
321:20,24 322:11,19
**Melendez**
283:9 292:5
**Melendez's**
292:8
**member**
81:15
**members**

261:14,17 263:3,4
272:14,16
**memorized**
287:4 290:21 293:2
**memory**
284:18 290:9,17,20
291:15,24 323:8
**mental**
12:20 14:1,15
**mentioned**
60:24 309:18
**mentions**
282:7
**mes**
203:21
**message**
5:19 212:25 213:16
214:11 215:6
271:11,12,16 320:8
**messages**
5:25 7:4 95:15 96:5
96:12,18 129:3
203:14,17,20
208:21 211:18,20
213:6 214:16
216:20,22 217:3,9
268:17 269:4
271:25 272:24
318:3 320:4
**messaging**
126:22
**met**
147:9,9,11 152:4
154:11
**method**
269:18
**Mexico**
111:1
**me@markanthony...**
134:25
**mic**
190:7,8
**microphone**
190:5
**might**



31:21 59:15,23 60:4
60:11 71:9 96:25
186:9,9 193:9
210:18 223:9
224:22 230:10
235:3 312:13,14
**mind**
9:13 64:2 125:15
215:22 323:10
**mine**
105:23
**minimal**
266:11
**minus**
92:6
**minute**
166:3 198:17 258:17
**minutes**
51:13 201:9 211:2
263:11,12 264:3,13
284:8 324:11
**mis**
84:5
**mischaracterization**
133:23 186:23
**mischaracterizing**
35:16 94:22 102:16
136:4 183:3 184:10
186:17,19
**mishearing**
95:21
**mispronouncing**
78:9
**miss**
188:13
**missed**
268:24
**missing**
27:24 251:6,9,16
**mist**
139:13
**mister**
145:22 160:3
**mobile**
37:17,19 38:6,9 49:4

49:7 50:24 51:2
93:25 175:6,7,10,14
176:5,8,11,14,18
303:9 317:24
**model**
37:24,25 38:14
**mom**
263:22,24,25
**moment**
215:9 217:12 218:17
224:14,20 225:2,6
225:10 232:13
235:5 237:24
238:19,20 260:20
267:18 285:12
287:15 290:4,6
**Monday**
111:22,23 316:11
**money**
74:5 80:9 142:11
154:14,14,21 155:1
155:3 193:24 194:5
194:5 197:23,24
198:1,25 199:9
245:4 249:10
**monies**
145:6,8
**month**
42:20,22 107:20,23
108:3 175:18 196:2
196:19 228:3
260:13
**monthly**
143:20,21,23,25
144:1 196:1 255:16
255:25 256:1,19,20
261:2
**months**
33:15 93:18,22,23
95:1,3,5 199:13
228:4
**more**
43:24 44:7,14 45:9
45:23 46:4 48:19,20
54:25 56:23 74:3,11

75:10 77:1,3,4,5
85:19,20 88:2,6,8
88:12,13 93:23
123:25 124:4
130:19 133:20
134:15,16 138:25
141:10 143:9,18
155:1 159:9 175:19
183:23 198:13
202:12 203:2
208:15,21 211:20
215:13,15,17,19
216:3 221:20
228:11 230:10
261:20,22 262:10
299:21 306:18
**morning**
8:15,22 199:20
201:14 310:20
**mortega@utexas.e...**
134:19
**mortgage**
83:17 155:2,3
**most**
33:15
**motion**
5:21 184:14 218:8
223:5 224:2
**move**
20:16 36:22 52:23
74:21,22 94:12,13
116:6 221:20
223:13 233:4 247:3
248:16
**moved**
36:24 74:23 319:1,8
**moves**
198:5
**moving**
36:25 61:22 74:24
199:3
**Mrs**
64:10
**Ms**
5:7 18:19 64:2 75:7

75:23 76:1,7,9,12
76:19,23 77:7,11,15
77:17 78:6,12 79:14
82:3 84:17,17 86:12
86:15,25 87:9,11
88:14,15 89:13,17
90:8,13 106:7,16
107:1,5,8 110:24
111:2,11 112:3
114:5 115:9 118:17
118:25 119:10
125:15 138:16,18
150:9,14,21,23
151:14,17 152:3,4,6
152:9,11,14,16,17
161:8 165:3,6,15,23
168:11,14 169:2,2
169:12 177:11,17
178:2 184:6 187:17
187:23 188:14
189:6 217:20,23
218:8,19 219:1,4,11
219:22,25 220:4
221:3 222:8,9 288:9
326:13
**much**
29:17 49:23 74:5,8,9
76:15 80:9 88:10
94:11,11 111:1
118:25 119:3,8,10
142:11 162:19
173:18,21 183:23
210:18 245:4 325:8
325:9
**muddled**
18:18
**muffled**
189:7
**multiple**
58:1 83:10 85:10,11
137:23,24 140:11
183:8 270:10,11
311:9
**must**
238:12



**muted**
49:16
**myself**
26:4 173:5 218:1
220:24
**M-A-L-I-S-S-A**
305:23

---
**N**

**N**
3:1 8:1
**nail**
141:10 159:8 185:11
**name**
21:2,2 29:25 31:7
33:3,20 34:22 35:4
41:17 56:1 57:14
58:18 66:11 70:11
70:16,18,23,24
71:16 75:6,19 80:19
80:20 82:13,15,21
84:22,24,25 138:8,9
140:17 149:11,12
150:6 154:9 155:18
156:23 157:2
164:23,23 167:5,11
168:8 178:19 187:4
187:9 243:22 244:4
249:8 256:4 273:1
285:1,2 292:22
300:19,21 306:3
309:18 310:14
319:9,13 320:20
328:22
**named**
232:9,11 233:20,22
234:19,21 236:2,17
307:4
**names**
55:3 79:1,2 88:1
140:12 186:7,11,15
186:16 187:1
288:17 291:14
**Nano**
246:13

**narrative**
63:23 64:12 65:2
**narratives**
169:23
**National**
180:20 181:1,2,8,18
181:22 182:7,9,12
182:15 183:1,6,9,12
183:18
**native**
269:15,19
**nature**
19:12 75:12 154:20
256:22 281:17
**necessary**
67:14 281:16
**need**
10:10,12 11:23 18:13
22:6 51:7 52:21
100:20 142:10
143:18 162:22
175:18 184:14
190:9 199:12 201:6
219:4 225:1 229:3
244:2 263:20 270:3
296:9 299:12 315:1
**needed**
51:12 88:23 101:15
211:7 218:24 312:2
316:4,21
**needs**
166:1
**negative**
123:21
**negotiations**
225:16,19,23
**neighborhood**
73:3 79:11
**neither**
332:4
**networking**
139:8 141:21
**never**
27:16,18,19 50:16
90:11 152:4 183:10

184:6 205:11
228:11 294:18
**new**
1:7 94:11,12,14,20
94:25 96:1 243:14
249:19 329:17
330:7
**next**
35:17 52:23,24 53:1
53:3,5,8,10 100:19
108:20 113:16
116:7,8,11,13,18,23
116:25 117:2,4,6,8
117:11,13,15,17,19
120:4,6,8,17,19,21
121:3,5,7,9 149:10
150:5 151:11 153:9
199:6 211:18,22
212:7,10,14,16
219:3 249:7,22
255:5 279:14,16,19
299:20,24 300:1
302:8 306:6 317:17
323:18
**nice**
195:6,11
**nine**
113:14 208:21
211:20 213:5
216:17
**nobody**
222:4
**none**
40:6 241:15
**nonjudicial**
84:2
**nonworking**
129:15,22,25 130:10
130:23
**non-truthful**
35:15
**Nope**
259:11
**nor**
332:5

**Nora**
168:7
**normal**
111:15,16,25
**normally**
181:13 312:1
**notarized**
294:9 316:22
**notary**
2:2 316:3,5 329:8
331:5
**noted**
328:3
**notes**
226:21
**nothing**
42:1 301:7 308:24
314:22
**notice**
6:16 9:1 14:2,21 15:1
15:25 309:16
310:16 311:3,6
**notified**
333:3,6
**notion**
257:12
**notwithstanding**
233:12
**November**
225:20 226:5,10,12
226:13,19 227:5
310:11,18
**now**
8:2 9:11 10:16 13:3
48:20 51:11 52:2
61:22 104:18
119:20 122:14
150:9 166:16,18
170:19 178:10
182:21 189:2,25
190:21 191:14
192:2,15 196:8
199:11 211:8,11
217:8,13 240:11
249:7,21 251:10



254:1 271:14 272:4
296:12 312:22
323:2
**nuclear**
262:2
**numbered**
1:19
**numbers**
37:6 40:2,8,12,18,20
43:2,6,14,20 44:18
44:24 45:4,12 68:1
68:8,21 69:3,9,12
93:1,8 95:18,20
97:7,8 103:17,19,22
103:23 104:2,4,7
107:14,18,22 108:3
110:5,7,8 111:3,6
113:25 114:1,11
136:14 156:16
186:8 187:2 207:8
207:12,16 257:19
258:4 267:14,15,16
267:19 271:20
281:8 283:20
284:16 286:1 287:2
287:13,21 288:6
289:20 290:8,15,17
291:19 292:25
293:6 324:12,16,19
324:20,21,22 326:4
**numerous**
83:11 252:22

——————
**O**
——————
**O**
8:1
**oath**
328:20
**object**
13:11 14:10 15:16
20:16 21:5 33:8
44:9 53:22 54:7
56:25 59:23 61:13
61:24 65:20 89:20
90:4 122:6 123:13

170:8 172:9 186:23
219:14 220:11
225:21 235:12,19
242:6 247:2 248:15
252:24 255:2,18
297:15,20 325:19
**objecting**
16:4 18:3 60:13
61:18 69:20 91:3
170:15 172:22
226:1 233:5,9,16
**objection**
15:20,21 17:19,24
18:1,4,8,22 19:2,14
19:19,25 20:5,9,23
21:5,15,19,25 22:16
22:17 23:4,18,25
24:11,15,19,25
25:13 30:9 35:10
37:7 40:10 43:3
44:13 54:13 68:14
71:18 72:8 90:21
91:10 104:23
106:19 118:19
119:5,12 125:8,19
126:2 127:12 128:1
130:19 172:11
179:11 218:2
221:21 225:14
230:10 234:10
241:11 255:22,23
273:6 276:4 298:6
306:20 314:16
**objections**
5:5 6:3 22:5 52:9,19
66:18,19 68:16
69:18 254:7,13,16
273:6 280:12
283:21,23 284:12
**obstruction**
116:9
**obstructionist**
228:11
**obtain**
24:6,17,22 25:3,4,5,8

25:10,16 133:14
136:24,25 137:7
139:9 140:23
144:20 146:1,8
149:7,14 150:3,13
152:5 153:6,11
155:13,20 157:4
158:22 159:3
160:15,22 161:2,7
161:12 163:13,25
164:5,10 165:5
168:10 170:20,21
172:25 173:3 174:3
177:4 180:11
183:11 211:12
219:21 258:3
**obtained**
137:20 138:1,5
139:13,17 140:14
141:2,4,8 145:16
146:13,25 147:15
148:8 151:9 152:22
156:20 164:19
167:1 168:4 169:2,2
169:14 178:4,15
204:24
**obtaining**
137:11 140:7 141:14
142:5,8 147:6
149:17 150:20
152:8 153:14,23
159:20 171:9 181:3
182:7 184:7,18,21
184:24 258:2
**obviously**
143:14 197:21
**occ**
256:25
**occasion**
255:4,6,9,11 256:8
256:25 262:24
265:21 266:7
280:23
**occasional**
66:24 257:3 273:11

281:14 283:12,13
284:1
**occasionally**
255:13,25 256:1
274:19,22
**occasions**
137:1,2
**occur**
135:8 144:16 157:13
165:17 168:16
171:13 177:23
181:5 185:10
**occurred**
144:8 226:18 229:11
284:2
**October**
1:13,19 8:8 42:23,24
229:11 330:12
**off**
10:9 18:21 33:11
40:19 51:18 55:13
61:21 72:8 78:24
93:12 96:8,23
100:24 104:5 117:8
120:23 124:12
131:2 143:15,15,15
147:18 157:25
158:2,7,19 164:16
166:8,11 191:16,20
195:9 197:6,9 198:3
201:6 205:15 206:4
253:15 258:20,22
259:4 262:20
263:10 264:16
265:6,13 271:9,14
271:14 272:19
281:9 284:14,17
285:4,10 286:16
287:1,11,19,23,25
289:10,16,18
290:17,20 291:15
292:9 293:1 299:9
304:11,12,15,16,17
321:17 326:11,21
**offering**



123:4 132:8
**offers**
123:9
**office**
9:17,18 55:15,19,20
199:16 329:1
**officer**
330:18 331:18 333:6
**officer's**
332:1
**offices**
55:17
**oh**
10:16 12:12 28:3
30:8 45:5 53:10
55:18 89:4 99:11
124:6 133:7 153:24
186:12 194:7 195:6
195:11 196:12
202:23 204:7
213:20 256:14
275:23 293:15
305:6 306:23
317:13 323:23
**Oklahoma**
310:16
**once**
17:3 201:25
**ones**
87:16 150:2 166:24
167:2 178:14
217:10,17 224:10
236:10,11 263:4
310:4
**one-minute**
258:12,23
**one-page**
305:2
**ongoing**
17:16 19:24 58:13
71:2 80:22 228:17
**online**
180:1,2
**only**
10:9 66:21,23 67:7

69:15 191:2 204:2
228:13 258:4 266:7
270:2 271:13
272:13 273:8,10
280:1,7 296:23
305:3 314:7,7,12
**open**
113:6
**opening**
34:23
**operate**
42:2,4
**operates**
67:8
**operating**
42:5,10,12,14,16
173:13
**operations**
67:13 281:14
**opportunity**
299:19
**oppose**
217:23 218:19,24
**opposed**
219:11
**opposite**
209:15
**opposition**
218:8
**opt**
212:24
**option**
13:20 201:4
**options**
201:13
**opt-out**
212:25
**oral**
1:11,16 174:15
203:23,25 204:2
330:18
**order**
5:3 10:3,20 11:1,20
12:12,24 20:17
59:16 60:5,19 61:15

61:25 71:9 107:9
111:12 230:11,23
233:4 234:11
235:19 242:9 247:3
248:17 285:16
297:2 317:13
**ordered**
11:8 228:10 297:6
**ordinary**
204:14,16,21,22
205:1
**original**
123:1,3,23 127:2,9
129:9 330:21 332:2
**originally**
94:8 272:13
**Orlando**
223:1
**Oscar**
70:24 71:15 72:5,14
72:19,22 73:2,6
74:5,6 75:19,20
79:18,21 80:16,18
81:14,19
**others**
134:24 135:1,3 137:9
137:17 156:19
275:7 311:16
**otherwise**
332:8
**our**
51:22 101:3 166:14
191:4 192:23
253:19 300:20,20
304:21
**out**
11:11 13:6 22:14
27:17 35:2 41:25
49:15 55:12 66:18
132:1 142:10
143:13 169:24
178:10 188:21
189:19 190:15
192:9 195:19
197:20 198:13

199:15 201:15,24
204:14,16,21,22
205:6 211:7 212:18
229:2 249:8 266:17
266:18,19 267:3,12
267:13 300:22
310:21 311:23
319:8 323:14
325:15
**outcome**
332:8
**outgoing**
148:20,24 257:19
258:7
**outside**
86:8 126:18 137:11
137:20 138:18
276:3
**outstanding**
143:2
**over**
18:16 30:19 49:14
94:12 162:22
165:17 168:23
201:3,8,10,11,19
202:17 203:23
209:2 219:2 257:14
260:10 281:23
284:7 297:10
**overarching**
69:20
**owed**
173:21
**owing**
143:2
**own**
34:23,23 67:9,9
119:21 136:1
154:23 161:24
162:4,16,16,17,19
196:10 213:1
258:22 275:17,19
275:20 276:18
277:14,16,17,19
300:20,21 320:10



320:12,20 322:6
**owned**
29:23 41:16 162:7,9
162:10,13,14
277:24 317:1,2
318:7 320:12,17,20
320:23,24 321:11
**owner**
29:21 41:17 104:19
196:9,13 278:3
282:24,24 306:3
310:15
**owners**
190:18 192:12 278:6
278:7,12,13,19,21
278:24
**ownership**
29:18 163:10 295:1,3
319:6
**o'clock**
199:25 201:10

---

**P**

**P**
3:1,1 8:1
**page**
4:1 5:2 7:10 11:4
12:3,8 52:11,24
53:1,3,5,8,10 66:8
89:4 102:2 113:16
116:7,8,11,13,16,18
116:23,25 117:2,4,6
117:8,11,13,15,19
117:21 120:4,6,8,17
120:19,21 121:9
208:5,7 213:7,8
214:14 222:24
257:19 262:15
272:2 279:14,16,19
293:18 298:19
299:14,19,21 302:8
308:20 314:22
317:17 323:18,20
323:24 324:10
327:5 331:8

**pages**
52:12,22 119:24
293:16 300:10
**paid**
143:15 147:18
194:22 301:18,19
**Palazzo**
5:20 185:20,23 186:3
186:4,6 187:9,14,18
202:8,10 203:10,13
203:18 204:3,6,9,11
205:3,19,23 208:18
210:4,10,19,23
211:17 214:11,19
**Palazzo@ccap**
200:24
**pallets**
195:7,18
**paper**
179:25
**paragraph**
66:17 67:15 123:2,22
124:2,8 126:20
127:2,9,21 128:6,10
128:12 129:5,9,12
129:18 130:8,25
273:5
**parents**
262:3
**Park**
316:9
**part**
16:10 26:5 41:11
45:14 102:5 116:9
132:2 144:5 149:3
170:2,4,5 172:7,21
207:19,20,22
209:23 220:18
223:5,5 224:11
225:15 226:15
228:16,25 229:4
259:10,23 268:12
269:19 282:16,16
295:22 299:2
302:20 305:17

306:16 314:13
320:1
**partial**
308:16
**partially**
14:23 76:22 165:19
173:12
**participate**
133:18 171:15 174:8
174:10 228:9
274:16,18,20
**participated**
29:9,11,19,20 225:16
227:4,13
**participating**
108:11,11 226:8,14
**particular**
56:22 137:13 322:9
**parties**
11:9 330:24 331:19
332:5
**partner**
114:23 288:13
290:25 292:5 313:2
313:4,4,5,6
**partners**
115:1
**partnership**
113:18,20 114:1,9,15
114:25 115:5
151:21
**parts**
14:24 15:23
**party**
22:21 130:4 331:3,11
331:12
**Paso**
272:13,17
**passage**
281:21
**past**
43:4,9,13 45:3 69:12
77:24 78:1 96:2
150:10 223:9
271:21 277:25

285:25 312:22
**Patrick**
146:5,6 158:9 167:7
167:21
**Patrick's**
158:10
**Paulina**
76:6 118:12 230:4
**pay**
42:17 104:9,11
105:17,21 106:4
111:5,8,14,18
143:15,15 173:11
173:15 197:5,8,13
197:14 198:3
**payback**
197:4
**paying**
42:21 95:6 104:4
300:13
**payment**
104:12,14 111:11
198:14
**payments**
6:6 107:6,9 143:22
143:25 144:2 300:6
300:11
**payor**
303:12
**PBC**
247:7
**PDF**
122:15 269:16
**peace**
19:7
**penalties**
1:25
**pending**
20:3 56:4,6 71:24
80:24 232:14,23
234:6,7 235:8
236:15 237:8 238:8
238:23 239:14,25
240:7,11 241:21,22
242:25 243:16,17



244:14,24 245:14
245:25 246:5,20,21
247:14,24 248:10
248:12 249:1,2,14
249:15 250:19
251:4,5,19,21,23,24
252:9
**people**
36:6 37:13 40:25
92:9 133:25 154:24
186:7,10,11,14,16
186:25 253:11
258:2 261:12,24
262:14 272:14
284:10 288:18
293:8 311:18,21
**people's**
261:10
**per**
27:4,5,10,14 65:23
73:18,18,21 129:2
331:6 333:5
**percent**
193:14 196:9,13
212:2 267:6,8,10
272:23 320:22
**percentage**
193:4 194:15 197:17
254:24 266:3
**percentages**
197:4 258:22
**percentile**
257:16
**perfect**
203:6,7,7
**perform**
31:4,9 66:4 110:20
260:4
**performance**
108:7
**performed**
30:16 31:20 32:2,20
63:18 64:19 65:1,11
65:11,25 66:1 86:19
110:25 260:21,23

261:8
**performing**
32:9,12 34:10 64:15
**period**
5:8,23 30:4 32:3
103:11 104:25
260:1 269:5 270:6
278:15 284:6
286:20
**perjury**
1:25
**permissions**
301:9
**Perrong**
57:15,16,17,18 58:5
58:10 59:1 60:7,22
60:25 61:10 62:4,12
62:13,18,21,24 70:1
70:5 74:25 76:2
82:4 84:17
**person**
29:24 45:14 69:4
134:4,7 135:16
140:1 141:25
142:24 144:21,22
144:23 146:2,4
154:5 155:6 156:22
178:13 181:6 182:3
183:2,5 187:3
328:22
**personal**
17:13 18:25 19:17
43:15 44:3 66:22
67:14 72:18 126:22
126:23 127:4 128:7
128:8,9,11,13,15,20
128:21,23,25 129:2
129:4 201:20,22
254:18,20,23,25,25
255:6 256:22 257:1
257:2,5,7,13,20,24
258:9,14 260:15,17
260:24 263:14
264:6,18 265:9,12
265:17,24 266:3,10

266:15,25 267:7,10
267:17 271:11
272:22 273:8,9
274:11 280:20,22
291:9 303:10
307:20,21 312:2
314:2,2,4 316:16
319:13 322:10,12
322:17
**personally**
36:17 44:1 47:11
84:6 104:11 173:22
185:21 214:21
229:17 320:20
328:19
**perspective**
131:16
**petition**
118:4,5,8,11 119:1
123:16
**phase**
11:12 48:3
**Philbrick**
290:2
**phrase**
106:25 124:12 126:7
**physical**
41:2,7,11
**pick**
285:17,18,22 286:1
**place**
16:9 33:21 208:25
318:15
**places**
36:19
**plaintiff**
1:4 3:3 11:10,14 13:4
17:14 56:14 58:14
58:16 66:19,23 67:6
67:13 69:18 72:1
75:18 80:2 83:18,19
85:7,15,20 123:23
124:2,9 126:21
127:3 129:11
229:24,25 232:9,11

233:20,22 234:19
234:21 236:1,2,17
237:2,4 238:4,16
239:9,10,23 241:19
242:16 244:12,22
245:12 246:15
247:9,19 248:4,24
249:12,13 250:24
254:17 255:5
273:10 280:21,22
281:19 330:4
331:21
**Plaintiff's**
11:13,14 13:3 66:21
122:19 273:8
280:20
**plan**
103:23 104:2,8 199:2
201:4 237:20,21,23
261:15,18 262:5,9
262:13 300:23
301:19
**plans**
237:15,17,25
**plausible**
131:17
**play**
175:22 188:2 189:9
191:9 192:2 202:20
202:21
**playing**
175:25 188:6,17
189:13 190:10
192:5 202:15,19,24
**plays**
190:6
**pleading**
73:17
**pleadings**
72:6 73:10 74:9
**please**
8:13,19 18:16 29:25
49:13,18 55:2 72:11
133:3 138:10
140:16 155:18


MAGNA
LEGAL SERVICES

178:13 205:15
219:6 310:20,24
311:22 327:4
**PLLC**
234:17
**plus**
92:5
**point**
47:25 48:13 87:20
88:9 103:16 144:6
187:6 188:1 217:19
219:18 222:10,13
223:14,15,17
225:13 228:10
258:5 270:5 290:17
291:17
**pointing**
11:18
**points**
193:12
**policy**
5:15 206:13 208:11
208:14 210:7 213:1
213:19
**pop**
191:16
**pops**
305:8
**Port**
41:5
**portion**
11:20 29:23 64:7,11
116:9 125:17 203:5
282:1 286:24 287:9
287:18 288:2
289:24 290:12
291:2 292:16
**portions**
191:10
**pos**
205:13
**posed**
48:16
**position**
205:18

**possible**
21:21 175:13 191:18
197:21
**possibly**
45:22 46:15
**post-graduate**
25:20,21
**potential**
71:12 131:11
**potentially**
198:14
**Powur**
247:7,15
**precondition**
24:15
**Predominantly**
154:5
**preface**
298:4
**prefaced**
21:14 68:10
**prefer**
323:6
**preference**
310:25
**prejudice**
246:24
**premarked**
259:5
**prep**
13:17 54:2 297:21
**preparation**
14:14 15:3,17 16:13
297:21
**prepare**
13:9,16,24 14:2 54:1
89:13 109:16
118:13 221:18,22
222:5 268:18
293:24 302:25
**prepared**
5:7 53:17 89:17
118:11 221:25
269:15 280:14
307:4

**preparing**
53:19 54:5,14 220:13
265:15 293:3 332:2
**prepped**
14:15
**prerogative**
176:2
**presence**
275:11
**PRESENT**
3:11
**Presumably**
103:12
**presume**
321:13
**presumed**
185:24,25
**pretty**
35:17 185:7 198:6
199:15 210:18
296:9
**previous**
39:11,14 64:3 69:15
80:7,8 91:3 101:7
161:19,22 187:17
310:4,7
**previously**
17:9 30:5 40:7 48:16
58:5 59:1 68:21
69:19 79:18 132:14
136:4 148:23 184:6
204:25 206:12
224:21 237:12
238:20 254:4 258:1
275:1 309:18
**price**
104:6
**primarily**
66:22 67:11 124:11
126:21 127:4,21
128:24 129:2
150:19 155:6 157:7
157:10 168:13
254:18,19,22
256:25 273:9

277:12 280:22
281:12
**primary**
47:3 257:12,13 274:3
274:5 276:16,23
277:10,21,23 301:1
**prime**
40:22
**principal**
306:14
**printout**
269:16
**prior**
16:20 32:25 33:1
34:23 36:25 38:6
71:17 72:24 73:1
76:9,12,19 92:14,16
102:17 112:22
119:1,10 123:25
124:4,19,21 125:25
131:7 184:10
207:15 214:18,19
214:22 215:6
219:17 221:10,15
309:23 325:3
**prioritizing**
175:25
**Priority**
251:18
**Private**
194:5
**privilege**
57:1 61:14,19,23
62:1,7 65:14,16,21
90:22 91:4,10
118:19 119:6,13
122:6 123:14 126:3
127:13 128:2
130:20 169:24
170:12 218:3,20
219:15 220:20
**pro**
3:3 220:9,17 224:3
236:18,20 306:6
331:22



**Probab**
32:14
**probability**
186:9 187:3
**probable**
131:24
**probably**
9:8 20:16 27:9,12,23
  28:7,16,20 32:16,24
  38:18 44:21 45:8,10
  45:25 47:18 50:20
  61:14,24 68:5 71:22
  74:18 77:2,13,24
  78:1 79:11 87:1,2,3
  87:5 88:7,13 92:4
  93:18,24 115:7
  135:11 139:19
  141:9 143:18
  145:18 148:1 155:9
  166:3 168:5 173:17
  180:24 185:4,5,12
  187:6 193:20
  196:20 199:5,19
  228:4 260:24 286:5
  286:6,7 291:17
  322:9
**problem**
214:1
**procedural**
217:18
**Procedure**
1:23
**proceed**
220:9,17
**proceeding**
236:18,22 332:6
**Proceedings**
4:4
**process**
228:10
**produce**
149:2 229:5 297:2
  301:4 326:2
**produced**
1:17 95:8 102:5,8,10

169:22 170:2 172:7
259:22 268:11,13
269:20 299:2
302:19 305:16
308:17,19,21 320:1
325:24
**product**
13:12,14,20,23 14:10
  15:6 16:7,8 53:22
  53:24 54:7,11,13
  220:12,21,22
  221:21 252:25
  297:21
**production**
170:7,8 295:21,23
  296:3,4,15 297:1,6
  297:8
**productions**
296:11
**products**
277:1
**programs**
212:18
**promise**
175:19
**pronouncing**
82:16
**proper**
18:4
**properly**
49:19 297:7
**properties**
114:17,18,20,21
  115:2 154:16,22,24
  155:2 162:14
  313:23 320:25
**property**
159:11,13,14 160:8
  160:10,17,18,20,23
  160:25 161:3,5,8,9
  161:10,13,15,24
  162:4,7,9,10,13,16
  162:18,19 163:9,14
  163:16 164:1,3,6,8
  164:11,13 165:9,11

169:5,8 274:8,9,12
274:17,21 275:18
275:19,20 277:24
281:2 310:18
316:23,24,25 317:1
318:7,10 319:3,7
320:7,9,10,15,17,21
321:6,11 322:1,4,5
322:7
**proposed**
224:12,18,19
**prospective**
48:19 281:1,4 284:5
  284:9,13 286:19
  287:7,8,12 288:12
  289:17 310:17
**protected**
220:14
**Protection**
59:5 235:1 238:2
  239:2,19 240:24
  248:8 249:6
**protective**
20:16 59:16 60:5,18
  61:15,25 71:9
  230:11,23 233:4
  234:11 235:19
  242:9 247:3 248:16
**prove**
73:24,24
**proved**
328:20
**provide**
36:3 68:17 138:10
  260:8 269:3 270:2
  283:24 284:9
  299:13
**provided**
54:3,4 166:22 173:6
  270:8 271:24 273:4
  288:16 325:25
**provider**
39:17,19,21 50:10
  94:16 102:12
**providing**

90:2 228:19 296:24
  306:25
**provisions**
1:23
**public**
2:2 11:12 13:6 67:11
  109:24 218:10,17
  329:8 331:5
**public-facing**
67:8,13 281:13
**pull**
10:7 208:25 254:4
  270:5,6,14,17
  271:18 296:10
  302:1
**pulling**
174:1 264:7
**purchase**
38:4 114:18,20,21
  154:16 155:1,3
  196:22 274:17,18
**purchases**
196:19
**purchasing**
196:15
**pure**
46:24 74:12 88:11
  281:24
**purpose**
45:11,13 47:1,3,4,7,8
  108:2 159:24
  176:17,19 213:10
  276:23 277:10,21
  277:23
**purposes**
93:2 124:11 127:5
  254:18,20 257:1
  262:25 265:22
  266:8 271:22 293:9
  328:24
**pursuant**
1:22 9:1 225:24
  304:7 331:1,17
**pursue**
237:18



**pursuing**
243:14 253:1
**push**
60:18
**put**
10:10 33:8 54:1
102:4 116:16
122:10 124:16
130:17 190:6,9
207:13 223:14
224:2 228:10
241:11 254:24
298:25 302:16,18
306:5,19 314:1
**puts**
258:21
**putting**
216:22
**p.m**
1:20 166:11,12,12,16
191:21,21,23 201:6
211:21 253:16,17
253:17,21 271:2
304:19,19,23
316:11 326:21,22
**P.O**
36:14

**Q**

**qualifies**
193:10,17
**qualify**
193:9
**quantity**
103:19
**quarter**
78:2
**questioning**
69:24 133:23 151:7
192:3
**questions**
10:23 18:17 22:8
23:1 116:3 119:25
154:17 160:12
172:13 175:23

178:23 183:24
184:1 188:4 201:23
223:8,13 225:25
229:19 258:1 280:2
306:7 309:4 310:20
311:22 323:7
326:10
**quick**
10:24 51:14 198:24
199:15
**quickly**
21:21 205:9
**quod**
73:19
**quote**
94:14 281:14,15
283:12,13,14
**quoted**
13:2
**quotes**
284:2

**R**

**R**
3:1 8:1 135:5,6,7
136:15
**raising**
154:21
**ranging**
269:25
**rarely**
47:18,18 255:11
257:23
**rate**
142:13 191:3,4 306:6
**rates**
190:25 192:19
197:13
**rate/terms**
199:1
**Ray**
110:23 114:22
151:20 159:1,3,15
159:16,18,23 160:4
167:4

**Ray's**
164:15
**rcarnicle@greata...**
315:24
**reach**
37:14 310:21 311:23
**reaching**
188:21 189:19
190:15 192:9
**read**
1:25 2:1 10:13,24
11:7,24 12:4,14
64:7,11 66:11,18
67:6,15 69:17,19
90:12 116:14,20
123:3,6,23 124:2,8
125:17 126:21
127:3 128:6 129:1
129:10,14,21 130:9
130:22 207:2,12
210:24 212:17
223:3,7 254:17
255:5 256:4 271:20
273:7 280:18
281:11 283:23
288:11 290:23
292:3,12 294:10
295:7,12 305:11
306:2 310:14 313:8
318:21 319:4 328:1
**reading**
64:3 286:21 293:21
**reads**
129:1
**ready**
199:17 285:17 309:4
**realize**
18:2 43:10
**really**
84:3 85:18 88:9
130:15 193:14
204:19 325:8,20
**Realty**
229:22 231:15 239:7
**reason**

11:19 13:1 35:7
39:13 89:16,23,24
90:6 103:13,15
106:3,6 121:22
156:15,17 186:5
187:7,8 269:11
294:1 303:21 314:7
321:2,10,13 327:2,5
**reasoning**
122:3
**reasonings**
130:18
**reasons**
223:4 331:9 333:9
**Rebecca**
315:23
**recalling**
225:9 265:13
**receipt**
331:7
**receivable**
146:21,23
**receive**
34:4 36:9,16,19
62:17,19 109:25
111:9,11,14 113:9
114:8,10,13 133:8
172:1,4 195:24
201:25 204:14,18
204:22 205:6,20
257:21 269:16
295:23 298:1
**received**
14:2 62:20,22 82:7
129:24 132:3 145:3
172:4 187:19
200:22 257:14
269:19 270:9 271:2
295:21 298:1 320:5
**receiving**
124:4 211:19
**recess**
51:20 101:1 166:12
191:18,21 253:17
304:19



reciting
333:9
recognize
10:18,25 12:15 53:12
89:9 97:24 101:22
121:14 209:8 280:9
300:3
recollection
26:15 27:25 64:18
107:17 114:14
229:11 283:25
303:3 318:24 326:3
recommended
127:13 223:4
reconvene
212:3
record
1:24 8:3 18:18 26:17
49:17,20 51:19,23
62:3 100:24 101:4
166:9,11,15 191:20
191:23 207:20
219:5 226:1,19
227:8 235:13
253:16,20 258:6,7
281:20 304:7,12,15
304:16,18,22
326:12,21 327:2
330:19 331:20
recorded
86:19 227:21,23
228:14
recording
5:13 187:17,19,23
188:10,11 191:13
192:1 202:11
226:23 227:1,9,11
227:15,18,25 228:7
228:8,18,21 229:6
229:10
recordings
229:6
records
95:8 172:21 256:2,10
256:14 257:9,11,18

258:12 261:11
262:23 265:23
266:1 270:5
redact
169:23 260:6
redacted
65:15 169:23 170:13
260:3,19 261:5
262:16
redaction
260:4,21,23 261:9
redirect
205:9
Refer
60:7
reference
293:6
referenced
286:24 287:8 288:2
291:2 292:15 320:8
referencing
104:25
referral
110:21
referred
128:11
referring
287:17 296:5 297:1,2
297:5
refinance
191:5
reflected
66:5 261:13
reflection
269:12
refresh
107:17 229:10 303:3
318:24 323:8 326:3
refuse
230:20
refusing
231:10
regard
63:8 145:23 159:11
160:8,16,23 169:4

290:11 307:22,23
regarding
95:9 134:1 152:12,21
174:9,16 281:1,18
321:11
regards
57:24 63:8 64:23
65:3,12 67:18 71:7
80:15 81:6 82:23,25
85:3 86:6,22 87:11
91:15 124:13 142:5
144:15 145:16
146:25 152:21
154:1 156:12
159:20 160:13,18
161:3,8,13 163:14
164:1,6,11 165:8
171:8,19 178:22,23
180:10 181:1
182:12 184:17,20
184:23 219:5 220:7
226:10 230:18
288:17 307:12
316:17
region
98:21
register
91:22,24 92:1,7
registered
93:2,4,5,8,10 97:7,13
97:17,22 98:1,4,9
98:14,17,20,23 99:2
99:7,12,15,20,23
100:3,8,11,14
123:24 124:3
registering
92:14,21
registry
123:24 124:3
reimburse
300:22
Reimbursement
300:15
reimburses
301:22

related
11:10 332:5
relationship
61:16 62:9 72:18,21
76:16 118:20 314:4
322:10,17,19
relevance
18:1,4,8 19:3,14,19
19:25 20:5,9,23
21:6,15 22:9 23:4
23:18 24:1,11,19,25
25:13 72:9 172:9
241:12 276:4
relevant
11:16 13:7 170:1,14
remain
295:14
remember
35:4 42:9 70:11,23
82:15 84:23,25
112:25 178:18
226:18 296:8
remembered
284:18
Remote
1:22
remotely
8:10
remove
207:16
removed
207:9,12
Renewal
248:2,3,11
rent
42:17,21 306:9,25
307:1,2,23
rents
306:6
reopen
11:13 13:3
repaid
145:5,8
repay
143:12



**repayment**
142:13 143:7,8,10
**repeat**
30:15 64:9 77:9
97:19 125:14
182:11
**repeated**
182:21
**repeating**
125:16
**rephrase**
125:12 130:1 133:24
153:19 179:7
**rephrased**
22:6
**replay**
188:16
**report**
6:9 302:23,25 303:1
303:16,18,19,22
**reported**
1:21
**reporter**
8:12,18 18:13,18
21:21 30:1 49:13,22
64:4 213:14,20,24
214:3 326:11
330:14
**Reporter's**
4:10 330:10
**represent**
8:14 52:18 55:21,24
56:11 70:19,22 75:7
75:23 76:23 78:12
79:21 82:23,25 83:3
83:13 84:5 85:2
88:15 104:1 259:15
259:25 308:17
**representation**
76:17 127:18,19,24
210:11 303:24
**representations**
90:3,9 91:8,12
127:24 131:3
**represented**

13:14,19 54:17 57:10
58:5,10 59:1 64:22
70:2,5 74:4 75:2
76:3,22 77:7,11
78:6,22 79:14 82:4
83:7,9,11 84:7,18
86:5 87:17 186:1
187:5 230:1,2,3
232:12 234:3,4
235:6 236:3,4,5
237:10,12,16 238:6
238:18,21 239:11
243:5,9
**representing**
57:18,21 63:17 77:15
77:17,18 90:2
219:19 220:24
226:18 267:3
303:23
**represents**
56:15 103:18,20,21
103:24
**request**
8:10 61:15 170:3,6
170:14 207:14
213:1 217:24
228:24 229:2 230:9
230:10 262:22
270:9 275:14
282:13 296:4 326:1
**requested**
64:7,11 125:17
217:20 224:11
331:3,10
**requesting**
11:10 74:10 161:25
255:1 304:8
**requests**
208:16 270:11
295:21,23 296:3,15
296:21,22 297:1,6,8
297:19
**require**
281:24
**research**

92:13,16
**resell**
195:4
**reserve**
16:3
**reside**
36:7 37:1
**resided**
37:2
**residential**
124:11 127:4 161:19
161:22 274:9,12,20
280:21
**resize**
10:11,12 116:15
**resolve**
71:15
**resolved**
60:2,15,16 71:5
85:21 86:2 231:6
232:25 235:13
242:2 246:6,22,23
**respect**
254:20 280:24 281:3
281:11 282:6,18
284:3 286:17
296:18
**respected**
213:2
**respectful**
18:13 219:4
**respond**
110:3,4 214:16 296:2
296:14 297:18
**responded**
210:23 273:7
**responding**
69:15,16
**responds**
66:20 69:18
**response**
53:16 66:17 68:7
203:2,8 210:17
218:7 254:15
262:22 271:17

272:25 273:5 279:2
280:19 281:10
282:1 283:21,24
284:12 285:14
288:4 290:12
292:16 293:4,5,7
**responses**
265:15 283:19
296:23,24
**responsibility**
105:17,21
**responsible**
110:10,13 114:5
115:9 157:7,10
168:13 171:1,4
240:23
**rest**
173:15 175:21 280:3
**restroom**
51:14
**result**
126:19
**retail**
195:3 198:5 276:25
**retailer**
277:5
**retailers**
195:22
**retain**
76:7 88:15 237:23
**retained**
82:7,8,9 88:3
**retaining**
76:9,13,19 237:20
**returned**
331:5,7 333:11
**reverse**
317:13
**review**
10:21,23 11:2,23,25
14:17,20 15:2 16:14
32:21 52:4,15,21
73:17 74:9 124:20
124:22 221:8,14
254:12 256:2,7,10



256:14 262:23
263:20 298:20
299:13 304:8 323:7
333:7
**reviewed**
11:22 15:7,14,20
16:1,11 124:25
131:6,8 254:4,9,14
256:18
**reviewing**
74:14 207:24 208:10
257:9,11 258:6
263:15 297:18
305:4
**reviews**
12:2,5,7,13 52:25
53:2,4,7,9 68:12
89:1 101:17,19
116:10,12,17,22,24
117:1,3,5,7,10,12
117:14,16,18,20
120:3,5,7,9,11,13
120:16,18,20,22
121:2,4,6,8,10,12
123:7 207:7,11
208:4 222:23
279:15,18,20,24
293:17,19 299:23
299:25 300:2 302:4
302:10 305:10
309:5,7,10 312:17
312:19,21,23 315:3
315:5,7,11,13,16
317:12,21 319:21
319:23 323:22
**re-fi**
198:12
**Rick**
152:19 154:9,11
158:1 184:23,25
**ring**
81:17 112:20,22
113:2,3,5,12,12
**ringed**
113:10

**ringing**
112:13
**rings**
113:7
**risk**
193:15
**RK**
239:21
**Road**
316:25
**rock**
33:7,7 244:10
**Rocksauce**
33:5,6,22,24 34:2,4,6
34:8,11,21
**Rocky**
291:5,16
**Rocky's**
291:6
**role**
45:16
**roll**
306:9
**rolls**
306:25 307:1,2,23
**ROME**
3:7
**Roofing**
251:18
**room**
9:10,14 253:25
**Rosenthal**
226:9,15 227:5,14,24
228:14 229:7
**route**
229:4
**Ruben**
6:6 39:3,4,6,8 144:24
145:6,15,22 158:11
164:1 167:7 300:7
300:11,18,25
301:22
**Rule**
304:7 331:1
**rules**

1:23 9:2 18:12
**ruling**
252:13,15,20
**run**
71:8 288:22 296:6
**R-A-I-L**
47:22,23

_____

**S**
_____

**s**
3:1 8:1 300:19
**safe**
187:2 295:14
**safer**
22:13
**said**
15:12 19:8 27:7
30:19 34:15 42:12
67:20 68:9 74:15
94:23 99:9 112:19
112:20 113:8
129:25 131:25
133:11 135:15
136:4,19 137:9,16
140:10 155:6 182:1
182:2,6 183:5 184:6
185:9 187:13
197:23 201:2
202:16,17,22,23,23
203:3,6,7 216:3
220:22 225:10
229:13 232:22
236:17 255:25
263:24 274:2
278:16 286:11,18
289:14 293:8
313:24 331:18
**sake**
219:1
**salary**
111:9
**sale**
274:20 312:3,8
**sales**
196:1 276:25

**same**
15:4 16:16 30:15
33:25 63:4 71:9
75:20,22,24 79:17
79:19,20 91:9 95:6
119:17 127:23
141:25 151:21
160:12 184:8
231:24 232:17
236:8,10,11 239:3
250:11 272:4
284:13 328:2,24
**sample**
297:4
**San**
1:2 8:7,25 23:20,23
24:4,7 35:23 36:14
37:2,4 41:5 55:15
55:16,19,20 164:4
276:1 318:21 330:2
**Saturday**
310:18
**Saturday/Sunday**
310:24
**sauce**
33:8,9
**save**
197:10 198:7 201:20
**saved**
295:17
**saving**
198:10
**saw**
205:9 325:2
**say**
21:19 22:5 26:9,13
27:18 31:22 41:9
55:25 66:18 74:12
77:12,12 87:4 92:5
114:19 123:3 124:2
125:21 133:22
136:6 145:18 159:1
184:4 198:25
199:10 202:18,19
202:22,22 203:4,5



208:25 209:13,18
210:14 213:9
215:18 218:19
226:12 254:16,17
263:13 267:15
280:18 281:10
283:22 286:5,6
288:11 290:23
294:10 295:6,12
296:23 310:14
320:22 326:8
**saying**
17:10 44:4,9 68:10
68:19 71:18 85:5,7
94:23 125:5 162:15
162:17 163:6
184:11 185:12
211:11 216:6 225:5
225:7 265:21
267:11,14,14,15
286:7 298:7 307:21
313:8 320:25
**says**
11:7 66:11 67:6
103:7,17,19 104:2
107:14 113:17,18
126:21 127:3 128:6
129:1,10,14,20
130:9 207:8 208:17
222:25 259:17,18
270:22 271:1 282:6
292:3,12 298:23
302:14 303:2
305:13,19 306:1,2
307:12 310:19
316:7 318:20 319:5
324:11 326:6
**scenario**
194:20
**schedule**
142:13 229:3
**scheduling**
316:7
**Schertz**
322:5,7,8

**school**
23:11,13 25:22
**Scott**
3:6 8:16 330:22
331:15,25
**scott.kaplan@blan...**
3:9
**screen**
129:6
**screenshot**
7:4 209:25 216:17
317:24 320:4
**scroll**
11:4,24 12:3,6 52:12
52:12,22 64:5 88:23
89:2 101:15,18,20
116:2,14,16 120:10
120:12,14,17
121:11 207:1,17
222:22 261:4 279:9
279:21,23,25
282:20 298:16
302:5,7,8 308:10
309:8 310:6 312:14
312:18,20 314:21
315:6,8,12,14
317:14 319:20,22
323:17,19
**scrolling**
309:3 323:19
**se**
3:3 73:18,21 220:9
220:17 224:3
236:19,20 331:22
**seal**
329:1
**sealed**
243:8
**search**
92:22 295:19 296:1,7
296:8,20,25
**sec**
77:8,8
**second**
6:4 10:14,17 11:4

64:5 85:20 95:7
116:21 120:15
129:6 134:20
169:17 188:10
189:11 191:15,16
208:22 209:23
214:18 224:12,18
224:19 260:14
279:8 280:13
293:18 298:19
304:12 317:11
319:18 321:17
323:20 324:10
325:14 326:15
**secondary**
22:2
**seconds**
199:12 284:8
**section**
11:17 13:2 261:4
285:14
**Secure**
236:25 237:1,11
**Secured**
146:23
**security**
306:5
**seeing**
122:14 206:18
208:14
**seek**
132:25 136:24,25
144:20 146:1 149:7
150:2 153:6 155:13
158:22 159:2
161:12 170:19
172:25 174:3 177:4
180:11 219:21
**seeking**
74:6,8 80:9 81:9
137:10 184:8 245:5
258:2
**seen**
89:10,11 90:11
117:25 118:2

222:21 279:10
309:12 324:1
**self-employed**
26:2,3,4,7 28:1,23
**self-employment**
27:21
**self-evident**
143:12
**sell**
295:3
**seller**
306:4
**sellers**
48:19
**seller's**
115:10
**selling**
47:9 195:19 212:4
249:19 274:14
**send**
89:15 95:15 174:22
191:14 198:22
199:20 202:11
228:23,23,24 244:5
**sending**
109:15 203:2 221:10
307:3,7 311:4,7
**Senior**
244:20,21
**Senior's**
158:11
**sense**
199:1 296:19
**sent**
65:10 83:25 90:5,7
90:10 169:19
187:17 191:25
201:19 206:13
208:21 209:11,15
210:19,23 211:17
221:9 306:11
311:15 320:5
**sentence**
120:23 255:5
**separate**



67:9 108:3 212:15
222:2 250:2,14
300:8
**separately**
203:16
**separate-cated**
67:9
**September**
313:7
**served**
330:23
**server**
295:8
**service**
39:17,19,21 94:16
102:12 103:5
**services**
8:12 62:14 86:16
123:10 129:10
131:11,13,15,23
332:15 333:19
**set**
5:6 6:4 52:20 115:4
197:16 223:4 254:8
266:2 279:8 280:13
**Setting**
216:19
**settle**
20:8 21:3,12 59:13
59:21 232:23
**settled**
21:10 59:17 71:4,18
71:19,21 74:15 81:4
230:8,14 231:8
238:10 240:9,14
**settlement**
20:14 60:1,2,15 71:6
71:12,14 225:16,19
225:23,23 230:18
231:2,5 233:2,12,13
233:15 234:8
235:10,15 240:2
242:3 243:2 246:25
248:13 250:5
**seven**

21:22 31:24 96:21
175:18 266:13,19
267:3,13 299:9
**seven-hour**
223:10
**several**
142:25 162:14 267:9
320:13,24
**shall**
1:25 2:1 11:9 207:16
333:8
**share**
129:6 187:23 214:4
305:6
**sharing**
326:15
**Shark**
245:20,21
**Shavona**
316:9
**Shavonne**
75:6,7,23 76:1 84:17
86:12,14,15,25 87:9
87:11
**Shawn**
283:4 288:13 290:18
**she**
18:14 76:21 77:18,21
78:22 79:21 90:10
106:12,13,17 107:9
107:11,11,11,11
110:24 111:8,14
118:13 187:18,19
313:15 321:21
322:1
**sheer**
257:2,12 258:20
266:9
**sheet**
266:23 267:16
**Sheet(s)**
329:14
**She's**
110:18
**shoot**

202:1,16
**shop**
198:16 199:11
**Shopify**
178:16 179:20,21
**shorter**
198:1
**shorthand**
1:21 330:14
**should**
26:9 122:14 163:2
213:2 311:17 319:9
319:10,11,12,13
**shouldn't**
78:18 319:10
**show**
9:23 52:6 88:19
101:10 115:19
119:17 206:19
209:3 212:8 213:12
222:16 258:25
267:20 279:3 280:3
280:3 282:13
293:11 298:12,22
299:8,17 301:5,8,23
304:25 308:1
311:13 312:9
314:18 319:14
322:21,24
**showing**
9:13 89:25 147:11
212:11 216:18
**shown**
259:7 330:24
**shows**
258:7 261:2 324:8
**siblings**
262:3
**sic**
19:11 43:10 44:23,24
135:6,6,7 296:11
**side**
22:13 49:17 209:15
**side-by-side**
119:21 122:10,15

**Sien**
207:9
**Sienna**
1:6 5:5,11,15 8:5,16
8:24 52:19 90:14
91:18 94:9 118:6,9
123:3 131:10,13,14
131:23 132:4,7
206:13 209:14,19
210:5,9,13,15
216:10,16,25 217:4
217:11 221:9
224:13,16,22 225:3
225:17 254:8
283:19 329:16
330:6
**sign**
254:12 293:24 333:9
**signature**
4:8 117:23 148:4,9
148:13,20,22,23
307:10 327:1 328:2
331:2,5,8 333:11
**signatures**
12:9
**signed**
1:25 2:1 233:11
254:14 280:16
**Silver**
245:20,21 313:16,17
313:21 314:9,14
**similar**
194:8 234:2 249:18
249:20 288:4
290:13
**simple**
163:2
**simply**
71:13 285:15
**Simultaneously**
278:17
**since**
220:1,5 283:20
**single**
178:13 213:7



**single-family**
275:21,22
**sister**
272:10
**sit**
264:5,7,19 265:11,13
266:12,24 267:2,5
271:10,13 272:21
284:9,14 287:5,6,10
287:24 288:6,8
289:21 290:15,19
291:7,19,25 292:25
**sitting**
163:8 266:15 287:14
**six**
79:12 93:18,22,23
137:15 213:8,9,10
262:4,5,7,10 266:13
266:17,18
**six-page**
298:15
**skimmed**
14:25
**skip**
116:11 213:15
312:22
**Skipped**
5:22 6:10,11,12,13
6:19,20,21,22,23,24
6:25 7:1,2,5,6,7,8,9
**skipping**
259:4
**small**
10:3 279:13 299:22
**smaller**
52:11
**smoothly**
183:24
**snippet**
188:12
**social**
275:11
**software**
33:2,4 34:12,14 35:3
45:17

**Solar**
247:17 248:22,23
249:2
**Solcharge**
246:13
**sold**
295:1
**sole**
29:21 66:21 67:14
104:19 273:8 278:3
278:3 280:20
282:24,24
**solely**
258:22
**solicit**
258:19
**solicitation**
207:15
**Solutions**
5:14 188:19 189:17
190:13 192:8 210:8
210:12
**some**
16:22 18:12 22:4
67:25 68:1 85:23
101:10 116:3
122:25 134:5,8,8
135:15,16,17 160:3
166:21 188:4 192:3
217:19 218:14
219:18 220:19
222:10,10,11,13,13
222:15 223:14,15
223:15,17 225:16
229:19,19 251:9
260:24 262:7 263:2
268:2 283:22
284:23 289:5,6,25
294:20 295:16
296:22 304:1 310:1
320:4 324:11
**somebody**
37:12 72:24 132:3
142:9 143:12 182:8
222:1,1 298:8,10

307:4
**something**
52:16 58:18 59:15
60:5 112:1 193:9
198:19 199:2
201:15 206:15
260:25 285:15,16
285:22 286:1 305:3
**sometime**
21:16 71:22 78:2
93:18,21 273:22
310:18
**Somewhat**
149:23
**somewhere**
28:8,8 29:4 31:23,24
32:10,16 33:25
46:10 65:10 77:2,13
79:11,12 92:4 139:2
139:18 141:9
146:10 162:20
215:22
**sorry**
27:17 35:8 43:9
44:23 55:5 78:9
87:13 114:19
123:18 124:1 148:4
182:1 200:10
205:15 208:2
213:21,24 252:18
260:15 268:24
310:21
**sort**
14:13 85:18 194:13
195:18 205:11
260:24
**sought**
132:9,15,19 133:5
137:19 138:1,5,18
140:11,13 151:9
156:20 164:19
167:1 168:3 169:13
174:20 178:3,15
179:19 204:24
**sound**

212:20
**sounds**
49:21 109:15 286:22
**sovereigntitleok.com**
305:24
**SPAM**
92:9 94:11,24 186:12
186:25 205:5
**speak**
18:15 52:1 101:7
142:9 145:22
159:15,18 162:21
166:18 178:21
219:2 231:19
253:23
**speaking**
73:4,13,21,24 154:14
159:15 178:24
314:17
**spec**
89:21
**specialize**
188:23 189:21
190:17 192:10
**specific**
65:23 66:3,19 69:18
115:17,17 138:25
141:10 143:9,18
159:11 160:8,16,18
160:23 161:3,8,9,13
163:10,14 164:1,6,9
164:11 165:8 169:5
169:9 254:11
288:17 290:11
297:16 318:9
**specifically**
57:6 60:25 97:6
195:5 293:4 296:5
300:18
**specificity**
159:9 281:21
**specifics**
71:12 138:4,6,7
**speculate**
124:15



**speculating**
46:5
**speculation**
46:25 74:12 88:11
89:19 255:3,19
281:24 286:6
314:16 325:19
**spell**
19:10 29:25 35:25
82:17 133:3 138:12
140:20 149:12
155:18 163:22
164:25 168:8 283:6
**spelled**
56:2
**spent**
63:22 64:15,16
**spoke**
293:8
**spoken**
56:17,20,21 60:22
155:13 159:19,23
174:12 184:6
314:11,13
**spoof**
186:8
**spreadsheet**
269:16,20
**spreadsheets**
270:11
**Square**
174:7,9,13,15,20,24
175:1,1,9,14 176:4
176:7,10,14,17
177:3 178:2,5 194:6
194:7,9,12,14
212:18
**Staggs**
1:20 8:12 18:19 64:2
64:10 125:15
188:14 189:6 219:1
219:4 326:13
330:14 332:13
333:17
**stamp**

**stand**
54:12
**standard**
15:8 35:17
**stands**
130:21
**start**
28:1,4,10,14,18
30:13 31:12 32:9,11
43:19 58:3 116:3
134:17 137:17,18
138:16 212:9 219:3
262:18 273:18
308:12 312:13
314:23
**started**
49:15 61:21 93:20
206:4 219:19
**starting**
44:23 211:21 226:17
270:21
**starts**
40:21 270:7 308:14
**state**
1:21 8:13 56:7,9
66:11 83:22 127:8
187:4 255:23 256:4
267:5,10 273:1
328:14 329:9
330:15 333:2
**stated**
1:23 123:23 167:3
**statement**
81:13,18,22 172:4,5
207:10 262:24
333:9
**statements**
73:5,8,16 107:2,4
172:1,6 199:13
260:11
**states**
1:1 8:6 67:7 210:8
213:2 222:25 303:4
330:1

268:22,25 269:1

**static-y**
190:6
**stating**
22:22 107:21 125:18
125:19 183:14
216:7
**status**
301:9
**statute**
68:14 236:9 309:1
**statutes**
231:24 232:4,17
233:24 234:23
**stays**
284:12
**step**
16:22 17:21 79:3
87:14 104:16
136:13 182:24
295:20
**Stern**
244:10
**Steven**
153:10 157:24 167:5
167:13 180:23
**still**
13:20 17:16 19:4,24
20:1,3 23:5 38:21
43:11 44:11 54:6
67:5 71:2 72:10
78:1 80:22 81:23
93:25 143:2 173:13
188:25 189:23
190:19 191:12
192:13 232:14,23
234:6 235:8,18
236:15,18 237:8
238:8,23 239:14,25
240:7,11 241:13,21
241:22 242:25
244:14,24 245:14
245:25 246:5,20
247:14,24 248:10
249:1,2,14,15
250:19 251:4,5

**stop**
29:14,16 32:12 33:19
34:6 42:21 77:17
92:9 210:24 211:4,5
211:11,12 219:6
222:24 326:14
**Stopped**
77:18
**stopping**
51:11 188:9
**strange**
162:21
**strategies**
14:4 220:12,24
221:23,25 253:1
**strategies/preparat...**
297:22
**strategize**
223:12
**strategy**
13:17 15:16 16:15
54:1 119:3 220:16
237:18
**Straus**
150:7,9,14,21,23
151:14,15,17 161:8
167:6,17
**Straus's**
158:3
**stretch**
197:20 198:13
**strictly**
22:9
**strike**
25:25 136:14 246:4
249:23
**struck**
147:12
**structure**
62:13 163:10
**structured**
62:9

252:9 273:24,25
274:2 276:6 294:20
321:18



stuff
48:6 62:1 94:12,14
125:5 224:25 280:6
subject
44:13 68:16 71:17
125:18 148:3 217:7
254:16 255:22,23
283:23 284:11
298:5
submit
179:21,23 180:3
303:22
submitted
124:18,18 126:16
303:19
subpoena
270:3 301:8
subs
62:13
subscribed
328:23 333:13
substance
16:12 18:1 57:3
91:11 119:9 228:6
230:12,13 231:1,4
233:13 281:22
333:8
substantial
266:10
such
188:24 189:22 258:6
262:23 265:17,19
265:23 280:25
281:17,20 284:1,4
286:19 288:12
289:15 290:24
292:5,14 333:9
sued
73:12
suit
71:1,2,4,7 72:7,14,25
73:6,14 74:7,17
83:5
Suite
3:8

summaries
64:13,14,19 87:10
summarized
63:22,24 64:8,12,15
64:17
summary
63:19,20,21 86:18,20
102:23
support
90:25 91:17
supporting
91:5
supposed
85:20 205:14
sure
16:3 26:11,17 34:4
36:9 46:18 51:13
59:3 60:6 64:4,21
64:25,25 65:8 69:25
71:10 88:25 89:4
100:21 101:16,20
117:24 122:12
130:12 137:16
138:11 140:19
146:18 147:3,4
153:21 176:2 182:3
184:12 185:8
188:10 199:22
206:21 244:2,3
252:12 265:10
282:20 288:21,24
308:7 312:24
315:18 323:8,12
swear
8:19
switch
94:8 115:18
switching
51:10 169:17
sworn
1:18 8:21 294:6
330:18 333:13
system
47:21 191:9
systems

223:23

—————————————
T
—————————————
T
310:19
table
212:21 268:3
tablet
175:3,4,6 180:4
tabulate
256:21,23 257:16
258:22 266:5
tactics
175:20 228:11
take
8:23 11:12,25 16:22
17:21 18:14 28:21
51:4 79:3 87:14
100:20 104:16
136:13 166:3,8
170:15 182:24
186:15 191:17,17
219:9 226:21
253:12 295:20
304:15 317:11
319:18
taken
1:18 8:9 9:1 331:18
332:7
takes
199:11
talk
49:14 106:15 206:1
261:4,5 262:16
266:23 297:10
talked
136:3
talking
30:11 43:11 49:15
106:12,13 112:17
143:14,16 169:18
185:9 186:16
203:20,23 204:5,19
204:20 206:2
278:17 282:11

296:16
Tammy
1:20 8:12 214:1
259:3 304:2 317:7
330:14 332:13
333:17
tax
6:8,9 302:22,23
303:1,12,16,16,17
303:17
Taylor
3:12 8:11 326:18
TC
215:2
TCPA
58:23 79:4,6,9,14
214:20,23 215:2,6
215:10,23 216:11
217:5 229:15
231:15,16 232:4,17
233:24 234:23
235:3 236:7,12,13
237:6,7 239:1,4,17
240:22 242:20,23
243:10 244:17
245:2,17 246:3,10
246:18 247:12,22
248:7,9 249:4,17
250:9,17 251:2,6,12
252:16,22
team
201:8
telemarketing
92:10 212:24 213:10
213:11
telephone
59:5 66:21 67:10
92:2 93:1 95:18,20
95:22 96:2,9,15
111:13 148:14
187:1 207:15,16
223:22 226:9,15
235:1 239:2,19
240:24 241:3 248:8
249:5 258:4 269:8



273:7,9 280:18,21 281:7 303:6

**tele-marketer**
258:17

**tell**
10:7 46:4,6,7,8 110:8 116:6 130:25 140:16 167:2 204:11 208:18 263:2 264:17 265:11 268:15 272:21 281:4,7 284:16 285:13 287:2,5,7,12,16,20 288:1,5 289:20,23 290:7,14,16,19 291:18,25 292:24 296:17,18 299:14 299:18 308:12 309:2,3

**telling**
316:3

**ten**
7:10 28:7 43:24 44:7 44:14 46:10,20 47:1 47:7 66:14 68:17 69:20 77:3,4,5,10 77:12 88:6,12,13 104:4,7 138:23 139:1,2,18 141:9,11 159:7 209:2 215:15 217:8 271:21 273:4 281:23

**tenant**
309:21,23 311:8 321:25 322:2

**tenants**
47:9 280:25 281:1,4 281:4 284:5,5,8,9 284:13,14 286:19 286:19,23,24 287:7 287:8,13 288:12,13 289:1,12,13,15,16 289:17 311:4,7,9 312:1

**ten-month**
197:18

**ten-page**
323:4

**ten-year**
68:14

**term**
126:14 127:20 142:12 197:20 198:12

**termination**
69:11

**terms**
13:17 14:4,14 15:16 20:13 26:23 44:8 58:20 59:23 60:12 142:11,15 144:5 237:17 284:13 296:8 322:16

**testified**
8:21 68:3 101:9 102:11 286:14

**testimony**
35:7,16,19 68:1 69:14 102:17,17 113:2 183:3 184:10 186:17,20,23 215:24,25 216:1,8 228:13 330:19 331:18

**Texas**
1:1,21 3:7,8 8:6,25 22:16,23 23:20,21 23:23 24:4,7,9,18 24:23 25:8,17,25 35:23 36:14 37:4 41:6 58:23 59:5 83:22 84:3 163:19 163:24 164:4 231:24 232:4,17 233:24 234:23 235:2 236:8 240:25 243:20,21,23 245:8 251:20,22 252:5 276:3,8 316:9

318:22 330:1,15 333:2

**text**
5:17,19,25 7:3,4 95:15 96:5,12,18 126:22 129:3 130:21 202:1,17 203:14,17,19 208:20,21 211:4,5 211:18,19,20 212:23 213:5,7,16 214:11,16 215:6 216:20,22 217:3,9 268:17 269:4,12 271:11,12,16,25 272:14,22,22,24 310:24 317:11 318:3 320:4,8

**texts**
202:12 203:2 211:24 212:5,6 213:3,8 214:13,14 216:21 269:25

**than**
27:4,9 30:4 31:25 43:24 44:7,14 45:9 45:10,23 46:1,20,21 48:19 54:25 72:5 74:11 75:10 77:1,3 77:4,5 78:19,19 86:7 88:2,6,8,12,13 93:23 104:22 105:3 105:6 123:25 124:4 134:15,16 138:25 141:10 144:11,16 155:12 159:9 197:22 203:18 215:13,15,17,19 216:3,4 224:16 261:20,22 262:10 288:16 298:10

**thank**
12:1,4 49:22,22 64:6 163:12 183:22 185:15 188:14

189:10 214:3 226:2 269:23 292:11 299:20,22 304:24

**Thanks**
53:3 202:6

**their**
8:13 48:4 55:2,2 210:6,7 213:1 258:3 281:7 284:16,17 287:2,21 289:20 290:8 291:14 292:24

**them**
29:12 40:21 45:13 47:8 59:3 72:24 78:15 110:9 114:13 122:17 126:17,17 140:12 171:4,10 172:5 178:9 180:19 183:4,10 195:24 212:18 213:5 221:10,16 234:1 262:5 266:13 275:5 284:14,18 287:4,11 289:2,4,5 293:1 333:10

**then**
12:8 18:22 22:8 24:9 29:11 30:15 35:3 41:6 44:7 49:15,19 51:14 52:23 53:3,5 53:8 56:3 66:18 67:1,6 68:16,17 85:19,20 87:8 88:23 100:2 101:15,18 119:21 122:22 124:7 125:20 129:12 140:21 166:4 170:15 171:25 175:17 179:3 180:22 188:3 192:2 198:4 199:21 208:24 211:17 212:9,16 213:18 219:7 223:7,9



230:21 255:24
262:15,15 268:2
271:1,4 273:6,13
282:7 283:10,21
288:22 300:22
301:19,21 310:9
311:4,7 312:22
315:17 316:7 319:8
333:8
**theories**
14:16
**thereabout**
34:7
**therefore**
11:8 331:9
**therein**
328:25
**thereto**
218:15
**there's**
12:10,12 18:12 19:2
22:4,19 27:22,24
35:14 37:13 40:6
41:7,25 48:3,22,24
63:10,21 70:10,11
84:2 107:20 130:3
132:2 175:3 176:3
178:11,12,16,23
186:8 187:2 205:6
209:23 226:23
227:1 259:19
260:12,12 261:4
262:4 266:11,22,22
268:5 271:4 272:4
301:7 306:8 307:10
307:14 308:24
314:22 316:3,3
323:24
**these**
28:24 29:1 64:13
66:19 67:7 80:25
83:20,22 102:21
109:17,21,21 110:1
110:13,14 111:2,6
111:12 112:7,7

114:11 122:10
130:18 135:15,17
154:15,20,23 155:1
155:2 156:18
164:17 165:25
185:10 186:25
205:12 207:12
211:24,24,25 212:5
212:18 213:3
214:16 249:19,19
252:22 253:1
254:12,16 260:11
263:2,4 267:6,19
270:16 283:21,22
288:18 293:8 300:6
300:11 323:25
324:16,16,22
**they**
8:14 48:4,9,10,11
54:3 63:6 64:8
83:24 110:4,4,7
111:8 123:16
127:13 136:11
172:14 186:25
187:1,4 193:7,7,11
205:7,9,12 208:24
208:25,25 211:9,9
222:19 224:6 226:7
243:7 270:1 275:14
284:24 285:16,18
285:21 286:1,8,11
289:13 291:3
311:22 312:2 316:4
320:12 324:19,23
328:24
**they'll**
205:5
**they're**
26:20 95:13 170:13
184:1 205:12
212:24 234:1 253:2
258:16,17 267:16
310:7
**thing**
22:1 48:4 71:9 91:10

201:14
**things**
130:17 142:14 259:5
**think**
20:15 22:10,13 27:23
27:25 38:1 48:4
49:10 56:3,7 57:14
57:14 69:23 82:13
87:18,18 102:16
104:17 112:25
132:16 134:25
147:8 153:18
158:24 162:5
164:21 166:2 168:5
168:25 169:15
172:10 174:17,17
178:12 180:22,23
180:25 197:25
206:4 213:15 216:9
218:13,14 225:22
226:22 240:15
251:8 257:25
266:19 284:7
286:14 297:24
317:16 318:20
320:12
**thinking**
87:3 90:4 244:3
**third**
113:17 323:24
**third-party**
270:3
**though**
197:13 198:24
204:24 210:10
231:1 257:25
**thought**
51:11 224:21,23
**thoughts**
121:24 220:13,23
**thousands**
197:10 198:10
**thread**
7:3 313:16,17,21
314:9,14 317:11

**threat**
85:5
**threatened**
85:3,4 86:1
**three**
31:23,24 58:12 79:12
83:14,15,20 85:14
113:25,25 114:11
193:20,22 199:13
210:22 211:1,2
213:8 263:11,12
267:13 324:12
**three-minute**
191:18
**through**
14:25 22:1 32:19
48:25 49:1 50:7,23
51:1 52:12,12,22
63:9 76:21 77:19
81:24,25 87:16
101:15 110:21
111:22,23 116:2
119:24 128:17
134:8,8,9 135:8
136:7 137:15 139:7
141:20,21,21 150:2
151:18,25 153:6
154:7 155:25 156:2
156:21 166:21
170:18,19 171:14
174:23,25 175:17
179:24 180:25
188:3 191:10
198:11 207:1
208:22 212:15,16
216:9 222:22
229:18,18 254:10
258:11 265:22,23
266:1,12,23 269:24
279:9 283:22
288:22 296:12
299:10,11 304:1
306:16 308:11
310:19 314:8
318:23 319:18



328:20
**timeline**
 43:4
**times**
 17:2 33:18 83:11,12
   111:12 124:9,13
   125:21 126:7,14
   140:6 142:23 183:8
**time-sensitive**
 313:9 314:3
**timing**
 26:12 169:25
**title**
 34:8 294:3
**titled**
 6:8 268:1
**today**
 8:8 13:25 14:3,8,18
   15:3,14 16:2,20
   21:22 35:8,19 46:13
   60:10 69:14 163:8
   192:9 251:11 259:8
   264:5 265:11,13
   266:12,15,25 267:1
   267:5 271:11
   272:21 273:24
   284:10,14 287:5,6
   287:10,20,24 288:7
   289:21 290:15,19
   291:7,20 292:1,25
**today's**
 326:16,20
**together**
 54:1 115:2 306:5
**told**
 137:6 182:25 206:15
   208:20 231:6
   311:21
**Tommy**
 110:23 114:15,21,22
   114:25 115:5
   151:20,21 159:1
   164:15 167:4
**tomorrow**
 199:1,3,17 201:5

310:19
**Tomoso**
 232:15
**tonight**
 201:12
**tons**
 257:24
**too**
 94:10,11 167:9 175:3
   225:21 249:8
   279:13 304:5,6,7
**took**
 143:13 321:17
**top**
 11:24 12:11 33:11
   40:20 55:13 78:24
   91:25 93:12 96:8,23
   120:23 157:25
   158:2,7,20 164:16
   195:10 207:3
   259:18 262:20
   263:10 264:16
   265:6,13 268:2,22
   269:1 271:9,15
   272:19 281:9
   284:15,18 285:4,10
   286:16 287:1,11,19
   287:23,25 289:10
   289:16,18 292:9
   293:1 305:3 310:3,8
   314:25 315:8,19
   320:8
**topic**
 11:15 13:5,5 51:10
   79:19
**topics**
 11:15 13:7
**total**
 197:3 262:4
**totality**
 267:11,12
**touch**
 141:18
**towards**
 166:2

**track**
 108:4 238:12
**tracking**
 108:7
**traditional**
 146:16
**training**
 34:13,16
**transaction**
 57:24 85:24,25 306:4
   306:14 316:4,17,20
**transactional**
 85:19,22
**transactions**
 314:13
**transcript**
 207:22 259:10 304:8
   330:18 331:7 332:3
   333:6
**transcription**
 327:3
**transfer**
 39:10
**transferred**
 39:14
**transmitted**
 129:15,22 130:10,23
**tremendously**
 198:9
**trial**
 20:4,7 59:11 237:22
**tries**
 212:2
**Trinette**
 164:23 167:4 177:8,9
   178:5
**TriSmart**
 247:17,18
**true**
 125:7 328:3 330:19
**truncated**
 243:25
**truthful**
 35:7
**try**

212:21
**trying**
 18:22 21:20 27:22,24
   49:14 65:4,6 128:18
   130:7 176:2 184:2
   185:11 212:3,20
   258:19 322:24
**turn**
 142:10 190:3 219:8
**turning**
 66:7 88:14
**twenty**
 28:12 74:19 78:4
   93:19 276:21
**twice**
 182:21
**two**
 9:9 15:12,12,19,22
   23:1 33:5 46:10
   58:10,12,25 71:23
   74:16 85:14 86:7,8
   95:6 122:15 134:15
   134:16,17,18
   154:17 176:16
   178:23 195:21
   199:12 212:15
   213:8,9 228:4 251:7
   261:22 262:7
   264:12 286:1
   293:16 300:8
   323:25
**two-page**
 323:14
**two-thirds**
 107:13
**type**
 138:6
**typical**
 196:19
**typically**
 111:22,24,25 142:8
   194:4
**T-R-I-N-E-T-T-E**
 165:1



| U | | | |
|---|---|---|---|
| **UES** | **unsecured** | 138:10 166:8 216:18 | 283:14 |
| 59:8,9 | 191:5 192:24 197:24 | 228:20 262:4 | **UT** |
| **ultimately** | 199:9 | 284:16 304:15 | 34:20 |
| 81:2 94:13 | **unsworn** | **usage** | **util** |
| **under** | 6:5 294:2,7 | 103:7 266:11 | 113:25 |
| 1:25 42:2,4,10,12,17 | **until** | **USC** | **utilize** |
| 105:19 203:19 | 11:8 38:17 132:1 | 223:20 | 47:19 48:12 50:12,13 |
| 260:12 261:5 | 205:7 217:13,17 | **use** | 50:15,19,24,25 |
| 328:20 329:1 | 228:12 | 36:2,5,8 37:6,10,22 | 148:16 |
| **underlying** | **un-redacted** | 39:25 40:3,23 41:24 | **utilized** |
| 72:13 81:3,13,18 | 301:4 | 43:2,5,7,15 48:16 | 43:14,15 44:18,24 |
| **underneath** | **un-secured** | 48:17 49:9,25 50:2 | 45:4,20 46:13,20 |
| 114:16 307:14 | 154:14 | 51:2,14 95:1 107:12 | 93:1 102:12,14,18 |
| **understand** | **up** | 134:10 144:11 | 107:22 114:1 176:7 |
| 106:24 108:10 | 10:7 11:24 34:23 | 155:7 156:8 176:4,6 | 176:10,14 |
| 194:25 195:23 | 37:12 48:5 64:5 | 181:7 254:22,23 | **utilizes** |
| 198:18 | 68:13 69:19 76:16 | 256:25 257:13,24 | 126:22 129:2 |
| **understanding** | 92:25 102:24 | 271:16,20 294:17 | **utilizing** |
| 12:18,23 13:22 48:22 | 109:20,22 115:4 | 305:21 316:4 | 50:22 93:25 |
| 52:13 128:19 | 147:12 174:1 190:3 | **used** | |
| 308:11 311:14 | 193:13 198:16 | 40:8,12,17 41:9,10 | V |
| **Understood** | 208:21 217:13 | 41:11,18,20 43:20 | **vacant** |
| 22:24 209:17 226:2 | 223:12 253:9 254:5 | 43:22 44:6,9,14 | 318:22 |
| 235:17 270:15 | 256:7,10,15,24 | 48:1 49:8 50:16 | **vague** |
| **underwriting** | 257:9,11 259:16 | 66:12,24 68:20,22 | 22:5 30:10 37:7 |
| 201:8 | 264:8,22 266:6 | 69:3,5,9 96:1 106:4 | 40:10 43:3 44:10 |
| **unit** | 267:4 270:2 271:18 | 106:6 107:11 | 104:23 106:20 |
| 6:16 309:16 310:19 | 282:20 285:17,19 | 112:25 129:10 | 133:21,23 278:14 |
| 319:5 | 285:22 286:2 | 156:16 181:9,14 | 297:15 298:6 |
| **United** | 296:10 299:16 | 255:6 256:8,24 | 306:18,20 |
| 1:1 8:6 222:25 330:1 | 301:16 305:8 308:5 | 262:25 265:21 | **valid** |
| **University** | 309:3,6,8 312:18,20 | 266:7 271:21 273:2 | 15:21 172:11 |
| 23:20,21,23 24:4,7,9 | 312:22 315:8,12,14 | 273:11 280:23 | **value** |
| 24:18,22 25:8,17,24 | 315:17 | 331:12 | 173:24,25 |
| **unknown** | **update** | **user** | **varies** |
| 167:5,11 | 207:14 | 301:1 | 196:4 |
| **unless** | **updated** | **uses** | **vary** |
| 60:17 297:15 325:25 | 208:17 209:1 217:7 | 66:22 124:9 127:3 | 193:7,7 |
| **unlikely** | **updating** | 131:10,13,14,23 | **vast** |
| 325:6,7,11,13 | 208:16 | 254:17 273:9 | 258:12,13 |
| **unpaid** | **upon** | 280:21 | **vendors** |
| 173:19 | 62:6 63:16 108:15 | **using** | 284:5 285:13,14,15 |
| **unquote** | 129:14,21 130:9,22 | 47:11 48:21 67:14 | 286:20 288:1,2,6,13 |
| 94:14 | 218:20 | 93:20 94:5 131:18 | 290:10,11,15,16 |
| | **us** | 204:25 281:15 | **ventures** |



67:12 241:17
242:22 249:25
250:3 281:13
**verification**
53:11
**verified**
125:7
**Verizon**
5:23 39:19,21,23
44:23,24 45:1 94:18
94:19 256:10,14
257:18 258:7
259:17,18,25
261:13 266:24
268:21,22 269:3,13
270:4 301:8
**Verizon's**
269:6
**versus**
94:20 256:22 257:3
258:9 265:24 266:4
266:10 293:7
**very**
67:12 115:16 194:2,3
**via**
1:22 3:2 49:4 135:16
135:17 140:2 147:6
149:21 156:11
182:2 185:7
**vicinity**
34:1
**video**
191:16 304:9
**videographer**
3:12 8:2,11,18 51:17
51:21 100:23 101:2
166:8,13 191:19,22
253:14,18 304:14
304:20 326:14,19
**videotaped**
1:11,16 8:23
**view**
106:17 107:2,4
**Vincent**
5:14 185:20,23,24,25

188:7,8,18,19,21
189:14,15,16,19
190:11,12,15 191:2
192:6,7,21 193:2,6
193:22 194:3,7,11
194:17,25 195:6,11
195:16,23,25 196:6
196:8,12,21,24
197:5,18 198:18,23
199:7,22,25 200:3
200:10,13,15,21,23
201:1,18 202:5
209:13,19 249:20
**Vincent's**
5:17 209:11
**viol**
236:12
**violat**
236:8
**violate**
231:24
**violated**
216:11
**violation**
217:4 232:17 234:22
240:22
**violations**
215:23 231:25
233:23 234:23
236:7,8,13 237:5,7
238:25 239:4,17,18
240:24 242:19,23
244:16 245:1,16
246:2,9,17 247:11
247:21 248:6,9
249:3,5,16 250:8,16
251:1,12
**violative**
211:13
**virtual**
284:6 286:20 290:24
291:1,9,19 292:14
**voice**
203:21,21 226:16
**VOIP**

43:2,5,8,14,20 44:6
44:18,24 45:4,11,20
45:23 46:13,15,19
47:2,14,19 48:21
49:2 50:1,2,6,9,12
50:13,15,16,19,22
50:25 68:1,4,21
69:3,9,12 101:10
102:12 107:18,22
108:3 111:2 112:7
112:23 114:1,11
115:5,10,14,15
136:14 324:16,19
324:22
**VOIPs**
43:18
**volume**
266:9
**VOP**
114:11
**vs**
1:5 8:5,24 229:22
231:14 232:7
233:18 234:17
235:24 236:25
238:2,14 239:7,21
241:16 242:12
243:19 244:9,19
245:7,19 246:13
247:7,16 248:1,22
249:9,24 250:22
329:16 330:5

---

### W

**wait**
49:18 117:8 209:21
238:5 276:10 283:3
304:11
**waived**
15:22
**waiving**
66:19 69:17 273:6
283:23
**Walker**
70:11,12,19,22 74:25

75:23 76:1 82:3
84:13,15,16
**Walker's**
70:16
**wall**
41:13
**want**
10:23 11:23 17:7,7
19:4 20:1 22:14,15
22:18 23:5 44:11
51:4,5,9 60:17
72:10 77:13 78:4
101:10 115:18
116:1,2,6 119:24
122:25 142:9 159:1
160:13 163:1
165:25 166:1
175:21 176:1
177:15 178:25
207:2 222:22
223:11,12 228:9
229:2 241:13 253:8
254:3,10 255:20
260:8 276:6 279:9
297:15 299:10,10
299:16 302:7 304:6
308:10 310:6
312:13 317:10
319:17,20 323:4,17
**wanted**
188:25 189:23
190:19 192:12
206:1
**wanting**
212:3
**Wanyeung**
164:24 165:3,6,15,23
167:4 177:9,11,17
178:2
**warehouse**
40:24,25 41:1,2,4,16
41:19,24 42:3,18
67:8 171:25 195:13
292:17
**Wash**



**250:22**
**wasn't**
29:17 59:20 80:11
106:6 110:10 173:9
185:12 186:6
204:18 235:7
**was/was**
333:11
**water**
212:19
**way**
92:25 101:20 106:25
107:13 113:17
124:24 161:23
175:23 184:1 187:8
189:9 193:13 205:6
212:14 257:10
263:13 264:5,17,22
265:8 267:7 270:12
271:10,13 323:20
**weather**
48:3
**website**
171:14 269:6 270:12
275:9
**week**
26:25 27:4,5,10,14
112:4 196:25 199:6
227:5 323:5
**weekly**
40:3,4,8,13 255:14
255:15
**week's**
306:6
**Welchans**
138:11,15,16,18,19
138:20,20 139:4,6,7
139:10,14,17,22,25
140:2,7,12 144:14
144:19 146:1 152:2
158:18 164:11
167:8,25
**welcome**
166:17
**well**

10:8,25 17:10,25
18:7,20 20:15 21:14
22:7,19,22 25:6
26:4,8,12 29:10
38:2 41:20 52:18
68:15 69:17 75:16
76:14,22 79:3 85:17
87:3,6 90:20 91:7
112:22 113:5,21
114:25 119:25
124:17 136:7 142:8
143:14 147:2
154:19 170:4,13
172:19 179:11
188:14 192:8 194:9
202:21 205:11
206:3 210:6 211:2,9
212:9 216:3 218:1,7
218:13,14 223:9
231:3 240:24 244:2
251:8 253:10
258:10 263:2
271:25 274:15
276:10 296:24
297:5 304:8 305:6
310:8 311:16
315:24 322:8,16
325:5
**went**
30:19 32:19 77:18
121:25 136:7 167:9
170:18 180:25
216:9 284:7
**Wenzel**
155:17,21,24 156:4,6
156:9,11 160:12,16
167:5,11 178:20,21
179:15
**Wenzel's**
157:22
**weren't**
79:14 106:4 134:6
136:11
**West**
164:4

**Western**
1:1 8:6,25 251:19,21
252:5 330:1
**we'll**
175:17 288:10
**we're**
10:9 22:12 26:17
51:18,23 100:24
101:4 104:16
154:13 166:2,11,15
172:20 175:18,23
185:9,17 191:19,22
212:13,15,16
253:15,20 272:2
280:7 300:21,24
301:2 304:3,16,17
304:22 317:6,13
326:21
**we've**
46:12 87:16 136:2
137:15 149:8 150:2
153:5 155:12
166:24 216:14
253:7 254:9 266:12
266:22
**whatever**
184:4,14 299:12
314:10
**what's**
13:13,13 17:21,23
33:3 37:3 40:14
58:19 72:13 106:14
111:9 115:19
129:19 137:4,4,13
143:19 148:6
158:14 159:13
160:19,19,25 161:5
161:10,23 165:11
173:24 182:22
188:2 196:14 197:3
197:4,11 199:22
206:19 209:3
213:12 214:5
222:16 224:16
228:6,6 241:22

245:9 267:20
276:16,23 277:10
277:21 289:9
298:12 301:23
308:1,13 312:9
314:18 319:14
324:6,6
**whenever**
175:21 270:8 294:17
**where**
9:18 22:20,21 23:17
23:17 26:3 29:7,10
29:10 32:25 36:25
41:4 55:12,17
110:24 146:20
190:4,8,9,9 193:7
195:16 197:6,7
198:6 212:2,8
270:20 273:1
308:12 323:21
325:3
**whether**
11:10 13:5,24 54:14
57:4 60:14 62:4,5
71:13 83:7 91:14
92:25 105:23
124:25 131:6,22,22
174:15 187:8
227:18 231:5,8
233:11 235:15
237:22 252:20
264:6,17 265:9,16
267:16 271:11
272:22 318:25
**which**
15:21 44:20 49:17
54:24 66:22 67:8,13
84:8 97:5 114:2,9
122:19,22 128:14
129:13 134:11
135:12 137:16
154:8 159:14 181:9
192:1 206:8,9
210:12 212:5,5
213:3 226:18



228:10 233:16
234:25 254:4 257:5
257:5,19,20 258:8,9
258:13 260:13
263:4 269:18
271:22 273:5,9
275:14 281:12
282:5,10,16 283:9
296:4,10,21 320:9
320:15,15 322:6
324:25,25 325:2,20
325:22 332:6

**while**
122:13 157:1

**Whitehorn**
283:4 288:14,18
290:18

**whiz**
44:23,24 45:1

**whole**
22:1 47:14 48:4
52:11 217:25
308:18,18

**Wholesale**
276:25

**whom**
8:14 283:12 284:1

**whose**
33:20 66:12 256:5
264:15 265:3 271:7
272:7,12 273:2
307:1 328:22

**why**
29:16 33:19 35:7
92:7 94:3,5,5,8,13
94:19 115:1,4 127:8
127:13 130:16,17
172:20 205:2,2,2
211:4,5,11 212:7
217:23,23 218:19
218:24 219:11
220:9,16 250:14,14
260:6,23 261:8
275:24 288:22
294:1,14,16,24

299:10 300:13
319:2 325:7

**will**
8:13,18 9:24 12:4
13:23 15:18,24
18:14,24 20:6 51:17
51:21 88:19 100:23
101:2 104:18
166:10,13 182:11
183:23 184:14,15
186:21 188:16
192:2 197:9 201:4
201:14 202:1 207:8
207:21,21 219:10
252:21 253:14,18
258:23 304:16,20
310:17 322:21
326:19

**Williams**
229:22 231:15

**win**
237:22

**wind**
42:5 173:14

**Wing**
37:4 161:16,18
162:18 318:7,10,21

**Winter**
163:17,18

**Wire**
201:5

**wish**
208:19

**withdraw**
17:22 77:20 106:14
217:24 218:8

**withdrawal**
217:20 218:19
219:12

**withdrew**
77:21 219:22,25
220:2,4,6 222:8,9

**within**
31:19,22 138:23
139:1 199:6 228:4,4

255:8 331:6

**without**
66:19 67:12 69:17
74:14 131:19,25
159:8 172:13
173:25 187:11
205:7 216:12 217:1
217:6,6,12,14,16
246:23 263:15
264:7,21 267:3
272:24 273:6
283:23 301:17
325:1,24

**witness**
1:17 8:19 12:2,5,7,13
49:12,21 52:25 53:2
53:4,7,9 64:9 68:12
89:1 101:17,19
116:10,12,17,22,24
117:1,3,5,7,10,12
117:14,16,18,20
120:3,5,7,9,11,13
120:16,18,20,22
121:2,4,6,8,10,12
123:7 189:6 207:7
207:11 208:4
222:23 259:6,9
279:15,18,20,24
293:17,19 299:23
299:25 300:2 302:4
302:10 305:10
309:5,7,10 312:17
312:19,21,23 315:3
315:5,7,11,13,16
317:12,21 319:21
319:23 323:22
330:17,20,24 333:3
333:4,7,8,10,11

**wonder**
207:9

**won't**
9:16 22:4 60:20 62:3
62:8 128:3 220:25
235:20

**word**

31:8

**work**
13:12,14,20,22 14:10
15:6 16:7,8 30:7,12
30:16,18 31:4,6,9
31:20 32:2,3,5,9,12
32:20 33:13 34:10
34:22 53:22,24 54:7
54:10,13 63:18,22
63:22 64:15,19 65:1
65:11,11,23 66:1,2
66:3,4 86:19,20
110:20,25 194:4
197:1 201:15
220:11,22 221:21
252:24 297:20
312:6 319:4

**worked**
63:17

**worker**
105:11

**Workers**
105:10,10 275:2

**working**
27:1,6,11,15 28:4,10
28:14,19 29:14,16
29:17 30:11 31:12
33:19,23 34:6
111:15,25 112:3
189:1,24 190:20
192:14 313:20

**works**
189:12 310:23
313:15

**worries**
214:2

**worry**
210:1

**wouldn't**
77:12 90:4,4 113:5
131:19 151:4 153:1
177:2 185:14 286:8
290:7,9 303:25
318:9 325:2

**written**



11:8 174:15 203:22
218:7
**wrong**
45:14 69:4 150:9,11
**www.magnals.com**
332:16 333:20
**W-A-N-Y-E-U-N-G**
165:1
**W-E-L-C-H-A-N-S**
138:15
**W-E-N-Z-E-L**
155:19
**W-2**
29:8 30:6,11,13,18
34:3,4 105:8

**X**

**X**
197:14 331:3
**X-I-A**
56:3

**Y**

**year**
21:16 28:4,6,10,14
28:18,21 31:12,16
32:8,11 33:23 38:2
38:5 77:23,25 78:3
78:5 92:6 93:24
94:7 96:3 176:16
217:19 245:24
271:2 285:25
**years**
23:23 24:10 28:7
31:19,21,23,24
39:20 40:11,16
41:10 43:13,21,22
44:7,19,20,22,25
45:3,19,21,24 46:10
46:14,15 47:13 48:5
51:3 66:14 68:9,11
68:15,17,18,20 69:3
69:10,13,15,20 70:4
71:23 74:16 75:1
76:2 82:6,9 84:19

87:17,18,22 88:4
92:17 138:24 139:1
139:3,18 141:9,11
145:10 159:7
193:17,21,22 209:2
251:7 255:8 271:21
273:4 281:23
285:21 286:3
296:24,25
**yet**
208:1
**York**
1:7 329:17 330:7
**Yorker**
249:19
**yours**
44:18
**yourself**
21:18 104:22 105:3,7
177:4 178:3 188:24
189:22 190:18
192:12 196:15
219:19 236:19,21
**you'll**
49:18 326:14
**you've**
40:12 62:25 66:12
87:16,21 88:3 89:11
178:14 225:15
227:24 228:14
252:22 273:2
279:13 293:21

**Z**

**zip**
37:5 41:6
**zoom**
1:22 3:2 279:13
299:21 323:14
**zooming**
299:21

**$**

**$100,000**
74:11 90:15,19,25

91:6,18
**$122.37**
102:24
**$210,000**
147:15
**$50,000**
173:16,18
**$55,000**
241:8

**0**

**0:00**
331:14
**000001**
259:19
**001496**
6:7 298:23
**001502**
6:15 305:13
**001574**
6:1 268:6
**001623**
302:14
**001654**
102:2
**001655**
113:17
**025-0000**
271:4

**1**

**1**
5:3 8:3 9:24,25 11:20
11:22 12:16,24
51:18 254:16
256:13,14 262:22
262:23 271:17,18
283:15 293:5
300:18 327:2
**1st**
229:11
**1:02**
166:11,12
**1:05**
211:21

**1:37**
166:12,16
**10**
5:4,19 68:4 77:6
103:23 199:25
213:13 214:5,6
215:7 217:10 280:2
280:7,20 281:11
282:2
**10/31/2026**
332:14 333:18
**10:00**
199:24
**10:03**
51:19,20
**10:09**
51:20,24
**10:50**
306:2
**100**
196:12 212:2 267:6,8
267:10 272:23
320:22
**101**
5:10
**11**
5:21 92:4 222:17,18
280:2,7 283:11
316:10
**11:18**
100:25 101:1
**11:24**
101:1,4
**118**
5:11
**12**
5:22 259:4,6 262:16
**12th**
283:19
**121**
5:12
**13**
5:23 92:5,17 259:1,2
**13th**
187:19 206:13



MAGNA
LEGAL SERVICES

**14**
5:25 92:17 123:22
124:2 267:21,22
272:1
**14th**
7:11 324:9
**1400**
3:8
**15**
5:9,9 6:3 88:8 103:7
103:8,11,11 107:14
107:22,23,23 108:3
111:13 126:20
127:2,9,21 128:6,12
215:17,22 216:3
229:14 279:4,5
**15th**
5:24 103:1 260:1
313:7
**1507**
37:4 161:16,17
318:21
**152**
35:23 36:10,22 316:8
**15450**
41:5
**16**
6:5 293:12,13
**16th**
5:24 260:1 270:7
**16-page**
116:2
**17**
6:6 298:13,14
**17th**
310:9
**18**
6:8 129:9 264:3
272:2 301:24,25
**18th**
310:11
**19**
6:10 103:17,19
**19th**
226:10,13,19

**192**
5:14

---
**2**
---

**2**
5:5 12:3 51:22 52:7,8
66:7,8,8 68:7 69:16
93:20 100:24 208:5
254:4 256:3,12
273:1 283:15,20
316:11 327:2
**2:07**
191:20,21
**2:11**
191:21,23
**20**
6:11 46:21 68:4
196:25 201:9
215:19,22 216:4
310:18 329:2
330:25 332:10
333:12,14
**20th**
310:3,8,18
**201**
310:19
**2010**
23:14 24:5
**2011**
24:5,16
**2012**
92:4,5
**2014**
24:16 25:25 33:17
34:1,20
**2015**
28:17 29:2 30:4,16
30:24 31:2,17 32:4
32:20,25 33:1,16,17
34:1,7 273:22
283:20
**2016**
28:8 32:10
**2017**
146:10,10

**2018**
28:21
**2018-ish**
28:8
**2019**
5:9,10 32:10 103:1,7
103:8,11,11 105:5
105:12,25 106:7,16
107:1,5,19,23 109:3
111:20 114:3 115:6
146:10,11
**2020/2021**
74:19
**2021**
32:16 300:18 310:3
310:11
**2021/early**
36:24
**2022**
5:24,24 6:9 28:13
36:24 260:1,1
302:23 303:16,17
306:1 317:17,18
318:7,17 319:7
320:14
**2022-ish**
29:12 276:21
**2023**
7:11 29:15 32:16
313:7 324:9
**2023/2022**
276:22
**2024**
38:19 76:8 88:16,17
132:23 187:19
206:14 225:20
226:5,10,19 227:5
250:3,12 252:12
301:12,13
**2025**
1:13,19 8:8 11:8 29:2
30:4,17,24 31:2,17
32:4,20 42:25 93:19
227:14 229:11
230:5 249:25

252:11 270:7
283:19 330:12
**2025/late**
252:12
**205**
163:17
**208**
5:16
**209**
5:18
**21**
6:12 38:18,19 129:5
129:12 130:8
**21st**
1:13,19 8:8 330:12
**210**
37:16 40:21 66:13,20
67:20 91:22 92:2,8
92:15,21 93:13,21
94:6,16 95:2,9,12
95:16,19,23 96:5,10
96:13,16,19,22,24
97:2,5,7,10,13,22
98:1,4,20 99:7,9,10
99:12,15,17,18,20
99:23,25 108:20
124:10 135:23
200:1 260:15
262:19 263:8,17
264:1 265:5 269:8
270:22 273:3,7
280:19 283:14
303:6 307:17
310:22 311:24
313:9,10,25 316:12
**210,000**
146:14
**213**
99:2,4
**214**
5:20
**22**
6:13 32:17 38:18,19
**22nd**
271:1



**22-page**
268:1
**222**
5:21
**227b**
223:19,20
**228-6615**
98:1
**23**
6:14 304:25 305:1
**23rd**
272:4
**233-3758**
98:9
**24**
6:16 308:2,3
**24th**
317:17
**24-cv-00487**
8:25
**24-CV-01038**
243:24
**24-00801**
241:24
**2401438**
243:25
**25**
6:17 196:20,21
312:10,11
**25-CV-00816**
245:10
**25-CV-00850**
245:23
**250**
324:12
**252-5325**
158:15
**259**
5:24
**26**
6:18 314:19,20
**26th**
227:5
**2616**
316:10

**268**
6:1
**269**
164:4
**27**
6:19
**279**
6:4
**28**
6:20
**28th**
11:8
**280**
99:9
**281**
98:23,24
**29**
6:21 317:17
**294**
6:5
**298**
6:7

---
**3**
---

**3**
4:2 5:7 88:20,21
101:3 166:10
207:17 283:16,20
327:3
**3:16**
253:16,17
**3:22**
253:17,21
**30**
6:22 123:25 124:4
166:3 196:20,21
198:3 201:9 331:6
333:4
**30(e)**
304:7
**30(f)(1)**
331:1
**302**
6:9 236:11
**305**

6:15 236:11
**309**
6:16
**31**
6:23 209:1
**312**
6:17
**312-3292**
100:15 115:11
**314**
6:18
**317**
7:3
**32**
6:24
**320**
7:4
**323**
7:10
**324**
7:11
**328**
4:8
**33**
6:25 10:20
**331**
4:10
**337-791-262**
102:23
**34**
7:1
**35**
7:2 166:3
**36**
7:3 317:7,9
**360-0429**
263:8
**361**
98:9,11
**37**
7:4 319:15,16
**37-page**
259:16
**379-8891**
98:14

**38**
7:5
**382-2782**
100:11
**39**
7:6

---
**4**
---

**4**
5:8 101:11,12 166:14
207:18 253:15
283:16 327:3
**4:22**
304:18,19
**4:24**
304:19,23
**4:52**
1:20 326:21,22
**40**
7:7 112:4 193:14
**402**
225:22
**405-4798**
99:20
**405-6941**
99:12
**405-7811**
97:22 108:20
**41**
7:8
**418-2880**
99:23
**42**
7:9
**43**
7:10 322:22,23
**44**
7:11 323:10,11
**440-3070**
263:6 264:23
**448-4568**
100:3
**469**
98:14
**47**



**5**

223:20

**5**
4:3 5:11 77:6 115:20
 115:21 122:19
 201:6 253:19
 283:17 304:17
**5th**
 230:5
**5/22/2025**
 271:1
**5:00**
 112:1
**5:24-cv-487**
 1:6 8:7 330:6
**5:38**
 271:2
**50**
 193:14 196:9 216:6
**50,000**
 173:8
**50/50**
 196:9
**505**
 263:6 264:23
**512**
 97:17,20 108:17
  109:4
**52**
 5:6
**540-2479**
 272:11
**55,000**
 240:20
**561**
 272:5
**580**
 100:3,5,8,10,11
  264:9

**6**

**6**
 5:12 119:18,19
  122:22 185:17

 283:17 295:7
 304:21 326:20
**6:00**
 112:1 198:17
**6:22**
 202:11,13,21,23,25
**6:50**
 331:15
**60**
 198:3
**61**
 98:6
**610**
 40:21 67:20 98:6
**610-7702**
 98:4,17
**633**
 332:16 333:20
**685-1474**
 262:19 263:17
**686-6281**
 97:2,13 98:20
**695**
 271:4
**699-2298**
 264:9

**7**

**7**
 5:13 188:3 191:24
  192:1 201:10
  216:24 283:18
**7th**
 132:23 227:14 306:1
**700**
 196:25
**702099**
 36:14
**713**
 272:18
**713.228.6601**
 3:9
**717**
 3:7
**718**

 201:20
**744**
 124:11
**744-9663**
 37:16 66:13,20 91:23
  92:2,8,15,22 97:7
  135:23 260:15
  269:9 270:22 273:3
  273:8 280:19
  283:14 303:7
  307:17 310:22
  311:24 313:10,25
  316:12
**749-4999**
 100:8
**7496**
 332:14 333:18
**77002**
 3:8
**7702**
 67:23 98:7
**782-7817**
 272:5
**78231**
 35:24 316:9
**78260**
 318:22
**78270**
 36:15

**8**

**8**
 4:4 5:15 206:20,22
  213:16,19
**8:00**
 112:1
**802-9951**
 96:24 97:10
**816**
 245:11
**833-4095**
 264:1
**850**
 100:14,16 115:11
**861-8062**

 97:17,20 108:18
  109:4
**866.624.6221**
 332:15 333:19
**876-3384**
 99:7
**89**
 5:7

**9**

**9**
 4:6 5:17 123:2 209:4
  209:5 213:15,22
  215:7 217:10
**9:00**
 112:1
**9:03**
 1:20 8:9
**9:30**
 313:8
**90**
 198:3
**900-1511**
 313:10
**905-4504**
 99:2
**913-1653**
 272:18
**915**
 98:17 158:15 272:11
  272:14
**925-7599**
 98:23
**944-8803**
 99:15
**953-4195**
 265:5
**9633**
 94:24
**9663**
 38:8 39:18,22 94:21
  112:15,18 113:15
  135:21 136:10,12
  136:20 140:4 142:2
  144:11,16 145:19



| | | | |
|---|---|---|---|
| 149:24 151:2<br>152:24 156:13,16<br>157:16 160:1<br>165:20 168:21<br>171:25 172:18<br>175:10,15 176:5,8<br>176:11,15,18<br>177:25 179:17<br>180:8 181:19,23<br>182:14,17 183:17<br>183:19 185:3,12<br>204:15,21,25<br>252:18,21 256:3<br>258:8 266:7 285:19<br>285:22 286:2,8,10<br>286:12 318:2 320:5<br>**9664**<br> 252:14,17 | | | |

